**HARTER SECREST & EMERY LLP**
· *Proposed Counsel to Debtor*
12 Fountain Plaza, Suite 400
Buffalo, New York 14202-2293
(716) 853-1616
Raymond L. Fink, Esq. / rfink@hselaw.com
John A. Mueller, Esq. / jmueller@hselaw.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE:

| | |
|---|---|
| HEBREW HOSPITAL SENIOR HOUSING, INC., | CHAPTER 11 |
| (A/K/A WESTCHESTER MEADOWS CONTINUING CARE | CASE NO. 15-_____ |
| RETIREMENT COMMUNITY AND FIELDSTONE AT | |
| WESTCHESTER MEADOWS) | |

DEBTOR.

---

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF BANKRUPTCY CODE
(I) AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING AND
(B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

COMES NOW HHH Senior Housing, Inc. ("Debtor"), by and through counsel, pursuant

to Sections 105, 361, 362, 363(b), 364(c), 503 and 507 of Title 11 of the United States Code

("Bankruptcy Code"), Rules 2002, 2014(a), 2016, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "Local Rules"), which by this motion (the

"Motion") requests entry of an interim order, substantially in the form annexed hereto as

**Exhibit A**   (the "Interim Order"), and a final order (the "Final Order," and together with the

Interim Order, the "DIP Orders"): (a) authorizing the Debtor Sectionto obtain a super-priority

post-petition debtor-in-possession financing (the "DIP Facility"), secured by a first priority lien

4721145_1

on all property of the Debtor, in the aggregate principal amount of $12.2 million, $9.2 million of which is to be borrowed on an interim basis (the "Interim DIP Loan"), pursuant to the terms and conditions of that certain Senior Secured Super Priority Debtor In Possession Credit Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement") by and among the Debtor and Millennium Trust Company, LLC (as Custodian FBO Lapis Municipal Opportunities Fund II LP and Lapis Aquilo Fund II LP), as lender (the "DIP Lender"), a true and accurate copy of which is annexed hereto as **Exhibit B**; (b) granting the DIP Lender super-priority administrative expense status; (c) modifying the automatic stay; (d) scheduling a final hearing (the "Final Hearing") thereon; and (e) granting related relief.  In further support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court is the proper venue for this proceeding pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363(b), 364(c), 364(d) and 364(e) of the Bankruptcy Code, Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## BACKGROUND

3.     Debtor commenced the above-captioned chapter 11 case ("Chapter 11 Case") by filing a voluntary petition ("Voluntary Petition") for relief under Chapter 11 of the Bankruptcy Code with this Court on December 9, 2015 ("Petition Date") in the United States Bankruptcy Court for the Southern District of New York ("Court").

4.      No request for the appointment of a trustee or an examiner has been made in this case and no statutory committee has been appointed.  Prior to the Petition Date, Westchester Meadows Resident Council, an ad hoc committee representing the interests of the Debtor's continuing care retirement community residents (the "Resident Council"), was formed.

5.      The Debtor continues to operate its business and manage its assets as debtor-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.      The Debtor, a New York registered not-for-profit corporation, operates a continuing care retirement community ("CCRC") commonly known as *Westchester Meadows*. The CCRC consists of 120 independent living units, ten enriched housing units, and 20 beds in a skilled nursing facility. The facilities are located at 55 Grasslands Road in Valhalla, New York.

7.      The initial Debtor's Declaration sets forth additional information about the Debtor's business operations, the events leading to this Chapter 11 Case ("Debtor's Declaration") and is incorporated herein by reference.

## RELIEF REQUESTED

8.      The Debtor seeks entry of the DIP Orders granting the following relief:

a.      entry of the Interim Order authorizing the Debtor to obtain the DIP Facility  on an interim basis pursuant to the terms and conditions of the DIP Credit Agreement,[1] by and among the Debtor and the DIP Lender, attached to the Interim Order as Exhibit 1 (as amended, supplemented, restated or otherwise modified from time to time in accordance therewith, and together with the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, including security agreements, mortgages, deposit account control agreements, pledge agreements, guaranties and promissory notes, all as may be reasonably requested by and acceptable in form and substance to the DIP Lender (the "DIP Loan Documents");

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

4721145_1

b.      authorizing the Debtor to execute and deliver the DIP Loan Documents, and to perform such other acts as may be necessary or desirable in connection therewith;

c.      granting to the DIP Lender security interests in and liens on all of the DIP Collateral (as defined below) (the "DIP Liens") to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, and the DIP Orders, as applicable (collectively, the "DIP Obligations"), which liens and security interests shall be junior only to liens that are valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Pre-Petition Liens as of the Petition Date (the "Permitted Liens")  and the Carve-Out (as defined below);

d.      granting allowed super-priority administrative expense claims to the DIP Lender on the terms set forth in the Interim Order;

e.      authorizing the Debtor to make an initial draw under the DIP Facility in an aggregate amount of up to $9,200,000, subject to the terms and conditions in this Motion, the DIP Credit Agreement (including the Escrow Conditions contained therein), the Interim Order and the budget attached to the Interim Order as Exhibit 2 (as modified from time to time consistent with the terms of the DIP Loan Documents, the "Budget"), the proceeds of which shall be used as follows: (x) for the repayment in full in cash of the Pre-Petition Note (as defined below) in an amount not to exceed $3,500,000, (y) for the repayment in full in cash of the obligations owing in respect of the Letter of Credit, which will be drawn to pay in full the Pre-Petition Bonds (as defined below) in an amount not to exceed $5,455,000, and (z) in an amount up to $245,000 to fund ongoing working capital needs of the Debtor, the Interim Closing Fee, payments of fees and taxes due in connection with the recording of the Mortgage, payment of fees and expenses in connection with the payment of the Pre-Petition Bonds, payment of Escrow fees, and payment of Lender's attorney's fees and expenses;

f.      authorizing the Debtor to use cash collateral ("Cash Collateral") in accordance with the Budget, including payment in full of the obligations arising under the Pre-Petition Bonds and the Pre-Petition Note (each as defined below);

g.      vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders;

h.   waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including under Bankruptcy Rule 6004);

i.   approval of certain chapter 11 case milestones (the "Sale Milestones") as set forth in the DIP Credit Agreement with respect to the sale by the Debtor of its assets under section 363 of the Bankruptcy Code;

j.   subject to entry of the Final Order, authority to grant liens to the DIP Lender on the proceeds of any of the Debtor's claims or causes of action under Section 5 of the Bankruptcy Code (collectively, the "Avoidance Action Proceeds");

k.   authorizing waiver by the Debtor of any right to seek to surcharge against the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or any other law or principle of equity; and

l.   scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to be held no later than January 15, 2016, to consider entry of the Final Order, *inter alia*, approving and authorizing the Debtor's entry into the DIP Facility (including, without limitation, the advance of the financing pursuant to the Interim Order) on a final basis pursuant to the DIP Loan Documents.

## A.  THE DEBTOR'S PRE-PETITION OBLIGATIONS.

9.     Prior to the Petition Date, Westchester Industrial Development Agency ("WIDA"), as issuer, and U.S. Bank National Association, as Trustee ("Trustee") entered into that certain Indenture of Trust, dated as of January 1, 2008 (the "Indenture"), pursuant to which certain Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, in the aggregate principal amount of $14,985,000, were issued (the "Pre-Petition Bonds").  As of the Petition Date, an aggregate principal amount equal to $5,455,000 is owed by the Debtor in respect of the Pre-Petition Bonds (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Bonds, the "Pre-Petition Bond Debt").  The Pre-Petition Bonds are secured by, among other things, that certain direct pay letter of credit  (the "Letter of Credit"), issued by M&T for the account of the Borrower and HHH Home Care, Inc. ("Home Care") and for the benefit of the Trustee, in the current stated amount of Five Million Five

Hundred Twenty-Nine Thousand Six Hundred Fifty-Eight Dollars ($5,529,726) (the "Stated Amount"), of which (i) Five Million Four Hundred Fifty-Five Thousand Dollars ($5,455,000) (the "Principal Stated Amount") is available to pay the outstanding principal amount of the Pre-Petition Bonds, and (ii) Seventy-Four Thousand Six Hundred Fifty-Eight Dollars ($74,726) is available to pay up to fifty (50) days interest under the Pre-Petition Bonds (the "Interest Stated Amount").

10.    As of the Petition Date, the Debtor, as maker, and Hebrew Hospital Home of Westchester, Inc. ("HHHW" and together with WIDA and M&T, the "Pre-Petition Secured Creditors"), as holder, were party to that certain Promissory Note, dated as of November 4, 2015, in an aggregate principal amount equal to $3,500,000 (the "Pre-Petition Note").  As of the petition Date, the Debtor owes HHHW an aggregate principal amount equal to $3,500,000 (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Note, the "Pre-Petition Intercompany Debt" and, together with the Pre-Petition Bond Debt, the "Pre-Petition Secured Debt").

11.    On October 20, 2015, the Debtor, HHHW, the Office of the Attorney General of the State of New York (the "AG"), and Carl Winterrose, as an authorized agent of the Westchester Meadows Resident Council, (the "Resident Council") entered into that certain Restructuring Support and Loan Agreement (as amended and in effect from time to time, the "RSA" and together with the Pre-Petition Bonds, the Letter of Credit and the Pre-Petition Note, the "Pre-Petition Credit Documents"), pursuant to which the AG consented to the use of the proceeds of the Pre-Petition Note in accordance with the terms of the RSA.  The RSA, among other things, provided that an event of default occurred if the Debtor failed to commence a proceeding for bankruptcy relief under chapter 11 of the Bankruptcy Code by no later than

November 30, 2015, and that the proceeds of any debtor in possession financing would be used, in part, to pay off the Pre-Petition Note. The signatory parties verbally agreed to extend the November 30, 2015 deadline to the Petition Date.

12.    As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Pre-Petition Credit Documents was not less than $8,955,000 (together with accrued and unpaid interest, fees or expenses, and all other amounts due in accordance with the terms of the Pre-Petition Credit Documents, the "Pre-Petition Obligations").

13.    Pursuant to that certain Bargain and Sale Deed, dated August 4, 2000, WIDA acquired fee title to the Debtor's real property and improvements located on Glassland Road in the Valhalla section of the Town of Greenburgh, County of Westchester, State of New York, consisting of a continuing care retirement community including 120 Independent Residential Apartments, 10 Enriched Housing Apartments, 20 skilled nursing facility beds, common areas and facilities, an indoor pool, a convenience store and administration areas and related infrastructure such as road, sewers, utilities, parking lots, drainage areas and maintenance facilities (the "Property"), and leased the Property back to the Debtor pursuant to and in accordance with that certain Amended and Restated Lease Agreement, dated as of January 1, 2008 (the "Pre-Petition Lease Agreement").

14.    Prior to the Petition Date,  the Debtor entered into that certain (i) Mortgage and Security Agreement, dated as of January 1, 2008, by and among WIDA, the Debtor and M&T (the "Pre-Petition First Lien Mortgage"), (ii) General Assignment of Leases and Rents, by and among WIDA, the Debtor, and M&T (the "Pre-Petition Assignment"), (iii) Hazardous Substances Indemnity Agreement, dated as of January 1, 2008, by and among the Debtor, Hebrew Hospital Home Foundation, Inc., and M&T (the "Pre-Petition Environmental

Indemnity"), (iv) Pledge and Assignment of Variable Rate Bonds, dated as of January 1, 2008, by and among the Debtor, Hebrew Hospital Home Foundation, Inc and M&T Bank (the "Pre-Petition Pledge"), (v) Operating Account Assignment and Security Agreement, dated as of January 1, 2008, by and among the Debtor and M&T Bank (the "Pre-Petition Operating Account Agreement") and together with the Pre-Petition First Lien Mortgage, the Pre-Petition Assignment, the Pre-Petition Environmental Indemnity, the Pre-Petition Pledge, and the Pre-Petition Operating Account Agreement, the "Pre-Petition First Lien Security Documents), granting to M&T a first-priority security interest in and liens (the "Pre-Petition First-Priority Liens") on certain of the Debtor's and WIDA's assets (such assets as described in the Pre-Petition Security Documents, the "Pre-Petition First Lien Collateral").

15.    Prior to the Petition Date, to secure the obligations under the Pre-Petition Note, the Debtor entered into that certain Mortgage, dated as of November 4, 2015 and recorded on November 5, 2015, between WIDA, the Debtor and HHHW (the "Pre-Petition Second Lien Mortgage" and together with the Pre-Petition First Lien Security Documents, the "Pre-Petition Security Documents"), granting to HHHW a second-priority security interest in and lien (the "Pre-Petition Second-Priority Liens" and together with the Pre-Petition First-Priority Liens, the "Pre-Petition Liens") on certain of the Debtor's and WIDA's assets (such assets as described in the Pre-Petition Second Lien Mortgage, the "Pre-Petition Second Lien Collateral and together with the Pre-Petition First Lien Collateral, the "Pre-Petition Collateral").

**B.  NEED FOR POST-PETITION FINANCING UNDER THE DIP FACILITY.**

16.    As described in the Declaration, the Debtor's Chapter 11 Case is the result of operational and financial difficulties that have plagued the company since its inception.

17.    In February of 2015, the Debtor formed an ad hoc restructuring committee (the "Restructuring Committee") to develop a strategic course for consideration by the Debtor's board.  The Restructuring Committee recommended the engagement of Harter Secrest & Emery LLP as legal counsel and Getzler Henrich & Associates LLC as its financial advisor. The board duly engaged both firms in the spring of 2015.

18.    The Debtor's board promptly concluded that the Debtor should undertake an expedited effort to explore and market a sale of the Debtor's business and assets.  The Debtor engaged the Marwood Group for this purpose, particularly based upon its successes with facilitating the sale of other affiliates of the Debtor (*i.e.*, the home care programs).

19.    Following an expedited marketing effort, the Marwood Group identified a prospective *stalking horse* buyer.  A letter of intent was entered into which contemplated a sale process through a chapter 11 filing by the Debtor.  However, the letter of intent never progressed to a definitive asset purchase agreement.   As a result of concerns about the terms of the *stalking horse* bid, the Resident Council engaged both legal counsel and a financial adviser to provide guidance and representation and, thereafter, the Debtor's board agreed to terminate the pursuit of the *stalking horse* letter of intent and restart the marketing and sale process.

20.    To that end, the Debtor engaged RBC Capital Markets ("RBC") on September 15, 2015 as its investment banker.  Since that time, RBC has been actively marketing the Debtor's business in an attempt to identify a stalking horse purchaser willing to purchase the Debtor's

business on terms that will ensure a seamless transition for its residents and maximize value and recovery to the Debtor's estate and creditors.

21.    The Debtor has an immediate and critical need to obtain the post-petition financing under the DIP Facility and to use Cash Collateral so that it can ensure that services to its residents remain undisturbed and that the Debtor has sufficient runway to operate through an orderly sale process.  The quality of care for the clients who reside in the Debtor's enriched housing and skilled nursing facilities is of paramount importance, and without the DIP Facility the Debtor will have insufficient funds to service those needs on an ongoing basis.

22.    In addition to paying off the Debtor's existing Pre-Petition Obligations, which is required, in part, under the RSA, the funds received under DIP Facility will be used to pay various parties that provide essential services to the Debtor in the ordinary course of business and enable it to operate, maintain and insure its assets through the sale process.  These parties include employees, third party vendors, utilities, insurance companies, taxing authorities, professionals, consultants and advisors.  The services provided by these parties are absolutely critical to the well-being of the Debtor's residents and the preservation of the Debtor's business and asset value.  Without access to the DIP Facility and the use of Cash Collateral, the Debtor would suffer immediate and irreparable harm to the significant detriment of the Debtor's estate, its residents and its creditors.

23.    The Debtor's post-petition liquidity needs through this sale process cannot be met through Cash Collateral alone, and given the Debtor's financial circumstances and lack of unencumbered assets, it does not believe that it could obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense, or obtain credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b),

507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtor and

its estate that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property

of the Debtor and its estate that is subject to an existing lien.

## C.  DEBTOR'S MARKETING EFFORTS TO SECURE THE DIP FACILITY

24.    As described in further detail in the Declaration, the Debtor and RBC, with the

assistance of Cohn Reznick and DLA Piper (the Residents' Council's professionals) sought out

prospective lenders who would be interested in provide a debtor-in-possession facility to pay the

Pre-Petition Obligations in accordance with the terms of the RSA and to provide sufficient

working capital to guide the Debtor through the sale process.

25.    The initial prospective *stalking horse* purchaser offered a post-petition credit line

with a maximum discretionary lending capacity of up to Eight Million and No/100 Dollars

($8,000,000.00) payable with interest at the per annum rate of twelve percent (12%) and subject

to credit bid features.  In mid-September 2015, the Debtor received a proposal for an Eight

Million and No/100 Dollar ($8,000,000.00) post-petition credit line from another potential lender

payable with interest at a competitive rate with that of the proposed DIP Lender, but availability

was subject to a constrained borrowing base.  Upon analysis, in either case the Eight Million and

No/100 Dollars ($8,000,000.00) credit lines were not sufficient as the Debtor requires a larger

post-petition credit line.  The proposed DIP Lender's term were more favorable than either of the

aforementioned.

26.    The DIP Lender has indicated a willingness to provide the Debtor with capital to

pay the Pre-Petition Obligations and for operations, but solely on the terms and conditions set

forth in the DIP Loan Document and the Interim Order, and pursuant to the terms of an agreed

upon Budget.  After considering all of its alternatives, the Debtor has concluded, in an exercise

of sound business judgment, that the financing to be provided by the DIP Lender pursuant to the

terms of the DIP Loan Documents and the Interim Order represents the best financing presently

available to the Debtor.  These funds will be used to maintain the Debtor's assets through the

orderly sale process.

27.     The Debtor and the DIP Lender have negotiated the DIP Facility and the DIP

Loan Documents in good faith and at arm's length, and the Debtor believes that the terms of the

DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business judgment

consistent with its fiduciary duties, and is supported by reasonably equivalent value and fair

consideration.

28.     Without the DIP Facility, the Debtor will not have sufficient resources to conduct

or complete an orderly, value maximizing sale process, and the Debtor's estate and creditors will

suffer as a result.  Preservation of the value of the Debtor's business and assets is critical.  The

Debtor respectfully submits that the DIP Facility is essential for all of the above reasons.

### D.  SUMMARY OF PRINCIPAL TERMS OF DIP FACILITY.

29.     In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2 of the Local,

set forth below is a summary[2] of the terms of the material terms of the Interim Order and the DIP

Documents:

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| Borrower: | The Debtor.  *See* DIP Credit Agreement, Preamble; Interim Order at ¶1. |
| DIP Lender: | Millennium Trust Company, LLC, as Custodian FBO Lapis Municipal Opportunities Fund II LP and Lapis Aquilo Fund II LP |

---

[2]     The description of the terms and conditions of the DIP Credit Agreement and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties interested with an overview of the significant terms thereof and should only be relied upon as such. The summaries are qualified in their entirety by the DIP Credit Agreement and the Interim Order. In the event there is a conflict between this Motion and the DIP Credit Agreement or the Interim Order, the DIP Credit Agreement or the Interim Order, as applicable, shall control in all aspects.

| | |
|---|---|
| Commitment: | $12,200,000 senior secured super priority non-amortizing term loan facility. *See* DIP Credit Agreement §2.01; |
| Borrowing Limits: | Initial Term Loan: $9,200,000 (subject to Budget) *See* DIP Credit Agreement §2.01(a); Interim Order at ¶¶ F.(iv).(a),4.<br><br>Subsequent Term Loans: in an aggregate amount not to exceed $3 million (subject to Budget) *See* DIP Credit Agreement §2.01(b); Interim Order at ¶ F.(iv).(b). |
| Purpose/Use of Funds: | The Interim Order authorizes the Debtor, subject to the conditions precedent and other terms and conditions set forth in the DIP Loan Documents, including the Escrow Conditions contained therein, in accordance with the Budget, and consistent with the terms of this Interim Order, make an interim draw on the DIP Facility (the "<u>Interim Draw</u>") in the amount of $9,200,000 (the "<u>Initial Term Loan</u>"), the proceeds of which shall be used as follows: (x) for the repayment in full in cash of the Pre-Petition Intercompany Debt (as defined below) in an amount not to exceed $3,500,000, (y) for the repayment in full in cash of the obligations owing in respect of the Letter of Credit which will be drawn to pay in full the Pre-Petition Bonds (as defined below), in an amount not to exceed $5,455,000, and (z) in an amount up to $245,000 to fund the ongoing working capital needs of the Debtor, payment of the Interim Closing Fee, payment of any fee or tax due in connection with the recording of the Mortgage, payment of Escrow fees, payment of fees and expenses in connection with the payment of the Pre-Petition Bonds, and payment of DIP Lender's attorneys' fees and expenses. *See* DIP Credit Agreement § 2.10; Interim DIP Order at ¶¶ F.(iv).(a), 10..<br><br>The proceeds of the Subsequent Term Loans shall be used solely, and strictly in accordance with the Budget, following the entry of the Final Order as follows: (i) to fund the Interest and Fee Reserve for the payment interest, fees, costs and expenses incurred under the Facility in the amount of $1,320,000; (ii) for the payment of ordinary course of business post-petition operating expenses in such amounts and during such periods as provided for in the Budget, in the amount of $880,000; and (iii) for the payment of fees of the United States Trustee and allowed Chapter 11 estate professional fees and expenses (collectively "<u>Professional Fees</u>") in the amount of $800,000 from the Professional Fee Reserve. *See* DIP Credit Agreement §2.11; Interim Order at ¶ F.(iv).(b). |
| Escrow Provisions: | For the DIP Lender to obtain the DIP Liens on the DIP Collateral, the Pre-Petition Secured Debt must be satisfied and the Pre-Petition Liens must be released.  Prior to the Petition Date, the Debtor, the DIP Lender, the Pre-Petition Secured Creditors and |

| | |
|---|---|
| | the Trustee (collectively, the "<u>Escrow Parties</u>"), entered into an escrow agreement (the "<u>Escrow Agreement</u>"), pursuant to which the Escrow Parties shall effectuate a closing on the documents and deliverables necessary convey title to the Property to the Debtor, to satisfy and terminate the existing Pre-Petition Liens, and to provide the DIP Lender with the DIP Liens.  To that end, the Escrow Parties have agreed to deliver certain documents to the Escrow Agent, such documents as more fully described in the DIP Credit Agreement and the Escrow Agreement (the "<u>Escrow Documents</u>").  Following entry of the Interim Order, execution of the Escrow Agreement, and receipt of the copies of the Escrow Documents in form and substance acceptable to the DIP Lender in its sole and absolute discretion, the DIP Lender shall deposit the Initial Term Loan amount into escrow with the Escrow Agent (the "<u>Escrow Amount</u>").  The Escrow Amount will be released for use consistent with the terms of the DIP Credit Agreement, the Interim Order and the Budget upon satisfaction of the conditions to lending described in Section 3.01 of the DIP Credit Agreement, including that all of the Escrowed Documents are in form and substance acceptable to the DIP Lender, and have been fully executed, released from escrow and delivered, and filed and/or recorded in accordance with the terms of the DIP Credit Agreement and the Escrow Agreement. |
| Conditions to Closing and Borrowing: | Initial Term Loan:<br>• Entry of Interim Order on or before December 17, 2015;<br>• Executed counterparts of the DIP Credit Agreement and other DIP Loan Documents, including Collateral Agreement, financing statements, ;<br>• Assumption by the Debtor of its obligations under the RSA (provided that such assumption is conditioned upon deposit refunds due in 2016 being treated as unsecured pre-petition claims against the Debtor, subordinate to the Obligations under the DIP Facility);<br>• Evidence of insurance acceptable to Lender;<br>• Executed Control Account Agreements;<br>• Certified resolutions approving each DIP Loan Document, secretary's certificate, officer's certificate attesting to truthfulness of representations and warranties, and other organizational and good standing documents;<br>• Opinion of Debtor's counsel regarding corporate authority;<br>• Evidence satisfactory to the DIP Lender that the proceeds will be used in accordance with the Budget; and<br>• Fully executed and acknowledged real estate collateral documents having been released from escrow, including:<br>   o Mortgage, Assignment of Leases and Rents and |

|  |  |
|---|---|
|  | Environmental Indemnity in favor of DIP Lender; |
|  | ○ Deed conveying title to the Debtor; |
|  | ○ Termination and satisfaction documents with respect to the Pre-Petition Secured Debt, including without limitation: |
|  | ➢ Termination of lease; |
|  | ➢ Termination of Pre-Petition Pledge and Assignment; |
|  | ➢ Satisfaction of Prior Mortgage and Security Agreement; |
|  | ➢ Termination of Prior General Assignment of Leases and Rents; |
|  | ➢ Termination of Prior Operating Account Agreement; |
|  | ➢ Satisfaction of Second Lien Mortgage; |
|  | ➢ UCC-3 termination statements; and |
|  | ➢ Acknowledgment of Satisfaction of Bonds. |
|  | **Subsequent Term Loans:** |
|  | • Entry of the Final DIP Order on or before January 15, 2016; and |
|  | • Debtor shall have filed Sale Procedures Motion and Sale Motion on or before December 17, 2015, such motions in form and substance acceptable to DIP Lender. |
|  | **Conditions to All Borrowings:** |
|  | • Representations and warranties all correct in material respects; |
|  | • No Default or Event of Default; |
|  | • Funding request received; |
|  | • DIP Lender's fees have been paid; |
|  | • Borrowing will not violate any law; |
|  | • Post-petition Entrance Fee Deposits shall have been deposited in escrow in accordance with the RSA *See* DIP Credit Agreement §§3.01-3.03. |
| Pricing, Economic Terms and Fees: | The DIP Facility contemplates the payment of fees and reimbursement of expenses to professionals of the DIP Lender. Interim Order at ¶ 23; DIP Credit Agreement at § 2.11. |
|  | The DIP Facility also includes (i) an interim closing fee of 2.0% of DIP Lender's commitment amount under the DIP Facility, which is due and payable upon entry of the Interim Order, and (ii) an exit fee of 2.0% of DIP Lender's commitment amount under the DIP Facility, which is due and payable at maturity of the DIP Facility. DIP Credit Agreement at § 2.06.  The first $50,000 of the interim closing fee was paid by the Debtor to the DIP Lender upon execution of that certain commitment letter between the DIP |

| | |
|---|---|
| | Lender and the Debtor (the "Commitment Letter").<br><br>Loans under the DIP Facility will accrue interest at the rate of 9.75% per annum. DIP Credit Agreement at § 2.05(a). Upon the occurrence and during the continuance of an Event of Default, Loans under the DIP Facility will accrue interest at the rate of ___14.75% per annum. *See* DIP Credit Agreement § 2.05(b).<br><br>Payment of the DIP Lender's fees will constitute obligations under the DIP Facility having the same superpriority claim and lien protection as all other obligations under the DIP Facility. *See* DIP Credit Agreement §7.01(a)(i); Interim Order ¶ 6. |
| DIP Collateral: | Subject only to (i) valid, enforceable, non-avoidable liens in existence and senior in priority to the Pre-Petition Secured Debt as of the Petition Date, and (ii) the Carve-Out, to secured the Obligations under the DIP Facility, the Debtor will receive, pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, an automatically fully perfected, valid, enforceable, unavoidable, and first-priority security interest and lien on all of the Debtor's assets and all "property of the estate" (within the meaning of the Bankruptcy Code), of any kind or nature whatsoever, including, without limitation, all of the Debtor's all existing and future acquired property interests of any nature whatsoever, real and personal, tangible and intangible, (including post-petition assets), including, without limitation, owned and leased real property, any other interests in real property, accounts receivable, inventory, equipment, cash, deposit accounts, investment property, general intangibles, payment intangibles, supporting obligations, instruments, documents, chattel paper, commercial tort claims, insurance, licenses and permits, intellectual property, trade secrets, goodwill, machinery, equipment, chattel paper, contract rights (including rights and privileges in respect of any Government Contracts), tax refunds, and avoidance actions available to the Debtor or its' estate, and all proceeds of the foregoing (collectively, the "DIP Collateral"). |
| Effect on Existing Liens: | Liens under the Pre-Petition Security Documents securing the payment of the Pre-Petition Note Debt and the Pre-Petition Bond Debt shall be released upon payment of such obligations. Interim Order at ¶¶ ___.   The liens securing the DIP Facility will be subject only to customary permitted liens and the Carve-Out. DIP Credit Agreement at § 5.02(a). |

| | |
|---|---|
| Carve-Out: | The DIP Facility provides that an amount of up to $800,000 in proceeds of borrowings under the DIP Facility will be available for the payment of U.S. Trustee fees and applicable interest, professional fees of the Debtors and the official committee of unsecured creditors. Interim Order at ¶ 27; DIP Credit Agreement at § 2.11(b). |
| Cross-Collateralization: | The DIP Facility does not call for cross-collateralization with Pre-Petition Secured Debt. |
| Roll-Up Provision: | The DIP Facility does not call for a roll-up of Pre-Petition Secured Debt. |
| Limitations on Funding: | No proceeds of the DIP Facility may be used to pay any or all claims for services rendered by any of the professionals retained by the Debtor or the official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter against the DIP Lender or any of its Affiliates.   DIP Credit Agreement at § 2.11(b); Interim Order at 28. |
| Events of Default: | The DIP Facility sets forth a number of Events of Default, including, but not limited to (a) failure to pay principal, interest or any other amount when due under the DIP Facility, (b) default under the RSA, (c) the entry of an order appointing a Chapter 7 or Chapter 11 trustee, (d) reversal or modification of the Interim Order or the Final Order in a fashion not satisfactory to the DIP Lender), and (e) breach of negotiated budget variances or milestones. DIP Credit Agreement at § 6.01. |
| Change of Control: | The occurrence of a "Change of Control," defined as a majority of the directors of the Debtor ceasing to constitute a majority of the board of directors of the Debtor, constitutes an Event of Default thereunder. DIP Credit Agreement at § 6.01(k). |
| Sale Process; Milestones: | The DIP Credit Agreement requires (a) filing of a Sale Procedures Motion and a Sale Motion in form and substance acceptable to the DIP Lender on or before **December 17, 2015**; (b) entry of a Sale Procedures Order on or before **December 31**, **2015** approving the procedures for marketing, conducting an auction, and obtaining approval of a sale of all or substantially all of the Debtor's business and assets, (b) entry of a Sale Order on or before **January 29, 2016** approving the sale of all or substantially all of the Debtor's business and assets that provides for payment in cash in full of the obligations under the DIP Facility, (c) on or before **March 1, 2016**, assumption by the purchaser approved by the Sale Order of the management and operations of the Debtor, and (d) on or before **September 31, 2016**, closing of a sale of all or substantially all of the Debtor's business and assets that provides for indefeasible payment in cash in full of the obligations under |

| | |
|---|---|
| | the DIP Facility. DIP Credit Agreement at §§ 6.01(p), (s).  The DIP Lender shall be permitted to credit bid the outstanding amount of its debt under the DIP Facility at any sale.  DIP Credit Agreement at § 5.01(m). |
| Pre-Payment: | If the Debtor prepays the DIP Facility in full prior to the date which is 273 days after the entry of the Interim Order, then the Debtor shall pay to the DIP Lender additional interest. DIP Credit Agreement at § 2.04(c). |
| Joint Liability: | There is no joint liability with parties other than the Debtor. |
| Funding of Non-Debtor Entities: | No amounts under the DIP Facility shall be made available to entities other than the Debtor. |
| Avoidance Actions: | DIP Lender's superpriority liens grant it recourse, after the entry of the Final Order, to proceeds obtained as a result of Debtor's claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code. Interim Order ¶ 6. |
| Indemnification: | The DIP Facility contains customary indemnification provisions whereby the Debtor agrees to indemnify the DIP Lender and certain of its related parties (the "Indemnified Parties") from losses, claims and expenses incurred by or asserted or awarded against any Indemnified Party in connection with the  DIP Facility, any of the transactions contemplated therein, and, with certain provisos, the actual or alleged presence of Hazardous Materials on any property of the Debtors or any Environmental Action relating in any way to the Debtors. DIP Credit Agreement at § 3.01(b)(i). |
| Repayment: | Interest is payable under the DIP Facility monthly in arrears.  The entire principal amount of the DIP Facility, together with interest and fees thereon, is due and payable the date that is the earliest of: (a) twelve (12) months after entry of the Interim Order; (b) the closing date of the sale of all or substantially all of the collateral securing the obligations under the DIP Facility to occur on or prior to September 31, 2016; (c) the effective date of a confirmed plan of reorganization in this Chapter 11 Case; (d) dismissal of the Chapter 11 Case; (e) conversion of this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (f) the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition creditor; (g) acceleration of the obligations under the DIP Facility pursuant to its terms, including without limitation following an Event of Default under the DIP Facility; (h) the filing of a plan of reorganization in this Chapter 11 Case that does not provide for repayment in full in cash of all obligations owing under the DIP Facility; or (i) the filing of any action attacking or challenging the obligations owing under the DIP Facility or the liens granted in |

| | |
|---|---|
| | collateral to secure such obligations. DIP Credit Agreement at §§ 2.03, 2.05. |
| Financial Covenants: | The Debtor shall not make payments other than those set forth in the Budget; *provided*, that (i) other than professional fees, (A) actual disbursements for any prior week for any line item in the Budget may have a positive variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget and (B) actual cash receipts for any prior week for any line item in the Budget may have a negative variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget, (C) actual disbursements for all prior weeks for any line item in the Budget may have a positive variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget, and (D) actual cash receipts for all prior weeks for any line item in the Budget may have a negative variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget and (ii) the actual disbursement of professional fees shall not exceed $800,000. DIP Credit Agreement at §5.04(a). |
| Release: | The Debtor will provide a general release of the DIP Lender and its affiliates all past, present and future actions, causes of action, demands, suits, claims, and liabilities. DIP Credit Agreement at §8.18. |
| Section 506(c)Waiver: | The obligations under the Facility and the Liens securing the Facility shall not be subject to, and the Borrower hereby waives the right to, surcharge the same pursuant to Section 506(c) of the Bankruptcy Code. DIP Credit Agreement at §7.03;Interim Order at ¶ 30. |
| Section 552(b) Waiver: | The obligations under the Facility and the Liens securing the Facility shall not be subject to, and the Borrower hereby waives the right to, assert any rights under Sections 552 of the Bankruptcy Code. DIP Credit Agreement at §7.03; Interim Order at ¶ 31. |

## BASIS FOR RELIEF

## A.  THE PROPOSED DIP FACILITY SHOULD BE APPROVED

### I.      The Requested Relief Should Be Granted Pursuant to Sections 364(c) and 364(d)(l) of the Bankruptcy Code.

30.     As set forth above, the Debtor's ability to maximize the value of its estate hinges

upon its being able to access post-petition financing. Section 364 of the Bankruptcy Code

distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b)

obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. *See* 11 U.S.C. § 364. Pursuant to Section 364(c) of the Bankruptcy Code, if a debtor cannot obtain post-petition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.

31.    Under Section 364 of the Bankruptcy Code, courts also may authorize post-petition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See id.* Specifically, Section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)    the [debtor] is unable to obtain credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

Id. § 364(d)(l).

    *a.*    ***The Debtor Has Exercised Its  Business Judgment in Entering Into the DIP Facility.***

32.    A debtor's decision to enter into a post-petition lending facility under Section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit parties-in-interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

33.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) (noting that "[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of a debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

34.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); see *also In re Trans World Airlines, Inc.*, 163 B.R. at 974 (approving interim loan, receivables facility and asset based facility based upon prudent business judgment of the debtor). Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14. In determining whether the Debtor

has exercised sound business judgment, the Court should consider the economic terms of the DIP

Facility in light of current market conditions. *See In re Lyondell Chem. Co.,* Case No. 09-10023

(Bankr. S.D.N.Y. March 5, 2009).

35.    The Debtor has exercised sound business judgment in determining the

appropriateness of the DIP Facility and has satisfied the legal prerequisites to incur debt on the

terms and conditions set forth in the Interim Order. The Interim Order contains terms and

conditions that are the best available under the circumstances and provides the Debtor with

sufficient liquidity during the period of the Budget. In addition, the Interim Order preserves the

rights of any statutory committee of unsecured creditors, to investigate and challenge the

validity, amount, perfection, priority, extent or enforceability of pre-petition security interests.

36.    Moreover, approval of the Interim Order will provide the Debtor with immediate

and ongoing access to funds to pay its current and ongoing operating expenses, including post-

petition wages and salaries and vendor costs. Unless these expenditures are made, the Debtor

will be forced to cease operations, which would result in irreparable harm to its business and

deplete going concern value. Equally important, without borrowings under the Interim Order, the

health and well-being of the residents of the Retirement Community would be jeopardized.

Because cash collateral is insufficient to fund such expenditures, the credit provided under the

Interim Order essential to a successful reorganization.

37.    Accordingly, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, the

Debtor respectfully submits that they should be granted authority to obtain financing from the

DIP Lender on the terms set forth in the Interim Order.

b.    *The DIP Facility Represents the Best Financing Available.*

38.    A debtor seeking financing under Section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. *See, e.g., Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of Section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (*In re Snowshoe Co.*)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[T]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.,* 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

39.    Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under Section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Ames Dep't Stores*, 115 B .R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under Section 364(a) and (b)).

40.    The Debtor and its advisors have solicited proposals from and negotiated with several possible financing sources in an effort to secure debtor in possession financing on the

best terms available. The Debtor has determined that the terms and conditions of the Interim Order are the best available under the circumstances and address the Debtor's working capital needs. Post-petition financing is not otherwise available without granting, pursuant to Sections 364(c)(l) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the collateral for the DIP Facility pursuant to Section 364(c) and (d) of the Bankruptcy Code. The Debtor is unable to obtain the necessary post-petition financing that it needs on terms more favorable than those provided by the Interim Order. Accordingly, the Debtor's efforts to obtain post-petition financing satisfy the statutory requirements of Section 364(c) of the Bankruptcy Code.

> ### c.  *The DIP Facility Is Necessary to Maintain the Debtor's Ongoing Business Operations.*

41.    The DIP Facility will provide essential working capital, allowing the Debtor to maintain the value of its assets and its ongoing business operations while working to successfully effectuate a sale of the Debtor's business and to preserve value for the Debtor's creditors. In addition, the DIP Facility will provide the Debtor's various constituencies, including residents, employees, vendors, service providers, and regulatory agencies with confidence in the Debtor's ability to maintain operations during its chapter 11 case.

42.    If the relief sought in this Motion is denied or delayed, the Debtor likely will experience business disruptions, an inability to provide proper resident care, and difficulty maximizing value for the estates may be irreparably damaged. Accordingly, the DIP Facility is necessary to maximize value for the Debtor's estate and inure to the benefit of creditors and all parties in interest, including residents of the Retirement Community.

**d.** *The Terms of the Interim Order are Fair, Reasonable, and Adequate Under the Circumstances.*

43.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen Maclean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). Here, the terms and conditions of the Interim Order were negotiated in good faith and at arm's length among the parties and provide the Debtor with essential working capital and maintain their respective business operations. Indeed, when viewed in its totality, the Interim Order reflects the Debtor's exercise of prudent business judgment consistent with their fiduciary duties and is supported by fair consideration.

**e.** *Section 364(e) Protections Should Apply to the Interim Order.*

44.     The terms and conditions of the Interim Order are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of Bankruptcy Code Section 364(e), and is entitled to all of the protections afforded by that Section.

45.     The Debtor believes that the budgets required under the terms of the DIP Facility, considering the availability of post-petition financing and considering all available assets, will be adequate to pay all administrative expenses due or accruing during the period covering the DIP Facility.

46.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the DIP Lender to exercise, upon the occurrence and during the

continuance of an Event of Default, all rights and remedies under the DIP Credit Agreement;

provided, however, that upon the occurrence and during the continuance of an Event of Default

as determined by the Lender in its sole discretion, the Debtor, any statutory committee appointed

in the Chapter 11 Case, or the Resident Council shall have the right to contest, and only to

contest, such determination of the occurrence of an Event of Default within three (3) Business

Days of such occurrence by filing an expedited motion with the Bankruptcy Court, and unless

the Bankruptcy Court shall have determined that an Event of Default has not occurred and/or is

not continuing within two (2) Business Days of the filing of such motion, the automatic stay

shall automatically be terminated without further notice or order, and the DIP Lender shall be

immediately entitled to exercise all remedies available to it under the DIP Facility or applicable

law.

47.    Stay modifications of this kind are ordinary and standard features of post-petition

debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under

the present circumstances.

## INTERIM APPROVAL REQUESTED

48.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit

may not be commenced earlier than 15 days after the service of such motion. Upon request,

however, the Court is empowered to conduct a preliminary expedited hearing on the motion and

authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm

to a debtor's estate pending a final hearing.

49.    Pursuant to Bankruptcy Rule 4001(c), the Debtor requests that the Court (a)

conduct an expedited preliminary hearing on the Motion and authorize the Debtor to borrow $9.2

million on an interim basis to (i) maintain and finance the ongoing operations of the Debtor, (ii)

pay pre-petition obligations under the Promissory Note and the Bonds in accordance with the terms thereof, and (iii) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties  in interest, and (b) schedule a Final Hearing on the relief requested herein.

50.    Absent authorization from the Court to obtain the Interim DIP Loan pending a Final Hearing, the Debtor will be immediately and irreparably harmed. As set forth above, the Debtor's ability to enter into the DIP Credit Agreement is critical to the success of its chapter 11 case, its ability to effectuate the Sale, and the ability to preserve any value for its creditors. Without immediate liquidity provided by access to the Interim DIP Loan, the Debtor will simply be unable to conduct normal business operations, and its estate, creditors, employees, and equity holders will be immediately and irreparably harmed.

## REQUEST FOR FINAL HEARING

51.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date that is no later than January 15, 2016 as a final hearing for consideration of entry of the Final Order.

52.    The Debtor requests that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below.  The Debtor further requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## RESERVATION OF RIGHTS

53.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtor, (b) a waiver of the Debtor's or any appropriate party-in-interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under Section 365 of the Bankruptcy Code.  Likewise, if the

Court grants the relief sought herein, any payment made pursuant to this Interim Order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's right to dispute such claim subsequently.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND (H)

54.     This Application is necessary to prevent irreparable damage to the Debtor's operations and to preserve value for its estate.  Accordingly, to the extent applicable and to successfully implement the foregoing, the Debtor respectfully seeks a waiver of the notice requirements and 14-day stay under FED. R. BANKR. P. 6004(a) and (h) respectively.

## NOTICE

55.     The Debtor will provide notice of this Application to the following: (i) Office of the U.S. Trustee for the Southern District of New York; (ii) parties included on the Debtor's List of Creditors Holding Twenty (20) Largest Unsecured Claims; (iii) the Internal Revenue Service; (iv) counsel to each of the Pre-Petition Secured Creditors; (v) counsel to the DIP Lender; (vi) the Attorney General of the State of New York; (vii) counsel to the Resident Council; (viii) parties who have filed a notice of appearance in this case; and (ix) all parties entitled to receive notice under Bankruptcy Rule 2002 and the Local Rules.  The Debtor submits that it does not need to provide any other or further notice.

## NO PRIOR REQUEST

56.     The Debtor has not made any prior request for the relief sought in this Motion to this or any other court.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, substantially in the form attached hereto as **Exhibit A**, along with such other relief as this Court deems just and proper.

Dated: December 9, 2015           **HARTER SECREST & EMERY LLP**
       Buffalo, New York


                    */s/ Raymond L. Fink*
                Raymond L. Fink, Esq.
                John A. Mueller, Esq.
                *Proposed Counsel to Debtor*
                12 Fountain Plaza, Suite 400
                Buffalo, New York  14203-2293
                (716) 853-1616
                rfink@hselaw.com
                jmueller@hselaw.com

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE:

HEBREW HOSPITAL SENIOR HOUSING, INC.,
(A/K/A WESTCHESTER MEADOWS CONTINUING CARE
RETIREMENT COMMUNITY AND FIELDSTONE AT
WESTCHESTER MEADOWS)

               DEBTOR.

CHAPTER 11
CASE NO. 15-_____

---

## [PROPOSED] INTERIM ORDER PURSUANT TO
## SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF BANKRUPTCY CODE
## (I) AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING AND
## (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
## CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING
## FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

Upon the motion (the "Motion") of the debtor and debtor in possession (the "Debtor") in

the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105, 361, 362,

363, 364, 503, and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 2014(a), 2016, 4001, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice

and Procedure (as amended, the "Local Rules"), of the United States Bankruptcy Court for the

Southern District of New York (this "Court") seeking entry of an interim order (this "Interim

Order") *inter alia*:

       (i)        authorizing the Debtor to obtain secured, super-priority, post-petition

debtor-in-possession financing (the "DIP Facility"), consisting of a senior secured super-

priority credit facility in an aggregate amount not to exceed $12.2 million, pursuant to the

terms and conditions of that certain Senior Secured Super Priority Debtor In Possession

Credit Agreement (as amended, supplemented, restated, or otherwise modified from time

to time, the "DIP Credit Agreement"[1] and the loans under the DIP Credit Agreement, the

"DIP Loans") by and among the Debtor and Millennium Trust Company, LLC (as

Custodian FBO Lapis Municipal Opportunities Fund II LP and Lapis Aquilo Fund II LP),

as lender (the "DIP Lender"), substantially in the form of **Exhibit A** attached to this

Interim Order;

(ii)        authorizing the Debtor to execute and deliver the DIP Credit Agreement

and all other related documents, instruments and agreements, including security

agreements, mortgages, deposit account control agreements, pledge agreements,

guaranties and promissory notes (collectively, the "DIP Loan Documents") and to

perform such other and further acts as may be necessary, appropriate or desirable in

connection with the DIP Loan Documents;

(iii)        authorizing the Debtor to, subject to the conditions precedent and other

terms and conditions set forth in the DIP Loan Documents, including the Escrow

Conditions contained therein, in accordance with the budget (a copy of which is attached

to the DIP Credit Agreement and attached hereto as **Exhibit B**, as the same may be

modified from time to time consistent with the terms of the DIP Loan Documents, the

"**Budget**"), and consistent with the terms of this Interim Order: (a) use cash collateral,

and (b) make an interim draw on the DIP Facility (the "Interim Draw") in the amount of

$9,200,000 (the "Initial Term Loan"), the proceeds of which shall be used as follows: (x)

for the repayment in full in cash of the Pre-Petition Intercompany Debt (as defined

below) in an amount not to exceed $3,500,000, (y) for the repayment in full in cash of the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the DIP Credit Agreement.

2

obligations owing in respect of the Letter of Credit, which will be drawn to pay in full the Pre-Petition Bonds (as defined below), in an amount not to exceed $5,455,000, and (z) in an amount up to $245,000 to fund the ongoing working capital needs of the Debtor, the Interim Closing Fee, payment of fees and expenses in connection with the payment of the Pre-Petition Bonds (defined below), payments of fees and taxes due in connection with the recording of the Mortgage, payment of Escrow (as defined below) fees, and payment of Lender's attorneys' fees and expenses;

(iv)      the waiver by the Debtor of any right to surcharge against the DIP Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(v)      this Court's ordering, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code:

(a)      that the obligations of the Debtor under the DIP Loan Documents (collectively, the "DIP Obligations") are secured (x) under sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code by an automatically fully perfected, valid, enforceable, unavoidable, and first-priority security interest and lien on all of the Debtor's assets and all "property of the estate" (within the meaning of the Bankruptcy Code), of any kind or nature whatsoever, including, without limitation, all of the Debtor's all existing and future acquired property interests of any nature whatsoever, real and personal, tangible and intangible, (including post-petition assets), including, without limitation, owned and leased real property, any other interests in real property, accounts receivable, inventory, equipment, cash, deposit accounts, investment property, general intangibles, payment intangibles, supporting obligations, instruments, documents, chattel

3

4721146_1

paper, commercial tort claims, insurance, licenses and permits, intellectual property, trade secrets, goodwill, machinery, equipment, chattel paper, contract rights (including rights or privileges in respect of any Government Contracts), tax refunds, and avoidance actions available to the Debtor or its' estate, and all proceeds of the foregoing (collectively, the "DIP Collateral"), subject only to subject only to payment of the Carve Out and the Permitted Liens (each as defined below), and (y) under section 364 of the Bankruptcy Code by an automatically fully perfected, valid, enforceable, unavoidable, junior security interest in any such portion of the DIP Collateral that is subject to the Permitted Liens;

(b)     that the DIP Lender is granted an allowed superpriority administrative expense claim in this Chapter 11 Case (and against the Debtor's estate created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c) or 726 thereof), subject only to payment of the Carve Out and the Permitted Liens;

(vi)     this Court's authorization of a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order, as set forth herein;

(vii)     this Court's approval by this Court of the fees and expenses of the DIP Lender and its professionals and the payment thereof as provided for in the DIP Loan Documents;

(viii)          this Court's approval of certain chapter 11 case milestones (the "Sale Milestones") as set forth in the DIP Credit Agreement with respect to the sale by the Debtor of its assets under section 363 of the Bankruptcy Code; and

(ix)          this Court's scheduling, pursuant to Bankruptcy Rules 2002 and 4001(c)(2), and Local Bankruptcy Rules 2002-1, 4001-2, and 9013-1(m), a final hearing (the "Final Hearing") to consider entry of an order approving the relief requested in the Motion on a final basis, which, among other things, (i) approves the post-petition financing to be made pursuant to the DIP Loan Documents, (ii) authorizes the Debtor to obtain the DIP Loans in accordance with the DIP Loan Documents in the aggregate principal amount of $12.2 million (the "DIP Facility Commitment"), and (iii) approves the form of notice with respect to the Final Hearing; and

A hearing having been held and concluded on [ , 2015] on this Motion (the "Interim Hearing"); and notice of the Motion and Interim Hearing having been given; and based upon all of the pleadings filed with the Court, the evidence presented at the Interim Hearing and the entire record herein; and the Court having heard and resolved or overruled all objections to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the granting the interim relief requested in the Motion is in the best interests of the Debtor, its estate, and its creditors and is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, INCLUDING THE SUBMISSION OF DECLARATIONS AND THE

5

REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING

FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.    *Petition Date*.    On December 9, 2015 (the "Petition Date"), the Debtor filed

voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the Southern District of New York, commencing this Chapter 11 Case.

B.    *Debtor-in-Possession*.    The Debtor continues to operate its business and property

as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.    No

trustee or examiner has been appointed in this Chapter 11 Case.

C.    *Jurisdiction and Venue*.    The Court has jurisdiction, pursuant to 28 U.S.C.

§§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States

District Court for the Southern District of New York, dated as of January 31, 2012, over these

proceedings, and over the persons and property affected hereby.    Consideration of the Motion

constitutes a core proceeding under 28 U.S.C. § 157(b)(2).    Venue for this case and proceedings

on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.    The statutory

bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the

Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 and the applicable Local Rules.

D.    *Committee Formation*.    As of the date hereof, the United States Trustee (the "U.S.

Trustee") has not yet appointed an official committee of unsecured creditors (the "Committee")

in this Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.    Prior to the Petition

Date, Westchester Meadows Resident Council, an ad hoc committee representing the interests of

---

[2]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

4721146_1

the Debtor's continuing care retirement community residents, was formed (the "<u>Resident Council</u>").

E.      <u>*Debtor's Stipulations*</u>. After consultation with its attorneys and financial advisors, the Debtor (on behalf of, and for itself and not its estate) admits, stipulates, acknowledges, and agrees to the following (collectively, the "<u>Debtor's Stipulations</u>"):

      (i)      <u>*Pre-Petition Credit Documents*</u>.

            a.  The Pre-Petition Bond Debt

Prior to the Petition Date, Westchester Industrial Development Agency ("<u>WIDA</u>"), as issuer, and U.S. Bank National Association, as Trustee ("<u>Trustee</u>") entered into that certain Indenture of Trust, dated as of January 1, 2008 (the "<u>Indenture</u>"), pursuant to which certain Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, in the aggregate principal amount of $14,985,000, were issued (the "<u>Pre-Petition Bonds</u>").  As of the Petition Date, an aggregate principal amount equal to $5,455,000 is owed by the Debtor in respect of the Pre-Petition Bonds (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Bonds, the "<u>Pre-Petition Bond Debt</u>").  The Pre-Petition Bonds are secured by, among other things, that certain direct pay letter of credit  (the "<u>Letter of Credit</u>"), issued by Manufacturers and Traders Trust Company ("<u>M&T</u>") for the account of the Debtor and HHH Home Care, Inc. ("<u>Home Care</u>") and for the benefit of the Trustee, in the current stated amount of Five Million Five Hundred Twenty-Nine Thousand Six Hundred Fifty-Eight Dollars ($5,529,726) (the "<u>Stated Amount</u>"), of which (i) Five Million Four Hundred Fifty-Five Thousand Dollars ($5,455,000) (the "<u>Principal Stated Amount</u>") is available to pay the outstanding principal amount of the Pre-Petition Bonds, and (ii) up to Seventy-Four

7

Thousand Six  Hundred Fifty-Eight Dollars ($74,726) is available to pay up to fifty (50) days interest under the Pre-Petition Bonds (the "<u>Interest Stated Amount</u>").[3]

        b.  The Pre-Petition Intercompany Debt

As of the Petition Date, the Debtor, as maker, and Hebrew Hospital Home of Westchester, Inc. ("<u>HHHW</u>" and together with WIDA and M&T, the "<u>Pre-Petition Secured Creditors</u>"), as holder, were party to that certain Promissory Note, dated as of November 5, 2015, in an aggregate principal amount equal to $3,500,000 (the "<u>Pre-Petition Note</u>").  As of the petition Date, the Debtor owes HHHW an aggregate principal amount equal to $3,500,000 (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Note, the "<u>Pre-Petition Intercompany Debt</u>").

On October 20, 2015, the Debtor, HHHW, the Office of the Attorney General of the State of New York (the "<u>Attorney General</u>"), and Carl Winterrose, as an authorized agent of the Resident Council, entered into that certain Restructuring Support and Loan Agreement (as amended and in effect from time to time, the "<u>RSA</u>" and together with the Pre-Petition Bonds, the Letter of Credit and the Pre-Petition Note, the "<u>Pre-Petition Credit Documents</u>"), pursuant to which the Attorney General consented to the use of the proceeds of the Pre-Petition Note in accordance with the terms of the RSA.  The RSA, among other things, provided that the Debtor is required to commence a proceeding for bankruptcy relief under chapter 11 of the Bankruptcy Code by no later than November 30, 2015, and that the proceeds of any debtor in possession financing would be used, in

---

[3] Nothing herein shall prejudice the rights of any party in interest including, but not limited to, the Debtor, the DIP Lender, or any statutory committee to challenge the amount of interest, fees or expenses payable in respect of the Pre-Petition Bonds, the Letter of Credit, or any other Pre-Petition Credit Document.

part, to pay off the Pre-Petition Note.  The November 30, 2015 was extended by oral agreement among the parties.

(ii)     *Pre-Petition Obligations.*    As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Pre-Petition Credit Documents was not less than $8,955,000 (together with accrued and unpaid interest, fees or expenses, and all other amounts due in accordance with the terms of the Pre-Petition Credit Documents, the "Pre-Petition Obligations").

(iii)     *Pre-Petition Lease Agreement.*    Pursuant to that certain Bargain and Sale Deed, dated August 4, 2000, WIDA acquired fee title to the Debtor's real property and improvements located on Glassland Road in the Valhalla section of the Town of Greenburgh, County of Westchester, State of New York, consisting of a continuing care retirement community including 120 Independent Residential Apartments, 10 Enriched Housing Apartments, 20 skilled nursing facility beds, common areas and facilities, an indoor pool, a convenience store and administration areas and related infrastructure such as road, sewers, utilities, parking lots, drainage areas and maintenance facilities (the "Property"), and leased the Property back to the Debtor pursuant to and in accordance with that certain Amended and Restated Lease Agreement, dated as of January 1, 2008 (the "Pre-Petition Lease Agreement").

(iv)     *Pre-Petition Collateral.*    Prior to the Petition Date, the Debtor entered into that certain (i) Mortgage and Security Agreement, dated as of January 1, 2008, by and among WIDA, the Debtor and M&T (the "Pre-Petition First Lien Mortgage"), (ii) General Assignment of Leases and Rents, by and among WIDA, the Debtor, and M&T (the "Pre-Petition Assignment"), (iii) Hazardous Substances Indemnity Agreement, dated

9

as of January 1, 2008, by and among the Debtor, Hebrew Hospital Home Foundation, Inc., and M&T (the "Pre-Petition Environmental Indemnity"), (iv) Pledge and Assignment of Variable Rate Bonds, dated as of January 1, 2008, by and among the Debtor, Hebrew Hospital Home Foundation, Inc. and M&T (the "Pre-Petition Pledge"), (v) Operating Account Assignment and Security Agreement, dated as of January 1, 2008, by and among the Debtor and M&T (the "Pre-Petition Operating Account Agreement" and together with the Pre-Petition First Lien Mortgage, the Pre-Petition Assignment, the Pre-Petition Environmental Indemnity, the Pre-Petition Pledge, and the Pre-Petition Operating Account Agreement, the "Pre-Petition First Lien Security Documents), granting to M&T a first-priority security interest in and liens (the "Pre-Petition First-Priority Liens") on certain of the Debtor's and WIDA's assets (such assets as described in the Pre-Petition Security Documents, the "Pre-Petition First Lien Collateral").  Prior to the Petition Date, to secure the obligations under the Pre-Petition Note, the Debtor entered into that certain Mortgage, dated as of November 5, 2015, between WIDA, the Debtor and HHHW (the "Pre-Petition Second Lien Mortgage" and together with the Pre-Petition First Lien Security Documents, the "Pre-Petition Security Documents"), granting to HHHW a second-priority security interest in and lien (the "Pre-Petition Second-Priority Liens" and together with the Pre-Petition First-Priority Liens, the "Pre-Petition Liens") on certain of the Debtor's and WIDA's assets (such assets as described in the Pre-Petition Second Lien Mortgage, the "Pre-Petition Second Lien Collateral and together with the Pre-Petition First Lien Collateral, the "Pre-Petition Collateral").

(v)        *Validity, Perfection and Priority of Pre-Petition Liens and Obligations.* The Debtor (for itself and its estate only, and without limiting the rights of other parties

4721146_1

in interest), and the Pre-Petition Secured Creditors acknowledge and agree: (a) as of the Petition Date, the Pre-Petition Liens on the Pre-Petition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b) as of the Petition Date, the Pre-Petition Liens have priority over any and all other liens, if any, on the Pre-Petition Collateral, subject only to certain other liens otherwise permitted in the Pre-Petition Credit Documents (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Pre-Petition Liens as of the Petition Date, the "Permitted Liens") and otherwise had priority over any and all other liens on the Pre-Petition Collateral;[4] (c) the Pre-Petition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; and (d) as of the Petition Date, the value of the Pre-Petition Collateral securing the Pre-Petition Obligations exceeded the amount of these obligations, and accordingly the Pre-Petition Obligations are allowed secured claims within the meaning of section 506 of the Bankruptcy Code, in a principal amount of not less than $8,955,000 as of the Petition Date, together with accrued and unpaid and hereafter accruing interest, fees (including without limitation, reasonable attorneys' fees and related expenses), costs and other charges.

(vi)        *Default by the Debtor.*  The Debtor acknowledges and stipulates that the Debtor is in default under the Pre-Petition Credit Documents.

---

[4] For purposes of this Interim Order, Permitted Liens shall only include liens that were valid, senior, enforceable, nonavoidable, and perfected under applicable law, and senior in priority to the Pre-Petition Liens as of the Petition Date.  The Debtor has represented that there are no such Permitted Liens.  Nothing herein shall constitute a finding or a ruling by this Court that any such Permitted Liens are valid, senior, enforceable, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtor, the DIP Lender, or any statutory committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Liens and/or security interest.

11

4721146_1

F.    *Findings Regarding the Post-Petition Financing*.

(i)    *Request for Post-Petition Financing.*  The Debtor seeks authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, (b) repay any remaining balance of the Pre-Petition Obligations upon satisfaction of the conditions in the DIP Loan Documents, including the Escrow Conditions contained therein, and upon entry of the Interim Order and as otherwise set forth herein, and (c) use cash collateral on the terms described herein and in the DIP Loan Documents, and in accordance with and pursuant to the Budget, to administer its Chapter 11 Case, and fund its operations through an orderly sale process.  At the Final Hearing, the Debtors will seek final approval of the proposed post-petition financing arrangements and authorization for the Debtor to make final draws on the DIP Facility (as described below, the "Final Draws") in an amount not to exceed $3,000,000 (collectively, the "Subsequent Term Loans") pursuant to a proposed final order (the "Final Order"), which shall be in form and substance acceptable to the DIP Lender.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)    *Need for Post-Petition Financing and Use of Cash Collateral.*  The Debtor's need to use cash collateral and to obtain credit consistent with the terms of the RSA, the DIP Loan Documents and the Budget, as provided for herein, is necessary to enable the Debtor to comply with its obligations under the RSA, and fund working capital through an orderly sale process, preserving the value of the estate for the benefit of its creditors.  Without the ability to use cash collateral and access the DIP Facility, the Debtor, its estate, and its creditors would suffer immediate and irreparable harm.  The Debtor does not have sufficient available sources of working capital and financing to

12

4721146_1

operate its business, pay its employees, or maintain its property in the ordinary course of business without the DIP Facility.  The capital infusion provided by the DIP Facility and the use of cash collateral will enable the Debtor to conduct an orderly sale process and maximize the value available to creditors.

(iii)      *No Credit Available on More Favorable Terms.*  Given its current financial condition, financing arrangements and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Financing on a post-petition basis is not otherwise available without granting the DIP Lenders: (a) perfected security interests in and liens as provided in this Interim Order and the DIP Loan Documents, (b) superpriority administrative claims as set forth in this Interim Order, and (c) the other provisions set forth in this Interim Order.

(iv)      *Use of Proceeds of the DIP Facility.*  As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use cash collateral, the DIP Lender requires, and the Debtor has agreed, that the proceeds of the DIP Facility be used for certain purposes in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the Budget, as follows:

(a)      Initial Term Loans.  As set forth in the DIP Credit Agreement, upon entry of the Interim Order, execution of an escrow agreement by and among the Debtor, the DIP Lender, and the Pre-Petition Secured Creditors (the "Escrow Agreement"), and delivery of certain documents to the DIP Lender in form and substance acceptable to the DIP Lender in its sole and absolute discretion (the "Escrow

13

Documents"), the DIP Lender shall deposit $9,200,000 into the Escrow (the "Escrowed Funds"), to be held subject to the satisfaction of the Escrow conditions described Article III of the DIP Credit Agreement (the "Escrow Conditions").  Following the entry of the Interim Order, provided that the Interim Order is not subject to a stay, and subject to satisfaction (or waiver by the DIP Lender) of the conditions precedent set forth in the DIP Loan Documents, including, without limitation, satisfaction of all Escrow Conditions, the Escrowed Funds shall be released from the Escrow Agent to the Debtor and M&T, as set forth in the instructions delivered to the Escrow Agent (the "Escrow Instructions"), the proceeds of which shall be used (a) for the repayment in full in cash of the Pre-Petition Note, (b) for the repayment in full in cash of the obligations owing in respect of the Letter of Credit, which will be drawn to pay in full the Pre-Petition Bonds, and (c) in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the Budget, in an amount up to $245,000 for the Debtor's working capital needs, to pay, as available, the Interim Closing Fee, to pay fees and taxes due in connection with the recording of the Mortgage, to pay fees and expenses in connection with the payment of the Pre-Petition Bonds, to pay Escrow fees and costs, and to pay Lender's attorneys' fees and expenses.

(b)    Subsequent Term Loans.  Upon entry of the Final Order, provided that the Final Order is not subject to a stay, and subject to satisfaction (or waiver by the DIP Lender) of the conditions precedent as set forth in the DIP Loan Documents, including, without limitation, that the Debtor shall have filed a Sale Procedures Motion and Sale Motion in form and substance acceptable to the DIP Lender in its sole and absolute discretion and that the Entrance Fee Deposits shall have been deposited in

14

escrow in accordance with the terms of the RSA, the Debtor shall be permitted to make Final Draws, the proceeds of which shall be used (a) in an amount up to $3,000,000 to pay: (i) a funded reserve for interest and fees on the DIP Facility in the amount of $1,320,000 (with such amounts estimated for the period through maturity of the DIP Credit Agreement to be a reserve for such interest and fees); (ii) ordinary course of business post-petition operating expenses in such amounts and during such periods as provided for in the Budget in the aggregate amount of $880,000; and (z) a funded reserve for fees of the United States Trustee and allowed Chapter 11 estate professional fees and expenses in an amount not to exceed $800,000, with the foregoing to be paid in such amounts and during such periods as provided for in the Budget.

G.    *Sections 506(c) and 552(b)*.   In exchange for the DIP Facility Commitment and the DIP Lender's agreement to subordinate the DIP Liens to the Carve Out, the DIP Lender shall receive (i) a waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

H.    *Good Faith of the DIP Lender*.

(i)    *Willingness to Provide Financing*.   The DIP Lender has indicated a willingness to provide financing to the Debtor solely pursuant to the terms and conditions of this Interim Order and the DIP Loan Documents including, without limitation:  (a) the entry by this Court of this Interim Order; (b) approval by this Court of the terms and conditions of the DIP Loan Documents in their entirety; (c) granting of the liens and super-priority claims in favor of the DIP Lender as provided for in the DIP Loan Documents, (d) approval by this Court of the fees and expenses of the DIP Lender and its professionals and the payment thereof as provided for in the DIP Loan Documents, and

15

4721146_1

(e) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, that the DIP Loan Documents were the result of arms' length negotiations, and that the DIP Lender's claims, superpriority claims, security interests, liens, rights of repayment and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, or any other order of this Court or any other court.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.    The terms and conditions of this Interim Order and the DIP Loan Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent and sound business judgment consistent with its fiduciary duties, are supported by reasonably equivalent value and consideration and satisfy the "entire fairness" standard as to the Debtor.   The DIP Loan Documents were negotiated in good faith and at arms' length among the Debtor and the DIP Lender.   The credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

I.     *Notice*.   Notice of the Hearing and the relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier, or hand delivery, to

16

certain parties-in-interest, including: (i) the Office of the United States Trustee for the Southern

District of New York; (ii) counsel to each of the Pre-Petition Secured Creditors; (iii) counsel to

the DIP Lender; (iv) counsel to the Resident Council; (v) the Internal Revenue Service; (vi) the

Attorney General of the State of New York; (vii) the parties included on the Debtor's

consolidated list of thirty (30) largest unsecured creditors, (viii) parties who have filed a notice of

appearance in this case; and (ix) all parties entitled to receive notice under Bankruptcy Rule 2002

and the Local Rules.  The parties have made reasonable efforts to afford the best notice possible

under the circumstances and such notice is good and sufficient to permit the relief set forth in

this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the

Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      <u>Interim Financing Approved</u>.   The Debtor's entry into the DIP Loan

Documents, including the DIP Facility Commitment, and the use of cash collateral, is authorized

and approved on an interim basis, subject to the terms and conditions set forth in this Interim

Order, the DIP Loan Documents and the Budget.  This Interim Order shall be valid, binding on

all parties in interest, and fully effective immediately upon entry notwithstanding the possible

application of Bankruptcy Rules 6004(h), 7062 and 9014.

2.      <u>Objections Overruled</u>.  All objections to the Motion and/or entry of this

Interim Order to the extent not withdrawn or resolved are hereby overruled.

**<u>DIP Facility Authorization</u>**

3.      <u>Authorization of the DIP Facility and Entry Into the DIP Loan Documents</u>.

The DIP Facility and the DIP Loan Documents are hereby approved on an interim basis.  The

17

Debtor is expressly and immediately authorized and empowered (i) to execute and deliver the DIP Loan Documents, (ii) to incur the DIP Obligations and to obtain the DIP Loans in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and (iii) to deliver all instruments and documents that may be necessary or required for the performance by the Debtor under the DIP Loan Documents and the creation and perfection of the DIP Liens (as defined below) provided for by this Interim Order and the DIP Loan Documents. Upon execution and delivery, the DIP Loan Documents shall evidence valid and binding obligations of the Debtor, which shall be enforceable against the Debtor, its estate, and its creditors in accordance with the terms and conditions of the DIP Loan Documents and this Interim Order. The Debtor is hereby authorized and directed to perform all of its obligations under the DIP Loan Documents, including, but not limited to paying, in accordance with this Interim Order, the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents, including the fees and expenses of the DIP Lender, as such become due and without need to obtain further Court approval. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents. All of the obligations described in the DIP Loan Documents shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with the terms of the DIP Loan Documents.

4.     Authorization to Accelerate and Pay Pre-Petition Bonds. In furtherance of the authorization of the DIP Facility and the entry into the DIP Loan Documents as set forth above, and in accordance with the terms of the Escrow Agreement, M&T is hereby authorized to direct the Trustee to immediately accelerate the Pre-Petition Bonds, and the Trustee is hereby

18

authorized to immediately accelerate the Pre-Petition Bonds and draw on the Letter of Credit to cause the payment of the principal and interest on the Pre-Petition Bonds in full.

5.     <u>Authorization to Transfer Title and Terminate Lease Agreement</u>.  After the acceleration and payment of the Pre-Petition Bonds as described above, and pursuant to the terms of the Escrow Agreement, WIDA is hereby authorized to transfer title to the Property to the Debtor, to terminate its Pre-Petition Lease Agreement with the Debtor and to take any other actions as may be required in connection with such transfer and termination and as required by the DIP Lender.

6.     <u>Authorization to Access the DIP Facility Commitment</u>.  Subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order, including without limitation the Escrow Conditions, and to prevent immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized to access the DIP Facility Commitment on an interim basis in an amount up to $9,200,000 pursuant to and in accordance with the terms herein and the terms of the RSA, the DIP Loan Documents and the Budget (the "<u>Interim Financing</u>").

7.     <u>DIP Obligations</u>.  The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtor, its estate, and any successors thereto, including any trustee appointed in this case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of this Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  The DIP Obligations include all loans and any other Debt or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to the DIP Lender under the DIP Loan Documents or this Interim Order, including all principal, accrued interest, costs, fees, expenses, and other amounts under

19

the DIP Loan Documents.  The DIP Obligations shall be due and payable as provided for herein and in the DIP Loan Documents.

8.    <u>DIP Liens and Collateral</u>.    To secure the DIP Obligations, effective immediately upon (i) entry of this Interim Order and (ii) with respect to the lien on the Property, satisfaction of the Escrow Conditions in Article III of the DIP Credit Agreement and the release from and recordation of the documents described therein, and pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition first-priority security interests in and liens (collectively, the "<u>DIP Liens</u>") upon the Debtor's right, title, and interest in, to, and under all DIP Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the DIP Obligations.  The DIP Collateral shall include without limitation all of the Debtor's right, title and interest, now or hereafter arising, in real and personal property, tangible or intangible (including post-petition assets), including but not limited to: (a) all property of the estate; (b) avoidance actions; (c) accounts, chattel paper, and commercial tort claims (d); deposit accounts and securities accounts; (e) documents; (f) equipment, fixtures, general intangibles and goods; (g) intellectual property; (h) instruments; (i) inventory; (j) investment property and leases; (k) all letters of credit, letter of credit rights, and other supporting obligations; (l) all money, cash and cash equivalents; (m) tax refunds and tax credits; (n) owned and leased real property, (o) any other interests in real property, (p) payment intangibles, (q) supporting obligations, (r) insurance, (s) licenses and permits, (t) trade secrets, (u) goodwill, (v) machinery, (w) contract rights (including rights and privileges in respect of any Government Contracts), (x) tax refunds, and (y) all products and proceeds of any of the

20

4721146_1

foregoing, including all insurance proceeds payable for the loss, damage or destruction of any of the foregoing (whether in this Chapter 11 Case or any subsequent case to which this Chapter 11 Case is converted), including, without limitation, all such property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to, inter alia, sections 542, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code, *provided*, *however*, that the DIP Lien is subject solely to the Carve Out (defined below) and the Permitted Liens, and *provided*, *further*, for the avoidance of doubt, Entrance Fee Deposits held in an escrow in accordance with the terms of the RSA shall not be deemed DIP Collateral unless and until such Entrance Fee Deposits are lawfully released from escrow and become property of the Debtor free from the liens, claims and interests of any Customer.  If the DIP Lenders shall fail to have a perfected lien in any particular property or assets of the Debtor for any reason whatsoever, but the provisions of the DIP Loan Documents (including, without limitation, all financing statements and other public filings relating to liens filed or recorded by the DIP Lender against the Debtor) would be sufficient to create a perfected lien in any property or assets that the Debtor may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such proceeds of such particular property or assets shall be included in the DIP Collateral.

9.      <u>DIP Lien Priority</u>.  Subject only to the Carve Out and the Permitted Liens, the DIP Liens securing the DIP Obligations shall be senior in priority to all other security interests in, liens on, or claims against the DIP Collateral.  In entering into the DIP Loan Documents, and as consideration therefor, the Debtor hereby agrees that until such time as all DIP Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments thereunder are terminated in accordance with the terms of the DIP Loan

21

Documents, the Debtor shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) either the liens and security interests provided under this Interim Order to the DIP Lender by offering a subsequent lender or any party in interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to the Carve Out and the Permitted Liens.  The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest and shall be valid and enforceable against any trustee appointed in this Chapter 11 Case or any Successor Cases, and/or upon the dismissal of this Chapter 11 Case or any Successor Cases.  The DIP Liens shall not be subject to sections 510, 549, 550, 551, or 552 of the Bankruptcy Code.

10.    <u>DIP Superpriority Claim</u>.  The DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in this Chapter 11 Case against the Debtor, its estate in this Chapter 11 Case and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including any and all adequate protection claims, diminution claims and all other administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c) or 726 thereof), subject only to the payment of the Carve Out and the Permitted Liens on the terms and conditions set forth herein, which shall at all times be senior to the rights of the Debtor and its estate, and any successor trustee or other estate representative (the "<u>DIP Superpriority Claim</u>").

11.    <u>Extension of Credit</u>.  The DIP Lender shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Interim Order, including the Escrow Conditions, have been satisfied in full or waived by the DIP Lender in its sole and absolute discretion.

4721146_1

12.      Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtor

shall draw upon the DIP Facility and use advances of credit under the DIP Facility only for the

purposes specifically set forth in this Interim Order, the DIP Loan Documents, the RSA, and the

Budget, and shall be subject at all times to compliance with the Budget.

**Authorization to Use Cash Collateral**

13.      Authorization to Use Cash Collateral.  Subject to the terms and conditions

set forth herein, and in accordance with this Interim Order, the DIP Facility, the DIP Loan

Documents and the Budget (including any such variances as may be permitted thereby), the

Debtor is authorized to use cash collateral until the Maturity Date as set forth in the DIP Credit

Agreement.  Except as expressly provided in this Interim Order, the DIP Facility, the DIP Loan

Documents and the Budget, nothing in this Interim Order shall authorize the disposition of any

assets of the Debtor or its estate outside the ordinary course of business, or the Debtor's use of

any cash collateral or other proceeds resulting therefrom.  Upon the occurrence of an Event of

Default (as defined in the DIP Loan Documents), the Debtor's use of cash collateral shall

immediately terminate.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

14.      Amendment of the DIP Loan Documents.  The DIP Loan Documents may,

from time to time, be amended, amended and restated, modified, or supplemented by the parties

thereto without notice or a hearing if the amendment, amendment and restatement, modification,

or supplement is (a) in accordance with the DIP Loan Documents and (b) not prejudicial in any

material respect to the rights of third parties; *provided*, *however*, that notwithstanding the

foregoing, except for actions expressly permitted to be taken by the DIP Lender, no amendment,

modification, supplement, termination, or waiver of any provision of the DIP Loan Documents,

23

4721146_1

or any consent to any departure by the Debtor therefrom, shall in any event be effective without the express written consent of the DIP Lender (it being understood that any necessary signatures may be on a document consenting to such amendment, modification, termination, or waiver) to the extent required by the DIP Loan Documents.

15.    <u>Budget Compliance</u>.    The Debtor shall not use the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the DIP Loan Documents and the Budget.  The Budget annexed to the DIP Credit Agreement and attached hereto is hereby approved, and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to the DIP Lender and approved by the DIP Lender in its sole and absolute discretion, and any such modifications, amendments or updated are hereby approved without further order.  The Debtor shall comply with and update the Budget from time to time in accordance with the DIP Loan Documents (provided that any such update shall be in form and substance reasonably acceptable to the DIP Lender and approved by the DIP Lender in its sole and absolute discretion), but in any event not less than on a weekly basis (with delivery to the DIP Lender on or before Wednesday of each week and to counsel for the Committee, if any, each week after delivery to the DIP Lender).

16.    <u>Sale Milestones</u>.    The Debtor shall (a) file a Sale Procedures Motion and a Sale Motion in form and substance acceptable to the DIP Lender on or before **December 17, 2015**; (b) obtain entry of a Sale Procedures Order in form and substance acceptable to the DIP Lender on or before **December 31**, **2015** approving the procedures for marketing, conducting an auction, and obtaining approval of a sale of all or substantially all of the Debtor's business and assets, (b) obtain entry of a Sale Order on or before **January 29, 2016** approving the sale of all or substantially all of the Debtor's business and assets that provides for payment in cash in full of

24

the obligations under the DIP Facility, (c) on or before **March 1, 2016**, have the purchaser

approved by the Sale Order assume the management and operations of the Debtor, and (d) close

on the sale of all or substantially all of the Debtor's business and assets that provides for

indefeasible payment in cash in full of the obligations under the DIP Facility on or before

**September 31, 2016**.  The DIP Lender shall be permitted to credit bid the outstanding amount of

its debt under the DIP Facility at any sale.

17.    Modification of Automatic Stay.    The automatic stay imposed by

section 362(a) of the Bankruptcy Code is hereby modified to permit:  (a) the Debtor to grant the

DIP Liens and the DIP Superpriority Claim, and to perform such acts as the DIP Lender may

request in its sole and absolute discretion to assure the perfection and priority of the DIP Liens;

(b) the Debtor to incur all liabilities and obligations to the DIP Lender as contemplated under the

DIP Loan Documents; (c) the Debtor to pay all amounts referred to, required under, in

accordance with, and this Interim Order; (d) the DIP Lender to, in its sole discretion, file (i)

financing statements, mortgages, notices and other similar documents, and (ii) a photocopy of

this Interim Order as a financing statement with any filing or recording office or with any

registry of deeds or similar office, in addition to or in lieu of such financing statements, notices

of lien, or similar instruments; and (e) the implementation of the terms of this Interim Order.

18.    Perfection of DIP Liens.    This Interim Order shall be sufficient and

conclusive evidence of the validity, perfection, and priority of all liens granted herein, including

the DIP Liens, without the necessity of filing or recording any financing statement, mortgage,

notice, or other instrument or document which may otherwise be required under the law or

regulation of any jurisdiction or the taking of any other action (including, for the avoidance of

doubt, entering into any deposit account control agreement or real property mortgage) to validate

4721146_1

or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized to file, as in its sole and absolute discretion it deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The Debtor is authorized to execute and promptly deliver to the DIP Lender all such financing statements, mortgages, notices, and other documents as the DIP Lender may reasonably request. The DIP Lender, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments, and such filing shall not be subject to the imposition of any tax.

19.    Proceeds of Subsequent Financing. If the Debtor, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in this Chapter 11 Case or any Successor Case, shall obtain credit or incur debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code at any time prior to the indefeasible payment in full of all DIP Obligations, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, then all of the cash proceeds derived from such credit or debt shall immediately be turned over first to the DIP Lender until the DIP Obligations have been satisfied in full and fully and indefeasibly paid.

26

20.      _Maintenance of DIP Collateral_.  Until the indefeasible payment in full of all

DIP Obligations and the termination of the DIP Lender's obligation to extend credit under the

DIP Facility, the Debtor shall:  (a) insure the DIP Collateral as required under the DIP Facility;

and (b) maintain the cash management system in effect as of the Petition Date, as modified by

any order that may be entered by the Court in accordance with the DIP Loan Documents.

21.      _Insurance Policies_.  The DIP Lender is, and is deemed to be, without any

further action or notice (including endorsements), named as additional insured and loss payee on

each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral.

22.      _Disposition of DIP Collateral_.  Except as expressly provided for in the DIP

Loan Documents, the Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any

portion of the DIP Collateral other than in the ordinary course of business without the prior

written consent of the DIP Lender.

23.      _Events of Default_.  The term "Event of Default" shall have the same

meaning under this Interim Order as such term has under the DIP Loan Documents.

24.      _Rights and Remedies Upon Event of Default_.  Unless otherwise ordered by

the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the

third business day after the date the DIP Lender files a notice of an Event of Default on the

docket of the Debtor's Chapter 11 Case (such period, the "_Default Notice Period_"), the automatic

stay under section 362 of the Bankruptcy Code will be automatically lifted without further order

of this Court to allow the DIP Lender to take any and all actions permitted by law, as if no case

were pending under the Bankruptcy Code.  Unless otherwise ordered by the Court, the sole basis

on which the Debtor can contest the automatic lifting of the automatic stay pursuant to this

paragraph is on the grounds that an Event of Default has not occurred or is not continuing,

27

*provided however*, that any such contest shall be asserted by the Debtor within three (3) Business

Days of the occurrence of the Event of Default, by the filing of an expedited motion in the

Bankruptcy Court requesting a determination that an Event of Default has not occurred or is not

continuing.  Nothing in this paragraph 21 shall limit the ability of the Debtor and other parties-

in-interest to timely request any such expedited hearing on a motion seeking such a finding, and

the DIP Lender shall consent to such expedited hearing.  In the event the automatic stay is

automatically lifted in accordance with this paragraph, the use of cash collateral, including

accounts receivable, inventory, and the proceeds thereof, of the Debtor in which the DIP Lender

has an interest shall be prohibited.  In accordance with the DIP Credit Agreement, and subject to

any applicable grace periods, upon the occurrence of any Event of Default, the DIP Lender may,

without notice or demand, immediately suspend or terminate all or any portion of the DIP

Lender's obligations to make additional loans under the DIP Facility.  Upon the occurrence of an

Event of Default, all loans under the DIP Facility shall become immediately due and payable in

accordance with the DIP Credit Agreement.  Nothing herein shall be construed to limit or

otherwise restrict the availability of the rights and remedies provided for in the DIP Credit

Agreement.

        25.      <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification

or Stay of this Interim Order</u>.  The DIP Lender has acted in good faith in connection with this

Interim Order, and its reliance on this Interim Order is in good faith.  Based on the findings set

forth in this Interim Order and the record made during the Hearing, and in accordance with

section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim

Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any

other court, the DIP Lender is entitled to the fullest extent to the protections provided in section

28

364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Lender arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

26.     Fees and Expenses.  The Debtor is authorized and directed to pay all fees and reasonable out-of-pocket expenses of the DIP Lender in connection with the DIP Facility, to the extent provided in the DIP Loan Documents including, without limitation, whether the DIP Loan Documents are terminated by the DIP Lender in accordance with the terms of the applicable DIP Loan Documents.  Payment of fees and expenses consistent with the terms of the DIP Loan Documents shall not be subject to allowance by this Court, and parties entitled under the DIP Loan Documents to receive such payment of fees and expenses shall not be required to comply with the U.S. Trustee fee guidelines.

27.     Indemnification. The Debtor shall indemnify and hold harmless the DIP Lender and its shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations,  liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents and as further described herein and therein, or in connection with the Debtor's Chapter 11 Case, any plan, or any action or inaction by the Debtor, in each case except to the extent resulting from such

29

indemnified party's bad faith, gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Lender's exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly pay the reasonable fees and expenses of such counsel.

28.    Proofs of Claim.    The DIP Lender shall not be required to file proofs of claim in this Chapter 11 Case or any Successor Cases for the DIP Obligations. Any proof of claim filed by the DIP Lender shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by the DIP Lender. Any order entered by this Court in relation to the establishment of a bar date in this Chapter 11 Case or any Successor Cases shall not apply to the DIP Lender.

29.    Rights of Access and Information.    Without limiting the rights of access and information afforded the DIP Lender under the DIP Loan Documents, the Debtor shall be, and hereby is, required to afford representatives, agents and/or employees of the DIP Lender reasonable access to the Debtor's premises and its books and records in accordance with the DIP Loan Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtor authorizes its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the DIP Lender all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtor.

4721146_1

30.    <u>Carve Out</u>.

(a)    For purposes of this Interim Order, the term "<u>Carve Out</u>" means a professional fee reserve in the amount of $800,000 (the "<u>Professional Fee Reserve</u>") established by the Debtor in a segregated fund and funded by the proceeds of the Subsequent Term Loans, to be used solely for the payment of fees of the United States Trustee and allowed fees and expenses of professionals authorized to be retained by the Court (collectively, the "<u>Professional Fees</u>"), which Professional Fee Reserve shall be deemed drawn and funded upon entry of the Final Order.  For the avoidance of doubt and notwithstanding any provision herein or in the DIP Loan Documents to the contrary,  (i) no proceeds of the DIP Loans  may be used to pay any or all claims for services rendered by any of the professionals retained by the Debtor or the Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter against the DIP Lender or any of its Affiliates and (ii) except for the Professional Fee Reserve, no DIP Collateral or proceeds thereof shall be used for the payment of Professional Fees.  Any amounts left in the Professional Fee Reserve at Maturity shall be applied to the payment of the Obligations under the Facility.

(b)    The Carve Out shall be senior to all liens and claims (including administrative and superpriority claims) securing the DIP Obligations, the Debtor's pre-petition obligations, and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens or claims (including administrative and superpriority claims) securing the DIP Obligations and pre-petition obligations granted or recognized as valid, including the liens, security interests,

31

4721146_1

and claims (including administrative and superpriority claims) granted herein or pursuant to the DIP Loan Documents to the DIP Lenders.

31.    <u>Payment of Compensation</u>.   So long as an unwaived Event of Default has not occurred, and to the extent of the Professional Fee Reserve or as otherwise permitted under the DIP Loan Documents, the Debtor shall be permitted to pay fees and expenses allowed and payable, as applicable, by any interim, procedural, or final order of this Court (that has not been vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, *provided*, *however*, that nothing herein shall be construed as a consent by the DIP Lender to the allowance of any professional fees or expenses or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.   Notwithstanding anything contained herein or in the DIP Loan Documents, the DIP Lender shall not be responsible for the funding, direct payment or reimbursement of any fees or disbursements of the professionals or the Committee incurred in connection with the Chapter 11 Case or any Successor Cases.   Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or reimburse expenses of any professional (including any expenses of the Committee), or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement. Nothing in this Interim Order or otherwise shall be construed to increase the Carve Out if actual (i) allowed professional fees of any professional or (ii) Committee expenses are higher in fact than the estimated fees and disbursements reflected in the Budget.

32.    <u>Limitations on the DIP Facility, DIP Collateral and Carve Out</u>.   Unless otherwise ordered by the Court or consented to by the DIP Lender, and subject to entry of the Final Order, the DIP Facility, the DIP Collateral and the Carve Out may not be used: (a) in

32

connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to or against the interests of the DIP Lender or its rights and remedies under the DIP Loan Documents or this Interim Order or the Final Order, including, without limitation, for the payment of any serves rendered by the professionals retained by the Debtor in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Lender or its collateral, (iv) preventing, hindering or otherwise delaying the exercise by the DUP lender of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Lender upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any Chapter 11 Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body; (d) to pay any fees or similar amounts to any person who has proposed or may proposed to purchase interests in or assets of the Debtor; (e) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Lender from credit bidding in connection with any proposed plan of reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP Obligations remain outstanding in a manner inconsistent with the

33

Budget; (g) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender; (h) incurring Debt outside the ordinary course of business, except as permitted under the DIP Loan Documents; (i) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Lender; (j) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Lender; or (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens or any other rights or interests of the DIP Lender.

33.    Section 506(c) Claims.  No costs or expenses of administration which have been or may be incurred in this case at any time shall be charged against the DIP Lender or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

34.    No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

35.    No Marshaling/Application of Proceeds.  The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and all proceeds shall be received and applied in accordance with the DIP Loan Documents.

34

4721146_1

36.    <u>Section 552</u>.    The DIP Lender shall be entitled to all of the rights and benefits of Section 552 of the Bankruptcy Code.  Subject to entry of the Final Order, section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the DIP Collateral.

37.    <u>Discharge Waiver</u>.    The DIP Obligations shall not be discharged by the entry of an order approving the sale of the Debtor's assets or any order confirming any plan of reorganization in this case, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of such confirmed plan of reorganization. Unless otherwise agreed to by the DIP Lender, the Debtor shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash of the DIP Obligations on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

38.    <u>Rights Preserved</u>.    Except as expressly set forth in this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Lender's right to seek any other or supplemental relief in respect of the Debtor; (b) any of the rights of the DIP Lender under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender.

39.    <u>No Waiver by Failure to Seek Relief</u>.    The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Loan

Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

40.     <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Lender, all other creditors of the Debtor, the Committee, if any, any other statutory committee that may be appointed in this Chapter 11 Case, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in this Chapter 11 Case, any Successor Cases, or upon dismissal of this Chapter 11 Case or any Successor Cases.  To the extent of any inconsistency between the terms and conditions of this Interim Order and the Final Order entered in this case, the terms of the Final Order shall govern.

41.     <u>Effect on Certain Pre-Petition Agreements</u>.  Except as expressly set forth in this Interim Order, the terms and conditions, validity, and enforceability of the Pre-Petition Credit Documents and the Pre-Petition Security Documents shall not be affected by this Interim Order.

42.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and this Interim Order, the provisions of this Interim Order shall govern and control.

43.     <u>No Right to Seek Modification of Interim Order</u>.  Unless requested by the DIP Lender, the Debtor irrevocably waives any right to seek any modification or extension of this Interim Order (in whole or in part) without the prior consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.

36

44.     Survival.

(a)     The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in this Chapter 11 Case, (ii) converting this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing this Chapter 11 Case or any Successor Cases, or (iv) pursuant to which this Court abstains from hearing this Chapter 11 Case or Successor Cases.

(b)     The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Lender pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in this Chapter 11 Case, in any Successor Cases, or following dismissal of this case or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full and all commitments to extend credit under the DIP Facility are terminated.  The terms and provisions concerning the indemnification of the DIP Lender shall continue in this Chapter 11 Case, in any Successor Cases, following dismissal of this Chapter 11 Case or any Successor Cases, termination of the DIP Loan Documents, and/or the indefeasible repayment of the DIP Obligations.

45.     Waiver of Applicable Stay.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

37

46.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2015 at __:_0_.m. (Eastern Time).

47.    <u>Notice of Final Hearing</u>. On or before _____, 2015, the Debtor shall serve, by United States mail, first-class postage prepaid, a copy of the DIP Motion and this Interim Order upon: (i) Office of the U.S. Trustee for the Southern District of New York; (ii) parties included on the Debtor's List of Creditors Holding Twenty (20) Largest Unsecured Claims; (iii) the Internal Revenue Service; (iv) counsel to each of the Pre-Petition Secured Creditors; (v) counsel to the DIP Lender; (vi) the Attorney General of the State of New York; (vii) counsel to the Resident Council; (viii) parties who have filed a notice of appearance in this case; (ix) all parties entitled to receive notice under Bankruptcy Rule 2002 and the Local Rules; and (x) counsel for any statutory committee.

48.    <u>Objection Deadline</u>. Objections, if any, to the relief sought in the DIP Motion on a final basis shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the Clerk of the Bankruptcy Court, and personally served upon (a) _____ (Attn: _____, Esq.) counsel to the Debtors; (b) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: _____, Esq.; (c) counsel to any statutory committee; and (d) Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018-1405, Attn: Michael H. Goldstein, Esq. and Kizzy L. Jarashow, Esq., attorneys for the DIP Lender, with a copy to the Court's chambers, so that such objections are filed with the Court and received by said parties on or before 12:00 p.m. (Eastern Time) on _____, 2015.

38

49.    *Nunc Pro Tunc* Effect of this Interim Order.    This Interim Order shall

constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall

take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof,

notwithstanding anything to the contrary proscribed by applicable law.

50.    Retention of Jurisdiction.    The Court has retained and will retain

jurisdiction to implement, interpret, and enforce this Interim Order according to its terms.


Dated: _____, 2015
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

4721146_1

# Exhibit A

*Execution Version*

$12,200,000

**SENIOR SECURED SUPER PRIORITY DEBTOR IN POSSESSION
CREDIT AGREEMENT**

Dated as of December 9, 2015

among

HEBREW HOSPITAL SENIOR HOUSING, INC.

as a debtor and a debtor in possession and as Borrower

and

MILLENNIUM TRUST COMPANY, LLC, as Custodian FBO

LAPIS MUNICIPAL OPPORTUNITIES FUND II LP and

LAPIS AQUILO FUND II LP

as Lender

## Table of Contents

Page

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** ................................................ 2

SECTION 1.01.     Certain Defined Terms ........................................................... 2
SECTION 1.02.     Computation of Time Periods; Other Definitional Provisions ................... 16
SECTION 1.03.     Accounting Terms .............................................................. 17

**ARTICLE II AMOUNT AND TERMS OF THE TERM LOANS** ...................................... 17

SECTION 2.01.     Term Loan Commitment .......................................................... 17
SECTION 2.02.     Making the Term Loans ......................................................... 17
SECTION 2.03.     Repayment of Term Loans ....................................................... 18
SECTION 2.04.     Prepayments ................................................................... 18
SECTION 2.05.     Interest ...................................................................... 19
SECTION 2.06.     Fees .......................................................................... 19
SECTION 2.07.     Interest and Fee Reserve ...................................................... 19
SECTION 2.08.     Payments and Computations ..................................................... 19
SECTION 2.09.     Taxes ......................................................................... 20
SECTION 2.10.     Use of Proceeds ............................................................... 22
SECTION 2.11.     Evidence of Debt .............................................................. 22

**ARTICLE III CONDITIONS TO EFFECTIVENESS AND OF LENDING** ............................ 23

SECTION 3.01.     Conditions Precedent to Borrowing Interim Order Amount ........................ 23
SECTION 3.02.     Conditions to Borrowings in Excess of the Interim Order Amount ................ 26
SECTION 3.03.     Conditions Precedent to All Borrowings ........................................ 27
SECTION 3.04.     Conditions Subsequent to Closing Date ......................................... 27

**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ....................................... 28

SECTION 4.01.     Representations and Warranties of Borrowers ................................... 28

**ARTICLE V COVENANTS** ............................................................... 33

SECTION 5.01.     Affirmative Covenants ......................................................... 33
SECTION 5.02.     Negative Covenants ............................................................ 36
SECTION 5.03.     Reporting Requirements ........................................................ 39
SECTION 5.04.     Financial Covenants ........................................................... 42

**ARTICLE VI EVENTS OF DEFAULT** ..................................................... 43

SECTION 6.01.     Events of Default ............................................................. 43
SECTION 6.02.     Remedies upon Default ......................................................... 47

**ARTICLE VII PRIORITY AND COLLATERAL SECURITY** ..................................... 47

SECTION 7.01.     Superpriority Claims and Collateral Security .................................. 47
SECTION 7.02.     Collateral Security Perfection ................................................ 48
SECTION 7.03.     No avoidance, Subordination or Modification ................................... 49
SECTION 7.04.     No Discharge; Survival of Claims .............................................. 49

**ARTICLE VIII MISCELLANEOUS** ....................................................... 49

SECTION 8.01.     Amendments, Etc ............................................................... 49
SECTION 8.02.     Notices, Etc .................................................................. 49
SECTION 8.03.     No Waiver; Remedies ........................................................... 51
SECTION 8.04.     Costs and Expenses ............................................................ 51

i

SECTION 8.05.        Right of Set-off ............................................................................. 52
SECTION 8.06.        Binding Effect ............................................................................... 52
SECTION 8.07.        Assignments and Participations ................................................... 52
SECTION 8.08.        Execution in Counterparts............................................................ 54
SECTION 8.09.        Confidentiality .............................................................................. 54
SECTION 8.10.        Public Disclosure ......................................................................... 54
SECTION 8.11.        Jurisdiction, Etc............................................................................ 55
SECTION 8.12.        Governing Law .............................................................................. 55
SECTION 8.13.        Waiver of Jury Trial ..................................................................... 55
SECTION 8.14.        Interest Rate Limitation................................................................ 55
SECTION 8.15.        Release .......................................................................................... 55

**SCHEDULES**

Schedule 3.04         -      Conditions Subsequent to Closing Date
Schedule 4.01(a)      -      Holders of the Borrower's Equity Interests
Schedule 4.01(b)      -      Borrower's jurisdiction of incorporation
Schedule 4.01(f)      -      Disclosed Litigation
Schedule 4.01(m)      -      ERISA Disclosures
Schedule 4.01(o)      -      Liens
Schedule 4.01(p)      -      Investments
Schedule 5.02(b)      -      Debt
Schedule 5.02(m)      -      Transaction with Affiliates

**EXHIBITS**

Exhibit A             -      Form of Note
Exhibit B-1           -      Form of Notice of Borrowing:  Initial Term Loan
Exhibit B-2           -      Form of Notice of Borrowing:  Subsequent Term Loans
Exhibit C             -      Form of Collateral Agreement

ii

This SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of December 9, 2015 among HEBREW HOSPITAL SENIOR HOUSING, INC., a New York corporation and a debtor and a debtor in possession (the "*Borrower*") and MILLENNIUM TRUST COMPANY, LLC, as Custodian FBO LAPIS MUNICIPAL OPPORTUNITIES FUND II LP and LAPIS AQUILO FUND II LP, as the lender (together with its successors and assigns in such capacity, the "*Lender*").

PRELIMINARY STATEMENTS:

WHEREAS, on December 9, 2015 (the "*Petition Date*"), the Borrower commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "*Chapter 11 Case*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*");

WHEREAS, the Borrower intends to continue to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Borrower, as maker executed in favor of Hebrew Hospital Home of Westchester, Inc. (the "*Intercompany Lender*") a certain promissory note (the "*Intercompany Promissory Note*");

WHEREAS, prior to the Petition Date, the Borrower, the Intercompany Lender, the Attorney General, and Carl Winterrose, as an authorized agent of the Westchester Meadows Resident Council (the "*Resident Council*") have entered into that certain Restructuring Support and Loan Agreement dated as of October 20, 2015 (as amended and in effect from time to time, the "*RSA*"), pursuant to which the Intercompany Lender extended credit to Borrower on the terms set forth therein

WHEREAS, as of the Petition Date, the Intercompany Lender under the Intercompany Promissory Note is owed, together with any and all accrued interest under the RSA, an aggregate principal amount equal to $3,500,000 (with any fees or expenses payable under the Intercompany Promissory Note and the RSA, the "*Intercompany Debt*");

WHEREAS, as of the Petition Date, Westchester Industrial Development Agency (the "*Development Agency*", and together with the Intercompany Lender, the "*Prepetition Lenders*"), as issuer, and U.S. Bank National Association, as Trustee ("*Trustee*") entered into that certain Indenture of Trust, dated as of January 1, 2008 (the "*Indenture*"), pursuant to which certain Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, in the aggregate principal amount of $14,985,000 were issued (the "*Bonds*"). As of the Petition Date, an aggregate principal amount equal to $5,455,000 is owed by the Debtor in respect of the Bonds (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Bonds, the "**Bond Debt**").

WHEREAS, the Bonds are secured by, among other things, that certain direct pay letter of credit (the "*Letter of Credit*"), issued by Manufacturers and Traders Trust Company ("*M&T*") for the account of the Borrower and HHH Home Care, Inc. ("*Home Care*") and for the benefit of the Trustee, in the current stated amount of Five Million Five Hundred Twenty-Nine Thousand Six Hundred Fifty-Eight Dollars ($5,529,726) (the "*Stated Amount*"), of which (i) Five Million Four Hundred Fifty-Five Thousand Dollars ($5,455,000) (the "*Principal Stated Amount*") is available to pay the outstanding principal amount of the Bonds, and (ii) up to Seventy-Four Thousand Six Hundred Fifty-Eight Dollars ($74,726) is available to pay up to fifty (50) days interest under the Bonds (the "*Interest Stated Amount*");

WHEREAS, an immediate and on-going need exists for the Borrower to obtain additional funds in order to continue the operation of its business as debtors-in-possession under chapter 11 of the Bankruptcy Code and, accordingly, the Borrower has requested that the Lender provide financing to the Borrower consisting of a senior secured superpriority term loan facility in a principal amount of up to $12,200,000 (the "*Facility*") pursuant to Section 364(c) of the Bankruptcy Code, secured by liens and granted superpriority claim status, and for the proceeds to be used for repayment of the Prepetition Debt, for working capital, and for the payment of ordinary course of business post-petition expenses and other professional fees and expenses in such amounts and during such periods as provided in the Budget;

WHEREAS, the Borrower intends to file one or more motions with the Bankruptcy Court seeking the approval of, among other things, the sale of substantially all of the Borrower's assets on the terms outlined therein and in the attachments thereto;

WHEREAS, the Lender has indicated its willingness to agree to extend the Facility to the Borrower, all on terms and conditions set forth herein and in the other Loan Documents (as defined below) and in accordance with Section 364(c) of the Bankruptcy Code, so long as such post-petition credit obligations are (i) secured by Liens on substantially all of the property, rights and interests, real and personal, tangible and intangible, of the Borrower, whether now owned or hereafter acquired, subject in priority only to  Prepetition Permitted Liens and the Carve Out, as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and, on and after the entry thereof, the Final DIP Order; and

WHEREAS, the Borrower has agreed to provide such collateral security and superpriority claims, subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account*" means all "accounts" (as defined in the UCC) of the Borrower (or, if referring to another Person, of such Person), including without limitation, accounts, accounts receivables, health care insurance receivables, monies due or to become due and obligations in any form (whether arising in connection with contracts, contract rights, Instruments, General Intangibles or Chattel paper), in each case whether arising out of goods sold or services rendered or from any other transaction and whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"*Affiliate*" means Westchester Meadows/The Fieldstone, Adult Day Health Care Program, Westchester Meadows, a Continuing Care Retirement Community, and as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote ten percent (10%) or more of the Voting Interests

2

of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agreement*" means this Senior Secured Super Priority Debtor in Possession Credit Agreement, as amended, supplemented, replaced, or otherwise modified from time to time.

"*Amended Budget*" has the meaning specified in <u>Section 5.03(e)</u>.

"*Approved Plan of Reorganization*"  means a plan of reorganization for the Borrower under the Bankruptcy Code that is acceptable to the Lender in its sole and absolute discretion.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by the Lender and an Eligible Assignee.

"*Attorney General*" means the Office of the Attorney General of the State of New York or any duly authorized employees or representatives thereof.

"*Bankruptcy Code*" Title 11, United States Code, as now and hereafter in effect, or any applicable successor statute.

"*Bankruptcy Court*" has the meaning specified in the recitals to this Agreement.

"*Bond Indenture*"  has the meaning specified in the recitals hereto.

"*Bonds*"  has the meaning specified in the recitals hereto.

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrowing*" means a borrowing hereunder of a Term Loan.

"*Budget*" means collectively, the Initial Budget and each Amended Budget. Each Budget shall include detailed operating assumptions, projected receipts, disbursements, cash balances and accounts receivable balances and such other information as agreed by the Borrower and the Lender, as set forth on Exhibit A to the Interim Order and the Final DIP Order.  For the avoidance of doubt, the Budget shall not include any amounts for payments pursuant to  the PILOT Agreement, or for refunds of residential Entrance Fees.

 "*Business Day*" means a day of the year on which banks are not required or authorized by law to close in New York City.

"*Capital Expenditures*" means, for any Person for any period, the sum of, without duplication, all expenditures made, directly or indirectly, by such Person or any of its subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a balance sheet of such Person or have a useful life of more than one (1) year, including  the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such

equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"**Carve Out**" means the Professional Fee Reserve.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, 42 U.S.C. § 9601 et seq.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**Change of Control**" shall occur if the board of directors of the Borrower shall cease to consist of a majority of Continuing Directors.

"**Chapter 11 Case**" has the meaning specified in the recitals to this Agreement.

"**Closing Date**" means the date the initial Borrowing is made, which shall occur as soon as practical following the date that in accordance with Section 2.01(a) and Section 2.02(a) the conditions precedent set forth in Article III have been fulfilled.

"**Collateral**" means all "Collateral" referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Lender.  For the avoidance of doubt, Entrance Fee Deposits held in an escrow in accordance with the terms of the RSA shall not be deemed Collateral unless and until such Entrance Fee Deposits are lawfully released from escrow and become property of the Borrower free from the liens, claims and interests of any Customer.

"**Collateral Agreement**" has the meaning specified in Section 3.01(a)(iii).

"**Collateral Documents**" means the Collateral Agreement, the Real Estate Collateral Documents, the Control Account Agreement and each other agreement that creates or purports to create a Lien in favor of the Lender.

"**Commitment**" means, collectively, the Lender's obligations to make Term Loans under Section 2.01 in an aggregate amount not to exceed $12,200,000, subject to the terms and conditions set forth in this Agreement, as such amount may be reduced by the making of Term Loans and pursuant to Section 2.04.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming an Approved Plan of Reorganization under the Bankruptcy Code.

"**Continuing Directors**" means the directors of the Borrower on the Closing Date and each other director if, in each case, such other director's nomination for election to the board of directors of the Borrower is recommended by at least a majority of the then Continuing Directors.

"**Control Account Agreement**" means an account control agreement in favor of the Lender in form and substance reasonably acceptable to the Lender executed and delivered  by the Borrower, the Borrower's depositary bank and the Lender.

4

"*Counsel*" means Goodwin Procter LLP.

"*Customer*" means the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right and/or any party who enters into or proposes to enter into any contract or other arrangement with the Borrower, pursuant to which the Borrower is to delivery any personal property or perform any services, including, without limitation, any party who enters into a contract with the Borrower for the use of the Borrower's independent living units.

"*Creditors' Committee*" means the Official Unsecured Creditors' Committee appointed by the United States Trustee in relation to the Chapter 11 Case, as applicable.

"*Debt*" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment Obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

"*Deed*" has the meaning set forth in Section 3.01(b)(ii).

"*Default*" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"*Default Interest*" has the meaning set forth in Section 2.05(b).

"*Department of Financial Services*" means the Department of Financial Services for the State of New York or any duly authorized employees or representatives thereof.

"*Department of Health*" means the Department of Health for the State of New York or any duly authorized employees or representatives thereof.

"*Development Agency*" has the meaning specified in the recitals hereto.

"*Disclosed Litigation*" has the meaning specified in Section 3.01(d).

"*Disclosure Statement Hearing*" means a hearing to approve a Disclosure Statement under the Bankruptcy Code for an Approved Plan of Reorganization.

5

"***Disposition***" or "***Dispose***" means the sale, transfer, license, lease, conveyance or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer, conveyance or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"***Dollar***" and "***$***" means the lawful money of the United States.

"***Effective Date***" means the date that an Approved Plan of Reorganization is effective, as defined in such Approved Plan of Reorganization.

"***Eligible Assignee***" means any Person (other than an individual); *provided*, *however*, that neither Borrower nor any Affiliate of a Borrower shall qualify as an Eligible Assignee under this definition.

"***Entrance Fee Deposits***" means post-petition deposits in the amount of ten percent (10%) of the Entrance Fee.

"***Entrance Fees***" means the post-petition entrance fees payable by Customers to the Borrower for the Customer's (i) use of the Borrower's independent living units and (ii) right to receive certain services in connection therewith.

"***Environmental Action***" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health, safety or the environment, climate or natural resources, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions, damages, or response costs and (b) by any governmental or regulatory authority or third party for damages, response costs, contribution, indemnification, cost recovery, compensation or declaratory or injunctive relief.

"***Environmental Indemnity***" means that certain Environmental Indemnity Agreement, dated as of December [_], 2015, between Borrower (as Indemnitor) and Lender (as Indemnitee).

"***Environmental Law***" means all applicable current and future Federal, state, local and foreign laws (including common laws), statutes, regulations, rules having the force and effect of law, ordinances, codes, orders, writs, judgments, injunctions, decrees or judicial or agency interpretations, policies or guidance, in each case relating to pollution or protection of the environment, climate, health, safety or natural resources, or the presence, release of, discharge of, exposure to, or the generation, manufacture, processing, distribution, use, handling, transportation, treatment, storage, disposal, recycling of or the arrangement for such activities, with respect to Hazardous Materials.

"***Environmental Permit***" means any permit, approval, identification number, license, registration, notification, exemption or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person

6

(including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***ERISA Affiliate***" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of the Borrower, or under common control with the Borrower, within the meaning of Section 414(b) or (c) of the Internal Revenue Code, except that the term "ERISA Affiliate" shall also include a member of the controlled group of the Borrower, or under common control under the meaning of Section 414(m) or (o) for purposes of PBGC premium liabilities and pension plan funding liability under Section 41 of the Internal Revenue Code.

"***Escrow***" has the meaning specified in Section 3.01(b).

"***Escrow Agent***" means First Nationwide Title Agency LLC.

"***Escrow Agreement***" means an escrow agreement by and among the Borrower, the Lender, County of Westchester Industrial Development Agency, Hebrew Hospital Home of Westchester, Inc., and Manufacturers and Traders Trust Company, in form and substance acceptable to the Lender in its sole and absolute discretion.

"***Events of Default***" has the meaning specified in Section 6.01.

"***Exit Fee***" has the meaning specified in Section 2.06(b).

"***Exit Loan***" has the meaning specified in Section 2.02(c).

"***Extraordinary Receipt***" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including, without limitation, aggregate amount of tax refunds received, pension plan reversions, proceeds of insurance (including, without limitation, any key man life insurance but excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustment received in connection with any purchase agreement; *provided, however*, that an Extraordinary Receipt shall not include cash receipts received from proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto or adjustments received pursuant to any resolution of claims for reimbursements from any governmental sponsored health insurance programs..

"***Facility***" has the meaning specified in the recitals to this Agreement.

"***Final Order***" means an order by the Bankruptcy Court as to which (a) no request for a stay or any similar request is pending, no stay is in effect, the action or decision has not been vacated, reversed, set aside, annulled or suspended, and any deadline for filing such a request that may be designated by law, statute, regulation, or rule has passed; (b) no petition for rehearing or reconsideration or application for review is pending and the time for filing any such petition or application has passed; (c) no Governmental Authority has undertaken to reconsider the action on its own motion and the time within

which it may effect such reconsideration has passed; and (d) no appeal is pending (including other administrative or judicial review) or in effect and any deadline for filing any such appeal that may be specified by law, statute, regulation, or rule has passed.

"***Final DIP Order***" means a final order of the Bankruptcy Court authorizing and approving this Agreement and the other Loan Documents on a final basis and entered following a final hearing in form and substance satisfactory to the Lender in its sole discretion.

"***Final Order Amount***" means, at any time, $12,200.000, as such amount may be reduced at or prior to such time pursuant to Section 2.04(b).

"***Fiscal Year***" means a fiscal year of Borrower ending on December 31 in any calendar year.

"***GAAP***" has the meaning specified in Section 1.03.

"***General Assignment of Leases and Rents***" means that certain General Assignment of Leases and Rents, dated as of December [_], 2015, between Borrower (as Assignor) and Lender (as Assignee).

"***Government Account***" shall mean all Accounts arising out of or with respect to any Government Contract.

"***Government Contract***" shall mean all contracts with the United States Government, any Governmental Authority or with any agency thereof, and all amendments thereto.

"***Governmental Authority***" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"***Governmental Authorization***" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"***Guaranteed Debt***" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt, leases, dividends or other payment Obligations ("***primary obligations***") of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guaranteed Debt shall be deemed

8

to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Hazardous Materials*" means (a) any petroleum or petroleum product, by-product or breakdown product, and all other hydrocarbons, radioactive or nuclear materials, asbestos or asbestos-containing materials, polychlorinated biphenyls and radon gas, chlorofluorocarbons and all other ozone depleting substances and (b) any other chemical, material or substance or waste designated, classified, prohibited, limited or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Home Care*" has the meaning specified in the recitals hereto.

"*Indemnified Party*" has the meaning specified in Section 8.04(b).

"*Information*" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to or in the possession of the Lender or its Representatives on a non-confidential basis prior to disclosure by the Borrower; *provided* that, such information was or is clearly identified at the time of delivery as confidential or that is subsequently classified in a separate communication as confidential.

"*Initial Budget*" means (i) a cash flow forecast, business plan and operating budget for the thirteen-week period beginning immediately after the Petition Date and (ii) a monthly cash flow forecast, business plan and operating budget following the end of such thirteen-week period, in each case, based on the Projections and the Information, and in form and substance satisfactory to the Lender in its sole and absolute discretion and as annexed and approved as part of the Interim Order, as updated in accordance with the terms of this Agreement.

"*Initial Term Loan*" has the meaning specified in Section 2.01(a).

"*Insurance Stay Exception*" means the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition creditor solely against available insurance coverage.

"*Interest and Fee Reserve*" means a reserve established by the Lender and accounted for on its books and records and against which interest, the Exit Fee, the fees and expenses of Lender's counsel from and after the date of entry of the Interim Order, and other fees and expenses when due shall be credited. The Interest and Fee Reserve shall be deemed drawn and fully advanced and funded as of the date of entry of the Final DIP Order, with the funds not disbursed to the Borrower.

"*Intercompany Debt*" has the meaning specified in the recitals hereto.

"*Intercompany Lender*" has the meaning specified in the recitals hereto.

"*Intercompany Promissory Note*" has the meaning specified in the recitals hereto.

"*Interim Closing Fee*" has the meaning specified in Section 2.06(a).

9

"**Interim Order**" means in form and substance satisfactory to the Lender in its sole discretion the Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (a) approving post-petition financing pursuant to the Facility and the making of Term Loans in an aggregate amount not to exceed the Interim Order Amount, (b) authorizing use of cash collateral, (c) granting Liens and providing superpriority administrative expense status, (e) modifying the automatic stay, and (f) scheduling a final hearing with respect to the Facility (including the Budget), to be entered on the docket of the Chapter 11 Case on or before December 17, 2015 or such later date as the Lender agrees in its sole discretion.

"**Interim Order Amount**" means, at any time, $9,200,000 as such amount may be reduced at or prior to such time pursuant to Section 2.04(b).

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Investment**" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "Debt" in respect of such Person.

"**Lease Agreement**" means that certain Amended and Restated Lease Agreement, originally dated as of July 1, 2000 and amended and restated as of January 1, 2008, between County of Westchester Industrial Development Agency (as Lessor) and Hebrew Hospital Senior Housing, Inc. (as Lessee).

"**Lender**" means collectively, Millennium Trust Company, LLC, as Custodian FBO Lapis Municipal Opportunities Fund II LP and Lapis Aquilo Fund II LP, and each Person that shall become a Lender hereunder pursuant to Section 8.07 for so long as the Lender or Person, as the case may be, shall be a party to this Agreement as a Lender.

"**Lending Office**" means the office of the Lender specified as its "Lending Office" under its signature on the signature pages to this Agreement  or, including if no such office is specified, such other office of the Lender as it may from time to time specify in writing to the Borrower.

"**Letter of Credit**" has the meaning specified in the recitals hereto.

"**Lien**" means any lien, security interest, hypothecation or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"**Loan Documents**" means (a) this Agreement, (b) the Notes, and (c) the Collateral Documents, each of (a) through (c) as amended.

"**M&T**" has the meaning specified in the recitals hereto.

"**Margin Stock**" has the meaning specified in Regulation U.

"***Material Adverse Effect***" means any material adverse effect on any of the (a) operations, performance, business, assets or properties, of the Borrower or any Affiliate, taken as a whole, in each case other than (i) as a result of the commencement of the Chapter 11 Case, (ii) general economic, legal, regulatory or political conditions in the United States of America (*provided* that the impact on the Borrower is not materially disproportionate to the impact of similar entities), (iii) conditions generally affecting the industries in which the Borrower operates (*provided* that the impact on the Borrower is not materially disproportionate to the impact of similar entities).

"***Maturity Date***" means the date that is the earliest of: (a) twelve (12) months after entry of the Interim Order; (b) the closing date of the sale of all or substantially all of the Collateral; (c) the effective date of a confirmed Chapter 11 plan of reorganization; (d) dismissal of the Chapter 11 Case; (e) conversion of the Chapter 11 Case to a Chapter 7 case; (f) the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition creditor, except to the extent that such relief constitutes an Insurance Stay Exception and the Insurance Stay Exceptions, in the aggregate, shall not result in or have a Material Adverse Effect; (g) acceleration of the Term Loans pursuant to the terms of this Agreement; (h) the filing of a plan of reorganization in the Chapter 11 Case that does not provide for repayment in full in cash of all Obligations owing under the Facility; or (i) the filing of any action attacking or challenging the Obligations under the Facility or the Liens granted in the Collateral to secure such Obligations.

"***Mortgage***" means a Mortgage and Security Agreement with respect to the Mortgaged Property, in favor of, and in form and substance satisfactory to, the Lender.

"***Mortgaged Property***" means that certain plot, piece or parcel of real property and improvements located on Glassland Road in the Valhalla section of the Town of Greenburgh, County of Westchester, State of New York, consisting of a continuing care retirement community including 120 Independent Residential Apartments, 10 Enriched Housing Apartments, 20 skilled nursing facility beds, common areas and facilities, an indoor pool, a convenience store and administration areas and related infrastructure such as road, sewers, utilities, parking lots, drainage areas and maintenance facilities.

"***Multiemployer Plan***" means a multiemployer plan, as defined in Section 3(37) of ERISA, to which the Borrower or any ERISA Affiliate is making or has an obligation to make contributions, or has within any of the preceding six (6) plan years made or had an obligation to make contributions.

"***Multiple Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and at least one (1) Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could reasonably be expected to have liability under Section 4043, 4064 or 4069 of ERISA in the event of a withdrawal from such plan or if such plan has been or were to be terminated.

"***Net Cash Proceeds***" means:

(a)    in connection with any Disposition or any Recovery Event, the proceeds thereof in the form of cash and Permitted Investments (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of (w) attorneys' fees, accountants' fees, investment banking fees, (x) amounts required to be applied to the repayment of Debt secured by a Permitted Lien on any asset that is the subject to such Disposition or Recovery Event (other than any Lien pursuant to a Collateral Document), (y) other customary

fees and expenses actually incurred in connection therewith and (z) in the case of a Recovery Event, any actual and reasonable cost incurred and paid or payable in connection with restoration work to the extent required by any casualty insurance policy or as a result of a condemnation and, in each case, and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements);

(b)    in connection with any incurrence of Debt, the cash and Permitted Investments received from such incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith;

(c)    with respect to the sale or issuance of any Equity Interests (including, without limitation, the receipt of any capital contribution) by the Borrower, the excess of (i) the sum of the cash and Permitted Investments received in connection with such sale or issuance over (ii) the underwriting discounts and commissions or similar payments, and other out-of-pocket costs, fees, commissions, premiums and expenses, incurred by the Borrower in connection with such sale or issuance to the extent such amounts were not deducted in determining the amount referred to in clause (i); *provided*, *however*, that Net Cash Proceeds shall not include any funds received in connection with the exercise of stock options granted to employees or directors of the Borrower; and

(d)    with respect to any Extraordinary Receipt that is not otherwise included in clause (a), (b) or (c) above, the sum of the cash and Permitted Investments received in connection therewith.

"***Non-Excluded Taxes***" has the meaning specified in Section 2.09.

"***Note***" means a promissory note of the Borrower payable to the order of the Lender (or at a Lender's request, payable to the Lender and its registered assigns), in substantially the form of Exhibit A hereto, evidencing the indebtedness of the Borrowers to the Lender resulting from the Term Loans.

"***Notice of Borrowing***" means a notice of Borrowing in the form Exhibit B-1 or Exhibit B-2.

"***NPL***" means the National Priorities List under CERCLA.

"***Obligation***" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged or stayed. Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document, and (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that the Lender, in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"***Orders***" means the Interim Order and the Final DIP Order; and "***Order***" means whichever of the Interim Order or the Final DIP Order is then in effect.

"***Other Taxes***" has the meaning specified in Section 2.09(b).

"**Bond Indenture**" has the meaning specified in the recitals hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

"**Permitted Investments**" means (a) Dollars; (b) securities issued or unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof, in each case having maturities of not more than 24 months from the date of acquisition thereof; (c) securities issued by any state, commonwealth or territory of the United States of America or any political subdivision or taxing authority of any such state, province, commonwealth or territory or any public instrumentality thereof or any political subdivision or taxing authority of any such state, province, commonwealth or territory or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service); (d) commercial paper and variable or fixed rate notes issued by or guaranteed by the Lender or any bank holding company owning the Lender; (e) commercial paper and variable or fixed rate notes maturing no more than 12 months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); (f) time deposits with, or domestic and Eurodollar certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, the Lender or any other bank having combined capital and surplus of not less than $250,000,000 in the case of domestic banks and $100,000,000 (or the dollar equivalent thereof) in the case of foreign banks; (g) repurchase agreements with a term of not more than 30 days for underlying securities of the type described in clauses (b), (c) and (f) above entered into with any bank meeting the qualifications specified in clause (f) above or securities dealers of recognized national standing; (h) marketable short-term money market and similar securities having, at the time of acquisition, a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); and (i) shares of investment companies that are registered under the Investment Company Act of 1940 and invest solely in one or more of the types of securities described in clauses (a) through (h) above.

"**Permitted Liens**" has the meaning specified in Section 5.02(a)(ii).

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"**Petition Date**" has the meaning specified in the recitals hereto.

"**PILOT Agreement**" means that certain Payment In Lieu Of Taxes Agreement, dated as of July 18, 2000, by and between the County of Westchester Industrial Development Agency, a public benefit corporation of the State of New York, the Town of Greenburgh, a municipal corporation, and Hebrew Hospital Senior Housing, Inc., a New York Not-for-Profit Corporation as Lessee.

"**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

"**Prepetition Debt**" means the Bond Debt and the Intercompany Debt.

"**Prepetition Lenders**" has the meaning specified in the recitals to this Agreement.

13

"*Prepetition Loan Documents*" means the Intercompany Promissory Note, the Bond Indenture and all promissory notes, security and other documents relating to the foregoing or entered into in connection therewith, in each case as in effect on the Closing Date.

"*Prepetition Permitted Liens*" has the meaning specified in Section 4.01(p) hereof.

"*Prior General Assignment of Leases and Rents*" means that certain General Assignment of Leases and Rents, dated as of January 1, 2008, between Hebrew Hospital Senior Housing, Inc., Westchester Industrial Development Agency, and Manufacturers and Traders Trust Company.

"*Prior Mortgage and Security Agreement*" means that certain Mortgage and Security Agreement, dated as of January 1, 2008, between Hebrew Hospital Senior Housing, Inc. and Manufacturers and Traders Trust Company.

"*Professional Fee Reserve*" means a reserve in the amount of $800,000 established by the Borrower in a segregated account to be used solely for the payment of Professional Fees, which shall be deemed drawn and funded upon entry of the Final DIP Order.

"*Professional Fees*" has the meaning specified in Section 2.11.

"*Projections*" has the meaning specified in Section 4.01(h).

"*Real Estate Collateral Documents*" means the Mortgage, the General Assignment of Leases and Rents, and the Environmental Indemnity.

"*Recovery Event*" means any settlement of or payment in respect of any real property insurance claim or any condemnation proceeding relating to any asset of the Borrower.

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Released Parties*" has the meaning specified in Section 8.15.

"*Releasing Parties*" has the meaning specified in Section 8.15.

"*Requirement of Law*" means, as to any Person, (a) the partnership agreement, charter, certificate of incorporation, articles of incorporation, bylaws, operating agreement or other organizational or governing documents of such Person, (b) any federal, state or local law, treaty, ordinance, rule or regulation, and (c) any order, decree or determination of a court, arbitrator or other Governmental Authority; in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Resident Council*" has the meaning specified in the recitals.

"*Resident Professionals*" shall mean DLA Piper LLP (US) and CohnReznick LLP

"*RSA*" has the meaning specified in the recitals hereto.

14

15-13264-mew    Doc 5    Filed 12/09/15    Entered 12/09/15 15:31:45    Main Document
Pg 88 of 218

"***Sale Motion***" means a motion by the Borrower seeking approval of the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which motion shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"***Sale Procedures Motion***" means a motion by the Borrower seeking approval of procedures for marketing, conducting an auction and obtain approval of a sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which motion shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"***Sale Procedures Order***" means an order of the Bankruptcy Court approving procedures for marketing, conducting an auction in connection with the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which order shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"***Sale Order***" means an order of the Bankruptcy Court approving with the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which order shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"***Second Lien Mortgage***" means that certain Mortgage, made as of November 5, 2015, between County of Westchester Industrial Development Agency, as Owner, Hebrew Hospital Senior Housing, Inc., as Mortgagor, and Hebrew Hospital Home of Westchester, Inc., as Mortgagee.

"***Secured Obligations***" has the meaning specified in the Collateral Agreement.

"***Securities Account***" has the meaning specified in the Collateral Agreement.

"***Single Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and no Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could reasonably be expected to have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"***Statutory Liens***" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have commenced:  (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b); *provided* that such Liens are being challenged in good faith and by proper proceedings by the Borrower and for which adequate reserves in accordance with GAAP have been established on the books of the Borrower; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than thirty (30) days and (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the use of the property to which they relate; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) Liens securing judgments (or the payment of money) not constituting a Default or securing appeal or other surety bonds related to such

15

judgments; and (f) easements, rights of way and other similar encumbrances on title to real property that do not render title to the property encumbered thereby unmarketable or materially adversely affect the use of such property for its present purposes.

"*Statutory Reserve*" has the meaning specified in <u>Section 4.01(e)</u>.

"*Subordinated Debt*" means Debt subordinated in right of payment or lien priority to the obligations under this Agreement on terms reasonably satisfactory to the Lender.

"*Subsequent Term Loans*" has the meaning specified in <u>Section 2.01(b)</u>.

"*Superpriority Claim*" means a claim against a Borrower or its estate in the Chapter 11 Case which is an administrative expense claim having priority over (a) any and all allowed administrative expense claims, and (b) unsecured claims now existing or hereafter arising, including, without limitation, administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, Section 506(c)).

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "Debt," all (a) Obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "synthetic lease"), (b) Obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) Obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "Debt" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"*Taxes*" means any present or future taxes, levies, imposts, duties, deductions, charges, withholdings, assessments, fees or other charges and other similar liabilities and any interest, additions, or penalties with respect thereto.

"*Term Loan*" means the Initial Term Loan and the Subsequent Term Loans.

"*UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "*UCC*" means the Uniform Commercial Code as from time to time in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

"*Voting Interests*" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

SECTION 1.02.    <u>Computation of Time Periods; Other Definitional Provisions</u>.  In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each

16

mean "to but excluding." Unless expressly provided for otherwise, if any day on which the Lender or the Borrower is required to perform hereunder is not a Business Day, then such performance shall occur on the immediately succeeding Business Day. References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03.    Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles consistent with those applied in the preparation of the financial statements referred to in Sections 4.01 and 5.03 hereof ("*GAAP*").

## ARTICLE II

## AMOUNT AND TERMS OF THE TERM LOANS

SECTION 2.01.    Term Loan Commitment. The Lender agrees, on the terms and conditions hereinafter set forth, to make a term loan or term loans to the Borrower as follows:

(a)    on the Closing Date, in an amount equal to $9,200,000 (the "***Initial Term Loan***"), which amount shall have been funded into Escrow upon entry of the Interim Order and execution of the Escrow Agreement; *provided* that the aggregate amount of the Initial Term Loan shall not exceed the Interim Order Amount; and

(b)    from time to time after the Closing Date and until the Maturity Date, each in an amount selected by the Borrower pursuant to Section 2.02(b), and in an aggregate amount not to exceed $3,000,000 (the "***Subsequent Term Loans***"); *provided*, that the aggregate amount of the Subsequent Term Loans, plus Initial Term Loan shall not exceed the Final Order Amount.

Each Term Loan may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

SECTION 2.02.    Making the Term Loans. Subject to the terms and conditions hereinafter set forth:

(a)    Initial Term Loan. The Initial Term Loan shall be made on notice, given not later than 12:00 p.m. (New York City time) on the date of the hearing for approval of the Interim Order by the Borrower to the Lender. Such Notice of Borrowing for the Initial Term Loan shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-1 hereto, specifying therein the requested Interim Order Amount. Upon fulfillment of the applicable conditions set forth in Article III, the Interim Term Loan funds shall be released from Escrow and made available to the Borrower by transfer of such funds to the account designated by the Borrower.

(b)    Subsequent Term Loans. Each Borrowing of a Subsequent Term Loan shall be made on notice given not later than 12:00 p.m. (New York City time) on any Thursday occurring from the Closing Date until the Maturity Date by the Borrower to the Lender. Each such Notice of a Borrowing shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-2 hereto, specifying therein the requested amount. As long as no Default or Event of Default has occurred and is continuing, and upon fulfillment of the applicable conditions set forth in Article III, the Lender will make such amount of such requested funds available to the Borrower by transfer of such funds to the account designated by the Borrower by 12:00 p.m. (New

York City time) on the Thursday immediately following receipt of such Notice of Borrowing; *provided*, *however*, that (i) subject to the Final Order Amount, each such Subsequent Term Loan shall be in an amount of $250,000 or multiples thereof (unless there is less than $250,000 available, in which case such lower amount can be drawn in one final draw), and (ii) such Subsequent Term Loans shall be necessary, as determined by the Lender in its sole discretion, to satisfy the Borrower's obligations in the Budget for the next Budget period beginning on the date of any such Borrowing.

(c)    Exit Loan.  The Borrower and the Lender may consider converting the outstanding Term Loans into term loans under an exit term loan facility (the "***Exit Loan***"), provided that the Exit Loan is on terms and conditions acceptable to each party in its sole and absolute discretion.

(d)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower. The Borrower shall indemnify the Lender against any loss, cost or expense incurred by the Lender as a result of any failure to fulfill on or before the date for such Borrowing the applicable conditions set forth in Article III or in Section 2.02, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender to fund the Term Loans, as a result of such failure, is not made on such date.

SECTION 2.03.    Repayment of Term Loans.  The Borrower shall repay to the Lender the aggregate outstanding principal amount of the Term Loans on the Maturity Date (or on such earlier date on which such Term Loans become due and payable pursuant to Article VI), together with any and all accrued and unpaid interest thereon (which amounts shall be reduced as a result of the application of prepayments in accordance with Section 2.04).

SECTION 2.04.    Prepayments.  (a)  Optional.  Subject to Section 2.04(c), The Borrower may, upon at least one (1) Business Day's notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, and, if such notice is given, the Borrower shall prepay the outstanding aggregate principal amount of the Term Loans comprising part of the same Borrowing in whole or in part, together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid; *provided*, *however*, that each partial prepayment shall be in an aggregate principal amount of $500,000 or an integral multiple of $500,000 in excess thereof.

(b)    Mandatory.  If the Borrower Disposes of any property or assets, whether pursuant to a sale under Section 363 of the Bankruptcy Code or otherwise (other than any Disposition of any property or assets permitted by clauses (ii) through (v) of Section 5.02(e)), the Borrower shall prepay an aggregate principal amount of Term Loans equal to one hundred percent (100%) of all such Net Cash Proceeds immediately upon receipt thereof by the Borrower.  The Interim Order Amount and the Final Order Amount, as applicable, shall be reduced by an amount equal to the amount of Net Cash Proceeds from any sale of property or assets described in this Section 2.04(b) in excess of the amount applied to reduce the aggregate outstanding amount of the Term Loans to zero, unless otherwise agreed by the Lender.

(i)    Upon the sale or disposition by the Borrower of any or all of its assets, the Borrower shall prepay an aggregate principal amount (including any paid in kind interest) of Term Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof.

(ii)    Upon the incurrence or issuance by the Borrower of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 5.02(b)), the Borrower shall prepay an aggregate principal amount (including any paid in kind

18

interest) of Term Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof by the Borrower.

(iii)   Upon the receipt of any proceeds from an Extraordinary Receipt not otherwise included in this Section 2.04(b), the Borrower shall prepay an aggregate principal amount (including any paid in kind interest)  of Term Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof by the Borrower.

(c)   Early Termination.   If the Borrower shall prepay the Facility in cash in full prior to the date which is 273 days after the entry of the Interim Order, then the Borrower shall pay to the Lender additional interest equal to the product of (i) the interest rate then in effect, as determined in accordance with Section 2.05; times (ii) the outstanding amount of the Obligations under the Facility, times (iii) the difference between (x) 273 days and  (y) the number of days from the date of entry of the Interim Order to the date of such prepayment.

SECTION 2.05.   Interest.

(a)   Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Term Loan owing to the Lender from the date of such Term Loan until such principal amount shall be paid in full at a rate per annum equal at all times to nine and three-quarters percent (9.75%) per annum, payable monthly in arrears in cash on the first Business Day of each calendar month.

(b)   Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Term Loans and all other due and unpaid Obligations shall bear interest ("*Default Interest*") at a rate per annum equal at all times to five percent (5.00%) per annum above the rate per annum described in Section 2.05(a) hereof.  All such interest shall be payable in cash on demand by the Lender.

SECTION 2.06.   Fees.

(a)  Interim Closing Fee. The Borrower agrees to pay to the Lender, on the date of entry of the Interim Order a fee (the "*Interim Closing Fee*") in the amount of two percent (2.00%) of the Commitment, which shall be fully earned on such date and non-refundable.

(b)   Exit Fee.   The Borrower agrees to pay to the Lender, on the Maturity Date an exit fee (the "*Exit Fee*") in the amount of two percent (2.00%) of the Commitment, which shall be fully earned and non-refundable.

SECTION 2.07.   Interest and Fee Reserve.  Notwithstanding anything herein to the contrary, all interest, the Interim Closing Fee, the Exit Fee, and all other fees, costs and expenses payable hereunder and under the other Loan Documents shall be credited first against the Interest and Fee Reserve, and if and to the extent the Interest and Fee Reserve is exhausted, thereafter paid directly by the Borrower. Any amounts left in the Interest and Fee Reserve at Maturity shall be applied to the payment of the Obligations under the Facility.

SECTION 2.08.   Payments and Computations.  (a)  The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off, not later than 11:00 a.m. (New York City time) on the day when due in U.S. Dollars to the Lender at the account identified by the Lender in same day funds, with payments being received by the Lender after such time being deemed to have been received on the next succeeding Business Day. Upon the

effectiveness of an Assignment and Acceptance, from and after the effective date of such Assignment and Acceptance, the Borrower shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)     The Borrower hereby authorizes the Lender and each of its Affiliates, if and to the extent payment owed to the Lender is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with the Lender or such Affiliate any amount so due.

(c)     All computations of interest on the Obligations shall be made by the Lender on the basis of a year of three hundred sixty days (360) days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.  Each determination by the Lender of an interest or a fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)     Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest; *provided*, *however*, that, if such extension would cause payment of interest on or principal of Term Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

SECTION 2.09.     Taxes.  (a)  Any and all payments by the Borrower to or for the account of the Lender hereunder or under any other Loan Document shall be made, in accordance with Section 2.08 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future Taxes *excluding* Taxes that are imposed on its overall net income by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof or where the Lender is conducting business (and franchise taxes imposed in lieu thereof), and any branch profits taxes imposed by the United States or any political subdivision thereof (all such non-excluded Taxes, being hereinafter referred to as "***Non-Excluded Taxes***").  If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to the Lender, (i) in the case of Non-Excluded Taxes the sum payable by the Borrower shall be increased as may be necessary so that after the Borrower has made all required deductions (including deductions applicable to additional sums payable under this Section 2.09) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make all such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     In addition, the Borrower shall pay any present or future stamp, documentary, excise, property, intangible, mortgage recording or similar taxes, charges or levies that arise from any payment made by the Borrower hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "***Other Taxes***").

(c)     The Borrower shall indemnify the Lender for and hold it harmless against the full amount of Non-Excluded Taxes and Other Taxes, and for the full amount of Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.09, imposed on or paid by the Lender and any liability (including penalties, additions to tax, interest and expenses, other than penalties directly arising through the gross negligence or willful misconduct of the Lender) arising therefrom or with respect

20

thereto, whether or not such amounts were correctly or legally imposed by the relevant Governmental Authority.  This indemnification shall be made within thirty (30) days from the date the Lender makes written demand therefor.

(d)    Within thirty (30) days after the date of any payment of Taxes, the Borrower shall furnish to the Lender, at its address referred to in <u>Section 8.02</u>, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Lender.  In the case of any payment hereunder or under the other Loan Documents by or on behalf of the Borrower through an account or branch outside the United States or by or on behalf of the Borrower by a payor that is not a United States person, if the Borrower determines that no Taxes are payable in respect thereof, the Borrower shall furnish, or shall cause such payor to furnish, to the Lender, at such address, an opinion of counsel reasonably acceptable to the Lender stating that such payment is exempt from Taxes.  For purposes of subsections (d) and (e) of this <u>Section 2.09</u>, the terms "***United States***" and "***United States person***" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)    If the Lender is entitled to an exemption from, or reduction of, withholding tax, it shall, on or prior to the date of its execution and delivery of this Agreement in the case of the Lender party to this Agreement as of the date hereof and in the case of each other Lender, on the date pursuant to which it becomes a Lender, and from time to time thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as the Lender remains lawfully able to do so), provide the Borrower with two original Internal Revenue Service Forms W-8ECI  or W-8BEN or (in the case of a Lender that has certified in writing to the Borrower that it is not (i) a "bank" (as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Borrower or (iii) a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Internal Revenue Code)), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service certifying that the Lender is exempt from or entitled to a reduced rate of withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender that has certified that it is not a "bank" as described above, certifying that the Lender is a foreign corporation, partnership, estate or trust.  If the forms provided by a Lender at the time the Lender first becomes a party to this Agreement indicate a United States or other interest withholding tax rate, as applicable, in excess of zero, withholding tax at such rate shall be considered excluded from Non-Excluded Taxes unless and until the Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Non-Excluded Taxes for periods governed by such forms; *provided*, *however*, that if, at the effective date pursuant to which a Lender becomes a Lender, the Lender assignor was entitled to payments under subsection (a) of this <u>Section 2.09</u> in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Non-Excluded Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Non-Excluded Taxes) withholding tax, if any, applicable with respect to the Lender assignee on such date.  If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8ECI or the related certificate described above, that the applicable Lender reasonably considers to be confidential, the Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

(f)    For any period with respect to which a Lender has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such

21

form, certificate or other document otherwise is not required under subsection (e) above), the Lender shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.09 with respect to Non-Excluded Taxes imposed by reason of such failure; *provided*, *however*, that should a Lender become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrower shall take such steps as the Lender shall reasonably request to assist the Lender to recover such Taxes.

SECTION 2.10.    Use of Proceeds.  (a)  The proceeds of the Initial Term Loan shall be used solely, and strictly in accordance with the Budget and in compliance with Section 5.04(a), as follows: (i) for the repayment in full of all amounts due with respect to principal and accrued and unpaid interest on account of the Intercompany Debt in an amount not to exceed $3,500,000, plus accrued and unpaid interest through the date of payment; (ii) for the repayment in full in cash of the obligations owing in respect of the Letter of Credit, which shall have been drawn to pay in full the Bonds, in an amount not to exceed $5,455,000; (iii) in an amount up to $245,000 to pay, as available, the Interim Closing Fee, fees or taxes due in connection with the recording of the Mortgage, Escrow fees, fees and expenses in connection with the payment of the Pre-Petition Bonds, Lender's attorneys' fees and expenses, and the ongoing working capital needs of the Borrower.

(b)    The proceeds of the Subsequent Term Loans shall be used solely, and strictly in accordance with the Budget and in compliance with Section 5.04(a), following the entry of the Final DIP Order as follows: (i) to fund the Interest and Fee Reserve for the payment interest, fees, costs and expenses incurred under the Facility in the amount of $1,320,000; (ii) for the payment of ordinary course of business post-petition operating expenses in such amounts and during such periods as provided for in the Budget, in the amount of $880,000; and (iii) for the payment of fees of the United States Trustee and allowed Chapter 11 estate professional fees and expenses (collectively "***Professional Fees***") in the amount of $800,000 from the Professional Fee Reserve.

For the avoidance of doubt and notwithstanding any provision herein to the contrary,  (i) no proceeds of the Term Loans  may be used to pay any or all claims for services rendered by any of the professionals retained by the Borrower or the Creditors Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter against Lender or any of its Affiliates and (ii) except for the Professional Fee Reserve, no Collateral or proceeds thereof shall be used for the payment of Professional Fees.  Any amounts left in the Professional Fee Reserve at Maturity shall be applied to the payment of the Obligations under the Facility.

SECTION 2.11.    Evidence of Debt.  (a)  The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from each Term Loan owing to the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.  The Borrower agrees that upon notice by the Lender to the Borrower requesting a promissory note to evidence (whether for purposes of pledge, enforcement or otherwise) the Term Loans owing to, or to be made by, the Lender, the Borrower shall promptly (and in any event within three (3) Business Days) execute and deliver to the Lender a Note, in substantially the form of Exhibit A hereto payable to the order of the Lender (or, at the Lender's request, payable to the Lender and its registered assigns), in a principal amount equal to the Term Loans and Commitments of the Lender.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)    The Notes, including entries made in good faith by the holder thereof, and the books and accounts of the Lender shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to the Lender absent manifest error; *provided*, *however*, that the failure of the Borrower to issue any Note to the Lender, or the Lender to fail

22

to make any entry, or to make an entry that is incorrect, on the Note or in its books and accounts, shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01.    Conditions Precedent to Borrowing Interim Order Amount.  The obligation of the Lender to fund the Initial Term Loan is subject to the satisfaction or waiver by the Lender of the following conditions, and the conditions set forth in Section 3.03, precedent before or concurrently with the Closing Date:

(a)    The Lender shall have received on or before the Closing Date the following, each dated such day (unless otherwise specified), in form and substance satisfactory to the Lender:

(i)    Executed counterparts of this Agreement.

(ii)    If requested by the Lender, a Note in the amount of the Commitment.

(iii)    A collateral agreement substantially in the form of Exhibit C hereto (the "*Collateral Agreement*"), duly executed by the Borrower, together with, to the extent required under the Collateral Agreement:

(A)    financing statements in a form appropriate for filing under the UCC for all jurisdictions that the Lender may deem necessary or desirable in order to perfect and protect the first priority (subject to the Carve Out and the Prepetition Permitted Liens) liens and security interests created under the Collateral Agreement, covering the Collateral described in the Collateral Agreement;

(B)    all other recordings and filings of or with respect to the Collateral Agreement that the Lender may deem necessary or desirable in order to perfect and protect the security interest created thereunder;

(C)    evidence of the insurance required by the terms of the Collateral Agreement dated as of a recent date (including, without limitation, evidence that the Borrower has obtained individual insurance coverage); and

(D)    evidence that all other actions that the Lender may deem necessary or desirable in order to perfect and protect the first priority (subject to the Carve Out and the Prepetition Permitted Liens) liens and security interests created under the Collateral Agreements has been taken.

(iv)    Control Account Agreements with respect to each of the Borrower's Accounts.

(v)    The Escrowed Documents shall have been released from Escrow, the documents required to be filed or recorded in Section 3.01(b) hereof have been so filed or recorded, including without limitation, the Deed, and a copy of the Interim Order and the Mortgage has been recorded.

(vi)    The obligations under the RSA shall have been assumed by the Borrower; *provided* that such assumption shall be conditioned upon any deposit refunds that become due in 2016 shall constitute unsecured prepetition claims against the Borrower, which claims shall be subordinate to the Obligations under the Facility.

(vii)    Certified copies of the resolutions of the Board of Directors (or equivalent entity) of the Borrower approving each Loan Document, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to each Loan Document.

(viii)    A copy of a certificate of the Secretary of State of the jurisdiction of organization of the Borrower, dated reasonably near the Closing Date in the case of the certificates described in clause (B), certifying (A) as to a true and correct copy of the constituent documents of the Borrower and each amendment thereto on file in such Secretary's office and that such amendments are the only amendments to the Borrower's constituent documents on file in such Secretary's office, and (B) that the Borrower is duly organized and in good standing or presently subsisting under the laws of the State of the jurisdiction of its organization.

(ix)    A certificate of the Borrower signed on behalf of the Borrower by its President or a Vice President and its Secretary or any Assistant Secretary, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the absence of any amendments to the constituent documents of the Borrower since the date of the Secretary of State's certificate referred to in Section 3.01(a)(viii), (B) a true and correct copy of the organizational documents of the Borrower as in effect on the Closing Date, (C) the due organization and good standing or valid existence of the Borrower as an entity organized under the laws of the jurisdiction of its organization, and the absence of any proceeding for the dissolution or liquidation of the Borrower, (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Closing Date; *provided*, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects on and as of the Closing Date and (E) the absence of any event occurring and continuing, or resulting from the initial Borrowing, that constitutes a Default, and (F) certifying the names and true signatures of the officers (if any) of the Borrower authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(x)    A certificate dated the Closing Date signed by an officer of the Borrower, to the effect that (A) each of the representations and warranties of the Borrower contained in Article IV hereof is true and correct in all material respects as of the Closing Date; *provided*, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects as of the Closing Date and (B) all conditions to the effectiveness of this Agreement set forth in this Article III other than those which are subject to the discretion, satisfaction, consent or approval of the Lender, have been satisfied (or, if applicable, waived) in all respects.

(xi)    Evidence satisfactory to the Lender and Counsel that the proceeds of the Term Loans will be used solely for the purposes identified in the Budget.

(xii)    Favorable opinion of Harter Secrest & Emery LLP, counsel for the Borrower in form and substance satisfactory to the Lender and Counsel, ***provided*** that such opinion shall be limited to the authority of the Borrower to enter into, deliver and perform obligations under this Agreement and all related agreements, deeds, conveyances, pledge

24

agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and
continuations thereof, termination statements, notices of assignment, transfers, certificates,
assurances and other instruments referred to herein or otherwise required hereby.

        (b)     An escrow shall have established with the Escrow Agent (the "*Escrow*"), which
contains the following documents, each executed and duly authorized, and in form and substance
acceptable to the Lender in its sole and absolute discretion (collectively, the "***Escrowed Documents***"):

        (i)     fully executed and acknowledged Real Estate Collateral Documents in
form suitable for filing or recording in all filing or recording offices that the Lender may
reasonably deem necessary or desirable in order to create a valid and enforceable first priority
Lien on the Mortgaged Property in favor of the Lender; and

        (ii)     fully executed and acknowledged copies of (i) the Mortgage, and (ii) the
Collateral Agreement; and

        (iii)     fully executed and acknowledged documents in form suitable for filing
or recording in all filing or recording offices that the Lender may reasonably deem necessary or
desirable in order to create a valid and enforceable first priority Lien on the Mortgaged Property
in favor of the Lender, including without limitation: (i) a deed conveying title to the Mortgaged
Property to the Borrower (the "***Deed***"), (ii) a termination of the Lease, (iii) a termination of the
Pre-Petition Pledge and Assignment, (iv) a satisfaction of the Prior Mortgage and Security
Agreement, (v) a termination of the Prior General Assignment of Leases and Rents, (vi) a
termination of the Prior Operating Account Agreement, (vii) a satisfaction of the Second Lien
Mortgage, (viii) acknowledgement of satisfaction of the Bond Debt, (ix) a UCC-3 from M&T
terminating and releasing its security interest, (x) a UCC-1 naming the Lender as secured party,
(xi) a UCC-1 fixture filing in favor of the Lender as secured party, and (xii) any and all other and
further documents that the Lender reasonably deems necessary or appropriate to terminate,
satisfy, release and/or reconvey any related security interests or grants in the Borrower's property
contained in any of the foregoing or any other documents.

        (c)     Since the Petition Date (i) there shall have occurred no Material Adverse Effect
and (ii) there has been no material increase in the liabilities, liquidated or contingent, of the Borrower
(other than the liabilities in respect of the Term Loans under the Loan Documents), or material decrease
in the assets of the Borrower.

        (d)     There shall exist no action, suit, investigation, litigation or proceeding affecting
the Borrower pending or threatened before any Governmental Authority that (i) would be reasonably
likely to have a Material Adverse Effect other than the matters described on <u>Schedule 4.01(f)</u> hereto (the
"***Disclosed Litigation***") and there shall have been no adverse change in the status, or financial effect on
the Borrower, of the Disclosed Litigation from that described on <u>Schedule 4.01(f)</u> hereto, or (ii) purports
to affect the legality, validity or enforceability of any Loan Document or the consummation of the
transactions contemplated thereby.

        (e)     All Governmental Authorizations and third party consents and approvals
necessary in connection with the transactions contemplated by the Loan Documents shall have been
obtained (without the imposition of any conditions that are not reasonably acceptable to the Lender) or
requested and shall remain in effect; all applicable waiting periods in connection with the transactions
contemplated by the Loan Documents shall have expired without any action being taken by any
competent authority, and no law or regulation shall be applicable in the judgment of the Lender, in each
case that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated

by the Loan Documents or the rights of the Borrower freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(f)      The Borrower shall have commenced the Chapter 11 Case and the Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Lender in its sole discretion, on or before December 17, 2015 or as soon thereafter as practicable, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Lender), reversed, stayed or subject to a motion for reargument or reconsideration.  If the Interim Order is the subject of a pending appeal in any respect, none of the Interim Order, the making of the Term Loans, or the performance by the Borrower of any of the Obligations shall be the subject of a presently effective stay pending appeal.  The Borrower and the Lender shall be entitled to rely in good faith upon the Interim Order, notwithstanding objection thereto or appeal therefrom by an interested party.  The Borrower and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(g)      The Closing Date shall have occurred within one (1) Business Day of the date that the Bankruptcy Court shall have entered the Interim Order or such later date as the Lender agrees in its sole discretion.

(h)      The Lender shall have received the Budget prepared in good faith based upon assumptions believed to be reasonable when made and when delivered, satisfactory in all respects to the Lender.

(i)      The Collateral Agreement shall, upon entry of the Interim Order, be effective to create in favor of the Lender a legal, valid and enforceable first priority security interest in and lien upon the Collateral (subject to the Carve Out and the Prepetition Permitted Liens).

SECTION 3.02.      Conditions to Borrowings in Excess of the Interim Order Amount. The obligation of the Lender to make any Term Loan other than the Initial Term Loan shall be subject to the further conditions precedent, and the conditions set forth in Section 3.03, (unless waived pursuant to Section 8.01 hereof):

(a)      entry by the Bankruptcy Court of the Final DIP Order (with such Subsequent Term Loans to be made on the date which is on or after one (1) Business Day following the entry of the Final DIP Order), which Final DIP Order shall continue and confirm matters addressed in the Interim Order and shall not have been amended or modified (unless otherwise approved by the Lender), stayed or reversed thereafter or subject to a motion for reargument or consideration.  The Final DIP Order shall authorize an extension of credit under the Facility in an amount not greater than the Final Order Amount. If the Final DIP Order is the subject of a pending appeal in any respect, neither the Interim Order nor the making of the Term Loans, or the performance by the Borrower of any of the Obligations shall be the subject of a presently effective stay pending appeal.  The Borrower and the Lender shall be entitled to rely in good faith upon the Final DIP Order notwithstanding the objection thereto or appeal therefrom by any interested party.  The Borrower  and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(b)      The Borrower shall have filed with the Bankruptcy Court, the Sale Procedures Motion and the Sale Motion on or before December 17, 2015, and such motions shall have been in a form and substance satisfactory to the Lender in its sole discretion.

SECTION 3.03.    Conditions Precedent to All Borrowings.  (a)  The obligation of the Lender to make any Term Loan on the occasion of each Borrowing (including the initial Borrowing) in accordance with Section 2.02, shall be subject to the satisfaction or waiver in accordance with Section 8.01 hereof of the further conditions precedent that on the date of such Borrowing:

(i)    the following statements shall be true and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that both on the date of the applicable Notice of Borrowing and the date of such Borrowing, such statements are true:

(A)    the representations and warranties of the Borrower contained in each Loan Document are correct in all material respects on and as of such date, before and after giving effect to such Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Borrowing, in which case such representations and warranties were true and correct in all material respects as of such specific date; *provided*, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates; and

(B)    no Default or Event of Default has occurred and is continuing, or would result from such Borrowing;

(ii)    the Lender shall have received such required funding requests as set forth in Section 2.02(a) or Section 2.02(b), as applicable;

(iii)    subject to the authority of the Bankruptcy Court, the Borrower shall have paid to the Lender, all accrued and unpaid fees and expenses then due and payable to the Lender in connection with the transactions contemplated by the Loan Documents (including accrued and unpaid fees and expenses described in any fee letters executed by the Borrower in connection with this Agreement or in connection with the Lender's commitment to provide financing under the Facility and reasonable, documented and invoiced fees and expenses of Counsel); and

(iv)    such Borrowing shall not violate any Requirement of Law applicable to the Lender or the Borrower and shall not be enjoined, temporarily, preliminarily or permanently, by any Governmental Authority.

(v)    The post-petition Entrance Fee Deposits shall have been deposited in escrow in accordance with the terms of the RSA.

(b)    Each Borrowing hereunder shall constitute a representation and warranty by the Borrower as of the date of such Borrowing that the conditions contained in this Section 3.03 have been satisfied.

SECTION 3.04.    Conditions Subsequent to Closing Date.  The obligation of the Lender to continue to make the Term Loans to the Borrower is subject to (a) the entry of the Final DIP Order and (b) the fulfillment, on or before the date applicable thereto, of the conditions subsequent set forth on Schedule 3.04 (the failure by the Borrower to so perform or cause to be performed such conditions subsequent as and when required by the terms thereof, shall constitute an immediate Event of Default (it being understood and agreed that, to the extent that the existence of any such condition subsequent, or the failure to have satisfied such condition prior to the Closing Date, would otherwise

27

cause any representation, warranty or covenant in this Agreement or any Loan Document to be breached, such breach shall not be deemed to have occurred to the extent such condition subsequent is satisfied as and when required pursuant to Schedule 3.04)).

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.    Representations and Warranties of Borrowers.  The Borrower represents and warrants as follows:

(a)    The Borrower (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing in the jurisdiction in which it owns or leases property and in which the conduct of its business requires it to so qualify or be licenses, except where the failure to so qualify or be licensed would not be reasonably likely to have a Material Adverse Effect, and (iii) has all requisite corporate power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.  Schedule 4.01(a) sets forth each member of the board of directors of the Borrower as of the Closing Date.  Schedule 4.01(b) sets forth the Borrower's jurisdiction of incorporation, the address of its principal place of business and its U.S. taxpayer identification number.  As of the date hereof, the copy of the charter of the Borrower and each amendment thereto provided pursuant to Section 3.01(a)(viii) is a true and correct copy of each such document, each of which is valid and in full force and effect.

(b)    Subject to approval of the Bankruptcy Court and pursuant to the Orders, the execution, delivery and performance by the Borrower of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated thereby, are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action, and do not (i) contravene the Borrower's charter, bylaws or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting the Borrower or any of its properties or (iv) except for the Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of the Borrower.  The Borrower is not in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(c)    Except for the entry of the Orders,  no Governmental Authorization (other than the approval of the Bankruptcy Court or pursuant to the RSA), and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by the Borrower of any Loan Document to which it is or is to be a party, or for the consummation of the transactions contemplated thereby, (ii) the grant by the Borrower of the Liens granted or purported to be granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created or purported to be created under the Collateral Documents (including the first priority nature thereof, subject to the Carve Out and the Prepetition Permitted Liens) or (iv) the exercise by the Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents.  All applicable waiting periods in connection with the transactions contemplated by the Loan Documents have expired without any action having been taken by

any competent authority restraining, preventing or imposing materially adverse conditions upon the transactions contemplated by the Loan Documents or the rights of the Borrower freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(d)     This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by the Borrower.  Upon entry of the Interim Order, this Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, subject only to the entry of the Final DIP Order or as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditor's rights generally or by equitable principals relating to enforceability.

(e)     Except for the Chapter 11 Case and as otherwise set forth herein, there is no action, suit, investigation, litigation or proceeding affecting the Borrower, including any Environmental Action, pending or threatened before any Governmental Authority or arbitrator that (i) would be reasonably likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, and there has been no adverse change in the status, or financial effect on the Borrower, of the Disclosed Litigation from that described on Schedule 4.01(f) hereto.  The New York State Department of Financial Services has notified the Borrower that it is not in compliance with the reserve requirements established under Art. 46 of the Public Health Law and the regulations promulgated thereunder (the "**Statutory Reserve**") and for which a corrective plan of action is not feasible.

(f)     All Entrance Fees for which a refund obligations arose during the period prior to December 31, 2014 due to a Customer as a result of either  a Customer vacating a residential living unit prior to December 31, 2014, or otherwise, but that was not payable until prior to or during calendar year 2015, have been paid by the Borrower and all pending litigation relating to such refunds has been discontinued and discharged, and Borrower shall take all necessary and appropriate actions to ensure that all such actions will promptly be discharged.

(g)     The balance sheet of the Borrower as at December 31, 2014 and the related statement of income and statement of cash flows of the Borrower for the fiscal year then ended, accompanied by an opinion of Abbate DeMarinis, LLP, independent public accountants and, if otherwise provided, balance sheets of the Borrower as at September 30, 2015, and the related statement of income and statement of cash flows of the Borrower for the nine (9) months then ended, duly certified by the Chief Financial Officer of the Borrower, copies of which have been furnished to the Lender, fairly present, subject, in the case of said balance sheet as at September 30, 2015, and said statements of income and cash flows for the nine (9) months then ended, to year end audit adjustments and the absence of footnotes, the financial condition of the Borrower as at such dates and the results of operations of the Borrower for the periods ended on such dates, all in accordance with generally accepted accounting principles applied on a consistent basis (subject to year end audit adjustments and the absence of footnotes).  As of the Closing Date, the Borrower has no Guaranteed Debt, contingent liabilities and liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph or previously disclosed by the Borrower in its filings and current reports with the Securities Exchange Commission, except for any such liabilities or obligations which could not, individually or in the aggregate, have a Material Adverse Effect.

29

(h)     The forecasted balance sheets, statements of income and statements of cash flows of the Borrower (the "***Projections***") delivered to the Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable in light of the conditions existing at the time such were made and at the time of delivery of such forecasts.

(i)     No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.  There is no fact known to the Borrower that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

(j)     The Borrower is a board directed not-for-profit corporation formed under the laws of the State of New York and is an organization described in Section 501(c)(3) of the Code, and does not have a parent company or any wholly owned subsidiaries.

(k)     The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Term Loan will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(l)     The Borrower is not an "investment company," as such term is defined in the Investment Company Act of 1940, as amended.  Neither the making of any Term Loan, nor the application of the proceeds or repayment thereof by the Borrower, nor the consummation of the other transactions contemplated by the Loan Documents, will violate any provision of such Act or any rule, regulation or order of the Securities and Exchange Commission thereunder or equivalent under the applicable securities laws of other jurisdictions, in each case applicable to the Borrower.

(m)     The Borrower is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or corporate restriction that would be reasonably likely to have a Material Adverse Effect, which has not been disclosed to the Lender in writing on or before the Closing Date.

(n)     Except as described on Schedule 4.01(m), neither the Borrower nor any ERISA Affiliate maintains, sponsors, participates in or contributes to any Plan; neither the Borrower nor any ERISA Affiliate has incurred any material liability under Title I or Title IV of ERISA with respect to any Plan for which the Borrower could reasonably be expected to be liable; and no condition exists that would reasonably be expected to subject the Borrower to any material tax, fine, Lien or other liability imposed by ERISA, the Internal Revenue Code or other applicable law with respect to any Plan.

(o)     (i)  The operations and properties of the Borrower comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, and no circumstances exist that would be reasonably likely to (A) form the basis of an Environmental Action against the Borrower or any of its properties that could reasonably be expected to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law that could reasonably be expected to interfere with the Lender's interest therein in any material respect;

30

(ii)    (A) none of the properties currently or formerly owned or operated by the Borrower is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; (B) there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by the Borrower or on any property formerly owned or operated by the Borrower; and (C) there is no asbestos or asbestos-containing material on any property currently owned or operated by the Borrower; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by the Borrower; other than in the case of clauses (B) – (C) of this clause (ii) such exceptions that would have and have a Material Adverse Effect; and

(iii)    (A) the Borrower is not undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and (B) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by the Borrower have been treated or disposed of in a manner not reasonably expected to result in material liability to the Borrower.

(p)    Set forth on Schedule 4.01(o) hereto is a complete and accurate list, as of the date hereof, of all Liens on the property or assets of the Borrower, showing as of the date hereof the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of the Borrower subject thereto.  None of such Liens, or any other Liens, are valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Liens securing the Prepetition Debt as of the date hereof (and any such liens referred to herein as "***Prepetition Permitted Liens***").

(q)    Set forth on Schedule 4.01(p) hereto is a complete and accurate list, as of the date hereof, of all Investments held by the Borrower on the date hereof, showing as of the date hereof the amount, obligor or issuer and maturity, if any, thereof.

(r)    Except for its failure to comply with the Statutory Reserve, the Borrower is not in violation of any applicable Requirement of Law, including any building, zoning, occupational safety and health, fair employment, equal opportunity, pension, environmental control, health care, certificate of need, health care facility licensing or similar federal, state or local law, ordinance or regulation, relating to the ownership or operation of its business or assets, (ii) has not failed to obtain any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorizations necessary for the conduct of its businesses or the ownership and operation of its assets, (iii) has not received any notice from any Governmental Authority, and to its knowledge no such notice is pending or threatened, alleging that the Borrower has violated, or has not complied with, any Requirement of Law, condition or standard applicable with respect to any of the foregoing, and (iv) is not a party to any agreement or instrument, or subject to any judgment, order, writ, rule, regulation, code or ordinance, except to the extent that any violation, noncompliance, failure, agreement, judgment, etc. as described in clauses (i) and (ii) will not have a Material Adverse Effect.

(s)    The Borrower has all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary for the lawful conduct of their businesses or the ownership and operations of its assets wherever now conducted and as planned to be conducted, pursuant to all applicable statutes, laws, ordinances, rules

31

and regulations of all Governmental Authorities having, asserting or claiming jurisdiction over the Borrower or over any part of its operations, except to the extent that the cumulative effect of noncompliance with the foregoing will not have a Material Adverse Effect. A Schedule of all material licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations is set forth in Schedule 4.01(s) and copies shall be provided to the Lender upon request. Neither the Borrower is in default under any of such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations, and no event has occurred, and no condition exists, that with the giving of notice, the passage of time or both would constitute a default thereunder or would result in the suspension, revocation, impairment, forfeiture or non-renewal of any thereof, except to the extent that the cumulative effect of all such defaults, events, conditions, suspensions, revocations, impairments, forfeitures and non-renewals will not have a Material Adverse Effect. The continuation, validity and effectiveness of all such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations will not be adversely affected by the transactions contemplated by this Agreement. The Borrower knows of no reason why it will not be able to maintain after the date hereof all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary to conduct the business of each such entity as now conducted and presently planned to be conducted.

(t)     Upon the entry of the applicable Order, such Order shall be effective to establish and perfect the Lender's security interest in the Collateral; *provided*, that the Lender may take any steps it deems necessary in its sole discretion to attach or perfect the Liens, which steps may include the filing of financing statements, mortgages, notices of liens or other similar documents. The Lender's rights with respect to the Collateral are not subject to any setoff, claims, withholdings, or other defenses.

(u)     To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any material change in the Budget. The Budget is based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made and when delivered, has been prepared on the basis of the assumptions stated therein and reflects the estimates of the Borrower, believed to have been reasonable when made and when delivered, of the results of operations and other information projected therein, it being recognized by the Lender that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by the Budget may differ from the projected results.

(v)     The Borrower has filed or caused to be filed all U.S. federal, state, local, and other tax returns that are required to be filed by it, all such tax returns were when filed, and continue to be, true, correct and complete in all material respects, and the Borrower has paid (or caused to be paid) all taxes shown to be due and payable on said returns and any other assessments made against it or any of its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than the amounts which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower); and no tax Lien has been filed with respect to the property of the Borrower and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge that could reasonably be expected to result in the filing of a tax Lien with respect to the property of the Borrower other than with respect to (i) Taxes not yet due and payable, and (ii) a pre-petition judgment lien filed by the New York State Department of Labor (the "***NYS DOL***") on August 31, 2015 (the "***NYS Labor Judgment Lien***"), in respect of a judgment obtained by the NYS DOL against the Borrower in the approximate amount of $59,000.00 (the "***NYS DOL Judgment***"), ***provided, however,*** that the NYS DOL Judgment will be have been satisfied by the Borrower on or before the Petition Date.

(w)        The Borrower is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which it is engaged; and the Borrower (i) has not received notice from any insurer or agent of such insurer that material expenditures will have to be made in order to continue such insurance, other than expenditures that may be necessitated by or result from the Borrower's status as debtor in possession or (ii) has no reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a cost that would not reasonably be expected to have a Material Adverse Effect, other than changes to such coverage and costs that may be necessitated by or result from the Borrower's status as debtor in possession.

(x)        To the extent applicable, the Borrower is in compliance, in all material respects, with the Patriot Act.

(y)        Since the date of the last audited financials of the Borrower, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

(z)        Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower pending or threatened; (b) hours worked by and payment made to employees of the Borrower have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Borrower on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Borrower except for any contingent withdrawal liability, as appropriate.

(aa)        Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) the Borrower has not lost any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorization necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets, or has been threatened with the loss, revocation, or suspension of any of the foregoing; and (b) there has been no survey that has resulted in or is reasonably expected to result in a deficiency notice, with respect to the Borrower except for non-compliance with the Statutory Reserve.  The Mortgaged Property is not located in a flood hazard area.  No portion of the Mortgaged Property consists of wetlands or filled land.

(bb)        The Borrower hereby makes to the Lender each of the representations and warranties made by the Borrower contained in the Loan Documents and all other operative documents to which the Borrower is a party as if such representations and warranties were set forth in full herein.

## ARTICLE V

## COVENANTS

SECTION 5.01.        _Affirmative Covenants_.  From the Closing Date for so long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid or any Commitment remains outstanding, the Borrower shall:

(a)        _Compliance with Laws, Etc_.  Comply in all material respects, with all applicable laws, rules, regulations and orders except for the Statutory Reserve.

33

(b)        Payment of Taxes, Etc.  Except as are being challenged in good faith and by proper proceedings by the Borrower and for which adequate reserves in accordance with GAAP have been established on the books and records of the Borrower, pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property at any time after the Petition Date and (ii) all lawful claims (other than claims in respect of Debt) made after the Petition Date that, if unpaid, could reasonably be expected by law to become a Lien upon its property.

(c)        Compliance with Environmental Laws.  Comply, and, if such non-compliance could reasonably be expected to interfere with the Lender's interest in such properties, cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws.

(d)        Maintenance of Insurance.  Maintain insurance (including, without limitation, business interruption) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower operates. All insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Lender of written notice thereof, (ii) name the Lender as an insured party or loss payee, and (iii) be reasonably satisfactory in all other respects to the Lender. The Borrower shall deliver to the Lender a report of a reputable insurance broker with respect to such insurance as the Lender may from time to time reasonably request.

(e)        Preservation of Corporate Existence, Etc.  Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), privileges, licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary for the conduct of its businesses or the ownership and operation of its assets.

(f)        Visitation Rights.  Upon reasonable prior notice to the Borrower, at any time during normal business hours, (i) permit representatives of the Lender (including legal and financial advisers, auditors, appraisers, and any other consultants engaged from time to time at the direction of the Lender) to examine and make copies of and abstracts from the records and books of account of, and visit the properties of the Borrower, and to discuss the affairs, finances and accounts of the Borrower with any of its officers or directors and with their independent certified public accountants and (ii) permit field examinations to be conducted at any reasonable time by the Lender or a field auditor satisfactory to the Lender, in respect of the accounts receivable of the Borrower.

(g)        Keeping of Books.  Keep proper books of record and account in conformity with GAAP and all Requirements of Law, in which full and correct entries (in all material respects) shall be made of all financial transactions and the assets and business of the Borrower in accordance with generally accepted accounting principles in effect from time to time.

(h)        Maintenance of Properties, Etc.  Maintain and preserve all of its properties that are necessary in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

34

(i)        Further Assurances.  (i)  Promptly upon request by the Lender, correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document.

(ii)        Promptly upon request by the Lender, do, execute, acknowledge, deliver any and all acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Lender  may reasonably require from time to time (and consent to the Lender recording or filing such instrument) in order to (A) carry out more effectively the purposes of the Loan Documents, (B) to the fullest extent permitted by applicable law, subject the Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Loan Document or under any other instrument executed in connection with any Loan Document to which the Borrower is or is to be a party.

(j)        Due Diligence.  Use its best efforts to provide all due diligence materials requested by the Lender or its legal and financial advisors (including due diligence materials with respect to any proposed asset sales and any severance obligations of the Borrower to any employees or former employees); *provided*, *however*, to the extent the Borrower is prevented from providing the materials required by this Section 5.01(j) due to confidentiality restrictions to which it is bound, the Borrower shall use commercially reasonable efforts to remove any such restriction.

(k)        Use of Proceeds.  Use the proceeds of the Term Loans as set forth in Section 2.11 only in accordance with the Budget and in compliance with Section 5.04(a).

(l)        Control Account Agreements.  Execute and deliver to the Lender a Control Account Agreement, in form and substance satisfactory to the Lender and Borrower's post-petition depositary bank and executed by the Borrower's depositary bank and take all other steps necessary or, in the reasonable opinion of the Lender, desirable to ensure that the Lender has a perfected first priority security interest in such cash (subject to the Carve Out and the Prepetition Permitted Liens); *provided*, that if the Borrower is unable to obtain such agreement from such depositary bank, the Borrower shall promptly transfer all cash maintained at such depositary bank to a financial institution from which the Borrower has obtained such an agreement.

(m)        Sale Provisions.  (i) File a Sale Procedures Motion and a Sale Motion on or before December 17, 2015, for the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which motions shall be in form and substance acceptable to the Lender in its sole and absolute discretion, and (ii) designate and approve the Lender as a qualified bidder as that term is defined in the Sale Procedures Motion and the Sale Procedures Order, and seek and obtain court approval for the Lender to credit bid, under Bankruptcy Code section 363(k), in an amount up to the amount of the Commitment (or such lesser amount as may be required to pay the Obligations in cash in full at the closing of the sale), in any sale or disposition of the Collateral, whether such sale is pursuant to section 363(k) or in accordance with the terms of any plan of reorganization filed by or against the Borrower.  For the avoidance of doubt, the Lender does not intend to credit bid if there is a competing cash bid that is sufficiently greater than the aggregate outstanding amount of the DIP Loan such that the DIP Loan will be indefeasibly paid in cash in full upon the closing of any sale.

35

SECTION 5.02.    Negative Covenants.  From the Closing Date, for so long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid or any Commitment remains outstanding, the Borrower shall not, at any time:

(a)    Liens, Etc.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character whether now owned or hereafter acquired, or sign or file or suffer to exist under the UCC (or similar law) of any jurisdiction, a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except  the following (collectively, "***Permitted Liens***"):

(i)    Liens created pursuant to the Loan Documents, the Interim Order, or the Final DIP Order;

(ii)    Statutory Liens;

(iii)    Liens existing on the Petition Date and described on Schedule 4.01(o) hereto;

(iv)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower in the ordinary course of business to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction, improvement or installation of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition, construction, improvement or installation (other than any such Liens created in contemplation of such acquisition, construction, improvement or installation that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided*, *however*, that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed, improved or installed (or the proceeds of any of the foregoing), and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced (other than the proceeds of any such property); and *provided further* that the aggregate principal amount of the Debt hereafter incurred secured by Liens permitted by this clause (v) shall not exceed the amount permitted under Section 5.02(b)(iii) at any time outstanding;

(v)    Liens arising under Capitalized Leases permitted under Section 5.02(b)(iii); *provided* that no such Lien shall extend to or cover any Collateral or assets other than the assets subject to such Capitalized Leases (or the proceeds thereof);

(vi)    Liens securing the financing of insurance premiums in the ordinary course of business of the Borrower outstanding on the Closing Date or included in the Budget with the Lender's consent;

(vii)    the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or the consignment of goods; and

36

(viii)    to the extent constituting Liens, Liens of a Customer arising with respect to any real or personal property owned by such Customer or any other Person, that is in the possession or control of the Borrower pursuant to any similar arrangement.

(b)    Debt.  Create, incur, assume or suffer to exist any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    unsecured Debt not to exceed in the aggregate $50,000 at any time outstanding, except as reflected in the Budget;

(iii)    Capitalized Leases and Debt secured by purchase money Liens existing on the date hereof and listed on Schedule 5.02(b) hereto and Capitalized Leases and Debt secured by purchase money Liens hereafter incurred in accordance with the Budget, not to exceed an aggregate principal amount of $25,000 at any time outstanding; and

(iv)    Debt not otherwise specified above and existing on the date hereof and described in Schedule 5.02(b) hereto.

(c)    Change in Nature of Business.  Make any material change in the nature of its business as carried on at the date hereof.

(d)    Mergers, Etc.  Merge into or consolidate with any Person or permit any Person to merge into it.

(e)    Sales, Etc. of Assets.  Sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets, except:

(i)    the sale of any assets out of the ordinary course of its business to the extent approved by the Attorney General,  the Bankruptcy Court, and any other Governmental Authority whose consent is needed to effectuate such sale, and on terms and conditions satisfactory to the Lender; provided that the Borrower shall, on the date of receipt by it of the Net Cash Proceeds from such sale, prepay the Term Loans pursuant to, and in the amount set forth in, Section 2.04;

(ii)    entering into contracts with Customers for the use by such Customers of the Borrower's independent living units; provided that the Borrower shall, on the date of receipt by it of any Entrance Fee Deposits, deposit such Entrance Fee Deposits in an escrow in accordance with the terms of the RSA;

(iii)    sales of excess, obsolete or worn out equipment in the ordinary course of its business;

(iv)    the sale of any assets constituting a Permitted Investment and maintained in a Securities Account, subject to the terms and conditions of a securities account control agreement in form and substance satisfactory to the Lender, duly executed by the financial institution party thereto; and

(v)    Investments permitted under Section 5.02(f) and transactions permitted under Section 5.02(g).

37

(f)    <u>Investments in Other Persons</u>.  Make or hold any Investment in any Person, except:

(i)    Debt permitted under <u>Section 5.02(b)</u> hereof;

(ii)    Investments of Cash or Permitted Investments in Permitted Investments to the extent the Lender's security interests thereon retains the same priority in such Investment that it held in such Cash or Permitted Investments immediately prior to the making of such Investment (other than Liens in favor of a bank or other depository institution securing obligations owed to such bank or other depository institution in respect of or arising out of such Investment); and

(iii)    Investments existing on the date hereof and described on <u>Schedule 4.01(p)</u> hereto.

(g)    [Reserved].

(h)    <u>Amendments of Constitutive Documents</u>.  Amend its certificate of incorporation or bylaws or other constitutive documents.

(i)    <u>Accounting Changes</u>.  Make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by generally accepted accounting principles, or (ii) Fiscal Year.

(j)    <u>Prepayments, Etc., of Debt</u>.  (i) repay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment on any Debt, except (a) the prepayment of the Term Loans in accordance with the terms of this Agreement, and (b) the prepayment of the Bond Debt and Intercompany Debt in accordance with the terms of this Agreement, or (ii) amend, modify or change in any manner any term or condition of any Subordinated Debt.

(k)    <u>Prepetition Payments</u>.  Make or permit to be made any payments in respect of any prepetition obligation except (i) payments to prepetition critical trade vendors in accordance with an order of the Bankruptcy Court and the Budget, or (ii) payments made in accordance with the Budget, the Interim Order or the Final DIP Order.

(l)    <u>Negative Pledge</u>.  Enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except (i) agreements in favor of the Lender or (ii) prohibitions or conditions under (A) any purchase money Debt permitted by <u>Section 5.02(b)(iii)</u> solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property acquired with the proceeds of such Debt or (B) any Capitalized Lease permitted by <u>Section 5.02(b)(iii)</u> solely to the extent that such Capitalized Lease prohibits or requires the consent of any Person other than the Borrowers and their Affiliates as a condition to the creation of a Lien on the property subject thereto.

(m)    <u>Speculative Transactions</u>.  Engage in any transaction involving commodity options or futures contracts or any similar speculative transactions.

(n)    <u>Transactions with Affiliates</u>.  Except for the transactions disclosed on <u>Schedule 5.02(m),</u> directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except for (i) payment to employees and officers of reasonable compensation in the ordinary course of business, (ii) the

38

reimbursement of out of pocket costs and expenses for employees, directors, officers and consultants in the ordinary course of business, and (iii) other transactions approved by the Lender, which are in the ordinary course of business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate.

(o)     ERISA.  Except as disclosed on Schedule 4.01(m) on the Closing Date, maintain, sponsor, participate in or contribute to any Plan or Multiemployer Plan; or incur any material liability under Title I or Title IV of ERISA for which the Borrower could be reasonably expected to be liable, or permit any of its ERISA Affiliates to do any of the foregoing.

(p)     Material Amendments.  Make any material amendment to any agreements with any employee or independent contractor unless the Borrower reasonably determines that such amendment results in cash savings or improved liquidity for the Borrower and is reflected in the Budget or to which the Lender has agreed in writing.

(q)     Prepetition Indebtedness.  (i) Modify, supplement or amend the Prepetition Loan Document or any related loan documents in any material respect or (ii) pay or discharge or cause to be paid or discharged, any Debt of such the Borrower incurred before the Petition Date other than payments, which are:

(i)     approved by the Bankruptcy Court and consented to by the Lender (including, as applicable, payments made in accordance with any Bankruptcy Court order to critical vendors, employees, taxing authorities, and insurers); and

(ii)     consistent with the Budget; and

(iii)     in respect of adequate protection, if any, required to be made to the Prepetition Lenders pursuant to the Orders.

The Borrower shall not, without the consent of the Lender, file any motion with the Bankruptcy Court in accordance with Section 546(h) of the Bankruptcy Code seeking to return any goods shipped to the Borrower prior to the Petition Date.

(r)     Chapter 11 Case.  Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b) or 507(b) of the Bankruptcy Code or, from and after the entry of the Final DIP Order, Section 506(c) of the Bankruptcy Code) equal to or superior to the priority claim of the Lender in respect to the Obligations other than the Carve Out and the Prepetition Permitted Liens that are expressly permitted to be equal to or superior to the priority claim of the Lender in respect to the Obligations; and (iii) any Lien on any Collateral having a priority equal or superior to the Liens in favor of the Lender in respect of the Obligations other than the Carve Out and the Prepetition Permitted Liens.

SECTION 5.03.     Reporting Requirements.  So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid, or the Lender shall have any Commitment hereunder, the Borrower will furnish to the Lender:

(a)     Default Notice.  As soon as possible and in any event within two (2) business days day after any officer of the Borrower is actually aware of the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect continuing on the date of such statement, a statement of the Chief Financial Officer of the Borrower setting forth details of such Default, events, development or occurrence and the action taken and proposed to be taken with respect thereto.

(b)     Monthly Financials.  As soon as available, but in any event no later than 30 days after the end of each month occurring during each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such month and the related unaudited statements of income and stockholders' equity and cash flow for such month, certified by the Chief Financial Officer of the Borrower or as being fairly stated in all material respects (subject to normal year-end adjustments).  All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP except, for the absence of explanatory footnotes) applied consistently throughout the periods reflected therein and with prior periods.

(c)     Quarterly Financials.  As soon as available, but in any event no later than 30 days after the end of each quarter occurring during each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such quarter and the related unaudited statements of income and stockholders' equity and cash flow for such quarter, certified by the Chief Financial Officer of the Borrower or as being fairly stated in all material respects (subject to normal year-end adjustments).  All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP except, for the absence of explanatory footnotes) applied consistently throughout the periods reflected therein and with prior periods.

(d)     Annual Financials.  As soon as available, (i) but in any event no later than 60 days after the end of each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such fiscal year and the related unaudited statements of income and stockholders' equity and cash flow for such fiscal year, and (ii) but in any event no later than 90 days after the end of each fiscal year of the Borrower, the audited balance sheets of the Borrower as at the end of such fiscal year and the related audited statements of income and stockholders' equity and cash flow for such fiscal year, reported upon without qualification by an independent certified public accounting firm selected by Borrower and reasonably satisfactory to Lender.  All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP) applied consistently throughout the periods reflected therein and with prior periods.

(e)     Budget Update. No later than (i) the Friday of the ninth (9th) week covered by the initial Budget for the thirteen (13) week period commencing on the Petition Date and (ii) the last Friday of each subsequent 9-week period, (x) an updated budget in the same form as the Initial Budget and satisfactory to the Lender in its sole and absolute discretion, which, if approved by the Lender (and for the avoidance of doubt, without any further order of the Bankruptcy Court) in its sole and absolute discretion, shall become part of the Budget (each  an "**Amended Budget**"); and (y) alternate updated budgets in the same form as the Initial Budget and satisfactory to the Lender in its sole and absolute discretion, that models the Borrower's finances and operations assuming that a new operator does not assume the obligation to fund operations each month going forward.

40

(f)    Chief Financial Officer Report and Certificate.  Commencing with the first Wednesday after the Petition Date and on each Wednesday thereafter (or, if such day is not a Business Day, on the immediately succeeding Business Day), a certificate of the Chief Financial Officer of the Borrower containing:

(i)    an "actual to budget" report which sets forth for each line item of the Budget, the actual results for the prior week and for all prior weeks,

(ii)    a reconciliation of actual results for the prior week and cumulatively for all prior weeks to the corresponding amounts reflected in the Budget which shows the numerical and percentage variance in any line item, and which includes narrative explanations for each such variance,

(iii)    certifications that that no proceeds of the Term Loans have been used for any purpose not set forth in the Budget.

(g)    Chapter 11 Case Documents.  Promptly, but in any event no later than 4 days before filing, all pleadings, documents and reports to be filed in the Chapter 11 Case.

(h)    Weekly Conference Calls and Meetings.

(i)    On Wednesday of each week (or, if such day is not a Business Day, on the immediately succeeding Business Day) at 4 p.m. (Prevailing Eastern Time), Borrower's officers and advisers will hold a conference call with the Lender at which meeting shall be reviewed the financial results of the previous week and the financial condition of Borrower.

(ii)    To the extent that the Borrower causes members of its management, board of directors and advisers to meet with the Attorney General, the Resident Professionals, the Resident Council, the Department of Financial Services, the Department of Health, any other New York state agency, or any other Governmental Authority, the Borrower shall provide to Lender a prior notice and an opportunity to attend such meeting.

(i)    Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting the Borrower or the Affiliates of the type described in Section 4.01(e), and promptly after the occurrence thereof, notice of any material adverse change in the status or the financial effect on the Borrower or Affiliate of the Disclosed Litigation from that described on Schedule 4.01(f) hereto.

(j)    Licenses.  Promptly after receipt thereof, notice of any Governmental Authority or other Person that such Governmental Authority or other Person has rescinded or not renewed, or intends to rescind or not renew, any material any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorization of the Borrower or any Affiliate necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets.

(k)    Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by the Borrower or any of its

41

properties, with any Environmental Law or Environmental Permit in each case that could reasonably be expected to have a Material Adverse Effect, as well as any actual or threatened release, pollution or other environmental condition at or from any of the properties of the Borrower, that could reasonably be expected to constitute a violation of any Environmental Law.

(l)     Casualty Losses.  Promptly upon learning of any casualty loss or event not insured against in an amount in excess of $100,000, notice of such loss or event.

(m)     Insurance.  Promptly upon learning of any claim made by any co-insured party under any of the Borrower's insurance policies in excess of $100,000, notice of such claim, and updates with respect to such claim's resolution and the impact thereof upon the Borrower's insurance limits or policies.

(n)     Occupancy. On or prior to the last Business Day of each calendar month, schedules regarding occupancy and residence contracts of Customers, in form and substance acceptable to the Lender in its sole discretion, and such other and further information with respect to occupancy and/or the Borrower's Customers as the Lender may reasonably request from time to time.

(o)     Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower as the Lender may from time to time reasonably request and all information and documentation, including any statement or report, that has been prepared by, provided to or filed with the Resident Professionals, the Attorney General, the Department of Financial Services, the Department of Health, or any other state agency or Governmental Authority, or any committee appointed in the Chapter 11 Case.

(p)     Termination of Contracts, Etc.  Promptly after the occurrence thereof, written notice of (i) termination of any material contract to which the Borrower is a party, (ii) failure of any counterparty to any material contract to make any payment in an aggregate amount in excess of $100,000 more than three (3) months past due to the Borrower, and (iii) any tax audit or assessment of taxes on the Borrower. Notwithstanding the foregoing, the Borrower reserves it rights in furtherance of its fiduciary duties to reject any burdensome executory contracts or leases, provided, however, the rejection of any such contracts or leases shall not have a Material Adverse Effect and Borrower shall provide Lender with advance notice prior to filing any motions in respect thereof.

SECTION 5.04.     Financial Covenants.  So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid, or the Lender shall have any Commitment hereunder, the Borrower will:

(a)     Budget Compliance.  Not make payments other than those set forth in the Budget; provided, that (i) other than Professional Fees, (A) actual disbursements for any prior week for any line item in the Budget may have a positive variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget and (B) actual cash receipts for any prior week for any line item in the Budget may have a negative variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget, (C) actual disbursements for all prior weeks for any line item in the Budget may have a positive variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget, and (D) actual cash receipts for all prior weeks for any line item in the Budget may have a negative variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget and (ii) the actual disbursement of Professional Fees shall not exceed $800,000, which disbursement shall be made from the Professional Fee Reserve pursuant to an order of the Bankruptcy Court allowing for payment of such Professional Fees, and only after all retainers

42

held by the professionals on whose behalf Professional Fees have been allowed by the Bankruptcy Court shall have been exhausted.

(b)      The combined balance of cash on hand and accounts receivable of the Borrower (excluding any intercompany receivables) shall be no less than seven and one-half percent (7.5%) of the outstanding principal amount under the Facility, such testing to be based upon the Borrower's monthly internal financial report which is prepared in accordance with GAAP.

(c)      Capital Expenditures.  Not make any Capital Expenditures other than Capital Expenditures approved by the Lender in writing, which approval will not be unreasonably withheld or delayed.

Notwithstanding the foregoing, the line items in the Budget for payment of interest, expenses and all other amounts to the Lender are estimates only, and the Borrowers remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim Order and the Final DIP Order.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.      Events of Default.  If any of the following events ("***Events of Default***") shall occur and be continuing:

(a)      the Borrower shall fail to pay any principal or interest of any Term Loan or make any other payment under any Loan Document when the same shall become due and payable;

(b)      any representation or warranty made by the Borrower (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made;

(c)      the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(e), Section 5.02, Sections 5.03(a), 5.03(e), 5.03(f), 5.03(g), 5.03(h),  or Section 5.04;

(d)      the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.03 (except for Sections 5.03(a), 5.03(e), 5.03(f), 5.03(g), 5.03(h)),  if such failure shall remain unremedied for two (2) business days after notice;

(e)      the Borrower shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for ten (10) days after the earlier of the date on which (i) any officer of the Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by the Lender;

(f)      (i) the Borrower shall pay any principal of, premium or interest on or any other amount payable in respect of any pre-petition Debt unless provided for herein, (ii) the Borrower fails to pay any principal of, premium or interest on or any other payment in respect of any post-petition Debt, (iii) if with respect to any Debt, there is a default thereunder the holder thereof obtains relief from the automatic stay of Section 362 of the Bankruptcy Code to enforce such Debt; or  (iv) with respect to post-petition Debt, (I)  if any event shall occur or condition shall exist under any agreement or instrument

43

relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature, or (II) if any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or (III) an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in the case of each (I) through (III), prior to the stated maturity thereof;

(g)    any judgments or orders, either individually or in the aggregate, for the payment of money in excess of $100,000 after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such judgment or order, but inclusive of any deductible amount) shall be rendered against the Borrower after the Petition Date  and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(h)    any non-monetary judgment or order shall be rendered against the Borrower after the Petition Date that is reasonably likely to have a Material Adverse Effect, and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i)    any provision of any Loan Document after delivery thereof pursuant to Section 3.01 shall for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Borrower, or the Borrower shall so assert;

(j)    any Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority (subject to the Carve Out and the Prepetition Permitted Liens) lien on and security interest in the Collateral purported to be covered thereby, except as otherwise provided in such Collateral Document;

(k)    a Change of Control shall occur;

(l)    the Bankruptcy Court shall enter any order (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final DIP Order or any other order with respect to the Chapter 11 Case affecting in any material respect this Agreement or the Loan Documents, without the Lender's consent, (ii) appointing a Chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Chapter 11 Case, or a receiver, interim-receiver, receiver and manager or a trustee in bankruptcy, with respect to any of the Borrower, or any of its assets, (iii) dismissing the Chapter 11 Case or converting any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of the Borrower to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $100,000; (v) under Section 5.06(c) of the Bankruptcy Code surcharging any of the Collateral; (vi) avoiding or requiring repayment of any portion of the payments made on account of the Obligations owed to Lender; (vii) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority that would have a Material Adverse Effect or priority over any Lien of the Lender on the Collateral; or (viii) granting relief from the

44

automatic stay of Section 362 of the Bankruptcy Code and allowing any modification to the Prepetition Loan Documents or Prepetition Debt;

(m)   appointment of a receiver, interim receiver or other third party or entity by any Governmental Entity or other Person with respect to the Borrower or any of the Borrower's Affiliates, and any of each such entity's respective assets;

(n)   a motion shall be filed or a motion entered to: (i) obtain additional or replacement financing under Section 364(c) or (d) of the Bankruptcy Code or otherwise (including but not limited to the refinance, extension, renewal, restructure, replacement or issuance of other Debt in exchange or replacement for the Commitment hereunder, in whole or in part) or (ii) to grant any Lien on any Collateral except as permitted hereunder and under the other Loan Documents;

(o)   a motion shall be filed by the Borrower for the approval of any other Superpriority Claim in the Chapter 11 Case (other than the Carve Out) which is pari passu with or senior to the claims of any of the Lender against the Borrower unless after giving effect to the transactions contemplated by such motion, all Obligations of the Borrower under the Loan Documents (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) shall be paid in full in cash;

(p)   the failure of the Bankruptcy Court (i) to enter the Interim Order, in form and substance satisfactory to the Lender in its sole discretion, on or before December 17, 2015; (ii) to enter the Sale Procedures Order on or before December 31, 2015; (iii) to enter the Sale Order on or before January 29, 2016;

(q)   the failure of the Bankruptcy Court to enter the Final DIP Order, in form and substance satisfactory to the Lender in its sole discretion (including, without limitation, approval of the Facility) on or before January 15, 2016, or as soon thereafter as is practicable;

(r)   the failure of the Borrower to comply in all material respects with the Orders, the Sale Order, the Sale Procedures Order or any other order of the Bankruptcy Court applicable to the Borrower;

(s)   (i) the failure of the purchaser under the Sale Order of all or substantially all of the Collateral to assume the management and operations of the Borrower on or prior to March 1, 2016 or (ii) the failure of the closing of the sale of the Collateral to occur on or before September 31, 2016 and the payment in full of the Obligations under the Facility;

(t)   the Borrower shall pay any brokerage commission or any retention payment without the prior written consent of the Lender;

(u)   the Borrower shall seek Bankruptcy Court approval of a sale, or otherwise enter into a binding commitment for a sale, without the consent of the Lender in its sole discretion, of all or substantially all of the Borrower's assets (either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in any case or otherwise), that is not to the Lender or any of its Affiliates or does not provide for indefeasible payment in full in cash of the Obligations and termination of the Lender's obligations hereunder;

(v)   the Borrower shall file a motion in any of the Chapter 11 Case (i) except as provided in the Orders, to use cash collateral of the Lender under Section 363(c) of the Bankruptcy Code without the Lender's consent, (ii) to recover from any portions of the Collateral any costs or expenses of

45

preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating the Lender's interest in any of the Collateral;

(w)     the Borrower shall object to, join in any objection to, or otherwise support any objection to (i) the Lender being deemed a qualified bidder as that term is defined in the Sale Procedures Motion and Sale Procedures Order, or (ii) the Lender's ability to credit bid at any auction held pursuant to the Sale Procedures Motion and the Sale Procedures Order or other sale of Collateral, whether under section 363 of the Bankruptcy Code or any plan of reorganization;

(x)     the occurrence of any event or circumstance which could reasonably be expected to have a Material Adverse Effect;

(y)     the occurrence of (i) any material deterioration in the value of the Collateral of the Borrower taken as whole or (ii) any material damage to or loss of assets of the Borrower taken as a whole (after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such damage or loss, but inclusive of any deductible amount);

(z)     an order terminating exclusivity has been entered by the Bankruptcy Court or requested of the Bankruptcy Court unless actively contested by the Borrower;

(aa)     any filing with respect to the Borrower, whether voluntary or involuntary, to convert or dismiss the Borrower's Chapter 11 Case;

(bb)     the occurrence of a "default" under the RSA that has not been cured or waived within any applicable grace period;

(cc)     a material impairment of any license, permit, approval, registration, contract, consent, franchise, qualification, certificate, accreditation or other Governmental Authorization of the Borrower or any Affiliate necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets; and

(dd)     Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) the occurrence of any strikes or other labor disputes against the Borrower pending or threatened; (b) the hours worked by and payment made to employees of the Borrower have been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; (c) payments due from the Borrower on account of employee health and welfare insurance have not been paid or accrued as a liability on the books of the Borrower; and (d) any of the Borrower's Affiliates are liable for any past-due amounts due and owing on account of any employee wage, benefit, expense, insurance, pension, medical, dental or welfare insurance, or other employee cost or expense (other than as set forth in Schedule 6.01 (dd)).

(ee)     Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) the Borrower have lost any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorizations necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets, or have been threatened with the loss, revocation, or suspension of any of the foregoing; and (b) there has been a survey that has resulted in or is reasonably expected to result in a deficiency notice, with respect to the Borrower.

46

(ff)    appointment of a Chapter 11 trustee as examiner with expanded powers in any of the Chapter 11 Case;

then, and in any such event, the Lender may, by notice to the Borrower, declare (A) the Commitment and the obligation of the Lender to be terminated, whereupon the same shall forthwith terminate, and (B) the Term Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Term Loans, all such interest and all such amounts shall be forthwith due and payable.

SECTION 6.02.    Remedies upon Default.  Upon the occurrence and during the continuance of an Event of Default as determined by the Lender in its sole discretion, the Borrower, any Creditors' Committee or the Resident Council shall have the right to contest, and only to contest, such determination of the occurrence of an Event of Default within three (3) Business Days of such occurrence by filing an expedited motion with the Bankruptcy Court, and unless the Bankruptcy Court shall have determined that an Event of Default has not occurred and/or is not continuing within two (2) Business Days of the filing of such motion, the automatic stay shall automatically be terminated without further notice or order, and the Lender shall be permitted to (a) accelerate the Obligations under the Facility, (b) sweep any or all cash in any deposit account of the Borrower subject to a Control Account Agreement to prepay the Term Loans and to pay all other Obligations of the Borrower under the Loan Documents to the Lender, (b) foreclose on all or any portion of the Collateral and collect accounts receivable and apply the proceeds thereof to the Obligations of the Borrower under the Loan Documents, (c) occupy the Borrower's premises, (d) execute going-out-of business sales and (e) otherwise exercise remedies permitted by applicable non-bankruptcy law.  Upon the occurrence and during the continuance of an Event of Default (i) upon the direction of the Lender, the Borrower shall pursue an immediate sale of all or substantially all of the Collateral pursuant to the provisions of Section 363 of the Bankruptcy Code, in a manner and on terms satisfactory to the Lender, including, without limitation, that the Lender shall be authorized to credit bid at any such sale in an amount up to the amount of the Commitment (or such lesser amount as may be required to indefeasibly pay the Obligations in cash in full at the closing of the sale), and the proceeds of which sale shall be used to pay the Obligations of the Borrower under the Loan Documents to the Lender and (ii) the Borrower shall waive any right under Section 105 of Bankruptcy Code or otherwise, to enjoin the Lender from taking any action permitted under this Agreement.  If the Borrower fails to comply with the provisions of this Section 6.02, the Lender shall immediately be authorized, and is hereby appointed as an agent and attorney-in-fact of the Borrower, with such power coupled with an interest, to file a Sale Motion and pursue a sale on the Borrower's behalf, which Sale Motion shall provide the Lender with credit bid rights as described in this Section 6.02.

## ARTICLE VII
## PRIORITY AND COLLATERAL SECURITY

SECTION 7.01.    Superpriority Claims and Collateral Security.

(a)    The Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the applicable Order, the Obligations of the Borrower under the Loan Documents:

(i)    shall at all times constitute a Superpriority Claim in the Chapter 11 Case of the Borrower having priority, pursuant to Section 364(c)(1) and 507(b) of the Bankruptcy Code (subject only to the Carve Out and the Prepetition Permitted Liens), over the other administrative claims of any entity, including, without limitation any claims under Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the

47

Bankruptcy Code (including, subject to entry of the Final DIP Order, Section 506(c)), and shall at all times be senior to the rights of the Borrower, the Borrower's estate, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Case;

(ii)    subject to the Liens securing the Prepetition Debt until the release of such Liens concurrent with the payment of the obligations owed on account of such Prepetition Debt with the Initial Term Loan, pursuant to Section 364 of the Bankruptcy Code and the Collateral Documents, the security interests of the Lender hereunder shall at all times be secured by, and the Borrower hereby grants to the Lender, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority Lien (subject to the Carve Out and the Prepetition Permitted Liens) on all existing and after acquired real and personal property and other assets of the Borrower, tangible and intangible, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrower, whether owned or consigned by or to, or leased from or to the Borrower and regardless of where located, including without limitation, (A) the Collateral (as defined in the Collateral Documents), (B) all of the Borrower's present and future Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, except where the taking of such security interest is a violation of an express prohibition contained in the Government Contract or is prohibited by applicable law, unless in any case consent is otherwise validly obtained, (C) all avoidance power claims and actions arising under Section 549 of the Bankruptcy Code relating to post-petition transfers of Collateral and any proceeds thereof, (D) subject to entry of a Final DIP Order, all avoidance power claims and actions under Chapter 5 of the Bankruptcy Code and any proceeds thereof, and (E) any unencumbered assets of the Borrower.

(b)    The Borrower warrants and covenants that, except as otherwise expressly provided in this Section 7.01, the Obligations of the Borrower under the Loan Documents shall at all times be secured by a superpriority charge and senior priming security interest over all of the present and future assets of the Borrower with priority over all existing Liens and security (subject to the Carve Out and the Prepetition Permitted Liens).

(c)    Such Superpriority Claim and Liens referred to in Section 7.01(a) shall be junior to and subject to the Carve Out and the Prepetition Permitted Liens, but shall, notwithstanding anything to the contrary in this Agreement, otherwise be senior in priority to all other Liens on the assets and properties of the Borrower, entitled to priority under applicable non-bankruptcy law.

SECTION 7.02.    Collateral Security Perfection.  The Borrower agrees to take all action that the Lender may reasonably request, subject to the terms and conditions of the Collateral Agreement, as a matter of non-bankruptcy law to perfect and protect the Lender's Liens upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents, instruments and financing statements, providing such notices to third parties, obtaining such consents from any Governmental Authority and providing such other instruments and documents in recordable form, as the Lender may reasonably request.  The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of New York or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC of the State of New York or such other jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower, and (ii) in the case of a financing statement

filed as a fixture filing, a sufficient description of real property to which the Collateral relates.  The Borrower agrees to furnish any such information to the Lender promptly upon request.  Notwithstanding the provisions of this Section 7.02, the Lender shall have the benefit of the entry of the Interim Order and the Final DIP Order.

SECTION 7.03.      No avoidance, Subordination or Modification.  The Borrower's obligations under the Facility shall not be subject to avoidance, subordination or modification under any provision of the Bankruptcy Code or applicable law, and all claims arising under the Facility shall constitute an allowed claim against the Borrower that are valid, binding and enforceable against the Borrower and the Borrower's estate, and all claims, defenses, offsets to such obligations shall be waived, and all persons and entities shall be barred from asserting any such claims, defenses or offsets to such allowed claim. The obligations under the Facility and the Liens securing the Facility shall not be subject to, and the Borrower hereby waives the right to, surcharge the same pursuant to Section 506(c) of the Bankruptcy Code, and such obligations and Liens shall not be subject to, and the Borrower shall waive the right to assert any rights under, Sections 552 of the Bankruptcy Code, or 1129(b) of the Bankruptcy Code.

SECTION 7.04.      No Discharge; Survival of Claims.  Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrower hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) under this Facility.

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01.      Amendments, Etc.  No amendment or waiver of any provision of this Agreement or the Notes, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 8.02.      Notices, Etc.  All notices and other communications provided for hereunder shall be either (x) in writing (including telecopy or electronic communication) and mailed, telecopied or delivered or (y), in an electronic medium and delivered by electronic mail:

if to Borrower at its address at:

Hebrew Hospital Senior Housing, Inc. a.k.a. Westchester Meadows
55 Grasslands Road
Valhalla, New York 10595
Attention Mary Frances Barrett, Chief Executive Officer
E-mail:  mbarrett@hhhinc.org

with a copy (which shall not constitute notice) to

Harter Secrest & Emery LLP
Twelve Fountain Plaza, Suite 400
Buffalo, NY 14202-2293
Attention: Raymond L. Fink
Facsimile: 716.853.1617

49

Telephone: 716.844.3724
E-mail: rfink@hselaw.com

if to the Lender to its addresses at:

Attn: Rudy Gutierrez, Senior Account Manager
Millennium Trust Company, LLC
Custodian FBO Lapis Municipal Opportunities Fund II, LP
2001 Spring Road, Suite 700
Oakbrook, Illinois 60523
E-mail: rgutierrez@mtrustcompany.com

Attn: Rudy Gutierrez, Senior Account Manager
Millennium Trust Company, LLC
Custodian FBO Lapis Aquilo Fund II, LP
2001 Spring Road, Suite 700
Oakbrook, Illinois 60523
E-mail: rgutierrez@mtrustcompany.com

Kjerstin Hatch
Lapis Advisers, LP
12 Funston Avenue, Suite A
The Presidio of San Francisco
San Francisco, California 94129
E-mail: khatch@lapisadvisers.com

Basia Terrell
Lapis Advisers, LP
12 Funston Avenue, Suite A
The Presidio of San Francisco
San Francisco, California 94129
E-mail: bterrell@lapisadvisers.com

with a copy (which shall not constitute notice) to

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Attention: Michael H. Goldstein
Facsimile No. 212-355-3333
E-mail: mgoldstein@goodwinprocter.com

or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties. All such notices and other communications shall, when mailed, telecopied, or e-mailed, be effective when deposited in the mails, transmitted by telecopier or sent by electronic communication, respectively, except that notices and communications to the Lender pursuant to Article II, Article III or Article V shall not be effective until received by the Lender. Delivery by telecopier or other electronic means of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

SECTION 8.03.    No Waiver; Remedies.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 8.04.    Costs and Expenses.  (a)  The Borrower agrees to pay on demand (i) all reasonable costs and expenses of the Lender in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, and (B) the reasonable fees and expenses of counsel for the Lender with respect thereto, with respect to advising the Lender as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents and the Orders, with respect to negotiations with the Borrower or with other creditors of the Borrower arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency, refinancing or restructuring of the financing under the Loan Documents in the nature of a "work-out" or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto), (ii) all out-of-pocket costs and expenses of the Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Lender.

(b)    The Borrower agrees to indemnify, defend and save and hold harmless the Lender, and each of its Affiliates and its and their respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, disbursements , liabilities, and expenses (including, without limitation, reasonable fees and disbursements of counsel (including the allocated costs, expenses and disbursements of in-house counsel to the Lender), financial advisors and consultants) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of (i) the actual or proposed use of the proceeds of the Term Loans, the Loan Documents, or any of the transactions contemplated thereby, the loan documentation or any of the transactions contemplated thereby, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. or (ii) the actual or alleged presence of Hazardous Materials on any property of the Borrower or any Environmental Action relating in any way to the Borrower, except, in any case, to the extent such claim, damage, loss, disbursement, charge, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 8.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, its directors, shareholders or creditors, any Indemnified Party or any other Person, and whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated .  The Borrower also agrees not to assert any claim against the Lender, or any of its Affiliates, or any of its or their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facility, the actual or proposed use of the proceeds of the Term Loans, the Loan Documents, or any of the transactions contemplated by the Loan Documents.  The Borrower further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in

51

contract, tort, or otherwise) to the Borrower or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(c)      If the Borrower fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of the Borrower by the Lender, in its sole discretion.

(d)      Without prejudice to the survival of any other agreement of the Borrower hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Section 2.09 and this Section 8.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 8.05.      Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default or (b) the acceleration of the Term Loans pursuant to the provisions of Section 6.01, the Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether the Lender shall have made any demand under this Agreement and although such Obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Lender and its respective Affiliates under this Section 8.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that the Lender and its respective Affiliates may have.

SECTION 8.06.      Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Lender, and thereafter shall be binding upon and inure to the benefit of the Borrower, and the Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender.

SECTION 8.07.      Assignments and Participations.  (a)  The Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its obligations to advance Borrowings, the Term Loans owing to it and the Note or Notes held by it); the parties to each such assignment shall deliver any Note or Notes (if any) to the Borrower for reissuance subject to such assignment.

(b)      Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Section 2.09 and Section 8.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto).

(c)    By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Lender, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Lender may sell participations to one or more Persons (other than the Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Term Loans owing to it and the Note or Notes (if any) held by it); *provided*, *however*, that, unless the Lender's right and obligations shall have been assigned pursuant to Section 8.07(a), in which case, such proviso shall apply to the assignee Lender, (i) the Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, and the Lender shall continue to deal solely and directly in connection with the Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by the Borrower therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the Collateral or the value of the guaranties provided under the Collateral Agreement.

(e)    The Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 8.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to the Lender by or on behalf of the Borrower; *provided*, *however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree in writing to preserve the confidentiality of any Information received by it from the Lender in accordance with Section 8.09(b).

(f)    Notwithstanding any other provision set forth in this Agreement, the Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Term Loans owing to it and the Note or Notes (if any) held by it) in favor of any

Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(g)    Notwithstanding anything to the contrary contained herein, the Lender may create a security interest in all or any portion of the Term Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by the Lender as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 8.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

SECTION 8.08.    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier or other electronic means of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 8.09.    Confidentiality.  The Lender agrees to keep confidential all non-public information provided to it by the Borrower pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; *provided* that nothing herein shall prevent the Lender from disclosing any such information (a) to any other Lender or any Affiliate thereof on a confidential basis, (b) subject to an agreement to comply with the provisions of this Section 8.09, to any actual or prospective assignee or participant, (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates on a confidential basis, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to the Lender, (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, (j) in connection with the Chapter 11 Case, or (k) if agreed by the Borrower, to any other Person.  The Lender shall use commercially reasonable efforts to give written notice to the Borrower of any disclosure of confidential information made pursuant to clause (e) or (f) of the preceding sentence; *provided* that the Lender shall have no liability for failure to provide such notice.

SECTION 8.10.    Public Disclosure.  (a)  Other than pleadings filed in the Bankruptcy Court, in connection with the Chapter 11 Case, neither the Borrower nor Affiliate thereof will in the future issue any press releases or other public disclosure using the name of the Lender or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Lender and without the prior written consent of the Lender, unless (and only to the extent that) the Borrower or such Affiliate is required to do so under law and then, in any event, the Borrower or such Affiliate will consult with the Lender before issuing such press release or other public disclosure.  Other than pleadings filed in the Bankruptcy Court in connection with the Chapter 11 Case, no Lender or Affiliate thereof will in the future issue any press releases or other public disclosure (including, without limitation, the publication of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement) using the name of the Borrower or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Borrower and without the prior written consent of the Borrower, which shall not be unreasonably

54

withheld, unless (and only to the extent that) the Lender or Affiliate is required to do so under law and then, in any event, the Lender or Affiliate will consult with the Borrower before issuing such press release or other public disclosure.

SECTION 8.11.    Jurisdiction, Etc.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court, and any appellate court therefrom, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)      Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      The Borrower hereby irrevocably consents to the service of process in any such action or proceeding by the mailing thereof by the Lender by registered or certified mail, postage pre-paid, to it at its address specified herein.

SECTION 8.12.    Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of law principles that would require the application of laws of another jurisdiction.

SECTION 8.13.    Waiver of Jury Trial.  Each of the Borrower and the Lender irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Term Loans, or the actions of the Borrower or the Lender in the negotiation, administration, performance or enforcement thereof.

SECTION 8.14.    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 8.15.    Release.  Subject to applicable terms of the Interim Order and Final DIP Order, the Borrower hereby acknowledges effective upon entry of the Final DIP Order, that the

Borrower has no defense, counterclaim, offset, recoupment, cross complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Borrower's liability to repay the Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Lender.  The Borrower, in its own right, on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**_Releasing Parties_**"), hereby fully, finally and forever releases and discharges the Lender and all of its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**_Released Parties_**") of any from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which in each case are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.  The Borrower, for and on behalf of itself and the applicable Releasing Parties, acknowledges and agrees that each has been informed by the Borrower's attorney and advisors that, the release contained herein may extend to claims to which the parties do not know or suspect to exist in their favor, including claims which if known by them would have materially affected their decision to enter into the released contained herein, and notwithstanding the foregoing, hereby fully, finally, and irrevocably releases, acquits, waives and forever discharges any such unknown claims and any applicable law, statute or common law principle that, notwithstanding a general release, excludes from a general release and/or preserves claims that are not known or suspected at the time of executing the release.

[Signature Pages to Follow]

56

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

LENDER:

**MILLENNIUM TRUST COMPANY LLC**
**Custodian FBO Lapis Municipal**
**Opportunities Fund II LP**

By: _____

Title: VP

Date: 12/9/15

**MILLENNIUM TRUST COMPANY LLC**
**Custodian FBO Lapis Aquilo Fund II LP**

By: _____

Title: VP

Date: 12/9/15

**LAPIS ADVISERS, LP**

By: _____

Title: Managing Member of GP

Date: 12/9/15

[Signature Page to Senior Secured Super Priority Debtor In Possession Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER**

Hebrew Hospital Senior Housing, Inc.

By: _Mary Frances Barrett_
Name: MARY FRANCES BARRETT
Title: President / CEO

**Schedule 3.04**

**Conditions Subsequent to Closing**

[To be determined.]

**Schedule 4.01(a)**

**Holders of Borrower's Equity Interests and Board of Directors**

The Borrower is a New York State registered not-for profit corporation that has no equity holders or interests. It is a board self-directed organization.

Board of Directors of the Borrower as of the Closing Date:

Mary Frances Barrett
Charles Goldberger
Michael Laub
Marvin Lifson
Alan Pearce

**Schedule 4.01(b)**

**Jurisdiction of Incorporation, Principal Place of Business and U.S. Taxpayer ID Number**

New York

55 Grasslands Road
Valhalla, New York 10595

EIN: 13-3975534

**Schedule 4.01(f)**

**Disclosed Litigation**

None.

**Schedule 4.01(m)**

**ERISA Disclosures**

1.  1199 SEIU National Benefit Fund for Health and Human Service Employees
2.  1199 SEIU Health Care Employees Pension Fund
3.  The League/1199 SEIU Training and Upgrading Fund
4.  1199 SEIU Employer Child Care Fund
5.  The League/1199 SEIU Health Care Industry Job Security Fund
6.  1199 SEIU National Benefit Fund for Home Care Employees
7.  1199 SEIU Home Care Employees Pension
8.  1199 SEIU Home Care Industry Education Fund
9.  403(B) Plan for HHSH Employees

**Schedule 4.01(o)**

**Liens**

None.[1]

---

[1] Previous liens will be paid in connection with closing.

**Schedule 4.01(p)**

**Investments**

None.

**Schedule 4.01(s)**

**Material Licenses**

<u>New York State Department of Health</u>

      1.      Certificate of Authority

      2.      Operating Certificate - Non-Profit Enriched Housing Program (Fieldstone at Westchester Meadows)

      3.      Operating Certificate - Residential Health Care Facility - SNF

      4.      Controlled Substance License - Westchester Meadows

      5.      Controlled Substance License - Fieldstone at Westchester Meadows

<u>Westchester County Department of Health</u>

      1.      Permit - Food Service Establishment

**Schedule 5.02(b)**

**Debt & Capital Leases**

None.[2]

---

[2] Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, issued by the Westchester Industrial Development Agency in the amount of approximately $5,500,000.00 and Loan from Hebrew Hospital Home of Westchester, Inc., pursuant to that certain Restructuring Support and Loan Agreement, in the amount of approximately $3,500,000.00 to be paid at closing.

4698847_6

**Schedule 5.02(m)**

**Transactions with Affiliates**

As of 12/31/2014, Hebrew Hospital Senior Housing, Inc. owes approximately $17,800,000 to its affiliate entities.   Any other intercompany transactions which may have occurred during 2015 have not been reconciled.

**Schedule 6.01(dd)**

**Labor Matters**

      (a)      None.

      (b)      We are aware of no such violations; the HHSH Collective Bargaining Agreement with 1199 SEIU expired in May 2015, so HHSH is operating without a contract.  Borrower has not provided increases to union employees at a level consistent with the League increases in the downstate region during the past 2 annual cycles (years beginning October 1).

      (c)      HHSH has consistently run approximately 2-3 months behind on paying union pension fund contributions.  Accruals are booked on a regular basis.

      (d)      HHSH affiliates are all in a similar situation in which such affiliates are also 2-3 months in arrears on union pension funds.  There some unpaid amounts for PTO, severance and other benefits by HHSH affiliates due to lack of liquidity and resources.

# Exhibit B

# Hebrew Hospital Home - Cash Flow Forecast
## DIP 12/9/15
## Westchester Meadows

Post-Petition

| | | Week #1 | Week #2 | Week #3 | Week #4 | Week #5 | Week #6 | Week #7 | Week #8 | Week #9 | Week #10 | Week #11 | Week #12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | | Week #1 | Week #2 | Week #3 | Week #4 | Week #5 | Week #6 | Week #7 | Week #8 | Week #9 | Week #10 | Week #11 | Week #12 | Total |
| Week Ended: | | 12/11/2015 | 12/18/2015 | 12/25/2015 | 1/1/2016 | 1/8/2016 | 1/15/2016 | 1/22/2016 | 1/29/2016 | 2/5/2016 | 2/12/2016 | 2/19/2016 | 2/26/2016 | 12/11/15-2/26/16 |
| Beg. Balance (bank basis) M&T Bank acct.: | [1] | 294,972 | 366,472 | 137,479 | 86,310 | 118,426 | 283,426 | 203,043 | 301,874 | 158,990 | 140,990 | 90,107 | 129,438 | 294,972 |
| **Add: Weekly Projected Cash Receipts:** | | | | | | | | | | | | | | |
| Westchester Meadows | | 200,000 | 175,000 | 50,000 | - | 65,000 | 200,000 | 175,000 | 50,000 | 65,000 | 200,000 | 175,000 | 50,000 | 1,405,000 |
| ADC | | 25,000 | 50,000 | 25,000 | - | - | 25,000 | 50,000 | 25,000 | - | 25,000 | 50,000 | 25,000 | 300,000 |
| Intercompany Administrative Expense Recovery | [5] | - | - | - | - | - | - | - | - | 15,000 | - | - | - | 15,000 |
| Miscellaneous | [6] | - | - | - | - | - | - | - | - | 52,000 | - | - | - | 52,000 |
| DIP Draws (Lapis) | [3] | - | 9,200,000 | - | 289,321 | 250,000 | - | - | - | 95,312 | - | 150,000 | 250,000 | 10,234,633 |
| **Total Weekly Projected Cash Receipts:** | | 225,000 | 9,425,000 | 75,000 | 289,321 | 315,000 | 225,000 | 225,000 | 75,000 | 227,312 | 225,000 | 375,000 | 325,000 | 12,006,633 |
| **Total Cash Available (beg. Bal. plus cash receipts)** | | 519,972 | 9,791,472 | 212,479 | 375,630 | 433,426 | 508,426 | 428,043 | 376,874 | 386,303 | 365,990 | 465,107 | 454,438 | 12,301,605 |
| **Less: Weekly Cash Disbursements:** | | | | | | | | | | | | | | |
| Gross Payroll - WM and ADC | | - | 81,440 | - | 81,440 | - | 81,440 | - | 81,440 | - | 81,440 | - | 81,440 | 488,639 |
| Gross Payroll - Administrative | | - | 49,444 | - | 49,444 | - | 49,444 | - | 49,444 | - | 49,444 | - | 49,444 | 296,662 |
| M&T Bank: Bond Defeasance + Interest | | - | 5,456,500 [4] | - | - | - | - | - | - | - | - | - | - | 5,456,500 |
| M&T Letter of Credit and Bond Defeasance Fees | | - | (95,086) [4] | - | - | - | - | - | - | - | - | - | - | (95,086) |
| HHHW Principal + Interest | | - | 3,521,096 [4] | - | - | - | - | - | - | - | - | - | - | 3,521,096 |
| DIP Interest and fees; DIP repayments (Lapis) | | - | 477,600 [4] | - | 39,321 | - | - | - | - | 95,312 | - | - | - | 612,233 |
| Professional Fees / Retainers | [2] | - | - | - | - | - | - | - | - | - | - | 150,000 | - | 150,000 |
| WM Operating Disbursements | | 153,500 | 163,000 | 126,169 | 87,000 | 150,000 | 174,500 | 126,169 | 87,000 | 150,000 | 145,000 | 185,669 | 87,000 | 1,635,007 |
| **Total Weekly Cash Disbursements** | | 153,500 | 9,653,993 | 126,169 | 257,204 | 150,000 | 305,383 | 126,169 | 217,883 | 245,312 | 275,883 | 335,669 | 217,883 | 12,065,050 |
| **Total Weekly Cash Flow** | | 71,500 | (228,993) | (51,169) | 32,117 | 165,000 | (80,383) | 98,831 | (142,883) | (18,000) | (50,883) | 39,331 | 107,117 | (58,417) |
| **Ending Cash Balance** | | 366,472 | 137,479 | 86,310 | 118,426 | 283,426 | 203,043 | 301,874 | 158,990 | 140,990 | 90,107 | 129,438 | 236,555 | 236,555 |
| **Westchester Meadows Operating Disbursements:** | | | | | | | | | | | | | | |
| Nutrition Management Services | | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 528,000 |
| Con Edison/Direct Energy; Deposits | | 45,000 | - | - | - | 48,000 | - | - | - | 48,000 | - | - | - | 141,000 |
| Transportation Services-Westchester Ambulette | | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 156,000 |
| Oxford Health Plans-Employee Health Benefits | | - | 28,000 | - | - | - | 28,000 | - | - | - | 28,000 | - | - | 84,000 |
| Workers Compensation - State Insurance Fund | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Property and Casualty Insurance | | - | - | 24,169 | - | - | 24,169 | - | - | - | - | 24,169 | - | 72,507 |
| Rehab Consultants | | 15,000 | - | 15,000 | - | 15,000 | - | 15,000 | - | 15,000 | - | 15,000 | - | 90,000 |
| Security Services (FJC) | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Employee 403(B) Contributions | | 11,500 | - | - | - | - | 11,500 | - | - | - | - | 11,500 | - | 34,500 |
| Marketing (Specialty firm-senior housing) | | - | - | - | - | - | - | - | - | - | 30,000 | - | - | 30,000 |
| 1199 RN/Clerical Benefit & Pension payment | | - | 48,000 | - | - | - | 48,000 | - | - | - | - | 48,000 | - | 144,000 |
| Town of Greenburgh - PILOT program payments | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Accounts Payable disbursements | | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 295,000 |
| Resident Refunds | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total** | | 153,500 | 163,000 | 126,169 | 87,000 | 150,000 | 174,500 | 126,169 | 87,000 | 150,000 | 145,000 | 185,669 | 87,000 | 1,635,007 |

**Notes:**
[1] Assumes chapter 11 filing on December 7, 2015
[2] Post-petition professional fees per Administrative procedures; procedures assume December 2015 fees to be payable February 2016 @ 80%, expenses @ 100%; includes UST fees
[3] DIP Line of Credit - post-petition assumes use of DIP line from Lapis Advisers
[4] HHSH IDA defeasance; HHHW Loan repayment; DIP and related fees - see Escrow detail page
[5] Expenses incurred by HHSH staff in support of affiliates' administration including chapter 11 services
[6] Includes various items including Entrance Fee recovery from amortization of 2 recent residents' entry fees

**HHSH - DIP Line Availability**

| | Week #1 12/11/2015 | Week #2 12/18/2015 | Week #3 12/25/2015 | Week #4 1/1/2016 | Week #5 1/8/2016 | Week #6 1/15/2016 | Week #7 1/22/2016 | Week #8 1/29/2016 | Week #9 2/5/2016 | Week #10 2/12/2016 | Week #11 2/19/2016 | Week #12 2/26/2016 | Total 12/4/15-2/26/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total DIP Line** | | | | | | | | | | | | | |
| DIP Line Maximum | - | 9,200,000 | - | 3,000,000 | 630,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 3,000,000 |
| DIP Draws | - | (9,200,000) | - | (250,000) | (250,000) | - | - | - | - | - | - | (250,000) | (9,950,000) |
| DIP Interest and Fees Draw | | | | (1,320,000) | | | | | | | | | (1,320,000) |
| DIP Professional Fees Draw | | | | (800,000) | | | | | | | | | (800,000) |
| DIP Repayments | - | - | - | | | | | | | | | | - |
| DIP Line -Total Availability | - | - | - | 630,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 130,000 | (9,070,000) |
| **Sub-limits:** | | | | | | | | | | | | | |
| **IDA and HHHW Loans:** | | | | | | | | | | | | | |
| DIP Sub-line limit | - | 8,921,096 [1] | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 8,921,096 |
| DIP Draws/Uses | - | (8,882,510) | - | - | - | - | - | - | - | - | - | - | (8,882,510) |
| DIP Sub-line - Availability | - | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 | 38,586 |
| [1] Estimate of interest; excludes fees and expenses | | | | | | | | | | | | | |
| **DIP Interest and Fees:** | | | | | | | | | | | | | |
| DIP Sub-line limit | - | - | - | 1,320,000 | 1,280,679 | 1,280,679 | 1,280,679 | 1,280,679 | 1,280,679 | 1,185,367 | 1,185,367 | 1,185,367 | 1,320,000 |
| DIP Draws/Uses | - | - | - | (39,321) | - | - | - | - | (95,312) | - | - | - | (134,633) |
| DIP Sub-line - Availability | - | - | - | 1,280,679 | 1,280,679 | 1,280,679 | 1,280,679 | 1,280,679 | 1,185,367 | 1,185,367 | 1,185,367 | 1,185,367 | 1,185,367 |
| **Professional Fees:** | | | | | | | | | | | | | |
| DIP Sub-line limit | - | - | - | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 650,000 | 800,000 |
| DIP Draws/Uses | - | - | - | - | - | - | - | - | - | - | (150,000) | - | (150,000) |
| DIP Sub-line - Availability | - | - | - | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 650,000 | 650,000 | 650,000 |
| **Operations:** | | | | | | | | | | | | | |
| DIP Sub-line limit | - | 300,000 | - | 880,000 | 630,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 1,180,000 |
| DIP Draws/Uses | - | (300,000) | - | (250,000) | (250,000) | - | - | - | - | - | - | (250,000) | (1,050,000) |
| DIP Sub-line - Availability | - | - | - | 630,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 380,000 | 130,000 | 130,000 |
| **Interest Expense:** | | | | | | | | | | | | | |
| DIP Use | - | 9,200,000 | 9,200,000 | 11,570,000 | 11,820,000 | 11,820,000 | 11,820,000 | 11,820,000 | 11,820,000 | 11,820,000 | 11,820,000 | 12,070,000 | |
| Interest Expense | | | | 39,321 | | | | | 95,312 | | | | |

# Exhibit B

*Execution Version*

$12,200,000

**SENIOR SECURED SUPER PRIORITY DEBTOR IN POSSESSION
CREDIT AGREEMENT**

Dated as of December 9, 2015

among

HEBREW HOSPITAL SENIOR HOUSING, INC.

as a debtor and a debtor in possession and as Borrower

and

MILLENNIUM TRUST COMPANY, LLC, as Custodian FBO

LAPIS MUNICIPAL OPPORTUNITIES FUND II LP and

LAPIS AQUILO FUND II LP

as Lender

## Table of Contents

Page

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** ...................................................... 2

    SECTION 1.01.    Certain Defined Terms ........................................................ 2
    SECTION 1.02.    Computation of Time Periods; Other Definitional Provisions ................... 16
    SECTION 1.03.    Accounting Terms ............................................................. 17

**ARTICLE II AMOUNT AND TERMS OF THE TERM LOANS** ....................................... 17

    SECTION 2.01.    Term Loan Commitment ...................................................... 17
    SECTION 2.02.    Making the Term Loans ....................................................... 17
    SECTION 2.03.    Repayment of Term Loans .................................................... 18
    SECTION 2.04.    Prepayments .................................................................... 18
    SECTION 2.05.    Interest .......................................................................... 19
    SECTION 2.06.    Fees ............................................................................. 19
    SECTION 2.07.    Interest and Fee Reserve ..................................................... 19
    SECTION 2.08.    Payments and Computations ................................................. 19
    SECTION 2.09.    Taxes ........................................................................... 20
    SECTION 2.10.    Use of Proceeds ............................................................... 22
    SECTION 2.11.    Evidence of Debt .............................................................. 22

**ARTICLE III CONDITIONS TO EFFECTIVENESS AND OF LENDING** .......................... 23

    SECTION 3.01.    Conditions Precedent to Borrowing Interim Order Amount ...................... 23
    SECTION 3.02.    Conditions to Borrowings in Excess of the Interim Order Amount ............ 26
    SECTION 3.03.    Conditions Precedent to All Borrowings ..................................... 27
    SECTION 3.04.    Conditions Subsequent to Closing Date ..................................... 27

**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ............................................ 28

    SECTION 4.01.    Representations and Warranties of Borrowers ............................... 28

**ARTICLE V COVENANTS** ......................................................................................... 33

    SECTION 5.01.    Affirmative Covenants ....................................................... 33
    SECTION 5.02.    Negative Covenants .......................................................... 36
    SECTION 5.03.    Reporting Requirements ...................................................... 39
    SECTION 5.04.    Financial Covenants .......................................................... 42

**ARTICLE VI EVENTS OF DEFAULT** ....................................................................... 43

    SECTION 6.01.    Events of Default ............................................................. 43
    SECTION 6.02.    Remedies upon Default ....................................................... 47

**ARTICLE VII PRIORITY AND COLLATERAL SECURITY** .......................................... 47

    SECTION 7.01.    Superpriority Claims and Collateral Security ............................... 47
    SECTION 7.02.    Collateral Security Perfection ............................................... 48
    SECTION 7.03.    No avoidance, Subordination or Modification ............................. 49
    SECTION 7.04.    No Discharge; Survival of Claims ........................................... 49

**ARTICLE VIII MISCELLANEOUS** ............................................................................. 49

    SECTION 8.01.    Amendments, Etc ............................................................. 49
    SECTION 8.02.    Notices, Etc ................................................................... 49
    SECTION 8.03.    No Waiver; Remedies ........................................................ 51
    SECTION 8.04.    Costs and Expenses .......................................................... 51

i

SECTION 8.05.      Right of Set-off ................................................................. 52
SECTION 8.06.      Binding Effect ................................................................... 52
SECTION 8.07.      Assignments and Participations .................................... 52
SECTION 8.08.      Execution in Counterparts............................................. 54
SECTION 8.09.      Confidentiality ................................................................ 54
SECTION 8.10.      Public Disclosure ........................................................... 54
SECTION 8.11.      Jurisdiction, Etc.............................................................. 55
SECTION 8.12.      Governing Law ................................................................ 55
SECTION 8.13.      Waiver of Jury Trial ....................................................... 55
SECTION 8.14.      Interest Rate Limitation.................................................. 55
SECTION 8.15.      Release ............................................................................. 55

**SCHEDULES**

Schedule 3.04          -      Conditions Subsequent to Closing Date
Schedule 4.01(a)       -      Holders of the Borrower's Equity Interests
Schedule 4.01(b)       -      Borrower's jurisdiction of incorporation
Schedule 4.01(f)       -      Disclosed Litigation
Schedule 4.01(m)       -      ERISA Disclosures
Schedule 4.01(o)       -      Liens
Schedule 4.01(p)       -      Investments
Schedule 5.02(b)       -      Debt
Schedule 5.02(m)       -      Transaction with Affiliates

**EXHIBITS**

Exhibit A              -      Form of Note
Exhibit B-1            -      Form of Notice of Borrowing:  Initial Term Loan
Exhibit B-2            -      Form of Notice of Borrowing:  Subsequent Term Loans
Exhibit C              -      Form of Collateral Agreement

ii

This SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of December 9, 2015 among HEBREW HOSPITAL SENIOR HOUSING, INC., a New York corporation and a debtor and a debtor in possession (the "*Borrower*") and MILLENNIUM TRUST COMPANY, LLC, as Custodian FBO LAPIS MUNICIPAL OPPORTUNITIES FUND II LP and LAPIS AQUILO FUND II LP, as the lender (together with its successors and assigns in such capacity, the "*Lender*").

PRELIMINARY STATEMENTS:

WHEREAS, on December 9, 2015 (the "*Petition Date*"), the Borrower commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "*Chapter 11 Case*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*");

WHEREAS, the Borrower intends to continue to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Borrower, as maker executed in favor of Hebrew Hospital Home of Westchester, Inc. (the "*Intercompany Lender*") a certain promissory note (the "*Intercompany Promissory Note*");

WHEREAS, prior to the Petition Date, the Borrower, the Intercompany Lender, the Attorney General, and Carl Winterrose, as an authorized agent of the Westchester Meadows Resident Council (the "*Resident Council*") have entered into that certain Restructuring Support and Loan Agreement dated as of October 20, 2015 (as amended and in effect from time to time, the "*RSA*"), pursuant to which the Intercompany Lender extended credit to Borrower on the terms set forth therein

WHEREAS, as of the Petition Date, the Intercompany Lender under the Intercompany Promissory Note is owed, together with any and all accrued interest under the RSA, an aggregate principal amount equal to $3,500,000 (with any fees or expenses payable under the Intercompany Promissory Note and the RSA, the "*Intercompany Debt*");

WHEREAS, as of the Petition Date, Westchester Industrial Development Agency (the "*Development Agency*", and together with the Intercompany Lender, the "*Prepetition Lenders*"), as issuer, and U.S. Bank National Association, as Trustee ("*Trustee*") entered into that certain Indenture of Trust, dated as of January 1, 2008 (the "*Indenture*"), pursuant to which certain Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, in the aggregate principal amount of $14,985,000 were issued (the "*Bonds*").  As of the Petition Date, an aggregate principal amount equal to $5,455,000 is owed by the Debtor in respect of the Bonds (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Bonds, the "**Bond Debt**").

WHEREAS, the Bonds are secured by, among other things, that certain direct pay letter of credit  (the "*Letter of Credit*"), issued by Manufacturers and Traders Trust Company ("*M&T*") for the account of the Borrower and HHH Home Care, Inc. ("*Home Care*") and for the benefit of the Trustee, in the current stated amount of Five Million Five Hundred Twenty-Nine Thousand Six Hundred Fifty-Eight Dollars ($5,529,726) (the "*Stated Amount*"), of which (i) Five Million Four Hundred Fifty-Five Thousand Dollars ($5,455,000) (the "*Principal Stated Amount")* is available to pay the outstanding principal amount of the Bonds, and (ii) up to Seventy-Four Thousand Six  Hundred Fifty-Eight Dollars ($74,726) is available to pay up to fifty (50) days interest under the Bonds (the "*Interest Stated Amount*");

WHEREAS, an immediate and on-going need exists for the Borrower to obtain additional funds in order to continue the operation of its business as debtors-in-possession under chapter 11 of the Bankruptcy Code and, accordingly, the Borrower has requested that the Lender provide financing to the Borrower consisting of a senior secured superpriority term loan facility in a principal amount of up to $12,200,000 (the "*Facility*") pursuant to Section 364(c) of the Bankruptcy Code, secured by liens and granted superpriority claim status, and for the proceeds to be used for repayment of the Prepetition Debt, for working capital, and for the payment of ordinary course of business post-petition expenses and other professional fees and expenses in such amounts and during such periods as provided in the Budget;

WHEREAS, the Borrower intends to file one or more motions with the Bankruptcy Court seeking the approval of, among other things, the sale of substantially all of the Borrower's assets on the terms outlined therein and in the attachments thereto;

WHEREAS, the Lender has indicated its willingness to agree to extend the Facility to the Borrower, all on terms and conditions set forth herein and in the other Loan Documents (as defined below) and in accordance with Section 364(c) of the Bankruptcy Code, so long as such post-petition credit obligations are (i) secured by Liens on substantially all of the property, rights and interests, real and personal, tangible and intangible, of the Borrower, whether now owned or hereafter acquired, subject in priority only to  Prepetition Permitted Liens and the Carve Out, as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and, on and after the entry thereof, the Final DIP Order; and

WHEREAS, the Borrower has agreed to provide such collateral security and superpriority claims, subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account*" means all "accounts" (as defined in the UCC) of the Borrower (or, if referring to another Person, of such Person), including without limitation, accounts, accounts receivables, health care insurance receivables, monies due or to become due and obligations in any form (whether arising in connection with contracts, contract rights, Instruments, General Intangibles or Chattel paper), in each case whether arising out of goods sold or services rendered or from any other transaction and whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"*Affiliate*" means Westchester Meadows/The Fieldstone, Adult Day Health Care Program, Westchester Meadows, a Continuing Care Retirement Community, and as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote ten percent (10%) or more of the Voting Interests

2

of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agreement*" means this Senior Secured Super Priority Debtor in Possession Credit Agreement, as amended, supplemented, replaced, or otherwise modified from time to time.

"*Amended Budget*" has the meaning specified in Section 5.03(e).

"*Approved Plan of Reorganization*"  means a plan of reorganization for the Borrower under the Bankruptcy Code that is acceptable to the Lender in its sole and absolute discretion.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by the Lender and an Eligible Assignee.

"*Attorney General*" means the Office of the Attorney General of the State of New York or any duly authorized employees or representatives thereof.

"*Bankruptcy Code*" Title 11, United States Code, as now and hereafter in effect, or any applicable successor statute.

"*Bankruptcy Court*" has the meaning specified in the recitals to this Agreement.

"*Bond Indenture*"  has the meaning specified in the recitals hereto.

"*Bonds*"  has the meaning specified in the recitals hereto.

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrowing*" means a borrowing hereunder of a Term Loan.

"*Budget*" means collectively, the Initial Budget and each Amended Budget. Each Budget shall include detailed operating assumptions, projected receipts, disbursements, cash balances and accounts receivable balances and such other information as agreed by the Borrower and the Lender, as set forth on Exhibit A to the Interim Order and the Final DIP Order.  For the avoidance of doubt, the Budget shall not include any amounts for payments pursuant to  the PILOT Agreement, or for refunds of residential Entrance Fees.

 "*Business Day*" means a day of the year on which banks are not required or authorized by law to close in New York City.

"*Capital Expenditures*" means, for any Person for any period, the sum of, without duplication, all expenditures made, directly or indirectly, by such Person or any of its subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a balance sheet of such Person or have a useful life of more than one (1) year, including  the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such

3

equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"*Capitalized Leases*" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"*Carve Out*" means the Professional Fee Reserve.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, 42 U.S.C. § 9601 et seq.

"*CERCLIS*" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"*Change of Control*" shall occur if the board of directors of the Borrower shall cease to consist of a majority of Continuing Directors.

"*Chapter 11 Case*" has the meaning specified in the recitals to this Agreement.

"*Closing Date*" means the date the initial Borrowing is made, which shall occur as soon as practical following the date that in accordance with Section 2.01(a) and Section 2.02(a) the conditions precedent set forth in Article III have been fulfilled.

"*Collateral*" means all "Collateral" referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Lender.  For the avoidance of doubt, Entrance Fee Deposits held in an escrow in accordance with the terms of the RSA shall not be deemed Collateral unless and until such Entrance Fee Deposits are lawfully released from escrow and become property of the Borrower free from the liens, claims and interests of any Customer).

"*Collateral Agreement*" has the meaning specified in Section 3.01(a)(iii).

"*Collateral Documents*" means the Collateral Agreement, the Real Estate Collateral Documents, the Control Account Agreement and each other agreement that creates or purports to create a Lien in favor of the Lender.

"*Commitment*" means, collectively, the Lender's obligations to make Term Loans under Section 2.01 in an aggregate amount not to exceed $12,200,000, subject to the terms and conditions set forth in this Agreement, as such amount may be reduced by the making of Term Loans and pursuant to Section 2.04.

"*Confirmation Order*" means an order of the Bankruptcy Court confirming an Approved Plan of Reorganization under the Bankruptcy Code.

"*Continuing Directors*" means the directors of the Borrower on the Closing Date and each other director if, in each case, such other director's nomination for election to the board of directors of the Borrower is recommended by at least a majority of the then Continuing Directors.

"*Control Account Agreement*" means an account control agreement in favor of the Lender in form and substance reasonably acceptable to the Lender executed and delivered  by the Borrower, the Borrower's depositary bank and the Lender.

4

"*Counsel*" means Goodwin Procter LLP.

"*Customer*" means the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right and/or any party who enters into or proposes to enter into any contract or other arrangement with the Borrower, pursuant to which the Borrower is to delivery any personal property or perform any services, including, without limitation, any party who enters into a contract with the Borrower for the use of the Borrower's independent living units.

"*Creditors' Committee*" means the Official Unsecured Creditors' Committee appointed by the United States Trustee in relation to the Chapter 11 Case, as applicable.

"*Debt*" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment Obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

"*Deed*" has the meaning set forth in Section 3.01(b)(ii).

"*Default*" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"*Default Interest*" has the meaning set forth in Section 2.05(b).

"*Department of Financial Services*" means the Department of Financial Services for the State of New York or any duly authorized employees or representatives thereof.

"*Department of Health*" means the Department of Health for the State of New York or any duly authorized employees or representatives thereof.

"*Development Agency*" has the meaning specified in the recitals hereto.

"*Disclosed Litigation*" has the meaning specified in Section 3.01(d).

"*Disclosure Statement Hearing*" means a hearing to approve a Disclosure Statement under the Bankruptcy Code for an Approved Plan of Reorganization.

"***Disposition***" or "***Dispose***" means the sale, transfer, license, lease, conveyance or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer, conveyance or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"***Dollar***" and "***$***" means the lawful money of the United States.

"***Effective Date***" means the date that an Approved Plan of Reorganization is effective, as defined in such Approved Plan of Reorganization.

"***Eligible Assignee***" means any Person (other than an individual); *provided*, *however*, that neither Borrower nor any Affiliate of a Borrower shall qualify as an Eligible Assignee under this definition.

"***Entrance Fee Deposits***" means post-petition deposits in the amount of ten percent (10%) of the Entrance Fee.

"***Entrance Fees***" means the post-petition entrance fees payable by Customers to the Borrower for the Customer's (i) use of the Borrower's independent living units and (ii) right to receive certain services in connection therewith.

"***Environmental Action***" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health, safety or the environment, climate or natural resources, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions, damages, or response costs and (b) by any governmental or regulatory authority or third party for damages, response costs, contribution, indemnification, cost recovery, compensation or declaratory or injunctive relief.

"***Environmental Indemnity***" means that certain Environmental Indemnity Agreement, dated as of December [_], 2015, between Borrower (as Indemnitor) and Lender (as Indemnitee).

"***Environmental Law***" means all applicable current and future Federal, state, local and foreign laws (including common laws), statutes, regulations, rules having the force and effect of law, ordinances, codes, orders, writs, judgments, injunctions, decrees or judicial or agency interpretations, policies or guidance, in each case relating to pollution or protection of the environment, climate, health, safety or natural resources, or the presence, release of, discharge of, exposure to, or the generation, manufacture, processing, distribution, use, handling, transportation, treatment, storage, disposal, recycling of or the arrangement for such activities, with respect to Hazardous Materials.

"***Environmental Permit***" means any permit, approval, identification number, license, registration, notification, exemption or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person

6

(including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***ERISA Affiliate***" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of the Borrower, or under common control with the Borrower, within the meaning of Section 414(b) or (c) of the Internal Revenue Code, except that the term "ERISA Affiliate" shall also include a member of the controlled group of the Borrower, or under common control under the meaning of Section 414(m) or (o) for purposes of PBGC premium liabilities and pension plan funding liability under Section 41 of the Internal Revenue Code.

"***Escrow***" has the meaning specified in Section 3.01(b).

"***Escrow Agent***" means First Nationwide Title Agency LLC.

"***Escrow Agreement***" means an escrow agreement by and among the Borrower, the Lender, County of Westchester Industrial Development Agency, Hebrew Hospital Home of Westchester, Inc., and Manufacturers and Traders Trust Company, in form and substance acceptable to the Lender in its sole and absolute discretion.

"***Events of Default***" has the meaning specified in Section 6.01.

"***Exit Fee***" has the meaning specified in Section 2.06(b).

"***Exit Loan***" has the meaning specified in Section 2.02(c).

"***Extraordinary Receipt***" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including, without limitation, aggregate amount of tax refunds received, pension plan reversions, proceeds of insurance (including, without limitation, any key man life insurance but excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustment received in connection with any purchase agreement; *provided, however*, that an Extraordinary Receipt shall not include cash receipts received from proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto or adjustments received pursuant to any resolution of claims for reimbursements from any governmental sponsored health insurance programs..

"***Facility***" has the meaning specified in the recitals to this Agreement.

"***Final Order***" means an order by the Bankruptcy Court as to which (a) no request for a stay or any similar request is pending, no stay is in effect, the action or decision has not been vacated, reversed, set aside, annulled or suspended, and any deadline for filing such a request that may be designated by law, statute, regulation, or rule has passed; (b) no petition for rehearing or reconsideration or application for review is pending and the time for filing any such petition or application has passed; (c) no Governmental Authority has undertaken to reconsider the action on its own motion and the time within

which it may effect such reconsideration has passed; and (d) no appeal is pending (including other administrative or judicial review) or in effect and any deadline for filing any such appeal that may be specified by law, statute, regulation, or rule has passed.

"***Final DIP Order***" means a final order of the Bankruptcy Court authorizing and approving this Agreement and the other Loan Documents on a final basis and entered following a final hearing in form and substance satisfactory to the Lender in its sole discretion.

"***Final Order Amount***" means, at any time, $12,200.000, as such amount may be reduced at or prior to such time pursuant to Section 2.04(b).

"***Fiscal Year***" means a fiscal year of Borrower ending on December 31 in any calendar year.

"***GAAP***" has the meaning specified in Section 1.03.

"***General Assignment of Leases and Rents***" means that certain General Assignment of Leases and Rents, dated as of December [_], 2015, between Borrower (as Assignor) and Lender (as Assignee).

"***Government Account***" shall mean all Accounts arising out of or with respect to any Government Contract.

"***Government Contract***" shall mean all contracts with the United States Government, any Governmental Authority or with any agency thereof, and all amendments thereto.

"***Governmental Authority***" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"***Governmental Authorization***" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"***Guaranteed Debt***" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt, leases, dividends or other payment Obligations ("***primary obligations***") of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guaranteed Debt shall be deemed

8

to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Hazardous Materials*" means (a) any petroleum or petroleum product, by-product or breakdown product, and all other hydrocarbons, radioactive or nuclear materials, asbestos or asbestos-containing materials, polychlorinated biphenyls and radon gas, chlorofluorocarbons and all other ozone depleting substances and (b) any other chemical, material or substance or waste designated, classified, prohibited, limited or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Home Care*" has the meaning specified in the recitals hereto.

"*Indemnified Party*" has the meaning specified in Section 8.04(b).

"*Information*" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to or in the possession of the Lender or its Representatives on a non-confidential basis prior to disclosure by the Borrower; *provided* that, such information was or is clearly identified at the time of delivery as confidential or that is subsequently classified in a separate communication as confidential.

"*Initial Budget*" means (i)  a cash flow forecast, business plan and operating budget for the thirteen-week period beginning immediately after the Petition Date and (ii) a monthly cash flow forecast, business plan and operating budget following the end of such thirteen-week period, in each case, based on the Projections and the Information, and in form and substance satisfactory to the Lender in its sole and absolute discretion and as annexed and approved as part of the Interim Order, as updated in accordance with the terms of this Agreement.

"*Initial Term Loan*" has the meaning specified in Section 2.01(a).

"*Insurance Stay Exception*" means the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition creditor solely against available insurance coverage.

"*Interest and Fee Reserve*" means a reserve established by the Lender and accounted for on its books and records and against which interest, the Exit Fee, the fees and expenses of Lender's counsel from and after the date of entry of the Interim Order, and other fees and expenses when due shall be credited. The Interest and Fee Reserve shall be deemed drawn and fully advanced and funded as of the date of entry of the Final DIP Order, with the funds not disbursed to the Borrower.

"*Intercompany Debt*"  has the meaning specified in the recitals hereto.

"*Intercompany Lender*"  has the meaning specified in the recitals hereto.

"*Intercompany Promissory Note*"  has the meaning specified in the recitals hereto.

"*Interim Closing Fee*" has the meaning specified in Section 2.06(a).

"***Interim Order***" means in form and substance satisfactory to the Lender in its sole discretion the Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (a) approving post-petition financing pursuant to the Facility and the making of Term Loans in an aggregate amount not to exceed the Interim Order Amount, (b) authorizing use of cash collateral, (c) granting Liens and providing superpriority administrative expense status, (e) modifying the automatic stay, and (f) scheduling a final hearing with respect to the Facility (including the Budget), to be entered on the docket of the Chapter 11 Case on or before December 17, 2015 or such later date as the Lender agrees in its sole discretion.

"***Interim Order Amount***" means, at any time, $9,200,000 as such amount may be reduced at or prior to such time pursuant to Section 2.04(b).

"***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***Investment***" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "Debt" in respect of such Person.

"***Lease Agreement***" means that certain Amended and Restated Lease Agreement, originally dated as of July 1, 2000 and amended and restated as of January 1, 2008, between County of Westchester Industrial Development Agency (as Lessor) and Hebrew Hospital Senior Housing, Inc. (as Lessee).

"***Lender***" means collectively, Millennium Trust Company, LLC, as Custodian FBO Lapis Municipal Opportunities Fund II LP and Lapis Aquilo Fund II LP, and each Person that shall become a Lender hereunder pursuant to Section 8.07 for so long as the Lender or Person, as the case may be, shall be a party to this Agreement as a Lender.

"***Lending Office***" means the office of the Lender specified as its "Lending Office" under its signature on the signature pages to this Agreement  or, including if no such office is specified, such other office of the Lender as it may from time to time specify in writing to the Borrower.

"***Letter of Credit***" has the meaning specified in the recitals hereto.

"***Lien***" means any lien, security interest, hypothecation or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"***Loan Documents***" means (a) this Agreement, (b) the Notes, and (c) the Collateral Documents, each of (a) through (c) as amended.

"***M&T***" has the meaning specified in the recitals hereto.

"***Margin Stock***" has the meaning specified in Regulation U.

"***Material Adverse Effect***" means any material adverse effect on any of the (a) operations, performance, business, assets or properties, of the Borrower or any Affiliate, taken as a whole, in each case other than (i) as a result of the commencement of the Chapter 11 Case, (ii) general economic, legal, regulatory or political conditions in the United States of America (*provided* that the impact on the Borrower is not materially disproportionate to the impact of similar entities), (iii) conditions generally affecting the industries in which the Borrower operates (*provided* that the impact on the Borrower is not materially disproportionate to the impact of similar entities).

"***Maturity Date***" means the date that is the earliest of: (a) twelve (12) months after entry of the Interim Order; (b) the closing date of the sale of all or substantially all of the Collateral; (c) the effective date of a confirmed Chapter 11 plan of reorganization; (d) dismissal of the Chapter 11 Case; (e) conversion of the Chapter 11 Case to a Chapter 7 case; (f) the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition creditor, except to the extent that such relief constitutes an Insurance Stay Exception and the Insurance Stay Exceptions, in the aggregate, shall not result in or have a Material Adverse Effect; (g) acceleration of the Term Loans pursuant to the terms of this Agreement; (h) the filing of a plan of reorganization in the Chapter 11 Case that does not provide for repayment in full in cash of all Obligations owing under the Facility; or (i) the filing of any action attacking or challenging the Obligations under the Facility or the Liens granted in the Collateral to secure such Obligations.

"***Mortgage***" means a Mortgage and Security Agreement with respect to the Mortgaged Property, in favor of, and in form and substance satisfactory to, the Lender.

"***Mortgaged Property***" means that certain plot, piece or parcel of real property and improvements located on Glassland Road in the Valhalla section of the Town of Greenburgh, County of Westchester, State of New York, consisting of a continuing care retirement community including 120 Independent Residential Apartments, 10 Enriched Housing Apartments, 20 skilled nursing facility beds, common areas and facilities, an indoor pool, a convenience store and administration areas and related infrastructure such as road, sewers, utilities, parking lots, drainage areas and maintenance facilities.

"***Multiemployer Plan***" means a multiemployer plan, as defined in Section 3(37) of ERISA, to which the Borrower or any ERISA Affiliate is making or has an obligation to make contributions, or has within any of the preceding six (6) plan years made or had an obligation to make contributions.

"***Multiple Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and at least one (1) Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could reasonably be expected to have liability under Section 4043, 4064 or 4069 of ERISA in the event of a withdrawal from such plan or if such plan has been or were to be terminated.

"***Net Cash Proceeds***" means:

(a)    in connection with any Disposition or any Recovery Event, the proceeds thereof in the form of cash and Permitted Investments (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of (w) attorneys' fees, accountants' fees, investment banking fees, (x) amounts required to be applied to the repayment of Debt secured by a Permitted Lien on any asset that is the subject to such Disposition or Recovery Event (other than any Lien pursuant to a Collateral Document), (y) other customary

fees and expenses actually incurred in connection therewith and (z) in the case of a Recovery Event, any actual and reasonable cost incurred and paid or payable in connection with restoration work to the extent required by any casualty insurance policy or as a result of a condemnation and, in each case, and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements);

(b)    in connection with any incurrence of Debt, the cash and Permitted Investments received from such incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith;

(c)    with respect to the sale or issuance of any Equity Interests (including, without limitation, the receipt of any capital contribution) by the Borrower, the excess of (i) the sum of the cash and Permitted Investments received in connection with such sale or issuance over (ii) the underwriting discounts and commissions or similar payments, and other out-of-pocket costs, fees, commissions, premiums and expenses, incurred by the Borrower in connection with such sale or issuance to the extent such amounts were not deducted in determining the amount referred to in clause (i); *provided*, *however*, that Net Cash Proceeds shall not include any funds received in connection with the exercise of stock options granted to employees or directors of the Borrower; and

(d)    with respect to any Extraordinary Receipt that is not otherwise included in clause (a), (b) or (c) above, the sum of the cash and Permitted Investments received in connection therewith.

"***Non-Excluded Taxes***" has the meaning specified in Section 2.09.

"***Note***" means a promissory note of the Borrower payable to the order of the Lender (or at a Lender's request, payable to the Lender and its registered assigns), in substantially the form of Exhibit A hereto, evidencing the indebtedness of the Borrowers to the Lender resulting from the Term Loans.

"***Notice of Borrowing***" means a notice of Borrowing in the form Exhibit B-1 or Exhibit B-2.

"***NPL***" means the National Priorities List under CERCLA.

"***Obligation***" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged or stayed. Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document, and (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that the Lender, in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"***Orders***" means the Interim Order and the Final DIP Order; and "***Order***" means whichever of the Interim Order or the Final DIP Order is then in effect.

"***Other Taxes***" has the meaning specified in Section 2.09(b).

"**Bond Indenture**" has the meaning specified in the recitals hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

"**Permitted Investments**" means (a) Dollars; (b) securities issued or unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof, in each case having maturities of not more than 24 months from the date of acquisition thereof; (c) securities issued by any state, commonwealth or territory of the United States of America or any political subdivision or taxing authority of any such state, province, commonwealth or territory or any public instrumentality thereof or any political subdivision or taxing authority of any such state, province, commonwealth or territory or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service); (d) commercial paper and variable or fixed rate notes issued by or guaranteed by the Lender or any bank holding company owning the Lender; (e) commercial paper and variable or fixed rate notes maturing no more than 12 months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); (f) time deposits with, or domestic and Eurodollar certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, the Lender or any other bank having combined capital and surplus of not less than $250,000,000 in the case of domestic banks and $100,000,000 (or the dollar equivalent thereof) in the case of foreign banks; (g) repurchase agreements with a term of not more than 30 days for underlying securities of the type described in clauses (b), (c) and (f) above entered into with any bank meeting the qualifications specified in clause (f) above or securities dealers of recognized national standing; (h) marketable short-term money market and similar securities having, at the time of acquisition, a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); and (i) shares of investment companies that are registered under the Investment Company Act of 1940 and invest solely in one or more of the types of securities described in clauses (a) through (h) above.

"**Permitted Liens**" has the meaning specified in Section 5.02(a)(ii).

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"**Petition Date**" has the meaning specified in the recitals hereto.

"**PILOT Agreement**" means that certain Payment In Lieu Of Taxes Agreement, dated as of July 18, 2000, by and between the County of Westchester Industrial Development Agency, a public benefit corporation of the State of New York, the Town of Greenburgh, a municipal corporation, and Hebrew Hospital Senior Housing, Inc., a New York Not-for-Profit Corporation as Lessee.

"**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

"**Prepetition Debt**" means the Bond Debt and the Intercompany Debt.

"**Prepetition Lenders**" has the meaning specified in the recitals to this Agreement.

13

"*Prepetition Loan Documents*" means the Intercompany Promissory Note, the Bond Indenture and all promissory notes, security and other documents relating to the foregoing or entered into in connection therewith, in each case as in effect on the Closing Date.

"*Prepetition Permitted Liens*" has the meaning specified in Section 4.01(p) hereof.

"*Prior General Assignment of Leases and Rents*" means that certain General Assignment of Leases and Rents, dated as of January 1, 2008, between Hebrew Hospital Senior Housing, Inc., Westchester Industrial Development Agency, and Manufacturers and Traders Trust Company.

"*Prior Mortgage and Security Agreement*" means that certain Mortgage and Security Agreement, dated as of January 1, 2008, between Hebrew Hospital Senior Housing, Inc. and Manufacturers and Traders Trust Company.

"*Professional Fee Reserve*" means a reserve in the amount of $800,000 established by the Borrower in a segregated account to be used solely for the payment of Professional Fees, which shall be deemed drawn and funded upon entry of the Final DIP Order.

"*Professional Fees*" has the meaning specified in Section 2.11.

"*Projections*" has the meaning specified in Section 4.01(h).

"*Real Estate Collateral Documents*" means the Mortgage, the General Assignment of Leases and Rents, and the Environmental Indemnity.

"*Recovery Event*" means any settlement of or payment in respect of any real property insurance claim or any condemnation proceeding relating to any asset of the Borrower.

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Released Parties*" has the meaning specified in Section 8.15.

"*Releasing Parties*" has the meaning specified in Section 8.15.

"*Requirement of Law*" means, as to any Person, (a) the partnership agreement, charter, certificate of incorporation, articles of incorporation, bylaws, operating agreement or other organizational or governing documents of such Person, (b) any federal, state or local law, treaty, ordinance, rule or regulation, and (c) any order, decree or determination of a court, arbitrator or other Governmental Authority; in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Resident Council*" has the meaning specified in the recitals.

"*Resident Professionals*" shall mean DLA Piper LLP (US) and CohnReznick LLP

"*RSA*" has the meaning specified in the recitals hereto.

14

"**_Sale Motion_**" means a motion by the Borrower seeking approval of the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which motion shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"**_Sale Procedures Motion_**" means a motion by the Borrower seeking approval of procedures for marketing, conducting an auction and obtain approval of a sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which motion shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"**_Sale Procedures Order_**" means an order of the Bankruptcy Court approving procedures for marketing, conducting an auction in connection with the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which order shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"**_Sale Order_**" means an order of the Bankruptcy Court approving with the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which order shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

"**_Second Lien Mortgage_**" means that certain Mortgage, made as of November 5, 2015, between County of Westchester Industrial Development Agency, as Owner, Hebrew Hospital Senior Housing, Inc., as Mortgagor, and Hebrew Hospital Home of Westchester, Inc., as Mortgagee.

"**_Secured Obligations_**" has the meaning specified in the Collateral Agreement.

"**_Securities Account_**" has the meaning specified in the Collateral Agreement.

"**_Single Employer Plan_**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and no Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could reasonably be expected to have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"**_Statutory Liens_**" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have commenced:  (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b); *provided* that such Liens are being challenged in good faith and by proper proceedings by the Borrower and for which adequate reserves in accordance with GAAP have been established on the books of the Borrower; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than thirty (30) days and (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the use of the property to which they relate; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) Liens securing judgments (or the payment of money) not constituting a Default or securing appeal or other surety bonds related to such

15

judgments; and (f) easements, rights of way and other similar encumbrances on title to real property that do not render title to the property encumbered thereby unmarketable or materially adversely affect the use of such property for its present purposes.

"*Statutory Reserve*" has the meaning specified in Section 4.01(e).

"*Subordinated Debt*" means Debt subordinated in right of payment or lien priority to the obligations under this Agreement on terms reasonably satisfactory to the Lender.

"*Subsequent Term Loans*" has the meaning specified in Section 2.01(b).

"*Superpriority Claim*" means a claim against a Borrower or its estate in the Chapter 11 Case which is an administrative expense claim having priority over (a) any and all allowed administrative expense claims, and (b) unsecured claims now existing or hereafter arising, including, without limitation, administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, Section 506(c)).

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "Debt," all (a) Obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "synthetic lease"), (b) Obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) Obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "Debt" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"*Taxes*" means any present or future taxes, levies, imposts, duties, deductions, charges, withholdings, assessments, fees or other charges and other similar liabilities and any interest, additions, or penalties with respect thereto.

"*Term Loan*" means the Initial Term Loan and the Subsequent Term Loans.

"*UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "*UCC*" means the Uniform Commercial Code as from time to time in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

"*Voting Interests*" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

SECTION 1.02.    Computation of Time Periods; Other Definitional Provisions.  In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each

16

mean "to but excluding."  Unless expressly provided for otherwise, if any day on which the Lender or the Borrower is required to perform hereunder is not a Business Day, then such performance shall occur on the immediately succeeding Business Day.  References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03.    Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles consistent with those applied in the preparation of the financial statements referred to in Sections 4.01 and 5.03 hereof ("**GAAP**").

## ARTICLE II

## AMOUNT AND TERMS OF THE TERM LOANS

SECTION 2.01.    Term Loan Commitment.  The Lender agrees, on the terms and conditions hereinafter set forth, to make a term loan or term loans to the Borrower as follows:

(a)    on the Closing Date, in an amount equal to $9,200,000 (the "***Initial Term Loan***"), which amount shall have been funded into Escrow upon entry of the Interim Order and execution of the Escrow Agreement; *provided* that the aggregate amount of the Initial Term Loan shall not exceed the Interim Order Amount; and

(b)    from time to time after the Closing Date and until the Maturity Date, each in an amount selected by the Borrower pursuant to Section 2.02(b), and in an aggregate amount not to exceed $3,000,000 (the "***Subsequent Term Loans***"); *provided*, that the aggregate amount of the Subsequent Term Loans, plus Initial Term Loan shall not exceed the Final Order Amount.

Each Term Loan may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

SECTION 2.02.    Making the Term Loans.  Subject to the terms and conditions hereinafter set forth:

(a)    Initial Term Loan.  The Initial Term Loan shall be made on notice, given not later than 12:00 p.m. (New York City time) on the date of the hearing for approval of the Interim Order by the Borrower to the Lender.  Such Notice of Borrowing for the Initial Term Loan shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-1 hereto, specifying therein the requested Interim Order Amount.  Upon fulfillment of the applicable conditions set forth in Article III, the Interim Term Loan funds shall be released from Escrow and made available to the Borrower by transfer of such funds to the account designated by the Borrower.

(b)    Subsequent Term Loans.  Each Borrowing of a Subsequent Term Loan shall be made on notice given not later than 12:00 p.m. (New York City time) on any Thursday occurring from the Closing Date until the Maturity Date by the Borrower to the Lender.  Each such Notice of a Borrowing shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B-2 hereto, specifying therein the requested amount.  As long as no Default or Event of Default has occurred and is continuing, and upon fulfillment of the applicable conditions set forth in Article III, the Lender will make such amount of such requested funds available to the Borrower by transfer of such funds to the account designated by the Borrower by 12:00 p.m. (New

17

York City time) on the Thursday immediately following receipt of such Notice of Borrowing; *provided*, *however*, that (i) subject to the Final Order Amount, each such Subsequent Term Loan shall be in an amount of $250,000 or multiples thereof (unless there is less than $250,000 available, in which case such lower amount can be drawn in one final draw), and (ii) such Subsequent Term Loans shall be necessary, as determined by the Lender in its sole discretion, to satisfy the Borrower's obligations in the Budget for the next Budget period beginning on the date of any such Borrowing.

(c)    Exit Loan.  The Borrower and the Lender may consider converting the outstanding Term Loans into term loans under an exit term loan facility (the "***Exit Loan***"), provided that the Exit Loan is on terms and conditions acceptable to each party in its sole and absolute discretion.

(d)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower. The Borrower shall indemnify the Lender against any loss, cost or expense incurred by the Lender as a result of any failure to fulfill on or before the date for such Borrowing the applicable conditions set forth in Article III or in Section 2.02, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender to fund the Term Loans, as a result of such failure, is not made on such date.

SECTION 2.03.    Repayment of Term Loans.  The Borrower shall repay to the Lender the aggregate outstanding principal amount of the Term Loans on the Maturity Date (or on such earlier date on which such Term Loans become due and payable pursuant to Article VI), together with any and all accrued and unpaid interest thereon (which amounts shall be reduced as a result of the application of prepayments in accordance with Section 2.04).

SECTION 2.04.    Prepayments.  (a)  Optional.  Subject to Section 2.04(c), The Borrower may, upon at least one (1) Business Day's notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, and, if such notice is given, the Borrower shall prepay the outstanding aggregate principal amount of the Term Loans comprising part of the same Borrowing in whole or in part, together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid; *provided*, *however*, that each partial prepayment shall be in an aggregate principal amount of $500,000 or an integral multiple of $500,000 in excess thereof.

(b)    Mandatory.  If the Borrower Disposes of any property or assets, whether pursuant to a sale under Section 363 of the Bankruptcy Code or otherwise (other than any Disposition of any property or assets permitted by clauses (ii) through (v) of Section 5.02(e)), the Borrower shall prepay an aggregate principal amount of Term Loans equal to one hundred percent (100%) of all such Net Cash Proceeds immediately upon receipt thereof by the Borrower.  The Interim Order Amount and the Final Order Amount, as applicable, shall be reduced by an amount equal to the amount of Net Cash Proceeds from any sale of property or assets described in this Section 2.04(b) in excess of the amount applied to reduce the aggregate outstanding amount of the Term Loans to zero, unless otherwise agreed by the Lender.

(i)    Upon the sale or disposition by the Borrower of any or all of its assets, the Borrower shall prepay an aggregate principal amount (including any paid in kind interest) of Term Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof.

(ii)    Upon the incurrence or issuance by the Borrower of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 5.02(b)), the Borrower shall prepay an aggregate principal amount (including any paid in kind

18

interest) of Term Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof by the Borrower.

(iii)    Upon the receipt of any proceeds from an Extraordinary Receipt not otherwise included in this Section 2.04(b), the Borrower shall prepay an aggregate principal amount (including any paid in kind interest)  of Term Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof by the Borrower.

(c)    Early Termination.   If the Borrower shall prepay the Facility in cash in full prior to the date which is 273 days after the entry of the Interim Order, then the Borrower shall pay to the Lender additional interest equal to the product of (i) the interest rate then in effect, as determined in accordance with Section 2.05; times (ii) the outstanding amount of the Obligations under the Facility, times (iii) the difference between (x) 273 days and  (y) the number of days from the date of entry of the Interim Order to the date of such prepayment.

SECTION 2.05.    Interest.

(a)    Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Term Loan owing to the Lender from the date of such Term Loan until such principal amount shall be paid in full at a rate per annum equal at all times to nine and three-quarters percent (9.75%) per annum, payable monthly in arrears in cash on the first Business Day of each calendar month.

(b)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Term Loans and all other due and unpaid Obligations shall bear interest ("*Default Interest*") at a rate per annum equal at all times to five percent (5.00%) per annum above the rate per annum described in Section 2.05(a) hereof.  All such interest shall be payable in cash on demand by the Lender.

SECTION 2.06.    Fees.

(a) Interim Closing Fee. The Borrower agrees to pay to the Lender, on the date of entry of the Interim Order a fee (the "*Interim Closing Fee*") in the amount of two percent (2.00%) of the Commitment, which shall be fully earned on such date and non-refundable.

(b)    Exit Fee.   The Borrower agrees to pay to the Lender, on the Maturity Date an exit fee (the "*Exit Fee*") in the amount of two percent (2.00%) of the Commitment, which shall be fully earned and non-refundable.

SECTION 2.07.    Interest and Fee Reserve.  Notwithstanding anything herein to the contrary, all interest, the Interim Closing Fee, the Exit Fee, and all other fees, costs and expenses payable hereunder and under the other Loan Documents shall be credited first against the Interest and Fee Reserve, and if and to the extent the Interest and Fee Reserve is exhausted, thereafter paid directly by the Borrower. Any amounts left in the Interest and Fee Reserve at Maturity shall be applied to the payment of the Obligations under the Facility.

SECTION 2.08.    Payments and Computations.  (a)  The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off, not later than 11:00 a.m. (New York City time) on the day when due in U.S. Dollars to the Lender at the account identified by the Lender in same day funds, with payments being received by the Lender after such time being deemed to have been received on the next succeeding Business Day. Upon the

19

effectiveness of an Assignment and Acceptance, from and after the effective date of such Assignment and Acceptance, the Borrower shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)     The Borrower hereby authorizes the Lender and each of its Affiliates, if and to the extent payment owed to the Lender is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrower's accounts with the Lender or such Affiliate any amount so due.

(c)     All computations of interest on the Obligations shall be made by the Lender on the basis of a year of three hundred sixty days (360) days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable. Each determination by the Lender of an interest or a fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)     Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest; *provided*, *however*, that, if such extension would cause payment of interest on or principal of Term Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

SECTION 2.09.     Taxes. (a) Any and all payments by the Borrower to or for the account of the Lender hereunder or under any other Loan Document shall be made, in accordance with Section 2.08 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future Taxes *excluding* Taxes that are imposed on its overall net income by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof or where the Lender is conducting business (and franchise taxes imposed in lieu thereof), and any branch profits taxes imposed by the United States or any political subdivision thereof (all such non-excluded Taxes, being hereinafter referred to as "***Non-Excluded Taxes***"). If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to the Lender, (i) in the case of Non-Excluded Taxes the sum payable by the Borrower shall be increased as may be necessary so that after the Borrower has made all required deductions (including deductions applicable to additional sums payable under this Section 2.09) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make all such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     In addition, the Borrower shall pay any present or future stamp, documentary, excise, property, intangible, mortgage recording or similar taxes, charges or levies that arise from any payment made by the Borrower hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "***Other Taxes***").

(c)     The Borrower shall indemnify the Lender for and hold it harmless against the full amount of Non-Excluded Taxes and Other Taxes, and for the full amount of Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.09, imposed on or paid by the Lender and any liability (including penalties, additions to tax, interest and expenses, other than penalties directly arising through the gross negligence or willful misconduct of the Lender) arising therefrom or with respect

20

thereto, whether or not such amounts were correctly or legally imposed by the relevant Governmental Authority. This indemnification shall be made within thirty (30) days from the date the Lender makes written demand therefor.

(d)    Within thirty (30) days after the date of any payment of Taxes, the Borrower shall furnish to the Lender, at its address referred to in <u>Section 8.02</u>, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Lender. In the case of any payment hereunder or under the other Loan Documents by or on behalf of the Borrower through an account or branch outside the United States or by or on behalf of the Borrower by a payor that is not a United States person, if the Borrower determines that no Taxes are payable in respect thereof, the Borrower shall furnish, or shall cause such payor to furnish, to the Lender, at such address, an opinion of counsel reasonably acceptable to the Lender stating that such payment is exempt from Taxes. For purposes of subsections (d) and (e) of this <u>Section 2.09</u>, the terms "*United States*" and "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)    If the Lender is entitled to an exemption from, or reduction of, withholding tax, it shall, on or prior to the date of its execution and delivery of this Agreement in the case of the Lender party to this Agreement as of the date hereof and in the case of each other Lender, on the date pursuant to which it becomes a Lender, and from time to time thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as the Lender remains lawfully able to do so), provide the Borrower with two original Internal Revenue Service Forms W-8ECI or W-8BEN or (in the case of a Lender that has certified in writing to the Borrower that it is not (i) a "bank" (as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Borrower or (iii) a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Internal Revenue Code)), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service certifying that the Lender is exempt from or entitled to a reduced rate of withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender that has certified that it is not a "bank" as described above, certifying that the Lender is a foreign corporation, partnership, estate or trust. If the forms provided by a Lender at the time the Lender first becomes a party to this Agreement indicate a United States or other interest withholding tax rate, as applicable, in excess of zero, withholding tax at such rate shall be considered excluded from Non-Excluded Taxes unless and until the Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Non-Excluded Taxes for periods governed by such forms; *provided*, *however*, that if, at the effective date pursuant to which a Lender becomes a Lender, the Lender assignor was entitled to payments under subsection (a) of this <u>Section 2.09</u> in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Non-Excluded Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Non-Excluded Taxes) withholding tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8ECI or the related certificate described above, that the applicable Lender reasonably considers to be confidential, the Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

(f)    For any period with respect to which a Lender has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such

form, certificate or other document otherwise is not required under subsection (e) above), the Lender shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.09 with respect to Non-Excluded Taxes imposed by reason of such failure; *provided*, *however*, that should a Lender become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Borrower shall take such steps as the Lender shall reasonably request to assist the Lender to recover such Taxes.

SECTION 2.10.    Use of Proceeds.  (a)  The proceeds of the Initial Term Loan shall be used solely, and strictly in accordance with the Budget and in compliance with Section 5.04(a), as follows: (i) for the repayment in full of all amounts due with respect to principal and accrued and unpaid interest on account of the Intercompany Debt in an amount not to exceed $3,500,000, plus accrued and unpaid interest through the date of payment; (ii) for the repayment in full in cash of the obligations owing in respect of the Letter of Credit, which shall have been drawn to pay in full the Bonds, in an amount not to exceed $5,455,000; (iii) in an amount up to $245,000 to pay, as available, the Interim Closing Fee, fees or taxes due in connection with the recording of the Mortgage, Escrow fees, fees and expenses in connection with the payment of the Pre-Petition Bonds, Lender's attorneys' fees and expenses, and the ongoing working capital needs of the Borrower.

(b)    The proceeds of the Subsequent Term Loans shall be used solely, and strictly in accordance with the Budget and in compliance with Section 5.04(a), following the entry of the Final DIP Order as follows: (i) to fund the Interest and Fee Reserve for the payment interest, fees, costs and expenses incurred under the Facility in the amount of $1,320,000; (ii) for the payment of ordinary course of business post-petition operating expenses in such amounts and during such periods as provided for in the Budget, in the amount of $880,000; and (iii) for the payment of fees of the United States Trustee and allowed Chapter 11 estate professional fees and expenses (collectively "*Professional Fees*") in the amount of $800,000 from the Professional Fee Reserve.

For the avoidance of doubt and notwithstanding any provision herein to the contrary,  (i) no proceeds of the Term Loans  may be used to pay any or all claims for services rendered by any of the professionals retained by the Borrower or the Creditors Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter against Lender or any of its Affiliates and (ii) except for the Professional Fee Reserve, no Collateral or proceeds thereof shall be used for the payment of Professional Fees.  Any amounts left in the Professional Fee Reserve at Maturity shall be applied to the payment of the Obligations under the Facility.

SECTION 2.11.    Evidence of Debt.  (a)  The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from each Term Loan owing to the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.  The Borrower agrees that upon notice by the Lender to the Borrower requesting a promissory note to evidence (whether for purposes of pledge, enforcement or otherwise) the Term Loans owing to, or to be made by, the Lender, the Borrower shall promptly (and in any event within three (3) Business Days) execute and deliver to the Lender a Note, in substantially the form of Exhibit A hereto payable to the order of the Lender (or, at the Lender's request, payable to the Lender and its registered assigns), in a principal amount equal to the Term Loans and Commitments of the Lender.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)    The Notes, including entries made in good faith by the holder thereof, and the books and accounts of the Lender shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to the Lender absent manifest error; *provided*, *however*, that the failure of the Borrower to issue any Note to the Lender, or the Lender to fail

22

to make any entry, or to make an entry that is incorrect, on the Note or in its books and accounts, shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01.    Conditions Precedent to Borrowing Interim Order Amount.  The obligation of the Lender to fund the Initial Term Loan is subject to the satisfaction or waiver by the Lender of the following conditions, and the conditions set forth in Section 3.03, precedent before or concurrently with the Closing Date:

(a)    The Lender shall have received on or before the Closing Date the following, each dated such day (unless otherwise specified), in form and substance satisfactory to the Lender:

(i)    Executed counterparts of this Agreement.

(ii)    If requested by the Lender, a Note in the amount of the Commitment.

(iii)    A collateral agreement substantially in the form of Exhibit C hereto (the "*Collateral Agreement*"), duly executed by the Borrower, together with, to the extent required under the Collateral Agreement:

(A)    financing statements in a form appropriate for filing under the UCC for all jurisdictions that the Lender may deem necessary or desirable in order to perfect and protect the first priority (subject to the Carve Out and the Prepetition Permitted Liens) liens and security interests created under the Collateral Agreement, covering the Collateral described in the Collateral Agreement;

(B)    all other recordings and filings of or with respect to the Collateral Agreement that the Lender may deem necessary or desirable in order to perfect and protect the security interest created thereunder;

(C)    evidence of the insurance required by the terms of the Collateral Agreement dated as of a recent date (including, without limitation, evidence that the Borrower has obtained individual insurance coverage); and

(D)    evidence that all other actions that the Lender may deem necessary or desirable in order to perfect and protect the first priority (subject to the Carve Out and the Prepetition Permitted Liens) liens and security interests created under the Collateral Agreements has been taken.

(iv)    Control Account Agreements with respect to each of the Borrower's Accounts.

(v)    The Escrowed Documents shall have been released from Escrow, the documents required to be filed or recorded in Section 3.01(b) hereof have been so filed or recorded, including without limitation, the Deed, and a copy of the Interim Order and the Mortgage has been recorded.

23

(vi)    The obligations under the RSA shall have been assumed by the Borrower; *provided* that such assumption shall be conditioned upon any deposit refunds that become due in 2016 shall constitute unsecured prepetition claims against the Borrower, which claims shall be subordinate to the Obligations under the Facility.

(vii)    Certified copies of the resolutions of the Board of Directors (or equivalent entity) of the Borrower approving each Loan Document, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to each Loan Document.

(viii)    A copy of a certificate of the Secretary of State of the jurisdiction of organization of the Borrower, dated reasonably near the Closing Date in the case of the certificates described in clause (B), certifying (A) as to a true and correct copy of the constituent documents of the Borrower and each amendment thereto on file in such Secretary's office and that such amendments are the only amendments to the Borrower's constituent documents on file in such Secretary's office, and (B) that the Borrower is duly organized and in good standing or presently subsisting under the laws of the State of the jurisdiction of its organization.

(ix)    A certificate of the Borrower signed on behalf of the Borrower by its President or a Vice President and its Secretary or any Assistant Secretary, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the absence of any amendments to the constituent documents of the Borrower since the date of the Secretary of State's certificate referred to in Section 3.01(a)(viii), (B) a true and correct copy of the organizational documents of the Borrower as in effect on the Closing Date, (C) the due organization and good standing or valid existence of the Borrower as an entity organized under the laws of the jurisdiction of its organization, and the absence of any proceeding for the dissolution or liquidation of the Borrower, (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Closing Date; *provided*, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects on and as of the Closing Date and (E) the absence of any event occurring and continuing, or resulting from the initial Borrowing, that constitutes a Default, and (F) certifying the names and true signatures of the officers (if any) of the Borrower authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(x)    A certificate dated the Closing Date signed by an officer of the Borrower, to the effect that (A) each of the representations and warranties of the Borrower contained in Article IV hereof is true and correct in all material respects as of the Closing Date; *provided*, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects as of the Closing Date and (B) all conditions to the effectiveness of this Agreement set forth in this Article III other than those which are subject to the discretion, satisfaction, consent or approval of the Lender, have been satisfied (or, if applicable, waived) in all respects.

(xi)    Evidence satisfactory to the Lender and Counsel that the proceeds of the Term Loans will be used solely for the purposes identified in the Budget.

(xii)    Favorable opinion of Harter Secrest & Emery LLP, counsel for the Borrower in form and substance satisfactory to the Lender and Counsel, ***provided*** that such opinion shall be limited to the authority of the Borrower to enter into, deliver and perform obligations under this Agreement and all related agreements, deeds, conveyances, pledge

24

agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments referred to herein or otherwise required hereby.

(b)    An escrow shall have established with the Escrow Agent (the "*Escrow*"), which contains the following documents, each executed and duly authorized, and in form and substance acceptable to the Lender in its sole and absolute discretion (collectively, the "*Escrowed Documents*"):

(i)    fully executed and acknowledged Real Estate Collateral Documents in form suitable for filing or recording in all filing or recording offices that the Lender may reasonably deem necessary or desirable in order to create a valid and enforceable first priority Lien on the Mortgaged Property in favor of the Lender; and

(ii)    fully executed and acknowledged copies of (i) the Mortgage, and (ii) the Collateral Agreement; and

(iii)    fully executed and acknowledged documents in form suitable for filing or recording in all filing or recording offices that the Lender may reasonably deem necessary or desirable in order to create a valid and enforceable first priority Lien on the Mortgaged Property in favor of the Lender, including without limitation: (i) a deed conveying title to the Mortgaged Property to the Borrower (the "*Deed*"), (ii) a termination of the Lease, (iii) a termination of the Pre-Petition Pledge and Assignment, (iv) a satisfaction of the Prior Mortgage and Security Agreement, (v) a termination of the Prior General Assignment of Leases and Rents, (vi) a termination of the Prior Operating Account Agreement, (vii) a satisfaction of the Second Lien Mortgage, (viii) acknowledgement of satisfaction of the Bond Debt, (ix) a UCC-3 from M&T terminating and releasing its security interest, (x) a UCC-1 naming the Lender as secured party, (xi) a UCC-1 fixture filing in favor of the Lender as secured party, and (xii) any and all other and further documents that the Lender reasonably deems necessary or appropriate to terminate, satisfy, release and/or reconvey any related security interests or grants in the Borrower's property contained in any of the foregoing or any other documents.

(c)    Since the Petition Date (i) there shall have occurred no Material Adverse Effect and (ii) there has been no material increase in the liabilities, liquidated or contingent, of the Borrower (other than the liabilities in respect of the Term Loans under the Loan Documents), or material decrease in the assets of the Borrower.

(d)    There shall exist no action, suit, investigation, litigation or proceeding affecting the Borrower pending or threatened before any Governmental Authority that (i) would be reasonably likely to have a Material Adverse Effect other than the matters described on <u>Schedule 4.01(f)</u> hereto (the "*Disclosed Litigation*") and there shall have been no adverse change in the status, or financial effect on the Borrower, of the Disclosed Litigation from that described on <u>Schedule 4.01(f)</u> hereto, or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby.

(e)    All Governmental Authorizations and third party consents and approvals necessary in connection with the transactions contemplated by the Loan Documents shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Lender) or requested and shall remain in effect; all applicable waiting periods in connection with the transactions contemplated by the Loan Documents shall have expired without any action being taken by any competent authority, and no law or regulation shall be applicable in the judgment of the Lender, in each case that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated

25

by the Loan Documents or the rights of the Borrower freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(f)    The Borrower shall have commenced the Chapter 11 Case and the Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Lender in its sole discretion, on or before December 17, 2015 or as soon thereafter as practicable, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Lender), reversed, stayed or subject to a motion for reargument or reconsideration.  If the Interim Order is the subject of a pending appeal in any respect, none of the Interim Order, the making of the Term Loans, or the performance by the Borrower of any of the Obligations shall be the subject of a presently effective stay pending appeal.  The Borrower and the Lender shall be entitled to rely in good faith upon the Interim Order, notwithstanding objection thereto or appeal therefrom by an interested party.  The Borrower and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(g)    The Closing Date shall have occurred within one (1) Business Day of the date that the Bankruptcy Court shall have entered the Interim Order or such later date as the Lender agrees in its sole discretion.

(h)    The Lender shall have received the Budget prepared in good faith based upon assumptions believed to be reasonable when made and when delivered, satisfactory in all respects to the Lender.

(i)    The Collateral Agreement shall, upon entry of the Interim Order, be effective to create in favor of the Lender a legal, valid and enforceable first priority security interest in and lien upon the Collateral (subject to the Carve Out and the Prepetition Permitted Liens).

SECTION 3.02.    Conditions to Borrowings in Excess of the Interim Order Amount. The obligation of the Lender to make any Term Loan other than the Initial Term Loan shall be subject to the further conditions precedent, and the conditions set forth in Section 3.03, (unless waived pursuant to Section 8.01 hereof):

(a)    entry by the Bankruptcy Court of the Final DIP Order (with such Subsequent Term Loans to be made on the date which is on or after one (1) Business Day following the entry of the Final DIP Order), which Final DIP Order shall continue and confirm matters addressed in the Interim Order and shall not have been amended or modified (unless otherwise approved by the Lender), stayed or reversed thereafter or subject to a motion for reargument or consideration.  The Final DIP Order shall authorize an extension of credit under the Facility in an amount not greater than the Final Order Amount. If the Final DIP Order is the subject of a pending appeal in any respect, neither the Interim Order nor the making of the Term Loans, or the performance by the Borrower of any of the Obligations shall be the subject of a presently effective stay pending appeal.  The Borrower and the Lender shall be entitled to rely in good faith upon the Final DIP Order notwithstanding the objection thereto or appeal therefrom by any interested party.  The Borrower  and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(b)    The Borrower shall have filed with the Bankruptcy Court, the Sale Procedures Motion and the Sale Motion on or before December 17, 2015, and such motions shall have been in a form and substance satisfactory to the Lender in its sole discretion.

26

SECTION 3.03.    <u>Conditions Precedent to All Borrowings</u>.  (a)  The obligation of the Lender to make any Term Loan on the occasion of each Borrowing (including the initial Borrowing) in accordance with <u>Section 2.02</u>, shall be subject to the satisfaction or waiver in accordance with <u>Section 8.01</u> hereof of the further conditions precedent that on the date of such Borrowing:

(i)    the following statements shall be true and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that both on the date of the applicable Notice of Borrowing and the date of such Borrowing, such statements are true:

(A)    the representations and warranties of the Borrower contained in each Loan Document are correct in all material respects on and as of such date, before and after giving effect to such Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Borrowing, in which case such representations and warranties were true and correct in all material respects as of such specific date; *provided*, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates; and

(B)    no Default or Event of Default has occurred and is continuing, or would result from such Borrowing;

(ii)    the Lender shall have received such required funding requests as set forth in <u>Section 2.02(a)</u> or <u>Section 2.02(b)</u>, as applicable;

(iii)    subject to the authority of the Bankruptcy Court, the Borrower shall have paid to the Lender, all accrued and unpaid fees and expenses then due and payable to the Lender in connection with the transactions contemplated by the Loan Documents (including accrued and unpaid fees and expenses described in any fee letters executed by the Borrower in connection with this Agreement or in connection with the Lender's commitment to provide financing under the Facility and reasonable, documented and invoiced fees and expenses of Counsel); and

(iv)    such Borrowing shall not violate any Requirement of Law applicable to the Lender or the Borrower and shall not be enjoined, temporarily, preliminarily or permanently, by any Governmental Authority.

(v)    The post-petition Entrance Fee Deposits shall have been deposited in escrow in accordance with the terms of the RSA.

(b)    Each Borrowing hereunder shall constitute a representation and warranty by the Borrower as of the date of such Borrowing that the conditions contained in this <u>Section 3.03</u> have been satisfied.

SECTION 3.04.    Conditions Subsequent to Closing Date.  The obligation of the Lender to continue to make the Term Loans to the Borrower is subject to (a) the entry of the Final DIP Order and (b) the fulfillment, on or before the date applicable thereto, of the conditions subsequent set forth on <u>Schedule 3.04</u> (the failure by the Borrower to so perform or cause to be performed such conditions subsequent as and when required by the terms thereof, shall constitute an immediate Event of Default (it being understood and agreed that, to the extent that the existence of any such condition subsequent, or the failure to have satisfied such condition prior to the Closing Date, would otherwise

27

cause any representation, warranty or covenant in this Agreement or any Loan Document to be breached, such breach shall not be deemed to have occurred to the extent such condition subsequent is satisfied as and when required pursuant to Schedule 3.04)).

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.    Representations and Warranties of Borrowers.  The Borrower represents and warrants as follows:

(a)    The Borrower (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing in the jurisdiction in which it owns or leases property and in which the conduct of its business requires it to so qualify or be licenses, except where the failure to so qualify or be licensed would not be reasonably likely to have a Material Adverse Effect, and (iii) has all requisite corporate power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.  Schedule 4.01(a) sets forth each member of the board of directors of the Borrower as of the Closing Date.  Schedule 4.01(b) sets forth the Borrower's jurisdiction of incorporation, the address of its principal place of business and its U.S. taxpayer identification number.  As of the date hereof, the copy of the charter of the Borrower and each amendment thereto provided pursuant to Section 3.01(a)(viii) is a true and correct copy of each such document, each of which is valid and in full force and effect.

(b)    Subject to approval of the Bankruptcy Court and pursuant to the Orders, the execution, delivery and performance by the Borrower of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated thereby, are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action, and do not (i) contravene the Borrower's charter, bylaws or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting the Borrower or any of its properties or (iv) except for the Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of the Borrower.  The Borrower is not in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(c)    Except for the entry of the Orders,  no Governmental Authorization (other than the approval of the Bankruptcy Court or pursuant to the RSA), and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by the Borrower of any Loan Document to which it is or is to be a party, or for the consummation of the transactions contemplated thereby, (ii) the grant by the Borrower of the Liens granted or purported to be granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created or purported to be created under the Collateral Documents (including the first priority nature thereof, subject to the Carve Out and the Prepetition Permitted Liens) or (iv) the exercise by the Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents.  All applicable waiting periods in connection with the transactions contemplated by the Loan Documents have expired without any action having been taken by

28

any competent authority restraining, preventing or imposing materially adverse conditions upon the transactions contemplated by the Loan Documents or the rights of the Borrower freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(d)    This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by the Borrower.  Upon entry of the Interim Order, this Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, subject only to the entry of the Final DIP Order or as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditor's rights generally or by equitable principals relating to enforceability.

(e)    Except for the Chapter 11 Case and as otherwise set forth herein, there is no action, suit, investigation, litigation or proceeding affecting the Borrower, including any Environmental Action, pending or threatened before any Governmental Authority or arbitrator that (i) would be reasonably likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, and there has been no adverse change in the status, or financial effect on the Borrower, of the Disclosed Litigation from that described on <u>Schedule 4.01(f)</u> hereto.  The New York State Department of Financial Services has notified the Borrower that it is not in compliance with the reserve requirements established under Art. 46 of the Public Health Law and the regulations promulgated thereunder (the "***Statutory Reserve***") and for which a corrective plan of action is not feasible.

(f)    All Entrance Fees for which a refund obligations arose during the period prior to December 31, 2014 due to a Customer as a result of either  a Customer vacating a residential living unit prior to December 31, 2014, or otherwise, but that was not payable until prior to or during calendar year 2015, have been paid by the Borrower and all pending litigation relating to such refunds has been discontinued and discharged, and Borrower shall take all necessary and appropriate actions to ensure that all such actions will promptly be discharged.

(g)    The balance sheet of the Borrower as at December 31, 2014 and the related statement of income and statement of cash flows of the Borrower for the fiscal year then ended, accompanied by an opinion of Abbate DeMarinis, LLP, independent public accountants and, if otherwise provided, balance sheets of the Borrower as at September 30, 2015, and the related statement of income and statement of cash flows of the Borrower for the nine (9) months then ended, duly certified by the Chief Financial Officer of the Borrower, copies of which have been furnished to the Lender, fairly present, subject, in the case of said balance sheet as at September 30, 2015, and said statements of income and cash flows for the nine (9) months then ended, to year end audit adjustments and the absence of footnotes, the financial condition of the Borrower as at such dates and the results of operations of the Borrower for the periods ended on such dates, all in accordance with generally accepted accounting principles applied on a consistent basis (subject to year end audit adjustments and the absence of footnotes).  As of the Closing Date, the Borrower has no Guaranteed Debt, contingent liabilities and liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph or previously disclosed by the Borrower in its filings and current reports with the Securities Exchange Commission, except for any such liabilities or obligations which could not, individually or in the aggregate, have a Material Adverse Effect.

29

(h)    The forecasted balance sheets, statements of income and statements of cash flows of the Borrower (the "**Projections**") delivered to the Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable in light of the conditions existing at the time such were made and at the time of delivery of such forecasts.

(i)    No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.  There is no fact known to the Borrower that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

(j)    The Borrower is a board directed not-for-profit corporation formed under the laws of the State of New York and is an organization described in Section 501(c)(3) of the Code, and does not have a parent company or any wholly owned subsidiaries.

(k)    The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Term Loan will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(l)    The Borrower is not an "investment company," as such term is defined in the Investment Company Act of 1940, as amended.  Neither the making of any Term Loan, nor the application of the proceeds or repayment thereof by the Borrower, nor the consummation of the other transactions contemplated by the Loan Documents, will violate any provision of such Act or any rule, regulation or order of the Securities and Exchange Commission thereunder or equivalent under the applicable securities laws of other jurisdictions, in each case applicable to the Borrower.

(m)    The Borrower is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or corporate restriction that would be reasonably likely to have a Material Adverse Effect, which has not been disclosed to the Lender in writing on or before the Closing Date.

(n)    Except as described on Schedule 4.01(m), neither the Borrower nor any ERISA Affiliate maintains, sponsors, participates in or contributes to any Plan; neither the Borrower nor any ERISA Affiliate has incurred any material liability under Title I or Title IV of ERISA with respect to any Plan for which the Borrower could reasonably be expected to be liable; and no condition exists that would reasonably be expected to subject the Borrower to any material tax, fine, Lien or other liability imposed by ERISA, the Internal Revenue Code or other applicable law with respect to any Plan.

(o)    (i)  The operations and properties of the Borrower comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, and no circumstances exist that would be reasonably likely to (A) form the basis of an Environmental Action against the Borrower or any of its properties that could reasonably be expected to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law that could reasonably be expected to interfere with the Lender's interest therein in any material respect;

30

(ii)    (A) none of the properties currently or formerly owned or operated by the Borrower is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; (B) there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by the Borrower or on any property formerly owned or operated by the Borrower; and (C) there is no asbestos or asbestos-containing material on any property currently owned or operated by the Borrower; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by the Borrower; other than in the case of clauses (B) – (C) of this clause (ii) such exceptions that would have and have a Material Adverse Effect; and

(iii)    (A) the Borrower is not undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and (B) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by the Borrower have been treated or disposed of in a manner not reasonably expected to result in material liability to the Borrower.

(p)    Set forth on Schedule 4.01(o) hereto is a complete and accurate list, as of the date hereof, of all Liens on the property or assets of the Borrower, showing as of the date hereof the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of the Borrower subject thereto.  None of such Liens, or any other Liens, are valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Liens securing the Prepetition Debt as of the date hereof (and any such liens referred to herein as "***Prepetition Permitted Liens***").

(q)    Set forth on Schedule 4.01(p) hereto is a complete and accurate list, as of the date hereof, of all Investments held by the Borrower on the date hereof, showing as of the date hereof the amount, obligor or issuer and maturity, if any, thereof.

(r)    Except for its failure to comply with the Statutory Reserve, the Borrower is not in violation of any applicable Requirement of Law, including any building, zoning, occupational safety and health, fair employment, equal opportunity, pension, environmental control, health care, certificate of need, health care facility licensing or similar federal, state or local law, ordinance or regulation, relating to the ownership or operation of its business or assets, (ii) has not failed to obtain any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorizations necessary for the conduct of its businesses or the ownership and operation of its assets, (iii) has not received any notice from any Governmental Authority, and to its knowledge no such notice is pending or threatened, alleging that the Borrower has violated, or has not complied with, any Requirement of Law, condition or standard applicable with respect to any of the foregoing, and (iv) is not a party to any agreement or instrument, or subject to any judgment, order, writ, rule, regulation, code or ordinance, except to the extent that any violation, noncompliance, failure, agreement, judgment, etc. as described in clauses (i) and (ii) will not have a Material Adverse Effect.

(s)    The Borrower has all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary for the lawful conduct of their businesses or the ownership and operations of its assets wherever now conducted and as planned to be conducted, pursuant to all applicable statutes, laws, ordinances, rules

31

and regulations of all Governmental Authorities having, asserting or claiming jurisdiction over the Borrower or over any part of its operations,  except to the extent that the cumulative effect of noncompliance with the foregoing will not have a Material Adverse Effect.  A Schedule of all material licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations is set forth in Schedule 4.01(s) and copies shall be provided to the Lender upon request.  Neither the Borrower is in default under any of such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations, and no event has occurred, and no condition exists, that with the giving of notice, the passage of time or both would constitute a default thereunder or would result in the suspension, revocation, impairment, forfeiture or non-renewal of any thereof, except to the extent that the cumulative effect of all such defaults, events, conditions, suspensions, revocations, impairments, forfeitures and non-renewals will not have a Material Adverse Effect.  The continuation, validity and effectiveness of all such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations will not be adversely affected by the transactions contemplated by this Agreement.  The Borrower knows of no reason why it will not be able to maintain after the date hereof all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary to conduct the business of each such entity as now conducted and presently planned to be conducted.

(t)    Upon the entry of the applicable Order, such Order shall be effective to establish and perfect the Lender's security interest in the Collateral; *provided*, that the Lender may take any steps it deems necessary in its sole discretion to attach or perfect the Liens, which steps may include the filing of financing statements, mortgages, notices of liens or other similar documents.  The Lender's rights with respect to the Collateral are not subject to any setoff, claims, withholdings, or other defenses.

(u)    To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any material change in the Budget.  The Budget is based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made and when delivered, has been prepared on the basis of the assumptions stated therein and reflects the estimates of the Borrower, believed to have been reasonable when made and when delivered, of the results of operations and other information projected therein, it being recognized by the Lender that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by the Budget may differ from the projected results.

(v)    The Borrower has filed or caused to be filed all U.S. federal, state, local, and other tax returns that are required to be filed by it, all such tax returns were when filed, and continue to be, true, correct and complete in all material respects, and the Borrower has paid (or caused to be paid) all taxes shown to be due and payable on said returns and any other assessments made against it or any of its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than the amounts which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower); and no tax Lien has been filed with respect to the property of the Borrower and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge that could reasonably be expected to result in the filing of a tax Lien with respect to the property of the Borrower other than with respect to (i) Taxes not yet due and payable, and (ii) a pre-petition judgment lien filed by the New York State Department of Labor (the "***NYS DOL***") on August 31, 2015 (the "***NYS Labor Judgment Lien***"), in respect of a judgment obtained by the NYS DOL against the Borrower in the approximate amount of $59,000.00 (the "***NYS DOL Judgment***"), ***provided, however,*** that the NYS DOL Judgment will be have been satisfied by the Borrower on or before the Petition Date.

32

(w)    The Borrower is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which it is engaged; and the Borrower (i) has not received notice from any insurer or agent of such insurer that material expenditures will have to be made in order to continue such insurance, other than expenditures that may be necessitated by or result from the Borrower's status as debtor in possession or (ii) has no reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a cost that would not reasonably be expected to have a Material Adverse Effect, other than changes to such coverage and costs that may be necessitated by or result from the Borrower's status as debtor in possession.

(x)    To the extent applicable, the Borrower is in compliance, in all material respects, with the Patriot Act.

(y)    Since the date of the last audited financials of the Borrower, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

(z)    Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower pending or threatened; (b) hours worked by and payment made to employees of the Borrower have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Borrower on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Borrower except for any contingent withdrawal liability, as appropriate.

(aa)    Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a)  the Borrower has not lost any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorization necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets, or has been threatened with the loss, revocation, or suspension of any of the foregoing; and (b) there has been no survey that has resulted in or is reasonably expected to result in a deficiency notice, with respect to the Borrower except for non-compliance with the Statutory Reserve.  The Mortgaged Property is not located in a flood hazard area.  No portion of the Mortgaged Property consists of wetlands or filled land.

(bb)    The Borrower hereby makes to the Lender each of the representations and warranties made by the Borrower contained in the Loan Documents and all other operative documents to which the Borrower is a party as if such representations and warranties were set forth in full herein.

## ARTICLE V

## COVENANTS

SECTION 5.01.    <u>Affirmative Covenants</u>.  From the Closing Date for so long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid or any Commitment remains outstanding, the Borrower shall:

(a)    <u>Compliance with Laws, Etc</u>.  Comply in all material respects, with all applicable laws, rules, regulations and orders except for the Statutory Reserve.

33

(b)    <u>Payment of Taxes, Etc</u>.  Except as are being challenged in good faith and by proper proceedings by the Borrower and for which adequate reserves in accordance with GAAP have been established on the books and records of the Borrower, pay and discharge before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property at any time after the Petition Date and (ii) all lawful claims (other than claims in respect of Debt) made after the Petition Date that, if unpaid, could reasonably be expected by law to become a Lien upon its property.

(c)    <u>Compliance with Environmental Laws</u>.  Comply, and, if such non-compliance could reasonably be expected to interfere with the Lender's interest in such properties, cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws.

(d)    <u>Maintenance of Insurance</u>.  Maintain insurance (including, without limitation, business interruption) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower operates. All insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Lender of written notice thereof, (ii) name the Lender as an insured party or loss payee, and (iii) be reasonably satisfactory in all other respects to the Lender. The Borrower shall deliver to the Lender a report of a reputable insurance broker with respect to such insurance as the Lender may from time to time reasonably request.

(e)    <u>Preservation of Corporate Existence, Etc</u>.  Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), privileges, licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary for the conduct of its businesses or the ownership and operation of its assets.

(f)    <u>Visitation Rights</u>.  Upon reasonable prior notice to the Borrower, at any time during normal business hours, (i) permit representatives of the Lender (including legal and financial advisers, auditors, appraisers, and any other consultants engaged from time to time at the direction of the Lender) to examine and make copies of and abstracts from the records and books of account of, and visit the properties of the Borrower, and to discuss the affairs, finances and accounts of the Borrower with any of its officers or directors and with their independent certified public accountants and (ii) permit field examinations to be conducted at any reasonable time by the Lender or a field auditor satisfactory to the Lender, in respect of the accounts receivable of the Borrower.

(g)    <u>Keeping of Books</u>.  Keep proper books of record and account in conformity with GAAP and all Requirements of Law, in which full and correct entries (in all material respects) shall be made of all financial transactions and the assets and business of the Borrower in accordance with generally accepted accounting principles in effect from time to time.

(h)    <u>Maintenance of Properties, Etc</u>.  Maintain and preserve all of its properties that are necessary in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

34

(i)    _Further Assurances_.  (i) Promptly upon request by the Lender, correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document.

(ii)    Promptly upon request by the Lender, do, execute, acknowledge, deliver any and all acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Lender  may reasonably require from time to time (and consent to the Lender recording or filing such instrument) in order to (A) carry out more effectively the purposes of the Loan Documents, (B) to the fullest extent permitted by applicable law, subject the Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Loan Document or under any other instrument executed in connection with any Loan Document to which the Borrower is or is to be a party.

(j)    _Due Diligence_.  Use its best efforts to provide all due diligence materials requested by the Lender or its legal and financial advisors (including due diligence materials with respect to any proposed asset sales and any severance obligations of the Borrower to any employees or former employees); _provided_, _however_, to the extent the Borrower is prevented from providing the materials required by this Section 5.01(j) due to confidentiality restrictions to which it is bound, the Borrower shall use commercially reasonable efforts to remove any such restriction.

(k)    _Use of Proceeds_.  Use the proceeds of the Term Loans as set forth in Section 2.11 only in accordance with the Budget and in compliance with Section 5.04(a).

(l)    _Control Account Agreements_.  Execute and deliver to the Lender a Control Account Agreement, in form and substance satisfactory to the Lender and Borrower's post-petition depositary bank and executed by the Borrower's depositary bank and take all other steps necessary or, in the reasonable opinion of the Lender, desirable to ensure that the Lender has a perfected first priority security interest in such cash (subject to the Carve Out and the Prepetition Permitted Liens); _provided_, that if the Borrower is unable to obtain such agreement from such depositary bank, the Borrower shall promptly transfer all cash maintained at such depositary bank to a financial institution from which the Borrower has obtained such an agreement.

(m)    _Sale Provisions_.  (i) File a Sale Procedures Motion and a Sale Motion on or before December 17, 2015, for the sale of all or substantially all of the Collateral in an amount sufficient to pay the Obligations under the Facility indefeasibly in cash in full at the closing of such sale, which motions shall be in form and substance acceptable to the Lender in its sole and absolute discretion, and (ii) designate and approve the Lender as a qualified bidder as that term is defined in the Sale Procedures Motion and the Sale Procedures Order, and seek and obtain court approval for the Lender to credit bid, under Bankruptcy Code section 363(k), in an amount up to the amount of the Commitment (or such lesser amount as may be required to pay the Obligations in cash in full at the closing of the sale), in any sale or disposition of the Collateral, whether such sale is pursuant to section 363(k) or in accordance with the terms of any plan of reorganization filed by or against the Borrower.  For the avoidance of doubt, the Lender does not intend to credit bid if there is a competing cash bid that is sufficiently greater than the aggregate outstanding amount of the DIP Loan such that the DIP Loan will be indefeasibly paid in cash in full upon the closing of any sale.

35

SECTION 5.02.    Negative Covenants.  From the Closing Date, for so long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid or any Commitment remains outstanding, the Borrower shall not, at any time:

(a)    Liens, Etc.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character whether now owned or hereafter acquired, or sign or file or suffer to exist under the UCC (or similar law) of any jurisdiction, a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except  the following (collectively, "***Permitted Liens***"):

(i)    Liens created pursuant to the Loan Documents, the Interim Order, or the Final DIP Order;

(ii)    Statutory Liens;

(iii)    Liens existing on the Petition Date and described on Schedule 4.01(o) hereto;

(iv)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower in the ordinary course of business to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction, improvement or installation of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition, construction, improvement or installation (other than any such Liens created in contemplation of such acquisition, construction, improvement or installation that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided, however*, that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed, improved or installed (or the proceeds of any of the foregoing), and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced (other than the proceeds of any such property); and *provided further* that the aggregate principal amount of the Debt hereafter incurred secured by Liens permitted by this clause (v) shall not exceed the amount permitted under Section 5.02(b)(iii) at any time outstanding;

(v)    Liens arising under Capitalized Leases permitted under Section 5.02(b)(iii); *provided* that no such Lien shall extend to or cover any Collateral or assets other than the assets subject to such Capitalized Leases (or the proceeds thereof);

(vi)    Liens securing the financing of insurance premiums in the ordinary course of business of the Borrower outstanding on the Closing Date or included in the Budget with the Lender's consent;

(vii)    the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or the consignment of goods; and

(viii)    to the extent constituting Liens, Liens of a Customer arising with respect to any real or personal property owned by such Customer or any other Person, that is in the possession or control of the Borrower pursuant to any similar arrangement.

(b)    <u>Debt</u>.  Create, incur, assume or suffer to exist any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    unsecured Debt not to exceed in the aggregate $50,000 at any time outstanding, except as reflected in the Budget;

(iii)    Capitalized Leases and Debt secured by purchase money Liens existing on the date hereof and listed on <u>Schedule 5.02(b)</u> hereto and Capitalized Leases and Debt secured by purchase money Liens hereafter incurred in accordance with the Budget, not to exceed an aggregate principal amount of $25,000 at any time outstanding; and

(iv)    Debt not otherwise specified above and existing on the date hereof and described in <u>Schedule 5.02(b)</u> hereto.

(c)    <u>Change in Nature of Business</u>.  Make any material change in the nature of its business as carried on at the date hereof.

(d)    <u>Mergers, Etc</u>.  Merge into or consolidate with any Person or permit any Person to merge into it.

(e)    <u>Sales, Etc. of Assets</u>.  Sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets, except:

(i)    the sale of any assets out of the ordinary course of its business to the extent approved by the Attorney General,  the Bankruptcy Court, and any other Governmental Authority whose consent is needed to effectuate such sale, and on terms and conditions satisfactory to the Lender; *provided* that the Borrower shall, on the date of receipt by it of the Net Cash Proceeds from such sale, prepay the Term Loans pursuant to, and in the amount set forth in, <u>Section 2.04</u>;

(ii)    entering into contracts with Customers for the use by such Customers of the Borrower's independent living units; *provided* that the Borrower shall, on the date of receipt by it of any Entrance Fee Deposits, deposit such Entrance Fee Deposits in an escrow in accordance with the terms of the RSA;

(iii)    sales of excess, obsolete or worn out equipment in the ordinary course of its business;

(iv)    the sale of any assets constituting a Permitted Investment and maintained in a Securities Account, subject to the terms and conditions of a securities account control agreement in form and substance satisfactory to the Lender, duly executed by the financial institution party thereto; and

(v)    Investments permitted under <u>Section 5.02(f)</u> and transactions permitted under <u>Section 5.02(g)</u>.

37

(f)    <u>Investments in Other Persons</u>.  Make or hold any Investment in any Person, except:

(i)    Debt permitted under <u>Section 5.02(b)</u> hereof;

(ii)    Investments of Cash or Permitted Investments in Permitted Investments to the extent the Lender's security interests thereon retains the same priority in such Investment that it held in such Cash or Permitted Investments immediately prior to the making of such Investment (other than Liens in favor of a bank or other depository institution securing obligations owed to such bank or other depository institution in respect of or arising out of such Investment); and

(iii)    Investments existing on the date hereof and described on <u>Schedule 4.01(p)</u> hereto.

(g)    [Reserved].

(h)    <u>Amendments of Constitutive Documents</u>.  Amend its certificate of incorporation or bylaws or other constitutive documents.

(i)    <u>Accounting Changes</u>.  Make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by generally accepted accounting principles, or (ii) Fiscal Year.

(j)    <u>Prepayments, Etc., of Debt</u>.  (i) repay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment on any Debt, except (a) the prepayment of the Term Loans in accordance with the terms of this Agreement, and (b) the prepayment of the Bond Debt and Intercompany Debt in accordance with the terms of this Agreement, or (ii) amend, modify or change in any manner any term or condition of any Subordinated Debt.

(k)    <u>Prepetition Payments</u>.  Make or permit to be made any payments in respect of any prepetition obligation except (i) payments to prepetition critical trade vendors in accordance with an order of the Bankruptcy Court and the Budget, or (ii) payments made in accordance with the Budget, the Interim Order or the Final DIP Order.

(l)    <u>Negative Pledge</u>.  Enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except (i) agreements in favor of the Lender or (ii) prohibitions or conditions under (A) any purchase money Debt permitted by <u>Section 5.02(b)(iii)</u> solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property acquired with the proceeds of such Debt or (B) any Capitalized Lease permitted by <u>Section 5.02(b)(iii)</u> solely to the extent that such Capitalized Lease prohibits or requires the consent of any Person other than the Borrowers and their Affiliates as a condition to the creation of a Lien on the property subject thereto.

(m)    <u>Speculative Transactions</u>.  Engage in any transaction involving commodity options or futures contracts or any similar speculative transactions.

(n)    <u>Transactions with Affiliates</u>.  Except for the transactions disclosed on <u>Schedule 5.02(m)</u>, directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except for (i) payment to employees and officers of reasonable compensation in the ordinary course of business, (ii) the

38

reimbursement of out of pocket costs and expenses for employees, directors, officers and consultants in the ordinary course of business, and (iii) other transactions approved by the Lender, which are in the ordinary course of business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate.

(o)    ERISA.  Except as disclosed on Schedule 4.01(m) on the Closing Date, maintain, sponsor, participate in or contribute to any Plan or Multiemployer Plan; or incur any material liability under Title I or Title IV of ERISA for which the Borrower could be reasonably expected to be liable, or permit any of its ERISA Affiliates to do any of the foregoing.

(p)    Material Amendments.  Make any material amendment to any agreements with any employee or independent contractor unless the Borrower reasonably determines that such amendment results in cash savings or improved liquidity for the Borrower and is reflected in the Budget or to which the Lender has agreed in writing.

(q)    Prepetition Indebtedness.  (i) Modify, supplement or amend the Prepetition Loan Document or any related loan documents in any material respect or (ii) pay or discharge or cause to be paid or discharged, any Debt of such the Borrower incurred before the Petition Date other than payments, which are:

(i)    approved by the Bankruptcy Court and consented to by the Lender (including, as applicable, payments made in accordance with any Bankruptcy Court order to critical vendors, employees, taxing authorities, and insurers); and

(ii)    consistent with the Budget; and

(iii)    in respect of adequate protection, if any, required to be made to the Prepetition Lenders pursuant to the Orders.

The Borrower shall not, without the consent of the Lender, file any motion with the Bankruptcy Court in accordance with Section 546(h) of the Bankruptcy Code seeking to return any goods shipped to the Borrower prior to the Petition Date.

(r)    Chapter 11 Case.  Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b) or 507(b) of the Bankruptcy Code or, from and after the entry of the Final DIP Order, Section 506(c) of the Bankruptcy Code) equal to or superior to the priority claim of the Lender in respect to the Obligations other than the Carve Out and the Prepetition Permitted Liens that are expressly permitted to be equal to or superior to the priority claim of the Lender in respect to the Obligations; and (iii) any Lien on any Collateral having a priority equal or superior to the Liens in favor of the Lender in respect of the Obligations other than the Carve Out and the Prepetition Permitted Liens.

SECTION 5.03.    Reporting Requirements.  So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid, or the Lender shall have any Commitment hereunder, the Borrower will furnish to the Lender:

(a)    <u>Default Notice</u>.  As soon as possible and in any event within two (2) business days day after any officer of the Borrower is actually aware of the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect continuing on the date of such statement, a statement of the Chief Financial Officer of the Borrower setting forth details of such Default, events, development or occurrence and the action taken and proposed to be taken with respect thereto.

(b)    <u>Monthly Financials</u>.  As soon as available, but in any event no later than 30 days after the end of each month occurring during each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such month and the related unaudited statements of income and stockholders' equity and cash flow for such month, certified by the Chief Financial Officer of the Borrower or as being fairly stated in all material respects (subject to normal year-end adjustments).  All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP except, for the absence of explanatory footnotes) applied consistently throughout the periods reflected therein and with prior periods.

(c)    <u>Quarterly Financials</u>.  As soon as available, but in any event no later than 30 days after the end of each quarter occurring during each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such quarter and the related unaudited statements of income and stockholders' equity and cash flow for such quarter, certified by the Chief Financial Officer of the Borrower or as being fairly stated in all material respects (subject to normal year-end adjustments).  All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP except, for the absence of explanatory footnotes) applied consistently throughout the periods reflected therein and with prior periods.

(d)    <u>Annual Financials</u>.  As soon as available, (i) but in any event no later than 60 days after the end of each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such fiscal year and the related unaudited statements of income and stockholders' equity and cash flow for such fiscal year, and (ii) but in any event no later than 90 days after the end of each fiscal year of the Borrower, the audited balance sheets of the Borrower as at the end of such fiscal year and the related audited statements of income and stockholders' equity and cash flow for such fiscal year, reported upon without qualification by an independent certified public accounting firm selected by Borrower and reasonably satisfactory to Lender.  All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP) applied consistently throughout the periods reflected therein and with prior periods.

(e)    <u>Budget Update</u>. No later than (i) the Friday of the ninth (9th) week covered by the initial Budget for the thirteen (13) week period commencing on the Petition Date and (ii) the last Friday of each subsequent 9-week period, (x) an updated budget in the same form as the Initial Budget and satisfactory to the Lender in its sole and absolute discretion, which, if approved by the Lender (and for the avoidance of doubt, without any further order of the Bankruptcy Court) in its sole and absolute discretion, shall become part of the Budget (each  an "***Amended Budget***"); and (y) alternate updated budgets in the same form as the Initial Budget and satisfactory to the Lender in its sole and absolute discretion, that models the Borrower's finances and operations assuming that a new operator does not assume the obligation to fund operations each month going forward.

40

(f)     Chief Financial Officer Report and Certificate.  Commencing with the first Wednesday after the Petition Date and on each Wednesday thereafter (or, if such day is not a Business Day, on the immediately succeeding Business Day), a certificate of the Chief Financial Officer of the Borrower containing:

(i)     an "actual to budget" report which sets forth for each line item of the Budget, the actual results for the prior week and for all prior weeks,

(ii)     a reconciliation of actual results for the prior week and cumulatively for all prior weeks to the corresponding amounts reflected in the Budget which shows the numerical and percentage variance  in any line item, and which includes narrative explanations for each such variance,

(iii)     certifications that that no proceeds of the Term Loans have been used for any purpose not set forth in the Budget.

(g)     Chapter 11 Case Documents.  Promptly, but in any event no later than 4 days before filing, all pleadings, documents and reports to be filed in the Chapter 11 Case.

(h)     Weekly Conference Calls and Meetings.

(i)     On Wednesday of each week (or, if such day is not a Business Day, on the immediately succeeding Business Day) at 4 p.m. (Prevailing Eastern Time), Borrower's officers and advisers will hold a conference call with the Lender at which meeting shall be reviewed the financial results of the previous week and the financial condition of Borrower.

(ii)     To the extent that the Borrower causes members of its management, board of directors and advisers to meet with the Attorney General, the Resident Professionals, the Resident Council, the Department of Financial Services, the Department of Health, any other New York state agency, or any other Governmental Authority, the Borrower shall provide to Lender a prior notice and an opportunity to attend such meeting.

(i)     Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting the Borrower or the Affiliates of the type described in Section 4.01(e), and promptly after the occurrence thereof, notice of any material adverse change in the status or the financial effect on the Borrower or Affiliate of the Disclosed Litigation from that described on Schedule 4.01(f) hereto.

(j)     Licenses.  Promptly after receipt thereof, notice of any Governmental Authority or other Person that such Governmental Authority or other Person has rescinded or not renewed, or intends to rescind or not renew, any material any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorization of the Borrower or any Affiliate necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets.

(k)     Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by the Borrower or any of its

41

properties, with any Environmental Law or Environmental Permit in each case that could reasonably be expected to have a Material Adverse Effect, as well as any actual or threatened release, pollution or other environmental condition at or from any of the properties of the Borrower, that could reasonably be expected to constitute a violation of any Environmental Law.

(l)    <u>Casualty Losses</u>.  Promptly upon learning of any casualty loss or event not insured against in an amount in excess of $100,000, notice of such loss or event.

(m)    <u>Insurance</u>.  Promptly upon learning of any claim made by any co-insured party under any of the Borrower's insurance policies in excess of $100,000, notice of such claim, and updates with respect to such claim's resolution and the impact thereof upon the Borrower's insurance limits or policies.

(n)    <u>Occupancy</u>. On or prior to the last Business Day of each calendar month, schedules regarding occupancy and residence contracts of Customers, in form and substance acceptable to the Lender in its sole discretion, and such other and further information with respect to occupancy and/or the Borrower's Customers as the Lender may reasonably request from time to time.

(o)    <u>Other Information</u>.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower as the Lender may from time to time reasonably request and all information and documentation, including any statement or report, that has been prepared by, provided to or filed with the Resident Professionals, the Attorney General, the Department of Financial Services, the Department of Health, or any other state agency or Governmental Authority, or any committee appointed in the Chapter 11 Case.

(p)    <u>Termination of Contracts, Etc.</u>  Promptly after the occurrence thereof, written notice of (i) termination of any material contract to which the Borrower is a party, (ii) failure of any counterparty to any material contract to make any payment in an aggregate amount in excess of $100,000 more than three (3) months past due to the Borrower, and (iii) any tax audit or assessment of taxes on the Borrower. Notwithstanding the foregoing, the Borrower reserves it rights in furtherance of its fiduciary duties to reject any burdensome executory contracts or leases, provided, however, the rejection of any such contracts or leases shall not have a Material Adverse Effect and Borrower shall provide Lender with advance notice prior to filing any motions in respect thereof.

SECTION 5.04.    <u>Financial Covenants</u>.  So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid, or the Lender shall have any Commitment hereunder, the Borrower will:

(a)    <u>Budget Compliance</u>.  Not make payments other than those set forth in the Budget; *provided*, that (i) other than Professional Fees, (A) actual disbursements for any prior week for any line item in the Budget may have a positive variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget and (B) actual cash receipts for any prior week for any line item in the Budget may have a negative variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget, (C) actual disbursements for all prior weeks for any line item in the Budget may have a positive variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget, and (D) actual cash receipts for all prior weeks for any line item in the Budget may have a negative variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget and (ii) the actual disbursement of Professional Fees shall not exceed $800,000, which disbursement shall be made from the Professional Fee Reserve pursuant to an order of the Bankruptcy Court allowing for payment of such Professional Fees, and only after all retainers

42

held by the professionals on whose behalf Professional Fees have been allowed by the Bankruptcy Court shall have been exhausted.

(b)    The combined balance of cash on hand and accounts receivable of the Borrower (excluding any intercompany receivables) shall be no less than seven and one-half percent (7.5%) of the outstanding principal amount under the Facility, such testing to be based upon the Borrower's monthly internal financial report which is prepared in accordance with GAAP.

(c)    Capital Expenditures.  Not make any Capital Expenditures other than Capital Expenditures approved by the Lender in writing, which approval will not be unreasonably withheld or delayed.

Notwithstanding the foregoing, the line items in the Budget for payment of interest, expenses and all other amounts to the Lender are estimates only, and the Borrowers remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim Order and the Final DIP Order.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.    Events of Default.  If any of the following events ("***Events of Default***") shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal or interest of any Term Loan or make any other payment under any Loan Document when the same shall become due and payable;

(b)    any representation or warranty made by the Borrower (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made;

(c)    the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(e), Section 5.02, Sections 5.03(a), 5.03(e), 5.03(f), 5.03(g), 5.03(h),  or Section 5.04;

(d)    the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.03 (except for Sections 5.03(a), 5.03(e), 5.03(f), 5.03(g), 5.03(h)),  if such failure shall remain unremedied for two (2) business days after notice;

(e)    the Borrower shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for ten (10) days after the earlier of the date on which (i) any officer of the Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by the Lender;

(f)    (i) the Borrower shall pay any principal of, premium or interest on or any other amount payable in respect of any pre-petition Debt unless provided for herein, (ii) the Borrower fails to pay any principal of, premium or interest on or any other payment in respect of any post-petition Debt, (iii) if with respect to any Debt, there is a default thereunder the holder thereof obtains relief from the automatic stay of Section 362 of the Bankruptcy Code to enforce such Debt; or  (iv) with respect to post-petition Debt, (I)  if any event shall occur or condition shall exist under any agreement or instrument

43

relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature, or (II) if any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or (III) an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in the case of each (I) through (III), prior to the stated maturity thereof;

(g)        any judgments or orders, either individually or in the aggregate, for the payment of money in excess of $100,000 after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such judgment or order, but inclusive of any deductible amount) shall be rendered against the Borrower after the Petition Date  and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(h)        any non-monetary judgment or order shall be rendered against the Borrower after the Petition Date that is reasonably likely to have a Material Adverse Effect, and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i)        any provision of any Loan Document after delivery thereof pursuant to Section 3.01 shall for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Borrower, or the Borrower shall so assert;

(j)        any Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority (subject to the Carve Out and the Prepetition Permitted Liens) lien on and security interest in the Collateral purported to be covered thereby, except as otherwise provided in such Collateral Document;

(k)        a Change of Control shall occur;

(l)        the Bankruptcy Court shall enter any order (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final DIP Order or any other order with respect to the Chapter 11 Case affecting in any material respect this Agreement or the Loan Documents, without the Lender's consent, (ii) appointing a Chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Chapter 11 Case, or a receiver, interim-receiver, receiver and manager or a trustee in bankruptcy, with respect to any of the Borrower, or any of its assets, (iii) dismissing the Chapter 11 Case or converting any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of the Borrower to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $100,000; (v) under Section 5.06(c) of the Bankruptcy Code surcharging any of the Collateral; (vi) avoiding or requiring repayment of any portion of the payments made on account of the Obligations owed to Lender; (vii) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority that would have a Material Adverse Effect or priority over any Lien of the Lender on the Collateral; or (viii) granting relief from the

44

automatic stay of Section 362 of the Bankruptcy Code and allowing any modification to the Prepetition Loan Documents or Prepetition Debt;

(m)     appointment of a receiver, interim receiver or other third party or entity by any Governmental Entity or other Person with respect to the Borrower or any of the Borrower's Affiliates, and any of each such entity's respective assets;

(n)     a motion shall be filed or a motion entered to: (i) obtain additional or replacement financing under Section 364(c) or (d) of the Bankruptcy Code or otherwise (including but not limited to the refinance, extension, renewal, restructure, replacement or issuance of other Debt in exchange or replacement for the Commitment hereunder, in whole or in part) or (ii) to grant any Lien on any Collateral except as permitted hereunder and under the other Loan Documents;

(o)     a motion shall be filed by the Borrower for the approval of any other Superpriority Claim in the Chapter 11 Case (other than the Carve Out) which is pari passu with or senior to the claims of any of the Lender against the Borrower unless after giving effect to the transactions contemplated by such motion, all Obligations of the Borrower under the Loan Documents (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) shall be paid in full in cash;

(p)     the failure of the Bankruptcy Court (i) to enter the Interim Order, in form and substance satisfactory to the Lender in its sole discretion, on or before December 17, 2015; (ii) to enter the Sale Procedures Order on or before December 31, 2015; (iii) to enter the Sale Order on or before January 29, 2016;

(q)     the failure of the Bankruptcy Court to enter the Final DIP Order, in form and substance satisfactory to the Lender in its sole discretion (including, without limitation, approval of the Facility) on or before January 15, 2016, or as soon thereafter as is practicable;

(r)     the failure of the Borrower to comply in all material respects with the Orders, the Sale Order, the Sale Procedures Order or any other order of the Bankruptcy Court applicable to the Borrower;

(s)     (i) the failure of the purchaser under the Sale Order of all or substantially all of the Collateral to assume the management and operations of the Borrower on or prior to March 1, 2016 or (ii) the failure of the closing of the sale of the Collateral to occur on or before September 31, 2016 and the payment in full of the Obligations under the Facility;

(t)     the Borrower shall pay any brokerage commission or any retention payment without the prior written consent of the Lender;

(u)     the Borrower shall seek Bankruptcy Court approval of a sale, or otherwise enter into a binding commitment for a sale, without the consent of the Lender in its sole discretion, of all or substantially all of the Borrower's assets (either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in any case or otherwise), that is not to the Lender or any of its Affiliates or does not provide for indefeasible payment in full in cash of the Obligations and termination of the Lender's obligations hereunder;

(v)     the Borrower shall file a motion in any of the Chapter 11 Case (i) except as provided in the Orders, to use cash collateral of the Lender under Section 363(c) of the Bankruptcy Code without the Lender's consent, (ii) to recover from any portions of the Collateral any costs or expenses of

45

preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating the Lender's interest in any of the Collateral;

        (w)     the Borrower shall object to, join in any objection to, or otherwise support any objection to (i) the Lender being deemed a qualified bidder as that term is defined in the Sale Procedures Motion and Sale Procedures Order, or (ii) the Lender's ability to credit bid at any auction held pursuant to the Sale Procedures Motion and the Sale Procedures Order or other sale of Collateral, whether under section 363 of the Bankruptcy Code or any plan of reorganization;

        (x)     the occurrence of any event or circumstance which could reasonably be expected to have a Material Adverse Effect;

        (y)     the occurrence of (i) any material deterioration in the value of the Collateral of the Borrower taken as whole or (ii) any material damage to or loss of assets of the Borrower taken as a whole (after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such damage or loss, but inclusive of any deductible amount);

        (z)     an order terminating exclusivity has been entered by the Bankruptcy Court or requested of the Bankruptcy Court unless actively contested by the Borrower;

        (aa)     any filing with respect to the Borrower, whether voluntary or involuntary, to convert or dismiss the Borrower's Chapter 11 Case;

        (bb)     the occurrence of a "default" under the RSA that has not been cured or waived within any applicable grace period;

        (cc)     a material impairment of any license, permit, approval, registration, contract, consent, franchise, qualification, certificate, accreditation or other Governmental Authorization of the Borrower or any Affiliate necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets; and

        (dd)     Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) the occurrence of any strikes or other labor disputes against the Borrower pending or threatened; (b) the hours worked by and payment made to employees of the Borrower have been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; (c) payments due from the Borrower on account of employee health and welfare insurance have not been paid or accrued as a liability on the books of the Borrower; and (d) any of the Borrower's Affiliates are liable for any past-due amounts due and owing on account of any employee wage, benefit, expense, insurance, pension, medical, dental or welfare insurance, or other employee cost or expense (other than as set forth in Schedule 6.01 (dd)).

        (ee)     Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) the Borrower have lost any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorizations necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets, or have been threatened with the loss, revocation, or suspension of any of the foregoing; and (b) there has been a survey that has resulted in or is reasonably expected to result in a deficiency notice, with respect to the Borrower.

(ff)        appointment of a Chapter 11 trustee as examiner with expanded powers in any of the Chapter 11 Case;

then, and in any such event, the Lender may, by notice to the Borrower, declare (A) the Commitment and the obligation of the Lender to be terminated, whereupon the same shall forthwith terminate, and (B) the Term Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Term Loans, all such interest and all such amounts shall be forthwith due and payable.

SECTION 6.02.        Remedies upon Default.  Upon the occurrence and during the continuance of an Event of Default as determined by the Lender in its sole discretion, the Borrower, any Creditors' Committee or the Resident Council shall have the right to contest, and only to contest, such determination of the occurrence of an Event of Default within three (3) Business Days of such occurrence by filing an expedited motion with the Bankruptcy Court, and unless the Bankruptcy Court shall have determined that an Event of Default has not occurred and/or is not continuing within two (2) Business Days of the filing of such motion, the automatic stay shall automatically be terminated without further notice or order, and the Lender shall be permitted to (a) accelerate the Obligations under the Facility, (b) sweep any or all cash in any deposit account of the Borrower subject to a Control Account Agreement to prepay the Term Loans and to pay all other Obligations of the Borrower under the Loan Documents to the Lender, (b) foreclose on all or any portion of the Collateral and collect accounts receivable and apply the proceeds thereof to the Obligations of the Borrower under the Loan Documents, (c) occupy the Borrower's premises, (d) execute going-out-of business sales and (e) otherwise exercise remedies permitted by applicable non-bankruptcy law.  Upon the occurrence and during the continuance of an Event of Default (i) upon the direction of the Lender, the Borrower shall pursue an immediate sale of all or substantially all of the Collateral pursuant to the provisions of Section 363 of the Bankruptcy Code, in a manner and on terms satisfactory to the Lender, including, without limitation, that the Lender shall be authorized to credit bid at any such sale in an amount up to the amount of the Commitment (or such lesser amount as may be required to indefeasibly pay the Obligations in cash in full at the closing of the sale), and the proceeds of which sale shall be used to pay the Obligations of the Borrower under the Loan Documents to the Lender and (ii) the Borrower shall waive any right under Section 105 of Bankruptcy Code or otherwise, to enjoin the Lender from taking any action permitted under this Agreement.  If the Borrower fails to comply with the provisions of this Section 6.02, the Lender shall immediately be authorized, and is hereby appointed as an agent and attorney-in-fact of the Borrower, with such power coupled with an interest, to file a Sale Motion and pursue a sale on the Borrower's behalf, which Sale Motion shall provide the Lender with credit bid rights as described in this Section 6.02.

## ARTICLE VII
## PRIORITY AND COLLATERAL SECURITY

SECTION 7.01.        Superpriority Claims and Collateral Security.

(a)        The Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the applicable Order, the Obligations of the Borrower under the Loan Documents:

(i)        shall at all times constitute a Superpriority Claim in the Chapter 11 Case of the Borrower having priority, pursuant to Section 364(c)(1) and 507(b) of the Bankruptcy Code (subject only to the Carve Out and the Prepetition Permitted Liens), over the other administrative claims of any entity, including, without limitation any claims under Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the

Bankruptcy Code (including, subject to entry of the Final DIP Order, Section 506(c)), and shall at all times be senior to the rights of the Borrower, the Borrower's estate, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Case;

(ii)    subject to the Liens securing the Prepetition Debt until the release of such Liens concurrent with the payment of the obligations owed on account of such Prepetition Debt with the Initial Term Loan, pursuant to Section 364 of the Bankruptcy Code and the Collateral Documents, the security interests of the Lender hereunder shall at all times be secured by, and the Borrower hereby grants to the Lender, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority Lien (subject to the Carve Out and the Prepetition Permitted Liens) on all existing and after acquired real and personal property and other assets of the Borrower, tangible and intangible, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrower, whether owned or consigned by or to, or leased from or to the Borrower and regardless of where located, including without limitation, (A) the Collateral (as defined in the Collateral Documents), (B) all of the Borrower's present and future Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, except where the taking of such security interest is a violation of an express prohibition contained in the Government Contract or is prohibited by applicable law, unless in any case consent is otherwise validly obtained, (C) all avoidance power claims and actions arising under Section 549 of the Bankruptcy Code relating to post-petition transfers of Collateral and any proceeds thereof, (D) subject to entry of a Final DIP Order, all avoidance power claims and actions under Chapter 5 of the Bankruptcy Code and any proceeds thereof, and (E) any unencumbered assets of the Borrower.

(b)    The Borrower warrants and covenants that, except as otherwise expressly provided in this Section 7.01, the Obligations of the Borrower under the Loan Documents shall at all times be secured by a superpriority charge and senior priming security interest over all of the present and future assets of the Borrower with priority over all existing Liens and security (subject to the Carve Out and the Prepetition Permitted Liens).

(c)    Such Superpriority Claim and Liens referred to in Section 7.01(a) shall be junior to and subject to the Carve Out and the Prepetition Permitted Liens, but shall, notwithstanding anything to the contrary in this Agreement, otherwise be senior in priority to all other Liens on the assets and properties of the Borrower, entitled to priority under applicable non-bankruptcy law.

SECTION 7.02.    Collateral Security Perfection.  The Borrower agrees to take all action that the Lender may reasonably request, subject to the terms and conditions of the Collateral Agreement, as a matter of non-bankruptcy law to perfect and protect the Lender's Liens upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents, instruments and financing statements, providing such notices to third parties, obtaining such consents from any Governmental Authority and providing such other instruments and documents in recordable form, as the Lender may reasonably request.  The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of New York or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC of the State of New York or such other jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower, and (ii) in the case of a financing statement

filed as a fixture filing, a sufficient description of real property to which the Collateral relates. The Borrower agrees to furnish any such information to the Lender promptly upon request. Notwithstanding the provisions of this Section 7.02, the Lender shall have the benefit of the entry of the Interim Order and the Final DIP Order.

SECTION 7.03.    No avoidance, Subordination or Modification. The Borrower's obligations under the Facility shall not be subject to avoidance, subordination or modification under any provision of the Bankruptcy Code or applicable law, and all claims arising under the Facility shall constitute an allowed claim against the Borrower that are valid, binding and enforceable against the Borrower and the Borrower's estate, and all claims, defenses, offsets to such obligations shall be waived, and all persons and entities shall be barred from asserting any such claims, defenses or offsets to such allowed claim. The obligations under the Facility and the Liens securing the Facility shall not be subject to, and the Borrower hereby waives the right to, surcharge the same pursuant to Section 506(c) of the Bankruptcy Code, and such obligations and Liens shall not be subject to, and the Borrower shall waive the right to assert any rights under, Sections 552 of the Bankruptcy Code, or 1129(b) of the Bankruptcy Code.

SECTION 7.04.    No Discharge; Survival of Claims. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrower hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) under this Facility.

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01.    Amendments, Etc. No amendment or waiver of any provision of this Agreement or the Notes, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 8.02.    Notices, Etc. All notices and other communications provided for hereunder shall be either (x) in writing (including telecopy or electronic communication) and mailed, telecopied or delivered or (y), in an electronic medium and delivered by electronic mail:

if to Borrower at its address at:

Hebrew Hospital Senior Housing, Inc. a.k.a. Westchester Meadows
55 Grasslands Road
Valhalla, New York 10595
Attention Mary Frances Barrett, Chief Executive Officer
E-mail:  mbarrett@hhhinc.org

with a copy (which shall not constitute notice) to

Harter Secrest & Emery LLP
Twelve Fountain Plaza, Suite 400
Buffalo, NY 14202-2293
Attention: Raymond L. Fink
Facsimile: 716.853.1617

49

Telephone: 716.844.3724
E-mail:  rfink@hselaw.com

if to the Lender to its addresses at:

Attn: Rudy Gutierrez, Senior Account Manager
Millennium Trust Company, LLC
Custodian FBO Lapis Municipal Opportunities Fund II, LP
2001 Spring Road, Suite 700
Oakbrook, Illinois 60523
E-mail:  rgutierrez@mtrustcompany.com

Attn: Rudy Gutierrez, Senior Account Manager
Millennium Trust Company, LLC
Custodian FBO Lapis Aquilo Fund II, LP
2001 Spring Road, Suite 700
Oakbrook, Illinois 60523
E-mail:  rgutierrez@mtrustcompany.com

Kjerstin Hatch
Lapis Advisers, LP
12 Funston Avenue, Suite A
The Presidio of San Francisco
San Francisco, California  94129
E-mail:  khatch@lapisadvisers.com

Basia Terrell
Lapis Advisers, LP
12 Funston Avenue, Suite A
The Presidio of San Francisco
San Francisco, California  94129
E-mail:  bterrell@lapisadvisers.com

with a copy (which shall not constitute notice) to

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Attention: Michael H. Goldstein
Facsimile No. 212-355-3333
E-mail:  mgoldstein@goodwinprocter.com

or, as to any party, at such other address as shall be designated by such party in a written notice to the
other parties. All such notices and other communications shall, when mailed, telecopied, or e-mailed, be
effective when deposited in the mails, transmitted by telecopier or sent by electronic communication,
respectively, except that notices and communications to the Lender pursuant to Article II, Article III or
Article V shall not be effective until received by the Lender. Delivery by telecopier or other electronic
means of an executed counterpart of a signature page to any amendment or waiver of any provision of this
Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

SECTION 8.03.    No Waiver; Remedies.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 8.04.    Costs and Expenses.  (a)  The Borrower agrees to pay on demand (i) all reasonable costs and expenses of the Lender in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, and (B) the reasonable fees and expenses of counsel for the Lender with respect thereto, with respect to advising the Lender as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents and the Orders, with respect to negotiations with the Borrower or with other creditors of the Borrower arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency, refinancing or restructuring of the financing under the Loan Documents in the nature of a "work-out" or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto), (ii) all out-of-pocket costs and expenses of the Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Lender.

(b)    The Borrower agrees to indemnify, defend and save and hold harmless the Lender, and each of its Affiliates and its and their respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, disbursements , liabilities, and expenses (including, without limitation, reasonable fees and disbursements of counsel (including the allocated costs, expenses and disbursements of in-house counsel to the Lender), financial advisors and consultants) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of (i) the actual or proposed use of the proceeds of the Term Loans, the Loan Documents, or any of the transactions contemplated thereby, the loan documentation or any of the transactions contemplated thereby, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. or (ii) the actual or alleged presence of Hazardous Materials on any property of the Borrower or any Environmental Action relating in any way to the Borrower, except, in any case, to the extent such claim, damage, loss, disbursement, charge, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 8.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, its directors, shareholders or creditors, any Indemnified Party or any other Person, and whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated .  The Borrower also agrees not to assert any claim against the Lender, or any of its Affiliates, or any of its or their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facility, the actual or proposed use of the proceeds of the Term Loans, the Loan Documents, or any of the transactions contemplated by the Loan Documents.  The Borrower further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in

51

contract, tort, or otherwise) to the Borrower or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(c)    If the Borrower fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of the Borrower by the Lender, in its sole discretion.

(d)    Without prejudice to the survival of any other agreement of the Borrower hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Section 2.09 and this Section 8.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 8.05.    Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default or (b) the acceleration of the Term Loans pursuant to the provisions of Section 6.01, the Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether the Lender shall have made any demand under this Agreement and although such Obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Lender and its respective Affiliates under this Section 8.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that the Lender and its respective Affiliates may have.

SECTION 8.06.    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Lender, and thereafter shall be binding upon and inure to the benefit of the Borrower, and the Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender.

SECTION 8.07.    Assignments and Participations.  (a)  The Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its obligations to advance Borrowings, the Term Loans owing to it and the Note or Notes held by it); the parties to each such assignment shall deliver any Note or Notes (if any) to the Borrower for reissuance subject to such assignment.

(b)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Section 2.09 and Section 8.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto).

52

(c)      By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in <u>Section 4.01</u> and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Lender, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)      The Lender may sell participations to one or more Persons (other than the Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Term Loans owing to it and the Note or Notes (if any) held by it); *provided*, *however*, that, unless the Lender's right and obligations shall have been assigned pursuant to <u>Section 8.07(a)</u>, in which case, such proviso shall apply to the assignee Lender, (i) the Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, and the Lender shall continue to deal solely and directly in connection with the Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by the Borrower therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the Collateral or the value of the guaranties provided under the Collateral Agreement.

(e)      The Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this <u>Section 8.07</u>, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to the Lender by or on behalf of the Borrower; *provided*, *however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree in writing to preserve the confidentiality of any Information received by it from the Lender in accordance with <u>Section 8.09(b)</u>.

(f)      Notwithstanding any other provision set forth in this Agreement, the Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Term Loans owing to it and the Note or Notes (if any) held by it) in favor of any

Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(g)     Notwithstanding anything to the contrary contained herein, the Lender may create a security interest in all or any portion of the Term Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by the Lender as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 8.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

SECTION 8.08.     Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier or other electronic means of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 8.09.     Confidentiality.  The Lender agrees to keep confidential all non-public information provided to it by the Borrower pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; *provided* that nothing herein shall prevent the Lender from disclosing any such information (a) to any other Lender or any Affiliate thereof on a confidential basis, (b) subject to an agreement to comply with the provisions of this Section 8.09, to any actual or prospective assignee or participant, (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates on a confidential basis, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to the Lender, (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, (j) in connection with the Chapter 11 Case, or (k) if agreed by the Borrower, to any other Person.  The Lender shall use commercially reasonable efforts to give written notice to the Borrower of any disclosure of confidential information made pursuant to clause (e) or (f) of the preceding sentence; *provided* that the Lender shall have no liability for failure to provide such notice.

SECTION 8.10.     Public Disclosure.  (a)  Other than pleadings filed in the Bankruptcy Court, in connection with the Chapter 11 Case, neither the Borrower nor Affiliate thereof will in the future issue any press releases or other public disclosure using the name of the Lender or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Lender and without the prior written consent of the Lender, unless (and only to the extent that) the Borrower or such Affiliate is required to do so under law and then, in any event, the Borrower or such Affiliate will consult with the Lender before issuing such press release or other public disclosure. Other than pleadings filed in the Bankruptcy Court in connection with the Chapter 11 Case, no Lender or Affiliate thereof will in the future issue any press releases or other public disclosure (including, without limitation, the publication of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement) using the name of the Borrower or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Borrower and without the prior written consent of the Borrower, which shall not be unreasonably

withheld, unless (and only to the extent that) the Lender or Affiliate is required to do so under law and then, in any event, the Lender or Affiliate will consult with the Borrower before issuing such press release or other public disclosure.

SECTION 8.11.    Jurisdiction, Etc.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court, and any appellate court therefrom, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    The Borrower hereby irrevocably consents to the service of process in any such action or proceeding by the mailing thereof by the Lender by registered or certified mail, postage pre-paid, to it at its address specified herein.

SECTION 8.12.    Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of law principles that would require the application of laws of another jurisdiction.

SECTION 8.13.    Waiver of Jury Trial.  Each of the Borrower and the Lender irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Term Loans, or the actions of the Borrower or the Lender in the negotiation, administration, performance or enforcement thereof.

SECTION 8.14.    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 8.15.    Release.  Subject to applicable terms of the Interim Order and Final DIP Order, the Borrower hereby acknowledges effective upon entry of the Final DIP Order, that the

55

Borrower has no defense, counterclaim, offset, recoupment, cross complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Borrower's liability to repay the Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Lender.  The Borrower, in its own right, on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "*Releasing Parties*"), hereby fully, finally and forever releases and discharges the Lender and all of its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "*Released Parties*") of any from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which in each case are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.  The Borrower, for and on behalf of itself and the applicable Releasing Parties, acknowledges and agrees that each has been informed by the Borrower's attorney and advisors that, the release contained herein may extend to claims to which the parties do not know or suspect to exist in their favor, including claims which if known by them would have materially affected their decision to enter into the released contained herein, and notwithstanding the foregoing, hereby fully, finally, and irrevocably releases, acquits, waives and forever discharges any such unknown claims and any applicable law, statute or common law principle that, notwithstanding a general release, excludes from a general release and/or preserves claims that are not known or suspected at the time of executing the release.

[Signature Pages to Follow]

56

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**LENDER:**

**MILLENNIUM TRUST COMPANY LLC**
**Custodian FBO Lapis Municipal**
**Opportunities Fund II LP**

By: _____

Title: _VP_____

Date: _12/9/15_____

**MILLENNIUM TRUST COMPANY LLC**
**Custodian FBO Lapis Aquilo Fund II LP**

By: _____

Title: _VP_____

Date: _12/9/15_____

**LAPIS ADVISERS, LP**

By: _____

Title: _Managing Member of GP_____

Date: _12/9/15_____

[Signature Page to Senior Secured Super Priority Debtor In Possession Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER**

Hebrew Hospital Senior Housing, Inc.

By: _Mary Frances Barrett_
Name: MARY FRANCES BARRETT
Title: President/CEO

**Schedule 3.04**

**Conditions Subsequent to Closing**

[To be determined.]

**Schedule 4.01(a)**

**Holders of Borrower's Equity Interests and Board of Directors**

The Borrower is a New York State registered not-for profit corporation that has no equity holders or interests. It is a board self-directed organization.

Board of Directors of the Borrower as of the Closing Date:

Mary Frances Barrett
Charles Goldberger
Michael Laub
Marvin Lifson
Alan Pearce

**Schedule 4.01(b)**

**Jurisdiction of Incorporation, Principal Place of Business and U.S. Taxpayer ID
Number**

New York

55 Grasslands Road
Valhalla, New York 10595

EIN: 13-3975534

**Schedule 4.01(f)**

**Disclosed Litigation**

None.

**Schedule 4.01(m)**

**ERISA Disclosures**

1.  1199 SEIU National Benefit Fund for Health and Human Service Employees
2.  1199 SEIU Health Care Employees Pension Fund
3.  The League/1199 SEIU Training and Upgrading Fund
4.  1199 SEIU Employer Child Care Fund
5.  The League/1199 SEIU Health Care Industry Job Security Fund
6.  1199 SEIU National Benefit Fund for Home Care Employees
7.  1199 SEIU Home Care Employees Pension
8.  1199 SEIU Home Care Industry Education Fund
9.  403(B) Plan for HHSH Employees

**Schedule 4.01(o)**

**Liens**

None.[1]

---

[1] Previous liens will be paid in connection with closing.

**Schedule 4.01(p)**

**Investments**

None.

**Schedule 4.01(s)**

**Material Licenses**

<u>New York State Department of Health</u>

      1.      Certificate of Authority
      2.      Operating Certificate - Non-Profit Enriched Housing Program (Fieldstone at Westchester Meadows)
      3.      Operating Certificate - Residential Health Care Facility - SNF
      4.      Controlled Substance License - Westchester Meadows
      5.      Controlled Substance License - Fieldstone at Westchester Meadows

<u>Westchester County Department of Health</u>

      1.      Permit - Food Service Establishment

4698847_6

**Schedule 5.02(b)**

**Debt & Capital Leases**

None.[2]

---

[2] Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, issued by the Westchester Industrial Development Agency in the amount of approximately $5,500,000.00 and Loan from Hebrew Hospital Home of Westchester, Inc., pursuant to that certain Restructuring Support and Loan Agreement, in the amount of approximately $3,500,000.00 to be paid at closing.

**Schedule 5.02(m)**

**Transactions with Affiliates**

As of 12/31/2014, Hebrew Hospital Senior Housing, Inc. owes approximately $17,800,000 to its affiliate entities. Any other intercompany transactions which may have occurred during 2015 have not been reconciled.

## Schedule 6.01(dd)

## Labor Matters

(a)      None.

(b)      We are aware of no such violations; the HHSH Collective Bargaining Agreement with 1199 SEIU expired in May 2015, so HHSH is operating without a contract. Borrower has not provided increases to union employees at a level consistent with the League increases in the downstate region during the past 2 annual cycles (years beginning October 1).

(c)      HHSH has consistently run approximately 2-3 months behind on paying union pension fund contributions. Accruals are booked on a regular basis.

(d)      HHSH affiliates are all in a similar situation in which such affiliates are also 2-3 months in arrears on union pension funds. There some unpaid amounts for PTO, severance and other benefits by HHSH affiliates due to lack of liquidity and resources.