UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re

HEBREW HOSPITAL SENIOR
HOUSING, INC.,

Debtor.

------------------------------------------------------------x

**Hearing Date and Time:**
December 15, 2015 at 11:00 a.m.

Chapter 11

Case No. 15-13264 (MEW)

## OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTOR'S MOTION FOR INTERIM AUTHORITY TO OBTAIN POST-PETITION FINANCING AND USE OF CASH COLLATERAL

TO:    THE HONORABLE MICHAEL E. WILES,
       UNITED STATES BANKRUPTCY JUDGE:

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), by and through his undersigned counsel, hereby submits this objection (the "Objection") to the motion of Hebrew Hospital Senior Housing, Inc. (the "Debtor") for interim authority to obtain post-petition financing and use of cash collateral (the "DIP Financing Motion").  ECF Doc. No. 5.  In support of the Objection, the United States Trustee respectfully represents and alleges as follows:

## I.    INTRODUCTION

The Debtor is seeking the Court's approval for extraordinarily broad and far ranging relief in the DIP Financing Motion, and fails to demonstrate the emergency need for this relief at the first hearing in the case.[1]  The Court should deny this motion.

---

[1] Upon information and belief, the motion to approve a restructuring support agreement (the "RSA") will not go forward as a first day motion.

II.    **FACTS**

    A.    **Background**

    1.     On December 9, 2015 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code. By motion filed on the Petition Date, the Debtor seeks to extend its time to file Schedules of Assets and Liabilities and the Statement of Financial Affairs to January 22, 2016. ECF Doc. No. 6.

    2.     The United States Trustee has not appointed a committee of unsecured creditors in the bankruptcy case.

    3.     The Debtor, a New York registered not-for-profit corporation, operates a continuing care retirement community ("CCRC") commonly known as Westchester Meadows. See DIP Financing Motion at ¶ 6. The CCRC consists of 120 independent living units, ten enriched housing units, and 20 beds in a skilled nursing facility. Id. The facilities are located at 55 Grasslands Road in Valhalla, New York. Id.

    B.    **The Proposed Binding Restructuring Support Agreement**

    4.     According to the Debtor, prior to the Petition Date, Westchester Industrial Development Agency ("WIDA"), as issuer, and U.S. Bank National Association, as Trustee ("Trustee") entered into that certain Indenture of Trust, dated as of January 1, 2008 (the "Indenture"), pursuant to which certain Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, in the aggregate principal amount of $14,985,000, were issued (the "Pre-Petition Bonds"). See DIP Financing Motion at ¶ 9.

    5.     As of the Petition Date, again according to the Debtor, an aggregate principal amount equal to $5,455,000 is owed by the Debtor in connection with the Pre-Petition Bonds

(together with any and all accrued interest, fees and expenses payable under the Pre-Petition

Bonds, the "Pre-Petition Bond Debt"). Id.

6.      The Pre-Petition Bonds are allegedly secured by, among other things, a direct pay

letter of credit (the "Letter of Credit"), issued by M&T Bank for the account of the Debtor and

HHH Home Care, Inc. ("Home Care") and for the benefit of the Trustee, in the current stated

amount of Five Million Five Hundred Twenty-Nine Thousand Six Hundred Fifty-Eight Dollars

($5,529,726) (the "Stated Amount"), of which (i) Five Million Four Hundred Fifty-Five

Thousand Dollars ($5,455,000) (the "Principal Stated Amount") is available to pay the

outstanding principal amount of the Pre-Petition Bonds, and (ii) Seventy-Four Thousand Six

Hundred Fifty-Eight Dollars ($74,726) is available to pay up to fifty (50) days interest under the

Pre-Petition Bonds (the "Interest Stated Amount"). Id.

7.      The Debtor also asserts that as of the Petition Date, the Debtor, as maker, and

Hebrew Hospital Home of Westchester, Inc. ("HHHW" and together with WIDA and M&T, the

"Pre-Petition Secured Creditors"), as holder, were party to a Promissory Note, dated as of

November 4, 2015, in an aggregate principal amount equal to $3,500,000 (the "Pre-Petition

Note"). As of the Petition Date, the Debtor owes HHHW an aggregate principal amount equal to

$3,500,000 (together with any and all accrued interest, fees and expenses payable under the Pre-

Petition Note, the "Pre-Petition Intercompany Debt" and, together with the Pre-Petition Bond

Debt, the "Pre-Petition Secured Debt"). See DIP Financing Motion at ¶ 10.

8.      The Debtor further avers that on October 20, 2015, the Debtor, HHHW, the

Office of the Attorney General of the State of New York (the "AG"), and Carl Winterrose, as an

authorized agent of the Westchester Meadows Resident Council (the "Resident Council")

entered into that certain Restructuring Support and Loan Agreement (as amended and in effect

3

from time to time, the "RSA" and together with the Pre-Petition Bonds, the Letter of Credit and the Pre-Petition Note, the "Pre-Petition Credit Documents"), pursuant to which the AG consented to the use of the proceeds of the Pre-Petition Note in accordance with the terms of the RSA. See DIP Financing Motion at ¶ 11.

