Hearing Time: 11:00 a.m. on December 15, 2015

ALSTON & BIRD LLP
Martin G. Bunin
Craig E. Freeman
90 Park Avenue
New York, New York 10016
Tel: (212) 210-9400
Fax: (212) 210-9444

*Proposed Counsel to the Official
Committee of Unsecured Creditors of
HHH Choices Health Plan, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HEBREW HOSPITAL SENIOR HOUSING, INC. | : | Case No. 15-13264-MEW |
| (AKA WESTCHESTER MEADOWS CONTINUING CARE | : | |
| RETIREMENT COMMUNITY AND FIELDSTONE AT | : | |
| WESTCHESTER MEADOWS) | : | |
| | : | |
| Debtor. | : | |

-----------------------------------------------------------------x

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF HHH CHOICES HEALTH PLAN, LLC, TO DEBTOR'S
MOTION FOR INTERIM AND FINAL ORDERS PURSUANT
TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF
BANKRUPTCY CODE (I) AUTHORIZING DEBTOR TO
(A) OBTAIN POST-PETITION FINANCING AND (B) USE CASH
COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS,
(III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING
<u>FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND 4001(c)</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of HHH Choices Health Plan, LLC ("<u>HHH Choices</u>"), an affiliate of Hebrew Hospital Senior Housing, Inc. (the "<u>Debtor</u>"), hereby submits this objection (the "<u>Objection</u>") to the Debtor's *Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of Bankruptcy*

*Code (I) Authorizing Debtor to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, and (IV) Scheduling Final Hearing Pursuant to Fed. R. Bankr. P. 4001 (b) and 4001(c)* (Docket No. 5; the "DIP Motion"), and in support thereof respectfully submits as follows:

## Background

1. On May 24, 2015, an involuntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") was filed in this Court against HHH Choices, to which HHH Choices consented on June 1, 2015, commencing Case No. 15-11158-MEW (the "HHH Choices Bankruptcy Case").

2. On November 16, 2015, the United States Trustee appointed the Committee in the HHH Choices Bankruptcy Case (HHH Choices Docket No. 42). On December 11, 2015, the Committee selected Alston & Bird LLP as its counsel.

3. On December 9, 2015 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned bankruptcy case (the "Bankruptcy Case" or the "Hebrew Hospital Bankruptcy Case").

4. On the Petition Date, the Debtor filed the DIP Motion seeking, among other things, an Interim Order[1] authorizing the Debtor to borrow from the DIP Lender $9.2 million on an interim basis, at least $9 million of which will be immediately distributed to third parties, including an affiliate of the Debtor.

5. An interim hearing on the DIP motion is scheduled for December 15, 2015 (the "Interim Hearing"), and the Debtor has sought a final hearing no later than January 15, 2016 (the "Final Hearing").

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the DIP Motion.

2

6.  As of the filing of this Objection, no committee has been appointed in this Bankruptcy Case.

7.  The Debtor has acknowledged that it is an affiliate of HHH Choices (*See* Docket No. 1), but the HHH Choices Bankruptcy Case and the Hebrew Hospital Bankruptcy Case are not jointly administered.

8.  While the Debtor has not yet filed its schedules or statement of financial affairs, and the schedules and statement of financial affairs of HHH Choices do not detail such claims, upon information and belief, HHH Choices is a creditor of the Debtor.

9.  In light of HHH Choices status as an affiliate and creditor of the Debtor, the Committee is a party in interest in this Bankruptcy Case pursuant to Section 1109(b) of the Bankruptcy Code.

**Objection**

10. Post-petition financing should only be approved if its terms are not overreaching or excessively favorable to the proposed lender. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989). That is, the Court should not approve proposed post-petition financing if it is not in the best interests of the general creditor body but rather favors a particular creditor to the detriment of other parties in interest. *See A&K Endowment, Inc. v. Gen. Growth Props., Inc. (In re Gen. Growth Props., Inc.)*, 423 B.R. 716, 725 (S.D.N.Y. 2010) (quoting *In re Ames*, 115 B.R. at 39 ("[P]roposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.")).

11. In addition, any proposed financing must be "fair, reasonable, and adequate under the circumstances." *In re Ames*, 115 B.R. at 39 (internal quotation omitted); *see also, e.g.*, *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 127 (Bankr. S.D.N.Y. 2009) (finding that the "terms of

3

the borrowings and other financial accommodations authorized hereby are fair and reasonable under the circumstances").

