# EXHIBIT B

$2,000,000

## SECURED SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

Dated as of January [__], 2016

among

HEBREW HOSPITAL SENIOR HOUSING, INC.

as a debtor and a debtor in possession and as Borrower

and

HEBREW HOSPITAL HOME OF WESTCHESTER, INC.

as a debtor and a debtor in possession and as Lender

## Table of Contents

**Page**

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** ........................................................ 3

SECTION 1.01.    Certain Defined Terms ........................................................ 3
SECTION 1.02.    Computation of Time Periods; Other Definitional Provisions ................... 14
SECTION 1.03.    Accounting Terms ........................................................ 14

**ARTICLE II AMOUNT AND TERMS OF THE LOANS** ........................................................ 15

SECTION 2.01.    Loan Commitment ........................................................ 15
SECTION 2.02.    Making the Loans ........................................................ 15
SECTION 2.03.    Repayment of Loans ........................................................ 15
SECTION 2.04.    Prepayments ........................................................ 15
SECTION 2.05.    Interest ........................................................ 16
SECTION 2.06.    [Intentionally Omitted] ........................................................ 16
SECTION 2.07.    Payments and Computations ........................................................ 16
SECTION 2.08.    Use of Proceeds ........................................................ 17
SECTION 2.09.    Evidence of Debt ........................................................ 17

**ARTICLE III CONDITIONS TO EFFECTIVENESS AND OF LENDING** ........................................................ 17

SECTION 3.01.    Conditions Precedent to Borrowing Interim Order Amount ................... 17
SECTION 3.02.    Conditions to Borrowings in Excess of the Interim Order Amount ........... 20
SECTION 3.03.    Conditions Precedent to All Borrowings ........................................................ 20

**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ........................................................ 21

SECTION 4.01.    Representations and Warranties of Borrower ........................................................ 21

**ARTICLE V COVENANTS** ........................................................ 24

SECTION 5.01.    Affirmative Covenants ........................................................ 24
SECTION 5.02.    Negative Covenants ........................................................ 26
SECTION 5.03.    Reporting Requirements ........................................................ 29
SECTION 5.04.    Financial Covenants ........................................................ 31

**ARTICLE VI EVENTS OF DEFAULT** ........................................................ 31

SECTION 6.01.    Events of Default ........................................................ 31
SECTION 6.02.    Remedies upon Default ........................................................ 34

**ARTICLE VII PRIORITY AND COLLATERAL SECURITY** ........................................................ 35

SECTION 7.01.    Superpriority Claims and Collateral Security ........................................................ 35
SECTION 7.02.    Collateral Security Perfection ........................................................ 36
SECTION 7.03.    No Avoidance, Subordination or Modification ........................................................ 36
SECTION 7.04.    No Discharge; Survival of Claims ........................................................ 36

**ARTICLE VIII MISCELLANEOUS** ........................................................ 36

SECTION 8.01.    Amendments, Etc ........................................................ 36
SECTION 8.02.    Notices, Etc ........................................................ 37
SECTION 8.03.    No Waiver; Remedies ........................................................ 38
SECTION 8.04.    Costs and Expenses ........................................................ 38
SECTION 8.05.    Right of Set-off ........................................................ 39
SECTION 8.06.    Binding Effect ........................................................ 39
SECTION 8.07.    Assignments ........................................................ 39

SECTION 8.08.    Execution in Counterparts ..................................................................39
SECTION 8.09.    Confidentiality ..................................................................................40
SECTION 8.10.    Jurisdiction, Etc ................................................................................40
SECTION 8.11.    Governing Law ...................................................................................40
SECTION 8.12.    Waiver of Jury Trial ...........................................................................40
SECTION 8.13.    Interest Rate Limitation ......................................................................41
SECTION 8.14.    Release................................................................................................41

**EXHIBITS**

Exhibit A            -        Form of Note

This SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of January [__], 2016 between HEBREW HOSPITAL SENIOR HOUSING, INC., a New York corporation and a debtor and a debtor in possession, as the borrower (the "*Borrower*") and HEBREW HOSPITAL HOME OF WESTCHESTER, INC., a New York corporation and a debtor and a debtor in possession, as the lender (together with its successors and assigns in such capacity, the "*Lender*").

PRELIMINARY STATEMENTS:

WHEREAS, on December 9, 2015 (the "*Borrower Petition Date*"), the Borrower commenced a voluntary case under chapter 11 of the Bankruptcy Code, Case No. 15-13264-mew (the "*Borrower Chapter 11 Case*"), in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*");

WHEREAS, on January [__], 2016 (the "*Lender Petition Date*"), the Borrower commenced a voluntary case under chapter 11 of the Bankruptcy Code, Case No. _____ (the "*Lender Chapter 11 Case*", and together with the Borrower Chapter 11 Case, the "*Chapter 11 Cases*") in the Bankruptcy Court;

WHEREAS, the Borrower intends to continue to operate its business, and the Lender intends to manage its assets and exercise its rights, pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Borrower Petition Date, the Borrower, the Lender, the Attorney General, and Carl Winterrose, as an authorized agent of the Westchester Meadows Resident Council (the "*Resident Council*") have entered into that certain Restructuring Support and Loan Agreement dated as of October 20, 2015 (as amended and in effect from time to time, the "*RSA*"), pursuant to which the Lender extended credit to Borrower on the terms set forth therein

WHEREAS, prior to the Borrower Petition Date, the Borrower, as maker executed in favor of the Lender a certain promissory note (the "*Cross-Company Promissory Note*");

WHEREAS, as of the Borrower Petition Date, the Lender under the Intercompany Promissory Note is owed, together with any and all accrued interest under the RSA, an aggregate principal amount equal to $3,500,000 (with any fees or expenses payable under the Cross-Company Promissory Note and the RSA, the "*Pre-Petition Cross-Company Debt*");

WHEREAS, as of the Borrower Petition Date, Westchester Industrial Development Agency ("*WIDA*", and together with the Lender, the "*Prepetition Lenders*"), as issuer, and U.S. Bank National Association, as Trustee ("*Trustee*") entered into that certain Indenture of Trust, dated as of January 1, 2008 (the "*Indenture*"), pursuant to which certain Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, in the aggregate principal amount of $14,985,000 were issued (the "*Bonds*"). As of the Borrower Petition Date, an aggregate principal amount equal to approximately $5,455,000 is owed by the Debtor in respect of the Bonds (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Bonds, the "*Bond Debt*").

WHEREAS, the Bonds are secured by, among other things, that certain direct pay letter of credit, issued by Manufacturers and Traders Trust Company ("*M&T*") for the account of the Borrower and HHH Home Care, Inc. ("*Home Care*") and for the benefit of the Trustee, in the current stated amount of Five Million Five Hundred Twenty-Nine Thousand Six Hundred Fifty-Eight Dollars ($5,529,658), of

which (i) Five Million Four Hundred Fifty-Five Thousand Dollars ($5,455,000) is available to pay the outstanding principal amount of the Bonds, and (ii) Seventy-Four Thousand Six Hundred Fifty-Eight Dollars ($74,658) is available to pay up to fifty (50) days interest under the Bonds;

WHEREAS, the Borrower obligations to M&T under the direct pay letter of credit are secured by that certain (i) Mortgage and Security Agreement, dated as of January 1, 2008, by and among WIDA, the Borrower and M&T (the "*Pre-Petition First Lien Mortgage*"), (ii) General Assignment of Leases and Rents, by and among WIDA, the Borrower, and M&T (the "*Pre-Petition Assignment*"), (iii) Hazardous Substances Indemnity Agreement, dated as of January 1, 2008, by and among the Borrower, Hebrew Hospital Home Foundation, Inc., and M&T (the "*Pre-Petition Environmental Indemnity*"), (iv) Pledge and Assignment of Variable Rate Bonds, dated as of January 1, 2008, by and among the Borrower, Hebrew Hospital Home Foundation, Inc and M&T Bank (the "*Pre-Petition Pledge*"), (v) Operating Account Assignment and Security Agreement, dated as of January 1, 2008, by and among the Borrower and M&T (the "*Pre-Petition Operating Account Agreement*") and together with the Pre-Petition First Lien Mortgage, the Pre-Petition Assignment, the Pre-Petition Environmental Indemnity, the Pre-Petition Pledge, and the Pre-Petition Operating Account Agreement, the "*Pre-Petition First Lien Security Documents*"), granting to M&T a first-priority security interest in and liens (the "*Pre-Petition First-Priority Liens*") on certain of the Borrower's and WIDA's assets (such assets as described in the Pre-Petition First Lien Security Documents, the "*Pre-Petition First Lien Collateral*");

WHEREAS, the obligations under the Pre-Petition Cross-Company Debt are secured by that certain Mortgage, dated as of November 4, 2015 and recorded on November 5, 2015, between WIDA, the Borrower and the Lender (the "*Pre-Petition Second Lien Mortgage*" and together with the Pre-Petition First Lien Security Documents, the "*Pre-Petition Security Documents*"), granting to the Lender a second-priority security interest in and lien (the "*Pre-Petition Second Priority Liens*") on certain of HHSH's and WIDA's assets (such assets as described in the Pre-Petition Second Lien Mortgage, the "*Pre-Petition Second Lien Collateral*");

WHEREAS, an immediate and on-going need exists for the Borrower to obtain additional funds in order to continue the operation of its business as debtors-in-possession under chapter 11 of the Bankruptcy Code and, accordingly, the Borrower has requested that the Lender provide financing to the Borrower consisting of a secured superpriority line of credit facility in a principal amount of up to $2,000,000 (the "*Facility*") pursuant to Section 364(c) of the Bankruptcy Code, secured by Liens and granted superpriority claim status, and for the proceeds to be used for working capital and for the payment of ordinary course of business post-petition expenses and other professional fees and expenses in such amounts and during such periods as provided in the Budget;

WHEREAS, the Lender has indicated its willingness to agree to extend the Facility to the Borrower, all on terms and conditions set forth herein and in the other Loan Documents (as defined below) and in accordance with Section 364(c) of the Bankruptcy Code, so long as such post-petition credit obligations are (i) secured by Liens on substantially all of the property, rights and interests, real and personal, tangible and intangible, of the Borrower, whether now owned or hereafter acquired, subject in priority only to the Pre-Petition First Priority Liens, Prepetition Permitted Liens and the Carve Out, as hereinafter provided, and (ii) given superpriority claim status as provided in the Interim Order and, on and after the entry thereof, the Final DIP Order; and

WHEREAS, the Borrower has agreed to provide such collateral security and superpriority claims, subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

2

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account*" means all "accounts" (as defined in the UCC) of the Borrower (or, if referring to another Person, of such Person), including without limitation, accounts, accounts receivables, health care insurance receivables, monies due or to become due and obligations in any form (whether arising in connection with contracts, contract rights, Instruments, General Intangibles or Chattel paper), in each case whether arising out of goods sold or services rendered or from any other transaction and whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote ten percent (10%) or more of the voting Equity Interests of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting Equity Interests, by contract or otherwise.

"*Agreement*" means this Secured Super Priority Debtor in Possession Credit Agreement, as amended, supplemented, replaced, or otherwise modified from time to time.

"*Amended Budget*" has the meaning specified in Section 5.03(e).