9.      The RSA, among other things, provides that an event of default occurs if the Debtor failed to commence a proceeding for bankruptcy relief under chapter 11 of the Bankruptcy Code by no later than November 30, 2015, and that the proceeds of any debtor in possession financing would be used, in part, to pay off the Pre-Petition Note. Id. The signatory parties apparently agreed to extend the November 30, 2015 deadline to the Petition Date. Id.

10.     As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Pre-Petition Credit Documents, per the calculations of the Debtor, was not less than $8,955,000 (together with accrued and unpaid interest, fees or expenses, and all other amounts due in accordance with the terms of the Pre-Petition Credit Documents, the "Pre-Petition Obligations"). See DIP Financing Motion at ¶ 12.

C.      **The DIP Financing Motion**

11.     On December 9, 2015, the Debtor filed the DIP Financing Motion. In the DIP Financing Motion, the Debtor requests authorization to make an initial draw under the DIP Facility in an aggregate amount of up to $9,200,000, subject to the terms and conditions in the DIP Financing Motion, the DIP Credit Agreement (including the escrow conditions contained therein), the Interim Order and the budget attached to the Interim Order as Exhibit 2 (as modified from time to time consistent with the terms of the DIP Loan Documents, the "Budget"). See DIP Financing Motion at ¶ 8(e).

12.     The Debtor proposed that the proceeds shall be used as follows: (x) for the repayment in full in cash of the Pre-Petition Note (as defined below) in an amount not to exceed $3,500,000, (y) for the repayment in full in cash of the obligations owing in respect of the Letter of Credit, which will be drawn to pay in full the Pre-Petition Bonds in an amount not to exceed $5,455,000, and (z) in an amount up to $245,000 to fund ongoing working capital needs of the Debtor, the Interim Closing Fee, payments of fees and taxes due in connection with the recording of the Mortgage, payment of fees and expenses in connection with the payment of the Pre-Petition Bonds, payment of escrow fees, and payment of lender's attorney's fees and expenses; DIP Financing Motion at ¶ 8(e).

13.     The Debtor has stated that it was cash flow positive in 2014 with a net income of approximately $127,000. See Local Rule 1007 Statement of Mary Frances Barrett dated December 7, 2015 (the "Local Rule Affidavit") at ¶ 19.  A copy of the Local Rule Affidavit is attached as Exhibit A.

14.     According to the Debtor, the Debtor "owes approximately $17,800,000 to its affiliate entities.  Any other intercompany transactions which may have occurred during 2015 have not been reconciled." See DIP Financing Motion, Ex. A (DIP Financing Agreement, Schedule 5.02(m)).

III.    **DISCUSSION**

The Debtor requires financing to pay back the Pre-Petition Obligations. The Code

section under which the DIP Financing Motion arises is 11 U.S.C. § 364(d), which provides as

follows:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the
> incurring of debt secured by a senior or equal lien on property of the estate that is subject to a
> lien only if –
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the
> > property of the estate on which such senior or equal lien is proposed to be
> > granted.

11 U.S.C. § 364(d).

Credit should not be extended when its primary benefit is to assist a third party. See In re

Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("credit should not be approved when it

is sought for the primary benefit of a party other than the debtor. . ."); In re Ames Dep't Stores,

Inc., 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) ("(A) proposed financing will not be approved

where it is apparent that the purpose of the financing is to benefit a creditor rather than the

estate."). Postpetition financing is not consistent with the requirements of Bankruptcy Code

section 364 where it would "skew the conduct of the bankruptcy case" and "destroy the

adversary process." Ames, 115 B.R. at 38.

A.    **The Debtor has not demonstrated it needs this credit.**

The Debtor's schedules of assets and liabilities have not been filed, and the Debtor has

requested an extension of time to do so. See Dkt. No. 6. As such, it is incumbent on the Debtor

to provide details about the Debtor's assets and liabilities in the DIP Financing Motion. The

Debtor failed to provide this basic information.

The Debtor's books and records appear to be incomplete, even after the Debtor retained a financial advisor and legal counsel in the spring of 2015. See Local Rule Affidavit at ¶ 20. For example, the Debtor has failed to reconcile inter-company debts for 2015, despite the filing of this bankruptcy case in December 2015. According to the Debtor, the Debtor "owes approximately $17,800,000 to its affiliate entities. Any other intercompany transactions which may have occurred during 2015 have not been reconciled." See DIP Financing Motion, Ex. A (DIP Financing Agreement, Schedule 5.02(m)). In spite of this failure to reconcile its books with its affiliates, the Debtor is requesting permission to pay one of its affiliates, HHHW, $3,521,096 in the second week of this case. See DIP Financing Motion at Ex. A (at the end, a Budget).

As further evidence that the Debtor's books and records appear to be incomplete, the Debtor apparently did not reserve funds for resident refunds, requiring a complex financial arrangement ultimately resulting in the RSA. While these resident refunds may not be trust funds (although this point is not clear either), the Debtor must explain at the very least why it failed to allocate sufficient funds for these seemingly critical expenses. It is possible that the Debtor can recover these funds to support its operations. The Debtor should immediately provide tax returns or other financial documents required to be filed by a not-for-profit (such as a Form 990), to the United States Trustee and the other parties in interest.