12. The Committee has numerous objections to the relief sought by the DIP Motion, particularly the relief sought on an interim basis, and its effect on the bankruptcy estates of both HHH Choices and the Debtor:

    (A)    **Inappropriate Payment of Prepetition Secured Debt**: The primary purpose of the Initial Term Loan is to pay off the Debtor's Pre-Petition Secured Debt, including a $3.5 million loan from an affiliate of the Debtor, without providing any opportunity for creditors and parties in interest to review and, if appropriate, challenge the prepetition liens and claims of the holders of the Pre-Petition Secured Debt.

    (B)    **Unfavorable Economic Terms**: The DIP Facility proposes economic terms that are not in the best interest of the Debtor or its estate. After the payment of the Pre-Petition Secured Debt (which may be on more favorable terms than the DIP Facility) and interest, fees and costs owing to the DIP Lender, the Debtor's estate will receive net funding of only $1.68 million, $800,000 of which is attributable to Professional Fees. This $1.68 million in net funds to the Debtor comes at a cost of over $1.56 million in interest, fees and expenses to the DIP Lender. The grant of Collateral to the DIP Lender is also overly broad, including, but not limited to, the conveyance of liens in the Debtor's avoidance actions and proceeds thereof, with a super-priority administrative claim being payable from proceeds of avoidance actions as well.

(C) **Sale Process that May Chill Bidding**: The DIP Facility imposes on the Debtor a timeline for a sale process that does not provide creditor and parties in interest with an opportunity to analyze a sale's appropriateness or to otherwise maximize value for the Debtor's estate.

(D) **No Immediate or Irreparable Harm; Assumption of Prepetition Obligations**: The Initial Term Loan is not necessary for the Debtor's continued operations and thus there will be no immediate or irreparable harm to the Debtor's estate if the Debtor does not obtain the proposed DIP financing on an interim basis. Indeed, only $245,000 of the $9.2 million Initial Term Loan will not be used to pay Pre-Petition Secured Debt, and it appears that very little of that $245,000 will be used for working capital needs of the Debtor.[2] Further, the Initial Term Loan inappropriately requires that the Debtor assume certain prepetition obligations.

13. The Committee requested an adjournment of the hearing on the Motion. That request was denied.

    *A.    The Debtor Should Not Be Permitted To Satisfy its Pre-Petition Secured Debt with Proceeds of the Initial Term Loan.*

14. Under the terms of the proposed DIP Facility, the DIP Lender will make a total of $12.2 million dollars available to the Debtor, including a $9.2 million Initial Term Loan and Subsequent Term Loans not to exceed $3 million. *See* DIP Motion, p. 13. However, the proposed DIP Financing also requires that the Initial Term Loan be used to pay off the Debtor's

---

[2] The Motion indicates that the $245,000 will be used "to fund the ongoing working capital needs of the Debtor, payment of the Interim Closing Fee, payment of any fee or tax due in connection with the recording of the Mortgage, payment of Escrow fees, payment of fees and expenses in connection with the payment of the Pre-Petition Bonds, and payment of the DIP Lender's attorneys' fees and expenses." DIP Motion, p. 13. Accordingly, it appears that most of the $245,000 will used to pay for costs that are a result of the Initial Term Loan itself.

Pre-Petition Secured Debt, which equals $8.955 million. Thus, the proposed DIP Facility results in only $3.245 million in new money for the Debtor's estate (nearly half of which will ultimately go to the DIP Lender in the form of interest, fees and costs). While this is not a "roll-up" of prepetition debt owing to a proposed DIP lender in the traditional sense, the principle is the same and the potential consequences are worse. Because the Debtor proposes to use the proceeds of the Initial Term Loan to repay the claims of third parties who are not the DIP Lender, should the DIP Facility not be approved on a final basis or should the claims or liens of the holders of the Pre-Petition Secured Debt be deemed invalid, the Court will not have the ability to unwind these transfers (unlike a roll-up of a DIP lender's pre-petition debt).