"*Approved Plan of Reorganization*"  means a plan of reorganization for the Borrower under the Bankruptcy Code.

"*Attorney General*" means the Office of the Attorney General of the State of New York or any duly authorized employees or representatives thereof.

"*Bankruptcy Code*" means Title 11, United States Code, as now and hereafter in effect, or any applicable successor statute.

"*Bankruptcy Court*" has the meaning specified in the recitals to this Agreement.

"*Bond Indenture*" has the meaning specified in the recitals hereto.

"*Bonds*" has the meaning specified in the recitals hereto.

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrower Chapter 11 Case*" has the meaning specified in the recitals to this Agreement.

"*Borrower Creditors' Committee*" means the Official Unsecured Creditors' Committee appointed by the United States Trustee in relation to the Borrower Chapter 11 Case, as applicable.

"*Borrowing*" means a borrowing hereunder of a Loan.

"*Budget*" means collectively, the Initial Budget and each Amended Budget. Each Budget shall include detailed operating assumptions, projected receipts, disbursements, cash balances and accounts receivable balances and such other information as agreed by the Borrower and the Lender, as set forth on Exhibit A to the Interim Order and the Final DIP Order

"*Business Day*" means a day of the year on which banks are not required or authorized by law to close in New York City.

"*Capital Expenditures*" means, for any Person for any period, the sum of, without duplication, all expenditures made, directly or indirectly, by such Person or any of its subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a balance sheet of such Person or have a useful life of more than one (1) year, including  the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"*Capitalized Leases*" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"*Carve Out*" means a reserve under and against the Loans and the Commitment solely for the payment of Professional Fees in accordance with Section 2.09(b)(ii) hereof, not to exceed the amount of $400,000.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, 42 U.S.C. § 9601 et seq.

"*CERCLIS*" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"*Chapter 11 Cases*" has the meaning specified in the recitals to this Agreement.

"*Closing Date*" means the date the initial Borrowing is made, which shall occur as soon as practical following the date that in accordance with Section 2.01(a) and Section 2.02(a) the conditions precedent set forth in Article III have been fulfilled.

"*Collateral*" means all "Collateral" referred to in this Agreement and all other property that is or is intended to be subject to any Lien in favor of the Lender.  For the avoidance of doubt, Entrance Fee Deposits held in an escrow shall not be deemed Collateral unless and until such Entrance Fee Deposits are lawfully released from escrow and become property of the Borrower free from the Liens, claims and interests of any Customer.

"*Collateral Documents*" means each  agreement or document that creates or purports to create a Lien in favor of the Lender, including, but not limited to, this Agreement, the Interim Order and the Final DIP Order.

4

"*Commitment*" means the Lender's obligations to make Loans under Section 2.01 in an aggregate amount not to exceed $2,000,000, subject to the terms and conditions set forth in this Agreement, as such amount may be reduced by the making of Loans and pursuant to Section 2.04.

"*Confirmation Order*" means an order of the Bankruptcy Court confirming an Approved Plan of Reorganization under the Bankruptcy Code.

"*Creditors' Committee*" means, individually, each of the Borrower Creditors' Committee and the Lender Creditors' Committee.

"*Cross-Company Promissory Note*" has the meaning specified in the recitals hereto.

"*Customer*" means the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right and/or any party who enters into or proposes to enter into any contract or other arrangement with the Borrower, pursuant to which the Borrower is to delivery any personal property or perform any services, including, without limitation, any party who enters into a contract with the Borrower for the use of the Borrower's independent living units.

"*Debt*" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment Obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

"*Default*" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"*Default Interest*" has the meaning set forth in Section 2.05(b).

"*Department of Financial Services*" means the Department of Financial Services for the State of New York or any duly authorized employees or representatives thereof.

"*Department of Health*" means the Department of Health for the State of New York or any duly authorized employees or representatives thereof.

"*Disclosed Litigation*" has the meaning specified in Section 3.01(c).

5

"*Disclosure Statement Hearing* " means a hearing to approve a Disclosure Statement under the Bankruptcy Code for an Approved Plan of Reorganization.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease, conveyance or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer, conveyance or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Dollar*" and "*$*" means the lawful money of the United States.

"*Effective Date*" means the date that an Approved Plan of Reorganization is effective, as defined in such Approved Plan of Reorganization.

"*Entrance Fee Deposits*" means post-petition deposits in the amount of ten percent (10%) of the Entrance Fee.

"*Entrance Fees*" means the pre-petition and post-petition entrance fees payable by Customers to the Borrower for the Customer's (i) use of the Borrower's independent living units and (ii) right to receive certain services in connection therewith.

"*Environmental Action*" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health, safety or the environment, climate or natural resources, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions, damages, or response costs and (b) by any governmental or regulatory authority or third party for damages, response costs, contribution, indemnification, cost recovery, compensation or declaratory or injunctive relief.

"*Environmental Law*" means all applicable current and future Federal, state, local and foreign laws (including common laws), statutes, regulations, rules having the force and effect of law, ordinances, codes, orders, writs, judgments, injunctions, decrees or judicial or agency interpretations, policies or guidance, in each case relating to pollution or protection of the environment, climate, health, safety or natural resources, or the presence, release of, discharge of, exposure to, or the generation, manufacture, processing, distribution, use, handling, transportation, treatment, storage, disposal, recycling of or the arrangement for such activities, with respect to Hazardous Materials.

"*Environmental Permit*" means any permit, approval, identification number, license, registration, notification, exemption or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

4758415_2

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of the Borrower, or under common control with the Borrower, within the meaning of Section 414(b) or (c) of the Internal Revenue Code, except that the term "ERISA Affiliate" shall also include a member of the controlled group of the Borrower, or under common control under the meaning of Section 414(m) or (o) for purposes of PBGC premium liabilities and pension plan funding liability under Section 41 of the Internal Revenue Code.

"*Events of Default*" has the meaning specified in Section 6.01.

"*Extraordinary Receipt*" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including, without limitation, aggregate amount of tax refunds received, pension plan reversions, proceeds of insurance (including, without limitation, any key man life insurance but excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustment received in connection with any purchase agreement; *provided, however*, that an Extraordinary Receipt shall not include cash receipts received from proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto or adjustments received pursuant to any resolution of claims for reimbursements from any governmental sponsored health insurance programs..

"*Facility*" has the meaning specified in the recitals to this Agreement.

"*Final Order*" means an order by the Bankruptcy Court as to which (a) no request for a stay or any similar request is pending, no stay is in effect, the action or decision has not been vacated, reversed, set aside, annulled or suspended, and any deadline for filing such a request that may be designated by law, statute, regulation, or rule has passed; (b) no petition for rehearing or reconsideration or application for review is pending and the time for filing any such petition or application has passed; (c) no Governmental Authority has undertaken to reconsider the action on its own motion and the time within which it may effect such reconsideration has passed; and (d) no appeal is pending (including other administrative or judicial review) or in effect and any deadline for filing any such appeal that may be specified by law, statute, regulation, or rule has passed.

"*Final DIP Order*" means a final order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving this Agreement and the other Loan Documents on a final basis and entered following a final hearing in form and substance satisfactory to the Lender in its sole discretion.

"*Final Order Amount*" means, at any time, $2,000.000, as such amount may be reduced at or prior to such time pursuant to Section 2.04(b).

"*Fiscal Year*" means a fiscal year of Borrower ending on December 31 in any calendar year.

"*GAAP*" has the meaning specified in Section 1.03.

7

"*Government Account*" shall mean all Accounts arising out of or with respect to any Government Contract.

"*Government Contract*" shall mean all contracts with the United States Government, any Governmental Authority or with any agency thereof, and all amendments thereto.

"*Governmental Authority*" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"*Governmental Authorization*" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"*Guaranteed Debt*" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt, leases, dividends or other payment Obligations ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Hazardous Materials*" means (a) any petroleum or petroleum product, by-product or breakdown product, and all other hydrocarbons, radioactive or nuclear materials, asbestos or asbestos-containing materials, polychlorinated biphenyls and radon gas, chlorofluorocarbons and all other ozone depleting substances and (b) any other chemical, material or substance or waste designated, classified, prohibited, limited or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"*Home Care*" has the meaning specified in the recitals hereto.

"*Indemnified Party*" has the meaning specified in Section 8.04(b).

"*Information*" means all projections and information received from the Borrower relating to the Borrower or its business, other than any such information that is available to or in the possession of the Lender or its Representatives on a non-confidential basis prior to disclosure by the

8

Borrower; *provided* that, such information was or is clearly identified at the time of delivery as confidential or that is subsequently classified in a separate communication as confidential.

"***Initial Budget***" means (i) a cash flow forecast, business plan and operating budget for the thirteen-week period beginning immediately after the Borrower Petition Date and (ii) a monthly cash flow forecast, business plan and operating budget following the end of such thirteen-week period, in each case, based on the Information, and in form and substance satisfactory to the Lender in its sole and absolute discretion and as annexed and approved as part of the Interim Order, as updated in accordance with the terms of this Agreement.

"***Initial Loan***" has the meaning specified in Section 2.01(a).

"***Insurance Stay Exception***" means the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition creditor solely against available insurance coverage.

"***Interim Order***" means in form and substance satisfactory to the Lender in its sole discretion the Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (a) approving post-petition financing pursuant to the Facility and the making of Loans in an aggregate amount not to exceed the Interim Order Amount, (b) authorizing use of cash collateral, (c) granting Liens and providing superpriority administrative expense status, (e) modifying the automatic stay, and (f) scheduling a final hearing with respect to the Facility (including the Budget).

"***Interim Order Amount***" means, at any time, $500,000.00 as such amount may be reduced at or prior to such time pursuant to Section 2.04(b).

"***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***Investment***" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "Debt" in respect of such Person.

"***Lender***" has the meaning specified in the preamble to this Agreement.

"***Lender Chapter 11 Case***" has the meaning specified in the recitals to this Agreement.

"***Lender Creditors' Committee***" means the Official Unsecured Creditors' Committee appointed by the United States Trustee in relation to the Lender Chapter 11 Case, as applicable.

"***Lien***" means any lien, security interest, hypothecation or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"***Loan Documents***" means (a) this Agreement, (b) the Note, and (c) the Collateral Documents, each of (a) through (c) as amended.

9

"*Loans*" means, collectively, the Initial Loan and the Subsequent Loans.

"*M&T*" has the meaning specified in the recitals hereto.

"*Margin Stock*" has the meaning specified in Regulation U.

"*Material Adverse Effect*" means any material adverse effect on any of the (a) operations, performance, business, assets or properties, of the Borrower, taken as a whole, in each case other than (i) as a result of the commencement of the Borrower Chapter 11 Case, (ii) general economic, legal, regulatory or political conditions in the United States of America (*provided* that the impact on the Borrower is not materially disproportionate to the impact of similar entities), (iii) conditions generally affecting the industries in which the Borrower operates (*provided* that the impact on the Borrower is not materially disproportionate to the impact of similar entities).