In summary, the Debtor needs to show that it requires credit. It must show that it has insufficient cash to pay legitimate, ongoing operations. This showing should be in the DIP Financing Motion. The United States Trustee reserves all rights, including the right to seek the appointment of a Chapter 11 Trustee if the Debtor cannot make this showing because it lacks adequate books and records.

**B.**    __The proposed transaction is not fair, reasonable and adequate.__

As stated, the "proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." In re Ames Dep't Stores, 115 B.R. at 39. Here, the Debtor again fails to meet its burden. The loan requires the payment by the Debtor of $5,456,500 for "M&T Bank: Bond Defeasance + Interest"; $3,521,096 for "HHHW Principal + Interest"; and $477,600 for "DIP Interest and fees; DIP repayments (Lapis)" See DIP Financing Motion at Ex. B (Budget).

In contrast, a relatively de minimis amount ($245,000) is allocated to fund operations, and even this small amount must be shared with "payment of the Interim Closing Fee, payment of any fee or tax due in connection with the recording of the Mortgage, payment of Escrow fees, payment of fees and expenses in connection with the payment of the Pre-Petition Bonds, and payment of DIP Lender's attorneys' fees and expenses used to fund operations." See DIP Financing Motion at ¶ 8(e). Moreover, in the Debtor's budget, the Debtor has an undefined weekly line item of $20,000 to $25,000 for "other accounts payable disbursements." Id. at Ex. B (Budget).

While the Debtor states that the Financing Agreement is not a roll-up, the arrangement has common features with a roll-up, including a large loan that will pay off a pre-petition debt with a minor allocation for operating expenses. Roll-ups, of course, are not typically approved so early in a case because they commit capital to the repayment of certain favored pre-petition creditors instead of to operating expenses or more equitable allocations to all the Debtor's creditors. In summary, even assuming the Debtor needs funding for its post-petition operations, it has failed to demonstrate that the arrangement as proposed is fair and reasonable. The United States Trustee has been in discussion with the various parties and there may be consent to

8

adjourn the DIP Financing Motion.  If it is adjourned, however, the United States Trustee will

require answers to the questions as outlined in this objection.

## IV.    CONCLUSION

For the reasons set forth in this Objection, the United States Trustee requests that the

Court deny the Motion and grant other relief as is just.

Dated:   New York, New York
         December 14, 2015

                                        WILLIAM K. HARRINGTON
                                        UNITED STATES TRUSTEE, REGION 2

                              By:    /s/Greg M. Zipes
                                     Trial Attorney
                                     201 Varick Street, Room 1006
                                     New York, New York  10014
                                     Tel. No. (212) 510-0500
                                     Fax No. (212) 668-2255

EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

HEBREW HOSPITAL SENIOR HOUSING, INC.,
(A/K/A WESTCHESTER MEADOWS CONTINUING CARE
RETIREMENT COMMUNITY AND FIELDSTONE AT
WESTCHESTER MEADOWS)

CHAPTER 11
CASE NO. 15-_____

DEBTOR.

### DECLARATION OF MARY FRANCES BARRETT, CHIEF EXECUTIVE OFFICER OF HEBREW HOSPITAL SENIOR HOUSING, INC. (I) PURSUANT TO LOCAL RULE 1007-2 OF THE LOCAL RULES OF BANKRUPTCY PROCEDURE AND (II) IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Pursuant to FED. R. BANKR. P. 2014(a), Mary Frances Barrett declares:

1.    I am the Chief Executive Officer of the debtor and debtor-in-possession, Hebrew Hospital Senior Housing, Inc. ("Debtor"), in the above-captioned chapter 11 case ("Chapter 11 Case").

2.    Unless otherwise stated in this Declaration, I have personal knowledge of the facts hereinafter set forth.

### I. BACKGROUND

3.    The Debtor initially was incorporated in New York State on October 2, 1997 pursuant to Section 402 of the Not-For Profit Corporation Law ("NFPCL"), as a Type B corporation. The Debtor does not have any shareholders. It is a Board directed corporation and one of several distinct legal entities within the larger Hebrew Hospital Home health system, which was initially founded in 1928 as a not-for-profit nursing home in the Tremont section of the Bronx. I have served as the Chief Executive Officer of the Debtor since its inception.

4705779_3

4.     Specifically, the Debtor is engaged in the sponsorship and operation of a one hundred and twenty (120) unit continuing care retirement community ("CCRC") with ancillary components consisting of; a twenty (20) bed skilled nursing facility ("SNF"), which includes an adult day healthcare program ("ADHCP"), and a ten (10) bed enriched housing unit. These programs are commonly known as, *Westchester Meadows* and *Fieldstone.*

5.     CCRCs are senior adult (65 years and above) programs that offer independent living apartments (various sizes and configurations), residential amenities and long-term care services to senior adults.  Services offered at a CCRC include, but are not limited to; meals, transportation, social activities, fitness facilities, housekeeping, access to physicians and rehabilitation services, enriched living services, and skilled nursing facility care for residents who become temporarily ill or who require long-term care.