15. While not forbidden, roll-up provisions are not favored in Chapter 11 cases. *See In re Caccamise*, No. 09-17165-SSM, 2009 Bankr. LEXIS 4174, at *10-11 (Bankr. E.D. Va. Dec. 22, 2009). Indeed, the inclusion of a roll-up provision in a motion to obtain credit is a material provision that must be disclosed pursuant to Local Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"). Here, the proposed repayment of the Pre-Petition Secured Debt excessively prefers the holders of the Pre-Petition Secured Debt and the DIP Lender over other creditors and should not be approved. The non-default interest rate under the proposed DIP Facility is 9.75%, while the interest rate on the $3.5 million Pre-Petition Note is 5.5%. While the Committee does not know the interest rate on the remaining Pre-Petition Secured Debt proposed to be paid off from Initial Term Loan, given the nature of such debt -- Westchester Industrial Development Agency bonds -- the Committee presumes that the interest rate on such debt is lower than the interest rate for the DIP Facility. In light of the foregoing, the DIP Facility does not make economic sense.

16. In the DIP Motion, the Debtor indicates that the terms of the RSA (defined below) require that it use the proceeds of any DIP financing to pay off the $3.5 million Pre-Petition Note owing to an affiliate of the Debtor. The DIP Facility, in turn, requires as a condition precedent to closing and funding the Initial Term Loan that the Debtor assume its obligations under the RSA. Other than the circular promises made in connection with the RSA amongst the Debtor and its affiliate, on the one hand, and the DIP Lender, on the other, there is no reason why the Pre-Petition Note must be paid at this time. Further, the Debtor is under no obligation to pay the Pre-Petition Bond Debt at this time. The only reason for satisfying the Pre-Petition Secured Debt through use of the Initial Term Loan is so that the DIP Lender can obtain superpriority liens in the Debtor's assets without meeting the requirements set forth in Section 507(b) of the Bankruptcy Code. As such, the proposed DIP Facility unfairly prefers the Debtor's affiliate secured creditor and the DIP Lender over other creditors of the Debtor's estate. Such preferential treatment is inappropriate and should not be approved.

17. The proposed timing of the Initial Term Loan and payment of the Pre-Petition Secured Debt does not provide any opportunity for creditors and parties in interest to review and challenge the prepetition liens and claims of the holders of the Pre-Petition Secured Debt. To the contrary, the Debtor seeks authority to draw the full $9.2 million of the Initial Term Loan upon entry of the Interim Order and to immediately pay $8.955 million of such funds to third parties, including $3.5 million payable to the Debtor's affiliate on account of the Pre-Petition Note. Even if the Court were to determine that the payment of prepetition debt is an appropriate use of DIP financing funds, such payment should not be authorized unless or until there has been a determination by a disinterested party that such prepetition debt is valid and liens relating thereto are properly perfected. Were the Debtor authorized to satisfy the Pre-Petition Secured Debt with

funds from the Initial Term Loan, and were the liens and claims of the holders of the Pre-Petition Secured Debt later determined to be invalid, the Debtor's estate would not be able to recover those funds.

18. The foregoing concerns are precisely why, absent immediate and irreparable harm to a debtor's estate, Bankruptcy Rule 4001(c)(2) prohibits a bankruptcy court from authorizing a debtor to obtain credit on less than 14 days' notice and Bankruptcy Rule 6003(b) prohibits the granting of motions to use property of the estate outside of the ordinary course within 21 days of the petition date. While Bankruptcy Rule 6003(b) excepts from this prohibition motions under Rule 4001, here, the Debtor is not only seeking to incur debt, but is also seeking to use the proceeds of such debt outside of the ordinary course pursuant to Section 363 of the Bankruptcy Code. Such relief is clearly prohibited at this early stage of the Bankruptcy Case.

    *B. The Fees Related to the DIP Facility are Excessive and Inappropriate*

19. The Committee further objects to the DIP Facility on the basis that the related fees are excessive and inappropriate. The proposed DIP Facility requires the Debtors to pay at least $1,564,000 in interest, fees and costs (assuming a non-default interest rate), including an Interim Closing Fee of $244,000, an Exit Fee of $244,000 and 9.75% interest on the outstanding balance of the loan for the expected 273-day term, regardless of whether the loan is repaid early. Excluding the payment of the Pre-Petition Secured Debt (which may subject to more favorable terms than the DIP Facility), the DIP Facility provides the Debtor with only $800,000 for Professional Fees and $881,000 in "operating capital." This $1.68 million in net funds to the Debtor comes at a cost of over $1.56 million in interest, fees and expenses to the DIP Lender. It is difficult to comprehend how this could be in the best interest of the Debtor's estate and its creditors. It seems clear that instead, the DIP Lender is seeking to pay itself substantial fees for

funds utilized to pay off the Pre-Petition Secured Debt, solely for the purpose of securing its own superpriority liens.