"*Maturity Date*" means the date that is the earliest of: (a) the closing date of any replacement debtor-in-possession financing for the Borrower which provides for repayment in full in cash of all Obligations owing under the Facility; (b) the closing date of the sale of all or substantially all of the Collateral; (c) the effective date of a confirmed Chapter 11 plan of reorganization for the Borrower; (d) dismissal of the Borrower Chapter 11 Case; (e) conversion of the Borrower Chapter 11 Case to a Chapter 7 case; (f) the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition secured creditor with respect to collateral that is necessary for the Borrower's reorganization or sale, except to the extent that such relief constitutes an Insurance Stay Exception and the Insurance Stay Exceptions, in the aggregate, shall not result in or have a Material Adverse Effect; or (g) acceleration of the Loans pursuant to the terms of this Agreement.

"*Mortgaged Property*" means that certain plot, piece or parcel of real property and improvements located on Glassland Road in the Valhalla section of the Town of Greenburgh, County of Westchester, State of New York, consisting of a continuing care retirement community including 120 Independent Residential Apartments, 10 Enriched Housing Apartments, 20 skilled nursing facility beds, common areas and facilities, an indoor pool, a convenience store and administration areas and related infrastructure such as road, sewers, utilities, parking lots, drainage areas and maintenance facilities.

"*Multiemployer Plan*" means a multiemployer plan, as defined in Section 3(37) of ERISA, to which the Borrower or any ERISA Affiliate is making or has an obligation to make contributions, or has within any of the preceding six (6) plan years made or had an obligation to make contributions.

"*Multiple Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and at least one (1) Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could reasonably be expected to have liability under Section 4043, 4064 or 4069 of ERISA in the event of a withdrawal from such plan or if such plan has been or were to be terminated.

"*Net Cash Proceeds*" means:

(a)    in connection with any Disposition or any Recovery Event, the proceeds thereof in the form of cash and Permitted Investments (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of (w) attorneys' fees, accountants' fees, investment banking fees, (x) amounts required to be applied to the repayment

10

of Debt secured by a Permitted Lien on any asset that is the subject to such Disposition or Recovery Event (other than any Lien pursuant to a Collateral Document), (y) other customary fees and expenses actually incurred in connection therewith and (z) in the case of a Recovery Event, any actual and reasonable cost incurred and paid or payable in connection with restoration work to the extent required by any casualty insurance policy or as a result of a condemnation and, in each case, and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements);

(b)    in connection with any incurrence of Debt, the cash and Permitted Investments received from such incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith;

(c)    (d)    with respect to any Extraordinary Receipt that is not otherwise included in clause (a) or (b) above, the sum of the cash and Permitted Investments received in connection therewith.

"*Note*" means a promissory note of the Borrower payable to the order of the Lender (or at a Lender's request, payable to the Lender and its registered assigns), in substantially the form of Exhibit A hereto, evidencing the indebtedness of the Borrower to the Lender resulting from the Loans.

"*NPL*" means the National Priorities List under CERCLA.

"*Obligation*" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged or stayed. Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document, and (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that the Lender, in its sole discretion, may elect to pay or advance on behalf of the Borrower.

"*Orders*" means the Interim Order and the Final DIP Order; and "*Order*" means whichever of the Interim Order or the Final DIP Order is then in effect.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor).

"*Permitted Investments*" means (a) Dollars; (b) securities issued or unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof, in each case having maturities of not more than 24 months from the date of acquisition thereof; (c) securities issued by any state, commonwealth or territory of the United States of America or any political subdivision or taxing authority of any such state, province, commonwealth or territory or any public instrumentality thereof or any political subdivision or taxing authority of any such state, province, commonwealth or territory or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service); (d) commercial paper and variable or fixed rate notes issued by or guaranteed by the Lender or any bank holding company owning the Lender; (e) commercial paper and variable or fixed rate notes maturing no more than 12

months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); (f) time deposits with, or domestic and Eurodollar certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, the Lender or any other bank having combined capital and surplus of not less than $250,000,000 in the case of domestic banks and $100,000,000 (or the dollar equivalent thereof) in the case of foreign banks; (g) repurchase agreements with a term of not more than 30 days for underlying securities of the type described in clauses (b), (c) and (f) above entered into with any bank meeting the qualifications specified in clause (f) above or securities dealers of recognized national standing; (h) marketable short-term money market and similar securities having, at the time of acquisition, a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); and (i) shares of investment companies that are registered under the Investment Company Act of 1940 and invest solely in one or more of the types of securities described in clauses (a) through (h) above.

"*Permitted Liens*" has the meaning specified in Section 5.02(a).

"*Person*" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"*Plan*" means a Single Employer Plan or a Multiple Employer Plan.

"*Pre-Petition Cross-Company Debt*" has the meaning specified in the recitals hereto.

"*Prepetition Debt*" means the Bond Debt and the Pre-Petition Cross-Company Debt.

"*Prepetition Lenders*" has the meaning specified in the recitals to this Agreement.

"*Prepetition Loan Documents*" means the Cross-Company Promissory Note, the Bond Indenture and all promissory notes, security and other documents relating to the foregoing or entered into in connection therewith, in each case as in effect on the Closing Date.

"*Prepetition Permitted Liens*" means, collectively, the Pre-Petition First Priority Liens and the Pre-Petition Second Priority Liens.

"*Professional Fees*" has the meaning specified in Section 2.09(b).

"*Recovery Event*" means any settlement of or payment in respect of any real property insurance claim or any condemnation proceeding relating to any asset of the Borrower.

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"*Regulatory Agencies*" means, collectively, the Attorney General, the Department of Financial Services and the Department of Health.

12

"*Released Parties*" has the meaning specified in <u>Section 8.14</u>.

"*Releasing Parties*" has the meaning specified in <u>Section 8.14</u>.

"*Requirement of Law*" means, as to any Person, (a) the partnership agreement, charter, certificate of incorporation, articles of incorporation, bylaws, operating agreement or other organizational or governing documents of such Person, (b) any federal, state or local law, treaty, ordinance, rule or regulation, and (c) any order, decree or determination of a court, arbitrator or other Governmental Authority; in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Resident Council*" has the meaning specified in the recitals.

"*Resident Professionals*" shall mean DLA Piper LLP (US) and CohnReznick LLP

"*RSA*" has the meaning specified in the recitals hereto.

"*Second Lien Mortgage*" means that certain Mortgage, made as of November 5, 2015, between County of Westchester Industrial Development Agency, as Owner, Hebrew Hospital Senior Housing, Inc., as Mortgagor, and Hebrew Hospital Home of Westchester, Inc., as Mortgagee.

"*Single Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of the Borrower or any ERISA Affiliate and no Person other than the Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which the Borrower or any ERISA Affiliate could reasonably be expected to have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"*Statutory Liens*" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have commenced: (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under <u>Section 5.01(b)</u>; *provided* that such Liens are being challenged in good faith and by proper proceedings by the Borrower and for which adequate reserves in accordance with GAAP have been established on the books of the Borrower; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than thirty (30) days and (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the use of the property to which they relate; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) Liens securing judgments (or the payment of money) not constituting a Default or securing appeal or other surety bonds related to such judgments; and (f) easements, rights of way and other similar encumbrances on title to real property that do not render title to the property encumbered thereby unmarketable or materially adversely affect the use of such property for its present purposes.

"*Statutory Reserve*" has the meaning specified in <u>Section 4.01(e)</u>.

"*Subordinated Debt*" means Debt subordinated in right of payment or Lien priority to the obligations under this Agreement on terms reasonably satisfactory to the Lender.

"**Subsequent Loans**" has the meaning specified in Section 2.01(b).

"**Superpriority Claim**" means a claim against a Borrower or its estate in the Borrower Chapter 11 Case which is an administrative expense claim having priority over (a) any and all allowed administrative expense claims, and (b) unsecured claims now existing or hereafter arising, including, without limitation, administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, Section 506(c)).

"**Synthetic Debt**" means, with respect to any Person, without duplication of any clause within the definition of "Debt," all (a) Obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "synthetic lease"), (b) Obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) Obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "Debt" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"**Taxes**" means any present or future taxes, levies, imposts, duties, deductions, charges, withholdings, assessments, fees or other charges and other similar liabilities and any interest, additions, or penalties with respect thereto.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "**UCC**" means the Uniform Commercial Code as from time to time in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

SECTION 1.02.    Computation of Time Periods; Other Definitional Provisions.    In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."  Unless expressly provided for otherwise, if any day on which the Lender or the Borrower is required to perform hereunder is not a Business Day, then such performance shall occur on the immediately succeeding Business Day.  References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03.    Accounting Terms.    All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles consistent with those applied in the preparation of the financial statements referred to in Sections 4.01 and 5.03 hereof ("**GAAP**").

4758415_2

# ARTICLE II

## AMOUNT AND TERMS OF THE LOANS

SECTION 2.01.    Loan Commitment.  The Lender agrees, on the terms and conditions hereinafter set forth, to make a loan or loans to the Borrower as follows:

(a)    on the Closing Date, in an amount equal to $500,000 (the "*Initial Loan*"), *provided* that the amount of the Initial Loan shall not exceed the Interim Order Amount; and

(b)    from time to time after the date of entry of the Final DIP Order and until the Maturity Date, each in an amount selected by the Borrower pursuant to Section 2.02(b), and in an aggregate amount, together with the Initial Loan, not to exceed $2,000,000 (the "*Subsequent Loans*"); *provided*, that the aggregate amount of the Subsequent Loans plus Initial Loans shall not exceed the Final Order Amount.

Each Loan may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

SECTION 2.02.    Making the Loans.  Subject to the terms and conditions hereinafter set forth:

(a)    Upon (i) entry of the Interim Order, and (ii) fulfillment of the applicable conditions set forth in Article III, the Initial Loan funds shall be made available by the Lender to the Borrower by transfer of such funds to the account designated by the Borrower.

(b)    Subsequent Loans.  The Borrower shall file ("*Docket Filing*") a notice of Borrowing of any Borrowing of a Subsequent Loan ("*Notice of Borrowing*"), stating the amount of such Borrowing, on the dockets of the Bankruptcy Court for the Chapter 11 Cases.  As long as no Default or Event of Default has occurred and is continuing, and upon fulfillment of the applicable conditions set forth in Article III, on the date of the Docket Filing of such Notice of Borrowing the Lender will make the amount of funds requested in such Notice of Borrowing available to the Borrower by transfer of such funds to the account designated by the Borrower.

SECTION 2.03.    Repayment of Loans.  The Borrower shall repay to the Lender the aggregate outstanding principal amount of the Loans on the Maturity Date (or on such earlier date on which such Loans become due and payable pursuant to Article VI), together with any and all accrued and unpaid interest thereon (which amounts shall be reduced as a result of the application of prepayments in accordance with Section 2.04).

SECTION 2.04.    Prepayments.  (a)    Optional.  The Borrower may prepay the outstanding aggregate principal amount of the Loans in whole or in part, together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid, at any time with premium or penalty.  Prepayments of principal and interest made under this Section 2.04 shall be applied to the Loans in inverse order of maturity

(b)    Mandatory. If the Borrower Disposes of any property or assets, whether pursuant to a sale under Section 363 of the Bankruptcy Code or otherwise (other than any Disposition of any property or assets permitted by clauses (ii) through (v) of Section 5.02(e)), the Borrower shall prepay an aggregate principal amount of Loans equal to one hundred percent (100%) of all such Net Cash Proceeds immediately upon receipt thereof by the Borrower.  The Interim Order Amount and the Final Order

15

Amount, as applicable, shall be reduced by an amount equal to the amount of Net Cash Proceeds from any sale of property or assets described in this Section 2.04(b) in excess of the amount applied to reduce the aggregate outstanding amount of the Loans to zero, unless otherwise agreed by the Lender.