6.     On April 18, 2000, the Debtor received its Certificate of Authority from the New York State Department of Health ("DOH").  In close proximity, it also received its Operating Certificates for the enriched housing and its skilled nursing programs (which included the ADHCP program).  Generally, Article 46 of the New York Public Health Law is the overarching statute governing the creation and operation requirements of CCRCs.

7.     In addition to DOH, the New York State Department of Financial Services ("DFS") also has regulatory jurisdiction over CCRCs.  DOH oversees the non-financial operations, including the licensure process and ongoing monitoring of care and delivery of services to residents and clients in the enriched housing and skilled nursing facilities.  DFS oversees the financial performance of the Debtor and its compliance with regulatory requirements.  The applicable regulations are generally set forth in 11 NYCCRR §350.0.  The

2

New York State Attorney General's office ("NYSAG") has jurisdiction over all New York registered not-for-profit corporations.

8.      The Debtor generates the majority of its revenue from resident entrance fees and monthly rents.  The respective resident agreements are subject to regulatory approval and vary depending upon the level and extent of continuing care provided by the Debtor.  It is important to note that the controlling statutes and regulations do not require entrance fees be held in an escrow or other segregated account. To the contrary, both Article 46 of the Public health Law and 11 NYCCRR §350.0 contemplate and allow entrance fees to be used for the retirement of debt and operational support.

9.      Further, the CCRC residents have the right to self-organize through a Resident Council.

10.     The Debtor presold all of its CCRC units before construction was completed.  The Debtor enjoyed 100% occupancy shortly after its doors opened in April 2002.  Initially, the Debtor offered only a Lifecare Contract (Type A) with entrance fees that were 90% refundable and a life care feature that had no time limitation.  Generally, entrance fee refunds mature at the earlier of twelve months from vacancy or upon re-renting of the subject unit.  As discussed below, the template resident contract went through a few iterations.

11.     Initially, the Debtor issued its tax-exempt bonds in the combined amount of $48,120,000 through the Westchester County Industrial Development Agency ("WCIDA") to fund the construction of the CCRC.  The bonds consisted of an $18,120,000 long-term debenture and a short term $30,000,000 issue.  The short-term bond was retired prior to maturity.  As discussed below, in January of 2008 the Debtor refinanced its original long-term bond through

the issuance of tax-exempt variable rate bonds with a face value of $14,985,000.00 (the "New Issue Bonds").

## II. EVENTS LEADING TO BANKRUPTCY

12.     Until 2014, the Debtor suffered net operating losses since it opened for business. In 2008 the negative financial results were exacerbated due to the wide spread turbulence in the financial markets which adversely affected residential housing values. The market for prospective new residents rapidly eroded, particularly, as the ability of senior citizens to monetize sufficient equity through the sale of their houses to fund entrance fees evaporated. Census numbers at Westchester Meadows began to plummet and the existing residents were ageing. The ability of the Debtor to pay entrance fee refunds was increasingly becoming impaired coupled with the cumulative operating losses.

13.     The Debtor undertook numerous steps to address its operational and financial challenges.

14.     As referred to above, in order to reduce its interest expense the Debtor refinanced its original long-term bond issue through the New Issue Bonds with a locked in rate of interest for the first 5 years and a stated maturity date of July 1, 2028. The Manufacturers and Traders Trust Company ("M&T Bank") provided a credit enhancement by issuing its letter of credit. The letter of credit was secured by a first mortgage encumbering the Westchester Meadows real estate and improvements and collateralized with marketable securities pledged by the Hebrew Hospital Home Foundation, Inc. (the "Foundation").

15.     In 2009, with the approval of the regulators, the Debtor replaced the previous Type A resident contract with a revised Type B agreement. Every resident agreement has two components, respectively, a residential and life care portion. The features of the new Type B

4

agreement were as follows; after the expiration of the initial ninety-day rescission period (during the 1st ninety days the entrance fee is 100% refundable) a 4% administrative fee is charged and thereafter every full or partial month of occupancy the residential refund component is reduced by 2%.  Notwithstanding, the monthly reductions, for those residents who enrolled prior to January 1, 2006, their refunds would not decrease below 90% and for those residents who enrolled after that date their refunds would not decrease below 65%.  The life care feature (enriched housing and skilled nursing) was limited to sixty days of care.  Thereafter fees for services were charged.

16.    A further revision to the Type B agreement was instituted effective February 1, 2013.  For new enrollees the resident refund component continued to reduce at the rate of 2% per month, but with no floor.  After 51 months of occupancy, the resident refund fully amortized such that no refund of that portion of the entrance fee would be refunded.  The life care component remained unchanged.

17.    Numerous operational changes were implemented to curtail expenses such as:

    i.    Management assessments and reviews for all departments were performed which resulted in staffing reductions by layoff and attrition;

    ii.    The functions of various departments were outsourced through competitive bidding, including dietary/nutrition, housekeeping, maintenance, security and pharmacy;

    iii.    Insurances were put out for competitive bids and combined blanket coverages with other HHH entities were negotiated and put in place;

    iv.    Administrative services and purchasing of goods and services were consolidated with other HHH affiliates; and

5

     v.    Hamlyn Associates was engaged in the fall of 2013 to actively market apartments with some moderate success until marketing efforts ceased in 2015.