20.  Additionally, other terms of the DIP Facility are overly broad or excessive and not consistent with terms for DIP financing usually approved in this district. For example, the proposed default rate of interest under the DIP Facility is 14.75%, an additional 5% over the non-default rate. This is an unreasonably high rate and the Committee submits that a default rate of interest of an additional 2% is more appropriate. Additionally, the DIP Facility requires that the Debtor grant to the DIP Lender liens in the Debtor's Chapter 5 causes of action and the proceeds thereof. DIP Credit Agreement, § 7.01(a)(ii).

21.  The Court should not grant liens on avoidance actions. *See Official Comm. Of Unsecured Creditors v. Goold Electronics Corp.*, No. 93 C 4196, 1993 WL 408366, at *4 (N.D. Ill. Sept. 22, 1993) ("The financing order is invalid to the extent that the order assigns to the bank a security interest in the debtor's preference actions."); *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 905 (D.N.J. 1987) ("[T]he right to recover preferences clearly attaches only post-petition, and even then the right is vested exclusively in the trustee; the debtor cannot assign this right."). This is because avoidance actions are not property of the bankruptcy estate. *See, e.g., Webster v. Nagyunyom (In re Yelverton)*, No. 09-10048, 2011 WL 6257553, at *1 (Bankr. D.D.C. Dec. 15, 2011) ("[T]he trustee's avoidance claims themselves are not property of the estate."); *In re Novak*, 383 B.R. 660, 671 n.16 (Bankr. W.D. Mich. 2008) ("Avoidance actions, though, are not property of the estate . . . ."). Rather, avoidance actions are designed to facilitate equal distribution among creditors and should be preserved for the benefit of the estate. *See Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather

were creditor claims that could only be brought by a trustee or debtor in possession . . . ."); *In re Worldcom, Inc.*, 401 B.R. 637, 646-47 (Bankr. S.D.N.Y. Feb. 26, 2009) (holding that chapter 5 claims do not belong to the debtor); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 567 (3d Cir. 2003) (recognizing that the underlying intent of avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y.2002) ("[T]he purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors."). For the same reasons, the DIP Lender's super-priority administrative claim should not be payable from proceeds of avoidance actions.

22. The foregoing concerns regarding the excessive fees and interest and overly broad liens granted to the DIP Lender under the DIP Facility may not be exhaustive. The Committee continues to review the documents comprising the DIP Facility and reserves the right to lodge further objections to specific terms thereunder prior to any Final Hearing on the DIP Motion. For the foregoing reasons, and to allow the Committee and other creditors and parties in interest an opportunity to assess the proposed terms of the DIP Facility, the DIP Motion, and in particular the Initial Term Loan, should not be granted on an expedited basis.

  C. *The DIP Facility Requires a Sale Process with Milestones that May Chill Bidding.*

23. The DIP Facility imposes on the Debtor a timeline for a sale process that does not provide creditor and parties in interest with an opportunity to analyze a sale's appropriateness or to otherwise maximize value. The required milestones require the filing of a sales procedure motion by December 17, 2015, the entry of a sales procedures order by December 31, 2015 and the entry of a sale order by January 29, 2016, leaving only 4 weeks for the Debtor to run a sale process. Additionally, the Debtor does not propose to file its schedules until January 22, 2016,

10

such that potential bidders may not have the benefit of complete information regarding the Debtor's assets and liabilities before making a bid and creditors and parties in interest will have very little time to assess any proposed sale with the benefit of such information.

24. The proposed timeline also calls for the assumption of the Debtor's operations by the proposed purchaser no later than March 1, 2016, but does not require the closing of the sale until September 30, 2016. While there is no explanation for this timing provided in the DIP Motion, it is noteworthy that the DIP Facility explicitly entitles the DIP Lender (a) to credit bid and (b) to receive interest as if the DIP Facility were outstanding through September 30, 2016, even if the obligations thereunder are repaid earlier. Without further information regarding how or why the proposed sale timeline was decided upon, it appears that the timeline is crafted for the convenience and benefit of the DIP Lender and not for the purpose of maximizing value for the Debtor's estate. No sale timeline should be approved by this Court until the Court, creditors and parties in interest have an opportunity to understand the motivations behind the proposed timeline and the Debtor has demonstrated that such timeline will maximize value for the benefit of the Debtor's estate and its creditors.