(i)    Upon the sale or disposition by the Borrower of substantially all of its assets, the Borrower shall prepay an aggregate principal amount (including any paid in kind interest) of Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof.

(ii)    Upon the incurrence or issuance by the Borrower of any post-petition secured Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 5.02(b)), the Borrower shall prepay an aggregate principal amount (including any paid in kind interest) of Loans equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom immediately upon receipt thereof by the Borrower.

SECTION 2.05.    Interest.

(a)    Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Loan owing to the Lender from the date of such Loan until such principal amount shall be paid in full at a rate per annum equal at all times to five and one-half percent (5.50%) per annum, which interest shall accrue and shall be payable on the Maturity Date (or on such earlier date on which such Loans become due and payable pursuant to Article VI).

(b)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans and all other due and unpaid Obligations shall bear interest ("*Default Interest*") at a rate per annum equal at all times to two percent (2.00%) per annum above the rate per annum described in Section 2.05(a) hereof.  All such interest shall be payable in cash on demand by the Lender.

SECTION 2.06.    [Intentionally Omitted].

SECTION 2.07.    Payments and Computations.  (a)  The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off, not later than 11:00 a.m. (New York City time) on the day when due in U.S. Dollars to the Lender at the account identified by the Lender in same day funds, with payments being received by the Lender after such time being deemed to have been received on the next succeeding Business Day.

(b)    All computations of interest on the Obligations shall be made by the Lender on the basis of a year of three hundred sixty days (360) days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.  Each determination by the Lender of an interest or a fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)    Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest; *provided, however*, that, if such extension would cause payment of interest on or principal of Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(d)    [Intentionally Omitted]

16

SECTION 2.08.    Use of Proceeds.  (a)  The proceeds of the Initial Loan shall be used solely and strictly in accordance with the Budget and in compliance with Section 5.04(a), as follows to pay, as available, fees or taxes due in connection with the recording of the Collateral Documents and the ongoing working capital needs of the Borrower.

(b)    The proceeds of the Subsequent Loans shall be used solely, and strictly in accordance with the Budget and in compliance with Section 5.04(a), following the entry of the Final DIP Order as follows: (i) for the payment of ordinary course of business post-petition operating expenses in such amounts and during such periods as provided for in the Budget; and (ii) for the payment of fees of the United States Trustee and allowed Chapter 11 estate professional fees and expenses (collectively "*Professional Fees*") in the amount of $400,000.

For the avoidance of doubt and notwithstanding any provision herein to the contrary,  (i) no proceeds of the Loans may be used to pay any or all claims for services rendered by any of the professionals retained by the Borrower or either Creditors Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter against Lender and (ii) except for the Carve Out, no Collateral or proceeds thereof shall be used for the payment of Professional Fees.

SECTION 2.09.    Evidence of Debt.  (a)  The Borrower agrees that upon notice by the Lender to the Borrower requesting a promissory note to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to, or to be made by, the Lender, the Borrower shall promptly (and in any event within three (3) Business Days) execute and deliver to the Lender a Note, in substantially the form of Exhibit A hereto payable to the order of the Lender (or, at the Lender's request, payable to the Lender and its registered assigns), in a principal amount equal to the Loans and Commitment of the Lender.

(b)    The Note, including entries made in good faith by the holder thereof, and the books and accounts of the Lender shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to the Lender absent manifest error; *provided, however*, that the failure of the Borrower to issue any Note to the Lender, or the Lender to fail to make any entry, or to make an entry that is incorrect, on the Note or in its books and accounts, shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01.    Conditions Precedent to Borrowing Interim Order Amount.   The obligation of the Lender to fund the Initial Loan is subject to the satisfaction or waiver by the Lender of the following conditions, and the conditions set forth in Section 3.03, precedent before or concurrently with the Closing Date:

(a)    The Lender shall have received on or before the Closing Date the following, each dated such day (unless otherwise specified), in form and substance satisfactory to the Lender:

(i)    Executed counterparts of this Agreement.

(ii)    A Note in the amount of the Commitment.

(iii)    To the extent required by Lender:

(A)    financing statements in a form appropriate for filing under the UCC for all jurisdictions that the Lender may deem necessary or desirable in order to perfect and protect the first priority (subject to the payment of the Carve Out and the Prepetition Permitted Liens) Liens and security interests created under this Agreement, covering the Collateral described in this Agreement;

(B)    all other recordings and filings of or with respect to the Collateral that the Lender may deem necessary or desirable in order to perfect and protect the security interest created thereunder;

(C)    evidence of the insurance required by the terms of the Agreement dated as of a recent date; and

(D)    evidence that all other actions that the Lender may deem necessary or desirable in order to perfect and protect the first priority (subject to the payment of the Carve Out and the Prepetition Permitted Liens) Liens and security interests created under this Agreement has been taken.

(iv)    Certified copies of the resolutions of the Board of Directors (or equivalent entity) of the Borrower approving each Loan Document, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to each Loan Document.

(v)    A copy of a certificate of the Secretary of State of the jurisdiction of organization of the Borrower, dated reasonably near the Closing Date in the case of the certificates described in clause (B), certifying (A) as to a true and correct copy of the constituent documents of the Borrower and each amendment thereto on file in such Secretary's office and that such amendments are the only amendments to the Borrower's constituent documents on file in such Secretary's office, and (B) that the Borrower is duly organized and in good standing or presently subsisting under the laws of the State of the jurisdiction of its organization.

(vi)    A certificate of the Borrower signed on behalf of the Borrower by its President or a Vice President and its Secretary or any Assistant Secretary, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the absence of any amendments to the constituent documents of the Borrower since the date of the Secretary of State's certificate referred to in Section 3.01(a)(v), (B) a true and correct copy of the organizational documents of the Borrower as in effect on the Closing Date, (C) the due organization and good standing or valid existence of the Borrower as an entity organized under the laws of the jurisdiction of its organization, and the absence of any proceeding for the dissolution or liquidation of the Borrower, and (D) certifying the names and true signatures of the officers (if any) of the Borrower authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

4758415_2

(vii)    Evidence satisfactory to the Lender that the proceeds of the Loans will be used solely for the purposes identified in the Budget.

(b)    Since the Borrower Petition Date (i) there shall have occurred no Material Adverse Effect and (ii) there has been no material increase in the liabilities, liquidated or contingent, of the Borrower (other than the liabilities in respect of the Loans under the Loan Documents), or material decrease in the assets of the Borrower.

(c)    There shall exist no action, suit, investigation, litigation or proceeding affecting the Borrower pending or threatened before any Governmental Authority that purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, other than such litigation that has been identified and described by the Borrower to the Lender prior to the date hereof (the "*Disclosed Litigation*").

(d)    [Intentionally Omitted].

(e)    The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Lender in its sole discretion, in the Chapter 11 Cases, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Lender), reversed, stayed or subject to a motion for reargument or reconsideration. The Interim Order shall have authorized the Liens and Superpriority Claims granted and provided to the Lender pursuant to the terms of Section 7.01 of this Agreement. If the Interim Order is the subject of a pending appeal in either of the Chapter 11 Cases in any respect, none of the Interim Order, the making of the Loans, or the performance by the Borrower of any of the Obligations shall be the subject of a presently effective stay pending appeal. The Borrower and the Lender shall be entitled to rely in good faith upon the Interim Order, notwithstanding objection thereto or appeal therefrom by an interested party. The Borrower and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(f)    The Lender shall have received the Budget prepared in good faith based upon assumptions believed to be reasonable when made and when delivered, satisfactory in all respects to the Lender.

(g)    The Interim Order shall provide for the adequate protection of the Lender under Sections 361 and 364 of the Bankruptcy Code for the obligations of the Borrower to the Lender under the Pre-Petition Cross-Company Debt in the form of (i) a legal, valid and enforceable first priority security interest in and Lien upon the Collateral (subject to payment of the Carve Out and the Prepetition Permitted Liens) securing the obligations of the Borrower to the Lender under the Pre-Petition Cross-Company Debt, which shall be pari passu in priority and right of payment with the first priority security interest in and Lien upon the Collateral (subject to the payment of the Carve Out and the Prepetition Permitted Liens) granted to the Lender under Section 7.01(a)(ii) of this Agreement, and (ii) a Superpriority Claim in the Borrower Chapter 11 Case for the obligations of the Borrower to the Lender under the Pre-Petition Cross-Company Debt having priority, pursuant to Section 364(c)(1) and 507(b) of the Bankruptcy Code (subject only to the payment of the Carve Out and the Prepetition Permitted Liens), over the other administrative claims of any entity, which shall at all times be senior to the rights of the Borrower, the Borrower's estate, any successor trustee to the extent permitted by law, or any other creditor in the Borrower Chapter 11 Case, and which shall be pari passu in right of payment with the Superpriority Claim in the Borrower Chapter 11 Case granted to the Lender in accordance with Section 7.01(a)(i) of this Agreement.

19

(h)    The Agreement shall, upon entry of the Interim Order, be effective to create in favor of the Lender a legal, valid and enforceable first priority security interest in and Lien upon the Collateral (subject to the payment of the Carve Out and the Prepetition Permitted Liens).

SECTION 3.02.    Conditions to Borrowings in Excess of the Interim Order Amount. The obligation of the Lender to make any Loan other than the Initial Loan shall be subject to the further conditions precedent, and the conditions set forth in Section 3.03, (unless waived pursuant to Section 8.01 hereof):

(a)    entry by the Bankruptcy Court of the Final DIP Order in the Chapter 11 Cases, which Final DIP Order shall continue and confirm matters addressed in the Interim Order and shall not have been amended or modified (unless otherwise approved by the Lender), stayed or reversed thereafter or subject to a motion for reargument or consideration. The Final DIP Order shall authorize an extension of credit under the Facility in an amount not greater than the Final Order Amount. If the Final DIP Order is the subject of a pending appeal in any respect, neither the Interim Order nor the making of the Loans, or the performance by the Borrower of any of the Obligations shall be the subject of a presently effective stay pending appeal. The Borrower and the Lender shall be entitled to rely in good faith upon the Final DIP Order notwithstanding the objection thereto or appeal therefrom by any interested party. The Borrower and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

SECTION 3.03.    Conditions Precedent to All Borrowings.  (a)  The obligation of the Lender to make any Loan on the occasion of each Borrowing (including the initial Borrowing) in accordance with Section 2.02, shall be subject to the satisfaction or waiver in accordance with Section 8.01 hereof of the further conditions precedent that on the date of such Borrowing:

(i)    the following statements shall be true and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that both on the date of the applicable notice of borrowing made by Borrower pursuant to Section 2.02(a) or Section 2.02(b) and the date of such Borrowing, such statements are true:

(A)    the representations and warranties of the Borrower contained in each Loan Document are correct in all material respects on and as of such date, before and after giving effect to such Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Borrowing, in which case such representations and warranties were true and correct in all material respects as of such specific date; provided, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates; and

(B)    no Default or Event of Default has occurred and is continuing, or would result from such Borrowing;

(ii)    the Lender shall have received such required funding requests as set forth in Section 2.02(a) or Section 2.02(b), as applicable;

4758415_2

(iii)    such Borrowing shall not violate any Requirement of Law applicable to the Lender or the Borrower and shall not be enjoined, temporarily, preliminarily or permanently, by any Governmental Authority; and

(iv)    The post-petition Entrance Fee Deposits shall have been deposited in escrow.