18.    In order to induce new residents the Debtor offered trial visits where prospects could stay at Westchester Meadows and experience the facilities and programs, free indoor parking was made available during the winter months, maintenance fees were eliminated for a few months. Additionally, the Debtor hired a marketing firm to stimulate the market and generate new residents.

19.    Notwithstanding all of these efforts the Debtor still experienced operational losses on a cash flow basis although the annual deficits were declining as follows:

     i.    For year end 2008 the net loss was (~$1,212,000.00);

     ii.    2009 (~$1,064,000.00);

     iii.    2010 (~$988,000.00);

     iv.    2011 (~$590,000.00);

     v.    2012 (~$640,000.00); and

     vi.    2013 (~$225,000.00).

However, for calendar year 2014 a positive net income of ~$127,000 was achieved.

20.    The Debtor formed an ad hoc Restructuring Committee in February of 2015 to develop a strategic course for consideration by the Debtor's board. The Restructuring Committee recommended the engagement of Harter Secrest & Emery LLP as legal counsel and Getzler Henrich & Associates LLC as its financial advisor. The board duly engaged both firms in the spring of 2015.

21.     The Debtor's board promptly concluded that the Debtor should undertake an expedited effort to explore and market a sale of the Debtor's business and assets.  The Debtor engaged the Marwood Group for this purpose, particularly based upon its successes with facilitating transactions involving or the sale of programs of other affiliates of the Debtor; namely, HHH Home Care, Inc., and HHH Choices Health Plan, LLC.

22.     Following the marketing effort for Westchester Meadows, the Marwood Group identified a prospective *stalking horse* buyer.  A letter of intent was entered into which contemplated a sale process through a chapter 11 filing by the Debtor.  The letter of intent never progressed to a definitive asset purchase agreement.  Westchester Meadow's Residents' Council ("Residents Council") engaged both legal counsel and a financial adviser to provide guidance and representation, respectively, DLA Piper and Cohn Reznick.

23.     Following the recommendation of the Resident Council's professionals, the Debtor's board agreed to terminate the pursuit of the *stalking horse* letter of intent and restart the entire sale process.

24.     To that end and upon the recommendation of DLA Piper and Cohn Reznick, on September 15, 2015, the Debtor engaged RBC Capital Markets ("RBC") as its investment banker.  RBC has been actively pursuing a stalking horse purchaser.

25.     In 2015, the Debtor's cash flow has been substantially impaired.  By July 2015, it was unable to pay resident entrance fee refunds that matured as well as, anticipated refund for the balance of the year. Several legal representatives of former residents initiated lawsuits for the recovery of their entrance fees.  Vendors were extended and the Debtor ceased marketing vacant units, primarily out of concern that it could not reasonably assure new residents of its ability to pay future entrance fee refunds.  M&T Bank liquidated approximately $7,500,000 of the

7

marketable securities that served as collateral and after application of the funds, the balance due under the New Issue Bonds was approximately $5,500,000.

26.    By September 2015, the Debtor was running out of funds and needed a loan to bridge its operations into a chapter 11 proceeding.  One of its affiliates, Hebrew Hospital Home of Westchester, Inc. ("HHHW"), had previously sold its skilled nursing home in mid-2015, which generated net proceeds in excess of $10,000,000.00. Those funds were subject to a court-imposed escrow.  Obtaining a bridge loan from other sources was not possible.

27.    Accordingly, on October 20, 2015 a Restructuring Support and Loan Agreement ("RSA") was entered into between and among the Debtor, NYSAG and the Residents Council. The RSA provided for HHHW to loan $3,500,000 to the Debtor, secured by a second mortgage upon the Westchester Meadows real estate.  The proceeds of this loan were earmarked for the purpose of repaying approximately $2,500,000 of outstanding resident refunds and $1,000,000 for operations pursuant to a specific budget.  The loan is to be repaid from the Debtor's post petition debtor in possession financing ("DIP Loan").

28.    The RSA was approved by order of the Supreme Court, Westchester County (A.J.S.C. David Zuckerman, presiding) on October 21, 2015.  On November 9, 2015, the mortgage was recorded after obtaining the consents of M&T Bank, the WCIDA and the bond trustee.  The outstanding resident refunds were duly paid and satisfied.

29.    Further, the Debtor has entered into a letter of intent with a proposed lender for the DIP Loan and the definitive documentation and continued due diligence are in process.

### III. BANKRUPTCY FILING

#### A. *Voluntary Petition*

30.    The Debtor began this Chapter 11 Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December__, 2015 ("Petition Date"), in the United States Bankruptcy Court for the Southern District of New York.

31.    This Chapter 11 Case is intended to assist in facilitating a sale of all of the Debtor's assets post-filing, with the Debtor's continued operation of the CCRC being short term.

#### B. *Summary of Estate*

32.    An initial *draft* of the Debtor's List of Creditors Holding 20 Largest Unsecured Claims is attached hereto as **Exhibit A**.

33.    M&T Bank and HHHW are the Debtor's only secured creditors in the approximate total amount of $9,000,000, as detailed above.

34.    As of the Petition Date, the approximate value of the Debtor's assets is $36,000,000, against liabilities of approximately $65,000,000.