> D. *There Will Be No Immediate or Irreparable Harm if the DIP Motion is Not Granted on an Interim Basis and the Debtor Should Not Be Permitted To Assume Prepetition Obligations on an Emergency Basis.*

25. The Debtor has not demonstrated that the Interim Term Loan is necessary for the Debtor's operations. While the budget attached to the DIP Motion as Exhibit B (the "<u>Budget</u>") indicates that the Debtor will be cash flow negative the week of January 1, 2016, absent the DIP Facility, limiting the DIP financing obtained by the Debtor to that necessary for operating and Chapter 11 administrative expenses will potentially save the Debtor's estate millions of dollars. As set forth above, the Debtor is under no obligation—other than obligations imposed on itself

by virtue of the DIP Facility—to pay the Pre-Petition Secured Debt at this early stage in the Bankruptcy Case.

26. Indeed, the Initial Term Loan of $9.2 million allocates $8.955 million in payment of the Pre-Petition Secured Debt, purportedly leaving $245,000 available "to fund the ongoing working capital needs of the Debtor." DIP Motion, p. 13. However, $244,000 of the remaining Initial Term Loan proceeds must be used to satisfy the 2% Interim Closing Fee owing by the Debtor to the DIP Lender, effectively leaving the Debtor only $1,000 in "working capital." While the Debtor apparently prepaid $50,000 of the Interim Closing Fee to the DIP Lender, arguably leaving only $194,000 payable from the Initial Term Loan on account of the Interim Closing Fee, such calculation puts form over substance and rewards the Debtor's prepetition depletion of its working capital for the benefit of the DIP Lender. Thus, absent the Debtor's repayment of the Pre-Petition Secured Debt and had the Debtor not prepaid $50,000 of the Interim Closing Fee, the Initial Term Loan would be wholly unnecessary.

27. The terms of the DIP Facility also require that the Debtor assume its obligations under the Restructuring Support and Loan Agreement (the "RSA") between the Debtor, the Attorney General of the State of New York, Hebrew Hospital Home of Westchester, Inc. (the Debtor's affiliate and holder of the Debtor's Pre-Petition Note) and the Resident Council prior to the closing of and borrowing under the Initial Term Loan. DIP Credit Agreement, § 3.01(a)(vi). This is inappropriate, particularly before the Court has had a chance to hold a hearing on the motion to assume the RSA. Bankruptcy Rule 6003(c) expressly prohibits a debtor from assuming a contract within the first 21 days of a bankruptcy case absent irreparable harm. As set forth above, the Debtor has demonstrated no such harm. The Committee understands that the

Debtor's motion to assume the RSA is being adjourned. The Court's hands should not be tied with respect to the assumption of the RSA as a result of the DIP Facility.

28. The Debtor has not articulated any facts or circumstances necessitating the Initial Term Loan, the assumption of the obligations under the RSA, or the imposition of a sale timeline at this stage in the Bankruptcy Case. Even if the Court were to determine that the relief, or some portion of the relief, sought in the DIP Motion is appropriate on an "interim" basis, the Debtor has not made any showing to support the waiver of the stay imposed on the use of any funds outside of the ordinary course pursuant to Bankruptcy Rule 6004(h) and, as such, the 14-day stay should apply to any Interim Order.

## Standing of the Committee to Bring this Objection

29. The Committee is an official committee, appointed pursuant to Section 1102 of the Bankruptcy Code, of HHH Choices, a creditor of the Debtor. As such, the Committee files this Objection as a representative of a creditor of the Debtor, as well as in its capacity as a party in interest in this Bankruptcy Case pursuant to Section 1109(b) of the Bankruptcy Code.