(b)    Each Borrowing hereunder shall constitute a representation and warranty by the Borrower as of the date of such Borrowing that the conditions contained in this Section 3.03 have been satisfied.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.    Representations and Warranties of Borrower.    The Borrower represents and warrants as follows:

(a)    The Borrower (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing in the jurisdiction in which it owns or leases property and in which the conduct of its business requires it to so qualify or be licenses, except where the failure to so qualify or be licensed would not be reasonably likely to have a Material Adverse Effect, and (iii) has all requisite corporate power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted

(b)    Subject to approval of the Bankruptcy Court and pursuant to the Orders, the execution, delivery and performance by the Borrower of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated thereby, are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action, and do not (i) contravene the Borrower's charter, bylaws or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting the Borrower or any of its properties or (iv) except for the Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of the Borrower. The Borrower is not in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(c)    [Intentionally Omitted].

(d)    This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by the Borrower. Upon entry of the Interim Order, this Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, subject only to the entry of the Final DIP Order or as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditor's rights generally or by equitable principals relating to enforceability.

21

(e)    Except for the Borrower Chapter 11 Case and as otherwise set forth herein, there is no action, suit, investigation, litigation or proceeding affecting the Borrower, including any Environmental Action, pending or threatened before any Governmental Authority or arbitrator that (i) would be reasonably likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, and there has been no adverse change in the status, or financial effect on the Borrower, of the Disclosed Litigation from that described to the Lender prior to the date hereof. The New York State Department of Financial Services has notified the Borrower that it is not in compliance with the reserve requirements established under Art. 46 of the Public Health Law and the regulations promulgated thereunder (the "*Statutory Reserve*") and for which a corrective plan of action is not feasible.

(f)    The Borrower is a board directed not-for-profit corporation formed under the laws of the State of New York and is an organization described in Section 501(c) (3) of the Code, and does not have a parent company or any wholly owned subsidiaries.

(g)    The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loan will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(h)    The Borrower is not an "investment company," as such term is defined in the Investment Company Act of 1940, as amended. Neither the making of any Loan, nor the application of the proceeds or repayment thereof by the Borrower, nor the consummation of the other transactions contemplated by the Loan Documents, will violate any provision of such Act or any rule, regulation or order of the Securities and Exchange Commission thereunder or equivalent under the applicable securities laws of other jurisdictions, in each case applicable to the Borrower.

(i)    The Borrower is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or corporate restriction that would be reasonably likely to have a Material Adverse Effect, which has not been disclosed to the Lender in writing on or before the Closing Date.

(j)    Neither the Borrower nor any ERISA Affiliate maintains, sponsors, participates in or contributes to any Plan; neither the Borrower nor any ERISA Affiliate has incurred any material liability under Title I or Title IV of ERISA with respect to any Plan for which the Borrower could reasonably be expected to be liable; and no condition exists that would reasonably be expected to subject the Borrower to any material tax, fine, Lien or other liability imposed by ERISA, the Internal Revenue Code or other applicable law with respect to any Plan.

(k)    (i) The operations and properties of the Borrower comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, and no circumstances exist that would be reasonably likely to (A) form the basis of an Environmental Action against the Borrower or any of its properties that could reasonably be expected to have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law that could reasonably be expected to interfere with the Lender's interest therein in any material respect;

(l)    Except for its failure to comply with the Statutory Reserve, the Borrower is not in violation of any applicable Requirement of Law, including any building, zoning, occupational safety and health, fair employment, equal opportunity, pension, environmental control, health care, certificate of

22

need, health care facility licensing or similar federal, state or local law, ordinance or regulation, relating to the ownership or operation of its business or assets, (ii) has not failed to obtain any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorizations necessary for the conduct of its businesses or the ownership and operation of its assets, (iii) has not received any notice from any Governmental Authority, and to its knowledge no such notice is pending or threatened, alleging that the Borrower has violated, or has not complied with, any Requirement of Law, condition or standard applicable with respect to any of the foregoing, and (iv) is not a party to any agreement or instrument, or subject to any judgment, order, writ, rule, regulation, code or ordinance, except to the extent that any violation, noncompliance, failure, agreement, judgment, etc. as described in clauses (i) and (ii) will not have a Material Adverse Effect.

      (m)    The Borrower has all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary for the lawful conduct of their businesses or the ownership and operations of its assets wherever now conducted and as planned to be conducted, pursuant to all applicable statutes, laws, ordinances, rules and regulations of all Governmental Authorities having, asserting or claiming jurisdiction over the Borrower or over any part of its operations,  except to the extent that the cumulative effect of noncompliance with the foregoing will not have a Material Adverse Effect.  Neither the Borrower is in default under any of such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations, and no event has occurred, and no condition exists, that with the giving of notice, the passage of time or both would constitute a default thereunder or would result in the suspension, revocation, impairment, forfeiture or non-renewal of any thereof, except to the extent that the cumulative effect of all such defaults, events, conditions, suspensions, revocations, impairments, forfeitures and non-renewals will not have a Material Adverse Effect.  The continuation, validity and effectiveness of all such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations will not be adversely affected by the transactions contemplated by this Agreement.  The Borrower knows of no reason why it will not be able to maintain after the date hereof all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary to conduct the business of each such entity as now conducted and presently planned to be conducted.

      (n)    Upon the entry of the applicable Order, such Order shall be effective to establish and perfect the Lender's security interest in the Collateral; *provided*, that the Lender may take any steps it deems necessary in its sole discretion to attach or perfect the Liens, which steps may include the filing of financing statements, mortgages, notices of Liens or other similar documents.  The Lender's rights with respect to the Collateral are not subject to any setoff, claims, withholdings, or other defenses.

      (o)    The Budget is based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made and when delivered, has been prepared on the basis of the assumptions stated therein and reflects the estimates of the Borrower, believed to have been reasonable when made and when delivered, of the results of operations and other information projected therein, it being recognized by the Lender that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by the Budget may differ from the projected results.

      (p)    The Borrower is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which it is engaged; and the Borrower (i) has not received notice from any insurer or agent of such insurer that material expenditures will have to be made in order to continue such insurance, other than expenditures that may be necessitated by or result from the Borrower's status as debtor in possession or (ii) has no

23

reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a cost that would not reasonably be expected to have a Material Adverse Effect, other than changes to such coverage and costs that may be necessitated by or result from the Borrower's status as debtor in possession.

(q)    To the extent applicable, the Borrower is in compliance, in all material respects, with the Patriot Act.

(r)    Since the date of the last audited financials of the Borrower, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

(s)    Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower pending or threatened; (b) hours worked by and payment made to employees of the Borrower have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Borrower on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Borrower except for any contingent withdrawal liability, as appropriate.

(t)    Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) the Borrower has not lost any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorization necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets, or has been threatened with the loss, revocation, or suspension of any of the foregoing; and (b) there has been no survey that has resulted in or is reasonably expected to result in a deficiency notice, with respect to the Borrower except for non-compliance with the Statutory Reserve.

(u)    The Borrower hereby makes to the Lender each of the representations and warranties made by the Borrower contained in the Loan Documents and all other operative documents to which the Borrower is a party as if such representations and warranties were set forth in full herein.

**ARTICLE V**

**COVENANTS**

SECTION 5.01.    Affirmative Covenants.  From the Closing Date for so long as any Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid or any Commitment remains outstanding, the Borrower shall:

(a)    Compliance with Laws, Etc.  Comply in all material respects, with all applicable laws, rules, regulations and orders except for the Statutory Reserve.

(b)    Payment of Taxes, Etc.  Except as are being challenged in good faith and by proper proceedings by the Borrower and for which adequate reserves in accordance with GAAP have been established on the books and records of the Borrower, pay and discharge before the same shall become delinquent, (i) all post-petition taxes, assessments and governmental charges or levies imposed upon it or upon its property at any time after the Borrower Petition Date and (ii) all lawful claims (other than claims in respect of Debt) made after the Borrower Petition Date that, if unpaid, could reasonably be expected by law to become a Lien upon its property.

24

4758415_2

(c)    <u>Compliance with Environmental Laws</u>.  Comply, and, if such non-compliance could reasonably be expected to interfere with the Lender's interest in such properties, cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws.

(d)    <u>Maintenance of Insurance</u>.  Maintain insurance (including, without limitation, business interruption) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower operates. All insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Lender of written notice thereof, (ii) name the Lender as an insured party or loss payee, and (iii) be reasonably satisfactory in all other respects to the Lender. The Borrower shall deliver to the Lender a report of a reputable insurance broker with respect to such insurance as the Lender may from time to time reasonably request.

(e)    <u>Preservation of Corporate Existence, Etc</u>.  Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), privileges, licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations and other Governmental Authorizations necessary for the conduct of its businesses or the ownership and operation of its assets.

(f)    <u>Keeping of Books</u>.  Keep proper books of record and account in conformity with GAAP and all Requirements of Law, in which full and correct entries (in all material respects) shall be made of all financial transactions and the assets and business of the Borrower in accordance with generally accepted accounting principles in effect from time to time.

(g)    <u>Maintenance of Properties, Etc</u>.  Maintain and preserve all of its properties that are necessary in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(h)    <u>Further Assurances</u>.  (i)  Promptly upon request by the Lender, correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document.

(ii)    Promptly upon request by the Lender, do, execute, acknowledge, deliver any and all acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Lender may reasonably require from time to time (and consent to the Lender recording or filing such instrument) in order to (A) carry out more effectively the purposes of the Loan Documents, (B) to the fullest extent permitted by applicable law, subject the Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Loan Document or under any other instrument executed in connection with any Loan Document to which the Borrower is or is to be a party.

(i)    Use of Proceeds.  Use the proceeds of the Loans as set forth in Section 2.09 only in accordance with the Budget and in compliance with Section 5.04(a).

SECTION 5.02.    Negative Covenants.  From the Closing Date, for so long as any Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid or any Commitment remains outstanding, the Borrower shall not, at any time:

(a)    Liens, Etc.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character whether now owned or hereafter acquired, or sign or file or suffer to exist under the UCC (or similar law) of any jurisdiction, a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except the following (collectively, "**Permitted Liens**"):

(i)    Liens created pursuant to the Loan Documents, the Interim Order, or the Final DIP Order;

(ii)    Statutory Liens;

(iii)    Liens existing on the Borrower Petition Date;

(iv)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower in the ordinary course of business to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction, improvement or installation of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition, construction, improvement or installation (other than any such Liens created in contemplation of such acquisition, construction, improvement or installation that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided, however*, that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed, improved or installed (or the proceeds of any of the foregoing), and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced (other than the proceeds of any such property); and *provided further* that the aggregate principal amount of the Debt hereafter incurred secured by Liens permitted by this clause (iv) shall not exceed the amount permitted under Section 5.02(b)(iii) at any time outstanding;

(v)    Liens arising under Capitalized Leases permitted under Section 5.02(b)(iii); *provided* that no such Lien shall extend to or cover any Collateral or assets other than the assets subject to such Capitalized Leases (or the proceeds thereof);

(vi)    Liens securing the financing of insurance premiums in the ordinary course of business of the Borrower outstanding on the Closing Date or included in the Budget with the Lender's consent;

26

(vii)    the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or the consignment of goods; and

(viii)    to the extent constituting Liens, Liens of a Customer arising with respect to any real or personal property owned by such Customer or any other Person, that is in the possession or control of the Borrower pursuant to any similar arrangement.