35.    For a 30-day period following the Petition Date, the estimated amount of the weekly payroll to employees is $66,500 or $133,000 bi-weekly. A draft 13-week cash flow forecast for the Debtor that shows estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, is attached hereto as **Exhibit B**.[1]

36.    The Debtor owns real property located at 51 and 55 Grasslands Road, Valhalla, New York 10595, which is where the Debtor operates the CCRC, SNF and ADHCP, and maintains its books, records and substantial assets ("Premises"). The Premises consists of an

---

[1] The 13-week cash flow forecast is subject to revision based on further calculation and/or negotiation amongst the relevant parties.

approximate 29.5 acre site, with separate buildings and related structures that contain 120 independent residential apartments, 10 enriched housing apartments, 20 skilled nursing facility beds, common areas and facilities, including an indoor pool, a convenience store and administration areas and related infrastructure such as road, sewers, utilities, parking lots, drainage areas and maintenance facilities, and machinery and equipment in connection therewith.

37.    The Debtor was recently a named defendant in a series of estate refund actions. Two were resolved via settlement payments and filed stipulations of discontinuance, while a release and notice of discontinuance are pending in the third action.

38.    The Debtor's senior management consists of the following:

    i.    Mary Frances Barrett / Chief Executive Officer (23 years) – responsibilities include carrying out policies and initiatives adopted by the Board of Directors of the Debtor, and experience includes 6 years as Chief Operating Officer of another not-for-profit organization;

    ii.    Peter Cutaia / Chief Financial Officer (7 years (1+ as CFO)) – responsibilities include oversight of corporate financial records and preparation and presentation of statements of financial status for the Board of Directors of the Debtor, and experience includes facilitation of community-based programming as Director of Finance for Community-Based Programs with the Hebrew Hospital Home health system; and

    iii.    Peter Sanna / Former Executive Director of Westchester Meadows (now acts in a consultant capacity) (12 years) – responsibilities include the day-to-day operation of Westchester Meadows CCRC, and experience includes working for several other not-for-profit organizations.

### C. *First Day Motions*

39.    In an effort to minimize the adverse effects of commencing this Chapter 11 Case, and to provide much needed liquidity, the Debtor is requesting a variety of relief in "first day" motions and applications (collectively "First Day Pleadings"), as set forth in the list attached hereto as **Exhibit C**.

40.    The intent of the First Day Pleadings is to keep the Debtor operating in the ordinary course of business, while it vigorously pursues a sale of assets. One specific purpose of the First Day Pleadings is to keep all of the Debtor's necessary vendor relationships intact. Another is to provide the Debtor's employees with certainty regarding their compensation and benefit programs, because without them this Chapter 11 Case is doomed to fail. Most importantly, the First Day Pleadings will provide all of the elderly residents with stability and security as the Debtor proceeds through the Chapter 11 process towards an eventual, and mutually beneficial, sale of assets.

41.    The Debtor's estate will suffer immediate and irreparable harm without the relief sought in the First Day Pleadings; namely, the ability to obtain financing and make certain payments critical to operations and resident well-being. Approval of the relief requested in the First Day Pleadings will minimize disruptions to not only the Debtor's operations, but also most importantly, the daily lives of the employees and residents.

42.    I am familiar with the contents of each of the First Day Pleadings. To the best of my knowledge, information and belief, the facts set forth therein are true and correct, and the relief sought is necessary to facilitate a successful conclusion to this Chapter 11 Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: December __7__, 2015

_Mary Frances Barrett_
Mary Frances Barrett

# Exhibit A

| Fill in this information to identify the case: |
| --- |

| Debtor name | Hebrew Hospital Senior Housing Inc. |
| --- | --- |
| United States Bankruptcy Court for the: | SOUTHERN DISTRICT OF NEW YORK |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204
### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1199 SEIU Funds 330 West 42nd Street 27th Floor New York, NY 10036 | | Trade debt | Contingent Unliquidated | | | $23,516,694.00 |
| Akula, Rose c/o John Akula 5 Forest Street Cambridge, MA 02140 | | Entrance Fee Refund | | | | $316,800.00 |
| Blumenthal, Julie c/o Mary Blumenthal-Lane 10 Donellan Road Scarsdale, NY 10583 | | Entrance Fee Refund | | | | $467,100.00 |
| Clark, Ann c/o Peter Clark 123 Underhill Avenue Scarsdale, NY 10583 | | Entrance Fee Refund | | | | $499,500.00 |
| Dragoon, Marion c/o Amy Rosen 364 Weaver Street Larchmont, NY 10538 | | Entrance Fee Refund | | | | $245,700.00 |
| Duboff, Elizabeth c/o David Duboff 304 Orchard Hill Lane Brewster, NY 10509 | | Entrance Fee Refund | | | | $218,700.00 |
| Follman, Judith c/o Amy Brooks 9 Greenridge Drive Chappaqua, NY 10514 | | Entrance Fee Refund | | | | $232,200.00 |
| Frankel, Mirium 535 East 86th Street New York, NY 10028 | | Entrance Fee Refund | | | | $310,788.00 |