30. The Debtor, an entity affiliated with HHH Choices, has listed over $17.8MM in intercompany debt owed to its affiliate entities. DIP Credit Agreement, Schedule 5.02(m). The Committee understands that both the Debtor and HHH Choices, each a debtor in separate Chapter 11 cases, hold intercompany claims against one another, though neither party has fully determined the nature and extent of these claims. Until and unless the intercompany claims between HHH Choices and the Debtor are resolved, both the Debtor and HHH Choices have claims against the other, rendering each a creditor in the other's bankruptcy case. Section 1109(b) of the Bankruptcy Code confers upon creditors the right to appear and be heard in bankruptcy cases. Here, HHH Choices, a creditor of the Debtor, is an affiliate of the Debtor,

15-13264-mew    Doc 31    Filed 12/14/15    Entered 12/14/15 16:21:43    Main Document
Pg 14 of 18

sharing the same Chief Executive Officer and the same Chapter 11 counsel. Because it is not feasible or realistic for HHH Choices to assert this Objection, the Committee should be permitted to do so as a representative of a creditor of the Debtor and in the Debtor's stead.

31.    In reviewing a motion for interim DIP financing, courts consider whether the terms of the proposed financing "would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits." *In re Barbara K. Enterprises, Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (quoting *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)). The terms of the DIP Motion will have a significant impact on the rights of creditors in the HHH Choices Bankruptcy Case as well as the Hebrew Hospital Bankruptcy Case and may result in the preference of creditors of one debtor over another. The HHH Choices' Committee, therefore, as a representative of creditors of an affiliate of the Debtor, has sufficient interest in the outcome of the Debtor's DIP Motion to confer standing upon the Committee in connection with this matter.

32.    We understand that HHH Choices and the Debtor also share joint and several liability, exceeding $23 million, with respect to pension withdrawal liability owed to 1199SEIU Health Care Employees Pension Fund (the "<u>1199 Pension Fund</u>"). *See* HHH Choices' Schedules of Assets and Liabilities (HHH Choices Bankruptcy Case, Docket No. 21) (listing over $23MM in contingent, unliquidated debt owed to 1199 Pension Fund); Debtor's Petition (Docket No. 1) (same); *see also* DIP Credit Agreement, schedule 4.01(m) (listing pension obligations of the Debtor and its affiliates). As a result of its shared liability with the Debtor, HHH Choices has a

sufficient stake in the outcome of the DIP Motion such that the Committee is a "party in interest" under Section 1109(b) of the Bankruptcy Code.

33. Section 1109(b) provides a party in interest standing to "appear and be heard on any issue in a case in this chapter." 11 U.S.C. § 1109(b). Although the term "party in interest" is not defined by the Bankruptcy Code, courts construe its meaning broadly to ensure "fair representation of all constituencies impacted in any significant way by a Chapter 11 case." *In re Johns–Manville Corp.,* 36 B.R. 743, 754 (Bankr.S.D.N.Y.1984); *see also In re Amatex Corp.*, 755 F.2d 1034, 1042 (3rd Cir.1985); *In re Marin Motor Oil, Inc.,* 689 F.2d 445, 453 (3d Cir.1982); *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983). Courts determine on a case-by-case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation. *Amatex*, 755 F.2d at 1042. As a general principle, courts recognize that "a pecuniary interest. . . directly affected by the bankruptcy proceeding" is sufficient to provide a party standing under § 1109(b). *Nintendo Co. v. Patten (In re Alpex Computer Corp.),* 71 F.3d 353, 356 (10th Cir.1995); *see also Term Loan Holder Committee v. Ozer Group, LLC (In re Caldor Corp.),* 303 F.3d 161 (2d Cir.2002). A party's financial stake in a proceeding is often evaluated by determining whether the result of the proceeding "diminishes their property, increases their burdens or impairs their rights." *In re Westwood Cmty. Two Assoc., Inc.*, 293 F.3d 1332, 1335 (11th Cir. 2002). The DIP Motion has the potential to both diminish the property and increase the burdens of HHH Choices' bankruptcy estate and thus impact the rights of the HHH Choices' Committee and its constituents.