(b)    <u>Debt</u>. Create, incur, assume or suffer to exist any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    unsecured Debt not to exceed in the aggregate $150,000 at any time outstanding, except as reflected in the Budget;

(iii)    Capitalized Leases and Debt secured by purchase money Liens existing on the date hereof and identified by the Borrower to the Lender, and Capitalized Leases and Debt secured by purchase money Liens hereafter incurred in accordance with the Budget, not to exceed an aggregate principal amount of $100,000 at any time outstanding; and

(iv)    Debt not otherwise specified above and existing on the date hereof and identified by the Borrower to the Lender.

(c)    <u>Change in Nature of Business</u>.  Make any material change in the nature of its business as carried on at the date hereof.

(d)    <u>Mergers, Etc</u>. Merge into or consolidate with any Person or permit any Person to merge into it.

(e)    <u>Sales, Etc. of Assets</u>.  Sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets, except:

(i)    the sale of any assets out of the ordinary course of its business to the extent approved by the Attorney General, the Bankruptcy Court, and any other Governmental Authority whose consent is needed to effectuate such sale, and on terms and conditions satisfactory to the Lender; *provided* that the Borrower shall, on the date of receipt by it of the Net Cash Proceeds from such sale, prepay the Loans pursuant to, and in the amount set forth in, <u>Section 2.04</u>;

(ii)    entering into contracts with Customers for the use by such Customers of the Borrower's independent living units; *provided* that the Borrower shall, on the date of receipt by it of any Entrance Fee Deposits, deposit such Entrance Fee Deposits in an escrow in accordance with the terms of the RSA;

(iii)    sales of excess, obsolete or worn out equipment in the ordinary course of its business;

(iv)    the sale of any assets constituting a Permitted Investment and maintained in a securities account, subject to the terms and conditions of a securities account control

27

agreement in form and substance satisfactory to the Lender, duly executed by the financial institution party thereto; and

(v)    Investments permitted under Section 5.02(f) and transactions permitted under Section 5.02(g).

(f)    Investments in Other Persons.  Make or hold any Investment in any Person, except:

(i)    Debt permitted under Section 5.02(b) hereof;

(ii)    Investments of Cash or Permitted Investments in Permitted Investments to the extent the Lender's security interests thereon retains the same priority in such Investment that it held in such Cash or Permitted Investments immediately prior to the making of such Investment (other than Liens in favor of a bank or other depository institution securing obligations owed to such bank or other depository institution in respect of or arising out of such Investment); and

(iii)    Investments existing on the date hereof.

(g)    Restricted Payments. [NOT APPLICABLE].

(h)    Amendments of Constitutive Documents.  Amend its certificate of incorporation or bylaws or other constitutive documents.

(i)    Accounting Changes.  Make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by generally accepted accounting principles, or (ii) Fiscal Year.

(j)    Prepayments, Etc., of Debt.  (i) repay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment on any Debt, except the prepayment of the Loans in accordance with the terms of this Agreement, or (ii) amend, modify or change in any manner any term or condition of any Subordinated Debt.

(k)    Prepetition Payments.  Make or permit to be made any payments in respect of any prepetition obligation except (i) payments to prepetition critical trade vendors in accordance with an order of the Bankruptcy Court and the Budget, or (ii) payments made in accordance with the Budget, the Interim DIP Order or the Final DIP Order.

(l)    Negative Pledge.  Enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except (i) agreements in favor of the Lender or (ii) prohibitions or conditions under (A) any purchase money Debt permitted by Section 5.02(b)(iii) solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property acquired with the proceeds of such Debt or (B) any Capitalized Lease permitted by Section 5.02(b)(iii) solely to the extent that such Capitalized Lease prohibits or requires the consent of any Person other than the Borrower as a condition to the creation of a Lien on the property subject thereto.

(m)    Speculative Transactions.  Engage in any transaction involving commodity options or futures contracts or any similar speculative transactions.

4758415_2

(n)    Material Amendments. Make any material amendment to any agreements with any employee or independent contractor unless the Borrower reasonably determines that such amendment results in cash savings or improved liquidity for the Borrower and is reflected in the Budget or to which the Lender has agreed in writing.

(o)    Prepetition Indebtedness. Pay or discharge or cause to be paid or discharged, any Debt of such the Borrower incurred before the Borrower Petition Date other than payments, which are:

(i)    approved by the Bankruptcy Court (including, as applicable, payments made in accordance with any Bankruptcy Court order to critical vendors, employees, taxing authorities, insurers or through assumption of leases or executory contracts); and

(ii)    consistent with the Budget; and

(iii)    in respect of adequate protection, if any, required to be made to the Prepetition Lenders pursuant to the Orders.

SECTION 5.03.    Reporting Requirements.    So long as any Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid, or the Lender shall have any Commitment hereunder, the Borrower will furnish to the Lender:

(a)    Monthly Financials. As soon as available, but in any event no later than 30 days after the end of each month occurring during each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such month and the related unaudited statements of income and stockholders' equity and cash flow for such month, certified by the Chief Financial Officer of the Borrower or as being fairly stated in all material respects (subject to normal year-end adjustments). All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP except, for the absence of explanatory footnotes) applied consistently throughout the periods reflected therein and with prior periods.

(b)    Quarterly Financials. As soon as available, but in any event no later than 30 days after the end of each quarter occurring during each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such quarter and the related unaudited statements of income and stockholders' equity and cash flow for such quarter, certified by the Chief Financial Officer of the Borrower or as being fairly stated in all material respects (subject to normal year-end adjustments). All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP except, for the absence of explanatory footnotes) applied consistently throughout the periods reflected therein and with prior periods.

(c)    Annual Financials. As soon as available, (i) but in any event no later than 60 days after the end of each fiscal year of the Borrower, the unaudited balance sheets of the Borrower as at the end of such fiscal year and the related unaudited statements of income and stockholders' equity and cash flow for such fiscal year, and (ii) but in any event no later than 90 days after the end of each fiscal year of the Borrower, the audited balance sheets of the Borrower as at the end of such fiscal year and the related audited statements of income and stockholders' equity and cash flow for such fiscal year, reported upon without qualification by an independent certified public accounting firm selected by Borrower and reasonably satisfactory to Lender. All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP) applied consistently throughout the periods reflected therein and with prior periods.

29

(d)    Budget Update. No later than (i) the Friday of the ninth (9th) week covered by the initial thirteen (13) week period Budget and (ii) the last Friday of each subsequent 9-week period, (x) an updated budget in the same form as the Initial Budget and satisfactory to the Lender in its sole and absolute discretion, which, if approved by the Lender (and for the avoidance of doubt, without any further order of the Bankruptcy Court) in its sole and absolute discretion, shall become part of the Budget (each an "*Amended Budget*"); and (y) alternate updated budgets in the same form as the Initial Budget and satisfactory to the Lender in its sole and absolute discretion, that models the Borrower's finances and operations assuming that a new operator does not assume the obligation to fund operations each month going forward.

(e)    Chief Financial Officer Report and Certificate.  Commencing with the Friday of the second full week following the date of the entry of the Final DIP Order and on each Friday thereafter (or, if such day is not a Business Day, on the immediately succeeding Business Day), the Chief Financial Officer of the Borrower will deliver to the Lender, to the Regulatory Agencies, to the United State Trustee and to counsel to each of the Creditors' Committees:

(i)    copies of the most recent monthly operating reports filed by the Borrower with the United States Trustee as required by the Federal Rules of Bankruptcy Procedure; and

(ii)    a report of actual receipts and disbursements for the week preceding the week in which such report is delivered (the "*Prior Week*"); and

(iii)    a reconciliation of actual results for the Prior Week and cumulatively for all Prior Weeks to the corresponding amounts reflected in the Budget which shows the numerical and percentage variance in any line item, and which includes narrative explanations for each such variance.

(f)    Licenses.  Promptly after receipt thereof, notice of any Governmental Authority or other Person that such Governmental Authority or other Person has rescinded or not renewed, or intends to rescind or not renew, any material any licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates, accreditations or other Governmental Authorization of the Borrower necessary for the conduct of the Borrower's businesses or the ownership and operation of the Borrower's assets.

(g)    Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by the Borrower or any of its properties, with any Environmental Law or Environmental Permit in each case that could reasonably be expected to have a Material Adverse Effect, as well as any actual or threatened release, pollution or other environmental condition at or from any of the properties of the Borrower, that could reasonably be expected to constitute a violation of any Environmental Law.

(h)    Casualty Losses.  Promptly upon learning of any casualty loss or event not insured against in an amount in excess of $200,000, notice of such loss or event.

(i)    Insurance.  Promptly upon learning of any claim made by any co-insured party under any of the Borrower's insurance policies in excess of $100,000, notice of such claim, and updates with respect to such claim's resolution and the impact thereof upon the Borrower's insurance limits or policies.

4758415_2

(j)    Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower as the Lender may from time to time reasonably request and all information and documentation, including any statement or report, that has been prepared by, provided to or filed with the Resident Professionals, the Attorney General, the Department of Financial Services, the Department of Health, or any other state agency or Governmental Authority, or any committee appointed in the Borrower Chapter 11 Case.

(k)    Termination of Contracts, Etc.  Promptly after the occurrence thereof, written notice of (i) termination of any material contract to which the Borrower is a party, (ii) failure of any counterparty to any material contract to make any payment in an aggregate amount in excess of $100,000 more than three (3) months past due to the Borrower, and (iii) any tax audit or assessment of taxes on the Borrower. Notwithstanding the foregoing, the Borrower reserves it rights in furtherance of its fiduciary duties to reject any burdensome executory contracts or leases, provided, however, the rejection of any such contracts or leases shall not have a Material Adverse Effect and Borrower shall provide Lender with advance notice prior to filing any motions in respect thereof.

SECTION 5.04.    Financial Covenants.  So long as any Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of the Borrower under any Loan Document shall remain unpaid, or the Lender shall have any Commitment hereunder, the Borrower will:

(a)    Budget Compliance.  Not make payments other than those set forth in the Budget; provided, that (i) other than Professional Fees, (A) actual disbursements for any prior week for any line item in the Budget may have a positive variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget and (B) actual cash receipts for any prior week for any line item in the Budget may have a negative variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget, (C) actual disbursements for all prior weeks for any line item in the Budget may have a positive variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget, and (D) actual cash receipts for all prior weeks for any line item in the Budget may have a negative variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget and (ii) the actual disbursement of Professional Fees under the Carve Out shall not exceed $400,000, which disbursement shall be made pursuant to an order of the Bankruptcy Court allowing for payment of such Professional Fees, and only after all retainers held by the professionals on whose behalf Professional Fees have been allowed by the Bankruptcy Court shall have been exhausted.