Software Copyright (c) 1996-2015 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor | Hebrew Hospital Senior Housing Inc. | | | Case number *(if known)* | | |
|---|---|---|---|---|---|---|
| | Name | | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Gorelick, Herb c/o Judy Kamenstein 40 Overton Road Scarsdale, NY 10583 | | Entrance Fee Refund | | | | $358,723.00 |
| Health Facility Assessment Fun Assessment Fund Admin PO Box 4757 Syracuse, NY 13221 | | Trade debt | | | | $112,630.00 |
| Howard, Grace c/o Carl Howard 163 Millard Avenue Tarrytown, NY 10591 | | Entrance Fee Refund | | | | $221,400.00 |
| Landry, Beverly 4983 Bacopa Lane South Saint Petersburg, FL 33715 | | Entrance Fee Refund | | | | $157,592.00 |
| Lane, Estelle c/o Faye Ellen Lane 1 Strawberry Hill Ave, Apt. 1C Stamford, CT 06902 | | Entrance Fee Refund | | | | $398,700.00 |
| Lang, Leo c/o Annie Lang 805 Mills Green Court Raleigh, NC 27609 | | Entrance Fee Refund | | | | $427,500.00 |
| Nutrition Management Services Box 725 Kimberton Rd. Kimberton, PA 19442 | | Trade debt | | | | $202,396.85 |
| Steiner, Thelma c/o Miriam Cohen 19 Deartree Lane Briarcliff Manor, NY 10510 | | Entrance Fee Refund | | | | $329,400.00 |
| Tarshis, Suzette c/o Peter Tarshis 245 West 107th Street, #6B New York, NY 10025 | | Entrance Fee Refund | | | | $265,047.00 |
| Town of Greenburgh Comptroller 17 Hillside Ave. White Plains, NY 10607 | | Trade debt | | | | $1,178,263.61 |

Official form 204          Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured claims          page 2

| Debtor | **Hebrew Hospital Senior Housing Inc.** | | | | Case number *(if known)* | | |
|---|---|---|---|---|---|---|---|
| | Name | | | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Weiner, Ethel c/o Robert Weiner 360 East 72nd Street New York, NY 10021** | | **Entrance Fee Refund** | | | | $306,900.00 |
| **Zatz, Marvin 47 South Beach Drive Norwalk, CT 06853** | | **Entrance Fee Refund** | | | | $77,068.00 |

Software Copyright (c) 1996-2015 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

# Exhibit B

**Hebrew Hospital Home – Cash Flow Forecast**
**DIP as of 12/7/15**
**Westchester Meadows**

15-13264-mew   Doc 9   Filed 12/09/15   Entered 12/09/15 15:40:49   Main Document   Pg 18 of 20