34. Courts have granted "party in interest" status under Section 1109(b) to parties that can show that they have a pecuniary interest in the outcome of the proceeding, even where the

15

interest is not an immediately realizable interest. For example, in *In re Stone Barn Manhattan LLC*, 405 B.R. 68 (Bankr. S.D.N.Y. 2009), a prospective purchaser breached terms of an asset purchase agreement (APA) by declining to proceed with its acquisition of business assets of Chapter 11 debtor-retailers. The purchaser subsequently established a $6 million fund for payment of administrative expense claims, in which it had reversionary rights if the funds were not exhausted. *Id.* at 73. After the purchaser objected to a proposed settlement that resolved an administrative expense claim by making payments from the fund, the court concluded the purchaser had standing as a "party in interest," as the prospective purchaser's reversionary interest in funds gave it a pecuniary stake in the proposed settlement. *Id.* at 74; *see also Unofficial Committee of Zero Coupon Noteholders v. Grand Union Co.*, 179 B.R. 56 (D. Del. 1995) (concluding bondholders, who were not creditors or equity holders of the debtor, had sufficient practical stake in the outcome to object to a proceeding on interim and final financing where debtor proposed to eliminate the equity of the affiliated entity to which the bonds were issued).

35. Because of the Debtor and HHH Choices' shared liability to the 1199 Pension Fund, any reduction of the Debtor's funds available to pay the pension liabilities necessarily increase HHH Choices' liability, reducing the funds available to pay HHH Choices' creditors. *See, e.g.*, *In re Marcus Hook Dev. Park, Inc.*, 153 B.R. 693, 700 (Bankr. W.D. Pa. 1993) (concluding title company had interest sufficient for 1109(b) standing in action against debtor's attorneys where creditor's tax claim against estate would be satisfied by either defendants to proceeding or title company itself). If the claims against the Debtor—here pension fund claims—are not satisfied by the Debtor, HHH Choices may be liable for their payment, triggering a reduction of rights or increase in liabilities to the HHH Choices' estate.

16

Accordingly, the Committee, on behalf of the creditors of HHH Choices' bankruptcy estate, has standing to object to the DIP Motion as a party in interest.

36. The Committee recognizes that there is case law in the Second Circuit holding that a party's status as a "creditor of a creditor" of a debtor does not lend that party standing under Section 1109(b) of the Bankruptcy Code. *See, e.g.*, *In re Refco*, 505 F.3d 109, 117-19 (2nd Cir. 2007) (concluding individual investors in a creditor of the debtor did not have standing to object to a proposed settlement because their interests were tangential to the proceeding); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 JMP, 2012 WL 1057952, at *5 (S.D.N.Y. Mar. 26, 2012) ; (certificate holders of trust holding collateral did not have standing): *In re Innkeepers USA Trust*, 448 B.R. 131, 144 (Bankr. S.D.N.Y. 2011) (same). Those cases, however, involve holders of interests in a creditor of a debtor that predicate their standing on the potential reduction in their ultimate recovery should the distribution to the subject creditor be reduced. In contrast, the Committee, as a representative of creditors in the bankruptcy case of a related debtor, has standing as a party in interest based upon the real concern that the terms of the DIP Motion will deplete the available assets of the estate of an affiliate of the Debtor to the benefit of the Debtor's creditors and the detriment of the creditors of the Debtor's affiliate. Moreover, standing under Section 1109(b) is intended to ensure the fair representation of all parties impacted by the Chapter 11 case in a significant way, *In re Johns–Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984). As explained above, the Committee submits that it is the only party that will represent the interests of HHH Choices bankruptcy estate in this proceeding. The inherent conflict precluding HHH Choices from objecting to the DIP Motion renders its bankruptcy estate otherwise unrepresented in this Bankruptcy Case, and renders the Committee a party in interest under Section 1109(b).

**Reservation of Rights**

37. This Objection is filed by the Committee solely with respect to certain relief being sought by the Debtor on an interim basis and, in particular, with respect to the Initial Term Loan. The Committee reserves its right to further object to the DIP Motion and various terms proposed in the DIP Facility in advance of any Final Hearing.

WHEREFORE, the Committee respectfully requests that the Court sustain the objections set forth above and grant such other and further relief as the Court deems appropriate under the circumstances.

Dated: December 14, 2015

        ALSTON & BIRD LLP

        By: /s/ Martin G. Bunin
            Martin G. Bunin
            Craig E. Freeman
            90 Park Avenue
            New York, NY 10016
            (212) 210-9400
            Marty.Bunin@alston.com
            Craig.Freeman@alston.com

            *Proposed Counsel for the Official Committee of Unsecured Creditors of the Bankruptcy Estate of HHH Choices Health Plan, LLC*