Notwithstanding the foregoing, the line items in the Budget for payment of interest, expenses and all other amounts to the Lender are estimates only, and the Borrower remains obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim Order and the Final DIP Order.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.    Events of Default.  If any of the following events ("*Events of Default*") shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal or interest of any Loan or make any other payment under any Loan Document when the same shall become due and payable;

(b)    any representation or warranty made by the Borrower (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made;

(c)    the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(e), Section 5.02, Sections 5.03(a), 5.03(e), or 5.03(f), or Section 5.04;

(d)    the Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.03 (except for Sections 5.03(a), 5.03(e), or 5.03(f)), if such failure shall remain unremedied for two (2) business days after notice;

(e)    the Borrower shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for ten (10) days after the earlier of the date on which (i) any officer of the Borrower becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by the Lender;

(f)    (i) the Borrower shall pay any principal of, premium or interest on or any other amount payable in respect of any pre-petition Debt unless provided for herein, (ii) the Borrower fails to pay any principal of, premium or interest on or any other payment in respect of any post-petition Debt, (iii) if with respect to any Debt, there is a default thereunder the holder thereof obtains relief from the automatic stay of Section 362 of the Bankruptcy Code to enforce such Debt; or (iv) with respect to post-petition Debt, (I) if any event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature, or (II) if any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or (III) an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in the case of each (I) through (III), prior to the stated maturity thereof;

(g)    any judgments or orders, either individually or in the aggregate, for the payment of money in excess of $100,000 after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such judgment or order, but inclusive of any deductible amount) shall be rendered against the Borrower after the Borrower Petition Date and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(h)    any non-monetary judgment or order shall be rendered against the Borrower after the Borrower Petition Date that is reasonably likely to have a Material Adverse Effect, and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i)    any provision of any Loan Document after delivery thereof pursuant to Section 3.01 shall for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Borrower, or the Borrower shall so assert;

(j)    any Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority (subject to the payment of the Carve Out and the Prepetition Permitted Liens) Lien

32

on and security interest in the Collateral purported to be covered thereby, except as otherwise provided in such Collateral Document;

(k)    the Bankruptcy Court shall enter any order (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final DIP Order or any other order with respect to the Borrower Chapter 11 Case affecting in any material respect this Agreement or the Loan Documents, without the Lender's consent, (ii) appointing a Chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Borrower Chapter 11 Case, or a receiver, interim-receiver, receiver and manager or a trustee in bankruptcy, with respect to any of the Borrower, or any of its assets, (iii) dismissing the of the Borrower Chapter 11 Case or converting any of the Borrower Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of the Borrower to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $300,000; (v) under Section 5.06(c) of the Bankruptcy Code surcharging any of the Collateral; (vi) avoiding or requiring repayment of any portion of the payments made on account of the Obligations owed to Lender; (vii) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority that would have a Material Adverse Effect or priority over any Lien of the Lender on the Collateral; or (viii) granting relief from the automatic stay of Section 362 of the Bankruptcy Code and allowing any modification to the Prepetition Loan Documents or Prepetition Debt;

(l)    appointment of a receiver, interim receiver or other third party or entity by any Governmental Entity or other Person with respect to the Borrower and any of its assets;

(m)    a motion shall be filed or a motion entered to: (i) obtain additional or replacement financing under Section 364(c) or (d) of the Bankruptcy Code or otherwise (including but not limited to the refinance, extension, renewal, restructure, replacement or issuance of other Debt in exchange or replacement for the Commitment hereunder, in whole or in part) or (ii) to grant any Lien on any Collateral except as permitted hereunder and under the other Loan Documents;

(n)    a motion shall be filed by the Borrower for the approval of any other Superpriority Claim in the Borrower Chapter 11 Case (other than the Carve Out) which is pari passu with or senior to the claims of any of the Lender against the Borrower unless after giving effect to the transactions contemplated by such motion, all Obligations of the Borrower under the Loan Documents (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) shall be paid in full in cash;

(o)    the failure of the Borrower to comply in all material respects with the Orders or any other order of the Bankruptcy Court applicable to the Borrower;

(p)    the Borrower shall seek Bankruptcy Court approval of a sale, or otherwise enter into a binding commitment for a sale, without the consent of the Lender in its sole discretion, of all or substantially all of the Borrower's assets (either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in any case or otherwise), that does not provide for payment in full in cash of the Obligations and termination of the Lender's obligations hereunder;

(q)    the Borrower shall file a motion in the Borrower Chapter 11 Case (i) except as provided in the Orders, to use cash collateral of the Lender under Section 363(c) of the Bankruptcy Code without the Lender's consent, (ii) to recover from any portions of the Collateral any costs or expenses of

4758415_2

preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating the Lender's interest in any of the Collateral;

(r)    the occurrence of (i) any material deterioration in the value of the Collateral of the Borrower taken as whole or (ii) any material damage to or loss of assets of the Borrower taken as a whole (after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such damage or loss, but inclusive of any deductible amount);

(s)    an order terminating exclusivity has been entered by the Bankruptcy Court or requested of the Bankruptcy Court unless actively contested by the Borrower;

(t)    any filing with respect to the Borrower, whether voluntary or involuntary, to convert or dismiss the Borrower Chapter 11 Case;

(u)    the occurrence of a "default" under the RSA that has not been cured or waived within any applicable grace period;

(v)    appointment of a Chapter 11 trustee as examiner with expanded powers in the Borrower Chapter 11 Case;

then, and in any such event, the Lender may, by notice to the Borrower, declare (A) the Commitment and the obligation of the Lender to be terminated, whereupon the same shall forthwith terminate, and (B) the Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts shall be forthwith due and payable.

SECTION 6.02.    Remedies upon Default.    Upon the occurrence and during the continuance of an Event of Default as determined by the Lender in its sole discretion, the Borrower, any Creditors' Committee or the Resident Council shall have the right to contest, and only to contest, such determination of the occurrence of an Event of Default within three (3) Business Days of such occurrence by filing an expedited motion with the Bankruptcy Court, and unless the Bankruptcy Court shall have determined that an Event of Default has not occurred and/or is not continuing within two (2) Business Days of the filing of such motion, the automatic stay shall automatically be terminated without further notice or order, and the Lender shall be permitted to (a) accelerate the Obligations under the Facility, (b) foreclose on all or any portion of the Collateral and collect accounts receivable and apply the proceeds thereof to the Obligations of the Borrower under the Loan Documents, (c) occupy the Borrower's premises, (d) execute going-out-of business sales and (e) otherwise exercise remedies permitted by applicable non-bankruptcy law. Upon the occurrence and during the continuance of an Event of Default (i) upon the direction of the Lender, the Borrower shall pursue an immediate sale of all or substantially all of the Collateral pursuant to the provisions of Section 363 of the Bankruptcy Code, in a manner and on terms satisfactory to the Lender, including, without limitation, that the Lender shall be authorized to credit bid at any such sale in an amount up to the amount of the Commitment (or such lesser amount as may be required to indefeasibly pay the Obligations in cash in full at the closing of the sale), and the proceeds of which sale shall be used to pay the Obligations of the Borrower under the Loan Documents to the Lender and (ii) the Borrower shall waive any right under Section 105 of Bankruptcy Code or otherwise, to enjoin the Lender from taking any action permitted under this Agreement. If the Borrower fails to comply with the provisions of this Section 6.02, the Lender shall immediately be authorized, and is hereby appointed as an agent and attorney-in-fact of the Borrower, with such power coupled with an interest, to pursue a sale on the Borrower's behalf.

4758415_2

## ARTICLE VII
## PRIORITY AND COLLATERAL SECURITY

SECTION 7.01.    <u>Superpriority Claims and Collateral Security</u>.

(a)    The Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the applicable Order, the Obligations of the Borrower under the Loan Documents:

(i)    shall at all times constitute a Superiority Claim in the Borrower Chapter 11 Case having priority, pursuant to Section 364(c)(1) and 507(b) of the Bankruptcy Code (subject only to the payment of the Carve Out and the Prepetition Permitted Liens), over the other administrative claims of any entity, including, without limitation any claims under Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, Section 506(c)), and shall at all times be senior to the rights of the Borrower, the Borrower's estate, any successor trustee to the extent permitted by law, or, subject to <u>Section 3.01(g)</u> hereof, any other creditor in the Borrower Chapter 11 Case;

(ii)    subject to the Liens securing the Prepetition Debt, pursuant to Section 364 of the Bankruptcy Code and the Collateral Documents, and subject to <u>Section 3.01(g)</u> hereof, the security interests of the Lender hereunder shall at all times be secured by, and the Borrower hereby grants to the Lender, (i) a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition mortgage, security interest and Liens (subject to the payment of the Carve Out and the Prepetition Permitted Liens) on the Pre-Petition Second Lien Collateral and the Pre-Petition First Lien Collateral which are pari passu in priority and right of payment with the Pre-Petition Second Priority Liensand which are junior and subordinate in priority and right of payment to (x) the Pre-Petition First Priority Liens and (y) any Liens granted to M&T as adequate protection under Sections 361 and 364 of the Bankruptcy Code of the interests of M&T in the Pre-Petition First Lien Collateral, and (ii) a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority Lien (subject to the payment of the Carve Out and the Prepetition Permitted Liens) on all other existing and after acquired real and personal property and other assets of the Borrower, tangible and intangible, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrower, whether owned or consigned by or to, or leased from or to the Borrower and regardless of where located (the "***Collateral***"), including without limitation, (A) all of the Borrower's present and future Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, except where the taking of such security interest is a violation of an express prohibition contained in the Government Contract or is prohibited by applicable law, unless in any case consent is otherwise validly obtained, (B) all avoidance power claims and actions arising under Section 549 of the Bankruptcy Code relating to post-petition transfers of Collateral and any proceeds thereof, and (C) any unencumbered assets of the Borrower.

(b)    The Borrower warrants and covenants that, except as otherwise expressly provided in this <u>Section 7.01</u>, the Obligations of the Borrower under the Loan Documents shall at all times be secured by a superpriority charge and senior priming security interest over all of the present and future assets of the Borrower with priority over all existing Liens and security interests (subject to the payment of the Carve Out and the Prepetition Permitted Liens).

4758415_2

(c)    Such Superpriority Claim and Liens referred to in Section 7.01(a) shall be junior to and subject to the payment of the Carve Out and the Prepetition Permitted Liens, but shall, notwithstanding anything to the contrary in this Agreement, otherwise be senior in priority to all other Liens on the assets and properties of the Borrower, entitled to priority under applicable non-bankruptcy law.

SECTION 7.02.    Collateral Security Perfection.    The Borrower agrees to take all action that the Lender may reasonably request as a matter of non-bankruptcy law to perfect and protect the Lender's Liens upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents, instruments and financing statements, providing such notices to third parties, obtaining such consents from any Governmental Authority and providing such other instruments and documents in recordable form, as the Lender may reasonably request. The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of New York or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC of the State of New York or such other jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower, and (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. The Borrower agrees to furnish any such information to the Lender promptly upon request. Notwithstanding the provisions of this Section 7.02, the Lender shall have the benefit of the entry of the Interim Order and the Final DIP Order.