| Week Ended: | | Post-Petition Week #1 12/11/2015 | Week #2 12/18/2015 | Week #3 12/25/2015 | Week #4 1/1/2016 | Week #5 1/8/2016 | Week #6 1/15/2016 | Week #7 1/22/2016 | Week #8 1/29/2016 | Week #9 2/5/2016 | Week #10 2/12/2016 | Week #11 2/19/2016 | Week #12 2/26/2016 | Total 12/11/15-2/26/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beg. Balance (bank basis) M&T Bank acct.: | [1] | 294,972 | 366,472 | 137,479 | 86,310 | 118,426 | 283,426 | 203,043 | 301,874 | 376,874 | 365,998 | 465,107 | 129,438 | 294,972 |
| **Add: Weekly Projected Cash Receipts:** | | | | | | | | | | | | | | |
| Westchester Meadows | | 200,000 | 175,000 | 50,000 | - | 65,000 | 200,000 | 175,000 | 50,000 | 65,000 | 200,000 | 175,000 | 50,000 | 1,405,000 |
| ADC | | 25,000 | 50,000 | 25,000 | - | - | 25,000 | 50,000 | 25,000 | - | 25,000 | 50,000 | 25,000 | 300,000 |
| Intercompany Administrative Expense Recovery | [5] | | | | | | | | | 15,000 | | | | 15,000 |
| Misc Income | [6] | | | | | | | | | 52,000 | | | | 52,000 |
| DIP Draws (Lapis) | [3] | | 9,200,000 | | 250,000 | 250,000 | | | | 95,312 | | 150,000 | 250,000 | 10,195,312 |
| **Total Weekly Projected Cash Receipts:** | | 225,000 | 9,425,000 | 75,000 | 250,000 | 315,000 | 225,000 | 225,000 | 75,000 | 227,312 | 225,000 | 375,000 | 325,000 | 11,967,312 |
| **Total Cash Available (beg. Bal. plus cash receipts)** | | 519,972 | 9,791,472 | 212,479 | 336,310 | 433,426 | 508,426 | 428,043 | 376,874 | 386,303 | 365,998 | 465,107 | 454,438 | 12,262,284 |
| **Less: Weekly Cash Disbursements:** | | | | | | | | | | | | | | |
| Gross Payroll – WM and ADC | | - | 81,440 | - | 81,440 | - | 81,440 | - | 81,440 | - | 81,440 | - | 81,440 | 488,639 |
| Gross Payroll – Administrative | | - | 49,444 | - | 49,444 | - | 49,444 | - | 49,444 | - | 49,444 | - | 49,444 | 296,662 |
| M&T Bank: Bond Defeasance + Interest | | | 5,456,500 [4] | | | | | | | | | | | 5,456,500 |
| M&T Letter of Credit and Bond Defeasance Fees | | | (95,086) [4] | | | | | | | | | | | (95,086) |
| HHHW Principal + Interest | | | 3,521,096 [4] | | | | | | | | | | | 3,521,096 |
| DIP Interest and Fees; DIP repayments (Lapis) | | | 477,600 [4] | | | | | | | 95,312 | | | | 572,912 |
| Professional Fees / Retainers | [2] | 150,000 | | | | | | | | | | | | 150,000 |
| WM Operating Disbursements | | 153,500 | 163,000 | 126,169 | 87,000 | 150,000 | 174,500 | 126,169 | 87,000 | 150,000 | 145,000 | 185,669 | 87,000 | 1,635,007 |
| **Total Weekly Cash Disbursements** | | 153,500 | 9,653,593 | 126,169 | 217,883 | 150,000 | 305,383 | 126,169 | 217,883 | 245,312 | 275,883 | 335,669 | 217,883 | 12,025,730 |
| **Total Weekly Cash Flow** | | 71,500 | (228,593) | (51,169) | 32,117 | 165,000 | (80,383) | 98,831 | (142,883) | (18,000) | (50,883) | 39,331 | 107,117 | (58,417) |
| **Ending Cash Balance** | | 366,472 | 137,479 | 86,310 | 118,426 | 283,426 | 203,043 | 301,874 | 158,990 | 140,990 | 90,107 | 129,438 | 236,555 | 236,555 |
| **Westchester Meadows Operating Disbursements:** | | | | | | | | | | | | | | |
| Nutrition Management Services | | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 528,000 |
| Con Edison/Direct Energy: Deposits | | 45,000 | | | | | | | | | | | | 141,800 |
| Transportation Services-Westchester Ambulette | | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 156,000 |
| Oxford Health Plans-Employee Health Benefits | | | 28,000 | | | 28,000 | | | | | 28,000 | | | 84,000 |
| Workers Compensation-State Insurance Fund | | | | 24,169 | | | | 24,169 | | | | 24,169 | | 72,507 |
| Property and Casualty Insurance | | 15,000 | | 15,000 | | 15,000 | | 15,000 | | 15,000 | | 15,000 | | 90,000 |
| Rehab Consultants | | | | | | | | | | | | | | 60,000 |
| Security Services (FJC) | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Employee 401(B) Contributions | | 11,500 | | | | | 11,500 | | | | | 11,500 | | 34,500 |
| Marketing (Specialty firm-senior housing) | | | | | | | | | | | 30,000 | | | 30,000 |
| 1199 RN/Clerical Benefit & Pension payment | | | 48,000 | | | | 48,000 | | | | | | 48,000 | 144,000 |
| Times of Greenburgh – PILOT program payments | | | | | | | | | | | | | | 295,000 |
| Other Accounts Payable disbursements | | 20,000 | 25,000 | 25,000 | 25,000 | 23,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | |
| Resident Refunds | | | | | | | | | | | | | | |
| **Total** | | 153,500 | 163,000 | 126,169 | 87,000 | 150,000 | 174,500 | 126,169 | 87,000 | 150,000 | 145,000 | 185,669 | 87,000 | 1,635,007 |

**Notes:**
[1] Assumes chapter 11 filing on December 7, 2015
[2] Post-petition professional fees per Administrative procedures; procedures assume December 2015 fees to be payable February 2016 @ 80%; expenses @ 100%; includes UST fees
[3] DIP Line of Credit – post-petition assumes use of DIP line from Lapis Advisers
[4] HHHH IDA defeasance; HHHW Loan repayment; DIP and related fees – see Escrow detail page
[5] Expenses incurred by HHISH staff in support of affiliates' administration including chapter 11 services
[6] Includes various items including Entrance Fee recovery from amortization of 2 recent residents' entry fees

# Exhibit C

## MOTIONS FOR 'FIRST DAY' HEARING

1. Debtor's Motion for Order Extending Deadline for Debtor to File its Schedules of Assets and Liabilities and Statement of Financial Affairs

2. Debtor's Motion for Interim and Final Orders Authorizing, But Not Directing, the Debtor to Continue Using its Existing Bank Accounts and Business Forms

3. Debtor's Motion for Interim and Final Orders (I) Authorizing Debtor's Payment of Certain Pre-Petition Employee Benefits and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers

4. Debtor's Motion for Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Approving the Debtor's Proposed Form of Adequate Assurance and (III) Establishing Procedures for Resolving Objections by Utility Providers

5. Debtor's Motion for Interim and Final Orders Authorizing, But Not Directing Debtor to Pay Pre-Petition Obligations of Certain Critical Vendors

6. Debtor's Motion for Order Authorizing the Debtor to Assume Restructuring Support and Loan Agreement

7. Debtor's Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of Bankruptcy Code (I) Authorizing Debtor to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, and (IV) Scheduling Final Hearing Pursuant to Fed. R. Bankr. Pr. 4001(b) and (c)

4707628_1