SECTION 7.03.    No Avoidance, Subordination or Modification.    The Borrower's obligations under the Facility shall not be subject to avoidance, subordination or modification under any provision of the Bankruptcy Code or applicable law, and all claims arising under the Facility shall constitute an allowed claim against the Borrower that are valid, binding and enforceable against the Borrower and the Borrower's estate, and all claims, defenses, offsets to such obligations shall be waived, and all persons and entities shall be barred from asserting any such claims, defenses or offsets to such allowed claim. The obligations under the Facility and the Liens securing the Facility shall not be subject to, and the Borrower hereby waives the right to, surcharge the same pursuant to Section 506(c) of the Bankruptcy Code, and such obligations and Liens shall not be subject to, and the Borrower shall waive the right to assert any rights under, Sections 552 of the Bankruptcy Code, or 1129(b) of the Bankruptcy Code.

SECTION 7.04.    No Discharge; Survival of Claims.    Pursuant to Section 1141(d) (4) of the Bankruptcy Code, the Borrower hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) under this Facility.

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01.    Amendments, Etc.    No amendment or waiver of any provision of this Agreement or the Note, nor consent to any departure by the Borrower therefrom, shall in any event be

4758415_2

effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 8.02.    <u>Notices, Etc.</u>  All notices and other communications provided for hereunder shall be either (x) in writing (including telecopy or electronic communication) and mailed, telecopied or delivered or (y), in an electronic medium and delivered by electronic mail:

if to Borrower at its address at:

> Hebrew Hospital Senior Housing, Inc. a.k.a. Westchester Meadows
> 55 Grasslands Road
> Valhalla, New York 10595
> Attention:  Peter Cutaia
> E-mail:  pcutaia@hhhinc.org

with a copy (which shall not constitute notice) to

> Harter Secrest & Emery LLP
> Twelve Fountain Plaza, Suite 400
> Buffalo, NY 14202-2293
> Attention:  Raymond L. Fink
> Facsimile: 716.853.1617
> Telephone: 716.844.3724
> E-mail: rfink@hselaw.com

if to the Lender to its addresses at:

> Hebrew Hospital Home of Westchester, Inc.
> 55 Grasslands Road
> Valhalla, New York 10595
> Attention:  Mary Frances Barrett, Chief Executive Officer
> E-mail:  mbarrett@hhhinc.org

with a copy (which shall not constitute notice) to

> Harter Secrest & Emery LLP
> Twelve Fountain Plaza, Suite 400
> Buffalo, NY 14202-2293
> Attention: Raymond L. Fink
> Facsimile: 716.853.1617
> Telephone: 716.844.3724
> E-mail: rfink@hselaw.com

if to the Borrower Creditors' Committee, to its counsel at:

> DLA Piper LLP (US)
> 1251 Avenue of the Americas
> 27th Floor
> New York, New York 10020-1104
> Attention:  Thomas Califano
> Email:  thomas.califano@dla piper.com

4758415_2

if to the Lender Creditors' Committee, to its counsel at:

TO BE DETERMINED

if to the United States Trustee:

> William K. Harrington
> United States Trustee, Region 2
> 201 Varick Street, Room 1006
> New York, New York 10014
> Attention: Greg M. Zipes
> Email: greg.zipes@usdoj.gov

or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties. All such notices and other communications shall, when mailed, telecopied, or e-mailed, be effective when deposited in the mails, transmitted by telecopier or sent by electronic communication, respectively, except that notices and communications to the Lender pursuant to Article II, Article III or Article V shall not be effective until received by the Lender. Delivery by telecopier or other electronic means of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Note shall be effective as delivery of an original executed counterpart thereof.

SECTION 8.03.    No Waiver; Remedies.    No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 8.04.    Costs and Expenses.    (a) The Borrower agrees to pay on demand (i) all reasonable costs and expenses of the Lender in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents, (ii) all out-of-pocket costs and expenses of the Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally.

(b)    The Borrower agrees to indemnify, defend and save and hold harmless the Lender, and each of its Affiliates and its and their respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives (each, an "*Indemnified Party*") from and against, and shall pay on demand, any and all claims, damages, losses, disbursements , liabilities, and expenses that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of (i) the actual or proposed use of the proceeds of the Loans, the Loan Documents, or any of the transactions contemplated thereby, the loan documentation or any of the transactions contemplated thereby, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. or (ii) the actual or alleged presence of Hazardous Materials on any property of the Borrower or any Environmental Action relating in any way to the Borrower, except, in any case, to the extent such claim, damage, loss, disbursement, charge, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In the case of an

38

investigation, litigation or other proceeding to which the indemnity in this Section 8.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, its directors, shareholders or creditors, any Indemnified Party or any other Person, and whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated . The Borrower also agrees not to assert any claim against the Lender, or any of its Affiliates, or any of its or their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facility, the actual or proposed use of the proceeds of the Loans, the Loan Documents, or any of the transactions contemplated by the Loan Documents. The Borrower further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrower or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(c)    If the Borrower fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, indemnities, such amount may be paid on behalf of the Borrower by the Lender, in its sole discretion.

(d)    Without prejudice to the survival of any other agreement of the Borrower hereunder or under any other Loan Document, the agreements and obligations of the Borrower contained in Section 2.09 and this Section 8.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 8.05.    Right of Set-off.    Upon (a) the occurrence and during the continuance of any Event of Default or (b) the acceleration of the Loans pursuant to the provisions of Section 6.01, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether the Lender shall have made any demand under this Agreement and although such Obligations may be unmatured. The Lender agrees promptly to notify the Borrower after any such set-off and application; *provided, however*, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section 8.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that the Lender may have.

SECTION 8.06.    Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrower and the Lender, and thereafter shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns.

SECTION 8.07.    Assignments. Neither party to this Agreement may assign all or a portion of its rights and obligations under this Agreement without the consent of the other party..

SECTION 8.08.    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery by telecopier or other electronic means of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

39

4758415_2

SECTION 8.09.    Confidentiality.  The Lender agrees to keep confidential all non-public information provided to it by the Borrower pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; *provided* that nothing herein shall prevent the Lender from disclosing any such information (a) to any other Lender or any Affiliate thereof on a confidential basis, (b) subject to an agreement to comply with the provisions of this Section 8.09, to any actual or prospective assignee or participant, (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates on a confidential basis, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to the Lender, (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, (j) in connection with the Chapter 11 Cases, or (k) if agreed by the Borrower, to any other Person.  The Lender shall use commercially reasonable efforts to give written notice to the Borrower of any disclosure of confidential information made pursuant to clause (e) or (f) of the preceding sentence; *provided* that the Lender shall have no liability for failure to provide such notice.

SECTION 8.10.    Jurisdiction, Etc.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court, and any appellate court therefrom, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each of the parties hereto hereby irrevocably consents to the service of process in any such action or proceeding by the mailing thereof by the other party by registered or certified mail, postage pre-paid, to it at its address specified herein.

SECTION 8.11.    Governing Law.  This Agreement and the Note shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflicts of law principles that would require the application of laws of another jurisdiction.

SECTION 8.12.    Waiver of Jury Trial.  Each of the Borrower and the Lender irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Loans, or the actions of the Borrower or the Lender in the negotiation, administration, performance or enforcement thereof.

4758415_2

SECTION 8.13.    <u>Interest Rate Limitation</u>. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 8.14.    <u>Release</u>. Subject to applicable terms of the Interim Order and Final DIP Order, the Borrower hereby acknowledges effective upon entry of the Final DIP Order, that the Borrower has no defense, counterclaim, offset, recoupment, cross complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Borrower's liability to repay the Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Lender. The Borrower, in its own right, on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby fully, finally and forever releases and discharges the Lender and all of its respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of any from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which in each case are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing. The Borrower, for and on behalf of itself and the applicable Releasing Parties, acknowledges and agrees that each has been informed by the Borrower's attorney and advisors that, the release contained herein may extend to claims to which the parties do not know or suspect to exist in their favor, including claims which if known by them would have materially affected their decision to enter into the released contained herein, and notwithstanding the foregoing, hereby fully, finally, and irrevocably releases, acquits, waives and forever discharges any such unknown claims and any applicable law, statute or common law principle that, notwithstanding a general release, excludes from a general release and/or preserves claims that are not known or suspected at the time of executing the release.

[Signature Pages to Follow]

41

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**LENDER:**

Hebrew Hospital Home of Westchester, Inc.

By:_____
    Name:
    Title:

**BORROWER**

Hebrew Hospital Senior Housing, Inc.

By:_____
    Name:
    Title:

**EXHIBIT A**

**Form of Note**

# LINE OF CREDIT NOTE

January  , 2016

_____, New York
$2,000,000.00

FOR VALUE RECEIVED, the undersigned (the "Borrower") HEREBY PROMISES TO PAY to the order of HEBREW HOSPITAL HOME OF WESTCHESTER, INC. ,("Lender"), at its offices at _____ or at such place as Lender may designate from time to time in writing, in lawful money of the United States of America and in immediately available funds, the amount of TWO MILLION AND 00/100 DOLLARS ($2,000,000.00) or, if less, the aggregate unpaid amount of all Revolving Loans advanced to the Borrower by the Lender under the Credit Agreement (as hereinafter defined). Borrower further promises to pay interest on the outstanding unpaid principal amount hereof from the date hereof until payment in full at the rate or rates from time to time applicable to the Loans as determined in accordance with the Credit Agreement. All capitalized terms used but not otherwise defined herein have the meanings given to them in the Credit Agreement.

This Line of Credit Note (this "Note") is issued pursuant to that certain Secured Superpriority Debtor in Possession Credit Agreement dated as of January  , 2016 between the undersigned, as borrower, and Hebrew Hospital Home of Westchester, Inc., as lender (including all annexes, exhibits and schedules thereto, and as from time to time amended, restated, supplemented or otherwise modified, the "Credit Agreement"), and the holder hereof is entitled to the benefit and security of the Credit Agreement and all of the other Loan Documents referred to therein. Reference is hereby made to the Credit Agreement for a statement of all of the terms and conditions under which the Loans evidenced hereby are made and are to be repaid.

The principal amount of the indebtedness evidenced hereby shall be payable in the amounts and on the dates specified in the Credit Agreement, the terms of which are hereby incorporated herein by reference. Interest thereon shall be paid until such principal amount is paid in full at such interest rates and at such times, and pursuant to such calculations, as are specified in the Credit Agreement. If any payment on this Note becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

Upon and during the continuance of any Event of Default, the entire principal amount of this Note, together with all accrued interest thereon, may, as provided in the Credit Agreement, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable.

Except for such notices as may be required under the terms of the Credit Agreement, the Borrower waives, to the extent permitted by applicable law, presentment, demand, notice, protest and all other demands, or notices, in connection with the delivery,

2

acceptance, performance, default, or enforcement of this Note, and assents to any extension or postponement of the time of payment or any other indulgence. Borrower further agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including attorneys' fees and legal expenses, incurred by Lender in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by acceleration or otherwise.

**THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.** Whenever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provisions of this Note shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note. The provisions of this Note shall be binding upon and inure to the benefit of such successors and assigns, except that Borrower may not assign its rights or obligations. Borrower's successors and assigns shall include, without limitation, a receiver, trustee or debtor in possession of or for Borrower.

[signature page attached]

3

4758415_2

This Note has been executed by the undersigned as of the date first referenced above.

**HEBREW HOSPITAL SENIOR HOUSING, INC.**

By:_____
Name:
Title: